# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ESTATE OF GEORGE BERNARD    |
WORRELL, JR.,               |
                            |    Case No. 4:22 cv 11009
                            |
        *Plaintiff*,        |    Hon. Shalina D. Kumar
                            |    Hon. Mag. David R. Grand
v.                          |
                            |
THANG, INC., GEORGE CLINTON, |
SONY MUSIC ENTERTAINMENT,   |
UNIVERSAL MUSIC GROUP,      |
WARNER BROTHERS RECORDS,    |
HDH RECORDS,                |
WESTBOUND RECORDS,          |
AND SOUNDEXCHANGE, INC.     |
                            |
        *Defendants*.       |

---

## EXPERT WITNESS REPORT OF

## BOB KOHN

## NOVEMBER 15, 2024

---

TABLE OF CONTENTS

I.   Expert's Background ............................................................................................ 3

II.  Expert's Assignment ........................................................................................... 6

III.  Music Industry Customs & Practices Regarding Co-Authored Musical Works and Sound Recordings In General ............................................................................... 8

IV.  Music Industry Customs and Practices Regarding Questions of Joint Authorship in Musical Works and Sound Recordings ............................................................. 11

V. Record Demonstrates Overwhelming Indicia of the Requisite Shared Intent for Joint Authorship of the Subject Sound Recordings .................................................. 20

   A.   Factors For Determining Joint Authorship ......................................... 21

   B.   Factual Indicia in the Record of Shared Intent for Joint Authorship .................. 23

      1.   Distinguishing Characteristics of the Relationship that Weigh In Favor of the Requisite Shared Intent ............................................................................ 23

      2.   Mr. Worrell Contributed both Performance Authorship and Production Authorship of the Subject Sound Recordings, Superintending by Exercising Control Over Key Aspects of Such Authorship. ...................................................... 31

         a.   Song Selection and Songwriting ................................................ 33

         b.   Musical Arranging ..................................................................... 34

         c.   Performing ................................................................................ 37

         d.   Editing, Overdubbing, and Mixing ........................................... 40

      3.   The Audience Appeal of the Sound Recordings Can Be Attributed to Mr. Worrell's Contributions ............................................................................ 43

VI. Mr. Worrell Received Payments From Mr. Clinton Separate From the Payments He Received From the AFM Union for His Musical Arranging ........................................... 45

   A.   Payments from Mr. Clinton .................................................................. 45

   B.   Payments from American Federation of Musicians Union................... 46

VII. The Record Demonstrates that the Relationship Between Mr. Worrell and Funkadelic and Parliament/Funkadelic Was that of a Member of the Band, Not an Employment or Work for Hire Relationship ............................................................. 47

VIII.  Publications Authored By Expert Within The Preceding 10 Years ..................... 52

IX.  Cases Testified At Trial or By Deposition During Previous 4 Years ..................... 52

X.   Facts or Data Considered In Forming These Opinions ........................................ 52

XI.  Expert Witness Fee ............................................................................................ 53

XII.   Intended Trial Exhibits and Supplementation ..................................................... 53

## I. Expert's Background

1.      I have worked in the music industry as both as a transactional attorney for music industry clients and as an executive operating a digital music service in which my responsibilities included the licensing of millions of sound recordings and musical works and offering them to the public by means of digital transmission.

2.      I am the author of *Kohn On Music Licensing* (Wolters Kluwer 2019), a treatise of over 1,800 pages which was first published in 1992 and is now in its fifth edition. Among other matters, the book addresses the music industry customs and practices of licensing musical works and sound recordings and the "terms of art" associated with such customs and practices, as well as the various types of publishing and recording agreements both domestically and internationally, for the acquisitions and licensing of such music and recordings for distribution and delivery in physical and digital formats.

3.      *Kohn On Music Licensing* was cited by the U.S. Supreme Court in *Eldred v. Ashcroft*, 537 U.S. 186, fn. 21 (2003) for entertainment-industry business practices concerning the assignment of copyrights. It also was quoted at length in *Bridgeport Music v. Dimension Films*, 410 F.3d 792, fn. 18 (6th Cir. 2005), concerning industry customs and practices in the use of digital samples of existing sound recordings in new sound recordings. In *Woods v. Bourne Co.,* 60 F.3d 978 (2d Cir. 1995) and *Boosey & Hawkes Music Publishers, Ltd. v. Buena Vista Home Video*, 145 F.3rd 481 (2d Cir. 1988), the treatise was cited for industry practices concerning performance rights administered by ASCAP. In *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 958 F.Supp. 170 (1997), aff'd 155 F.3d 17 (2d Cir. 1998), the treatise was cited with approval regarding the

terms of mechanical licenses issued by the Harry Fox Agency and for similar reasons in *Entm't v. KIDdesigns, Inc.*, Case No. 3:03-cv-1129 (U.S. Dist. Ct. Tenn. 2005).

4.      I have J.D. Degree from Loyola Law School, Los Angeles (1981), and an LL.M degree from Columbia Law School (2016), earning highest honors (James Kent Scholar), where I also was a Visiting Scholar (2016-2018).

5.      Upon graduating law school, I entered private practice representing early-stage recording artists and comedians, including the late Bob Saget. I later joined as associate attorney the Law Offices of Milton A. "Mickey" Rudin, who represented, among others, Frank Sinatra, Liza Minelli, Cher, Steely Dan, Frontline Management, Inc. (Irving Azoff), Warner Bros. Music, Warner Bros. Records, 20th Century Fox Studios, and other music and entertainment industry clients. There I performed primarily transactional licensing work, such as the licensing of sound recordings and musical works for soundtrack albums, advising Warner Bros. Music, the world's largest music publishing company at that time, on their form mechanical and synchronization licenses, negotiating the terms and conditions of actor contracts, and assisting as operating counsel for two music publishing companies owned at the time by Frank Sinatra.

6.      I was the founder and Chairman of EMusic.com, Inc. (NASDAQ: EMUS), a pioneering digital music download company which, in July 1998, began selling for 99 cents per track the permanent download of sound recordings and musical works in the MP3 format and offering portions of such tracks for on-demand streaming. Serving also as chief legal counsel for EMusic, I drafted and negotiated virtually all of the early license agreements by which the company eventually procured the right to digitally reproduce and distribute nearly a million sound recordings, and the musical works embodied in them,

from hundreds of independent record labels, and hundreds of major and independent music publishers, both directly and through the Harry Fox Agency.

7.      I was also founder and CEO of RoyaltyShare, Inc. (started with venture capital in 2004 and sold to a subsidiary of Sony Music Entertainment in 2015), which provided revenue and royalty processing services for record companies and music publishers. Clients included one of the three major record companies, Sony Music Entertainment, over 40 independent record companies, numerous independent music publishers, and several book publishers, including Macmillan.

8.      I am the co-inventor of the patent for a means of tracking revenues and producing royalty statements arising from the exploitation of musical works and sound recordings. Web-based Royalty System and User Interface, Patent No. US 8,712825 (April 29, 2014).

9.      The information contained in this report is based, in part, upon my personal knowledge and upon my knowledge and understanding of music industry customs and practices—including "terms of art" employed by industry participants—regarding musical works and sound recordings, as well as my education, training, and personal experience in researching music industry customs and practices conducted over the past 40 years as a participant in music industry businesses and in gathering information from countless interviews and attendance at music industry events in connection with research for the five editions of the music industry treatise described above. See, Kohn CV attached hereto. I have also provided expert testimony in several significant music industry cases.[1]  I also

---

[1]    *See, for example, United States v. ASCAP in the Matter of America Online, Inc., RealNetworks, Inc., and Yahoo!, Inc.*, 559 F.Supp.23d 332 (2008) (expert witness

provide below, to the best of my knowledge and recollection, a list of facts or data I considered in forming the opinions in this report. If called as a witness, I could and would testify competently to the contents of this report.

## II. EXPERT'S ASSIGNMENT

10.     My assignment in this report is to help supplement the record with music industry customs and practices concerning how co-authors of musical works and sound recordings share their ownership interests in such works, with industry customs and practices related to the authorship of musical works and sound recordings, and other matters upon which I have been asked to opine.

11.     As a preliminary matter, it should be noted that the transactions and legal issues in this case, as in many cases like it, arise against the unique backdrop of the music industry with, as one court recently recognized, "its preexisting norms, customs, and terminology, which can be opaque to outsiders unversed in industry practice." *See*, *Eight*

---

testimony on how musical works and sound recordings are used on the Internet); *Fahmy v. Jay-Z, et. al.*, Case No. 2:07-cv-05715-CAS (April 28, 2015) (expert testimony on the language and interpretation of several music license agreements in light of music industry practices); *Marcus Gray v. Katy Perry*, Case No. 2:15-cv-05642-CAS-JC (April 3, 2017) (expert testimony on music industry customs and practices concerning the interpretation and scope of live concert public performances licenses granted by ASCAP); *Curtis James Jackson, III (p/k/a/ 50 CENT) v. William Leonard Roberts, II (p/k/a/ RICK ROSS)*, Case No. 3:17-cv-00550-WWE. (D. Conn.) (expert testimony on the the interpretation of the terms of an exclusive recording agreement between Universal Music Group and the recording artist known as "50 Cent," as well as industry practices concerning the use of his name, voice and likeness in connection with the marketing and distribution of sound recordings of other recording artists); *Gaudio v. Spotify USA Inc.*, (Case No. 3:17-cv-01052) (expert testimony concerning the licensing of musical works for use in the interactive subscription and non-subscription streaming services of Spotify); *Eight Mile Style, Inc. v. Spotify USA, Inc.*, Case No. 3:19-cv-00736, Dkt. 688 (2024) ("In recent years, Kohn has testified on music industry customs and practices in a number of significant lawsuits. [Citation omitted]. There is, in short, no reasonable basis for contesting Kohn's expertise in music licensing, and no party has done so").

*MILE Style, LLC v. Spotify USA Inc.*, No. 3:19-cv-0736, 2022 U.S. Dist. LEXIS 161220, at *7 (M.D. Tenn. Sep. 7, 2022). The definitions, explanations, and practical significance of music industry terms of art, are therefore often helpful in aiding the Court or the finder of facts to "cut through the thicket of highly specialized knowledge that frames this dispute." *Id.*

12.     Accordingly, the opinions I provide in this report—including the explanations of terms of art and related industry customs and practices—and the basis and reasons for such opinions, will necessarily include reference to applicable law, but any references to the law should not be construed as a legal pronouncement or conclusion of law on any ultimate issue in this matter, which is solely within the province of the Court to decide. After spending forty (40) years in and around the music industry—participating in it, studying it, and writing about it in a wide range of areas, including as author of a widely-cited treatise—I have observed that customs and practices in the music industry are driven by and are dependent upon the law—both the Copyright Act and how courts deal with issues arising under the act—not the other way around. In other words, the music industry does not create customs and practices contrary to statutory provisions or court decisions. It is the reverse. Such customs and practices, and terms of art, have always followed the law and conformed to it. Accordingly, an understanding of customs and practices of a business that is as legal intensive as the music industry requires some explication of the basis of such customs and practices in law.

### III.  Music Industry Customs & Practices Regarding Co-Authored Musical Works and Sound Recordings In General

13.     With that in mind, it may be useful to begin with a brief outline of some industry terms of art and related principles that underly the music industry customs and practices described below. These are not intended to be legal pronouncements or conclusions of law, both of which remain solely within the province of the Court, but rather to serve solely as a baseline of terms of art in the context of how they are customarily used in practice by music industry participants.

14.     To begin with, like other forms of property, a copyright may be *co-owned*. That is, a copyright may be owned by more than one person, each of whom is called a *co-owner* of the copyright. In the music business, *co-ownership* of copyright, typically arises from the fact that two or more authors collaborated in the creation of the copyrighted work, such as a musical work[2] or a sound recording.[3]  Ordinarily, each author owns the copyright in the authorship that he or she contributed to the work. *See*, Copyright Office Compendium §708. Where such a work is "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a

---

[2] The term *musical work*, while not defined by the Copyright Act, is generally understood to mean a song (*i.e.*, a short poem or set of words set to music) or an instrumental composition containing one or more organizational elements, such as melody, chord progression, and rhythm or beat. In the music industry, the terms musical work, musical composition, and song are often used synonymously. Musical works may be reproduced in *copies* or *phonorecords*, terms defined in Section 101 of the Copyright Act.

[3] A *sound recording* is a work that results "from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied." 17 U.S.C. §101. A sound recording embodying a musical work is considered a *derivative work* of such musical work.

unitary whole" such work is considered, by definition, to be a "*joint work*." 17 U.S.C. §101.[4] *See*, 17 U.S.C. § 201(a).

15.     By music industry custom and practice, and as noted below, when a lyricist and a composer collaborate on the creation of a musical work, or members of a musical group or band collaborate on the creation of a sound recording, such a work typically meets the foregoing criteria for a *joint work* and will be deemed such. The *joint authors* of such a work are considered *co-owners* of the work. 17 U.S.C. §201(a). This means—using the terms of art developed by custom and practice (if not by law)—each joint author, from the moment of creation, acquires an *undivided* ownership interest in the copyright of the *entire work*. Copyright Office Compendium §708 ("In the case of a joint work, all of the authors jointly own the copyright in each other's contributions and each author owns an undivided interest in the copyright for the work as a whole").

16.     References to "undivided interest" and "entire work" (or "work as a whole") concern the practice that, even if one of the joint author's contribution was limited to a portion of the work (e.g., composing of music; the playing of one musical instrument) the

---

[4] Since a joint work is one "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole," it follows, of course, that not all co-owned works constitute a "joint work." Thus, where an author's contribution to a musical work or sound recording is not "prepared with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole," each author may still become a co-owner of the work. For example, where an existing poem never intended to become a song lyric is later combined with a song melody, the respective contributors of the poem and melody may become *co-owners* the resulting musical work, but such work would not be considered a *joint work* and the *co-owners* would not be considered *joint authors* or *joint owners*. A practical significance of such a work being co-owned, rather than jointly owned, is that, unless otherwise agreed, the licensing of solely a co-owner's contribution (*e.g.*, melody without lyrics) may inure to solely the benefit of the composer (but not the lyricist), as each would have only an interest in their respective contribution, rather than having an undivided interest in the *entire* work.

joint author's interest in the copyright in the work is *undivided*, extending to the *entire work*, including all contributions to the work (*e.g.*, all words and music that comprise the musical work; all the sounds, including vocal and instrumental, that comprise the sound recording).

17.     The problem of who is considered to be a *joint author* of a work concerns the problem where one who merely made some "minimal contributions to the writing of the work" attempts to assert joint authorship (*i.e.,* an undivided interest in the entire work).[5] Music industry customs and practices in connection with this problem are addressed Section IV below.

18.     By custom and practice, unless otherwise agreed among the joint authors of a work, such authors share *equally* in the ownership of the work and the profits generated thereby. *See*, *Kohn On Music Licensing, 5th Ed.* at 292-94;[6] *Nimmer On Copyright* §6.08[A].[7] Thus, unless there is an agreement to the contrary, when two authors collaborate in the creation of a joint work, each will have a 50% undivided interest in the entire work; when three authors do so, each will have a 33 1/3% undivided interest in the entire work, and so on. This custom and practice holds true even where the respective contributions to the joint work are not equal (*id.*), provided each contributor is considered a *joint author*, as discussed below.

---

[5] *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998).
[6] This custom and practice has been so described in each edition of my treatise dating back to its first edition, published in 1992.
[7] The origin of this custom and practice appears to be connected with "the analogy of tenants-in-common generally, the long-settled rule is that 'if their share are not fixed in the deed or will creating the cotenancy, they take in equal shares'." *Sweet Music, Inc. v. Melrose Music Corp.*, 189 F.Supp. 655 (1960), citing 2 American Law of Property § 6.5 (Casner ed. 1952).

19.     As noted, however, the joint authors may agree to another division. For example, when the composer of music collaborates in the writing of a song with two lyricists, the composer may insist on a 50% undivided interest in the entire work with the two lyricists equally sharing the remaining 50%. Or, when an author contributed lyrics and music, and the other contributed only to the lyrics, the two may agree to, for example, a 75/25 division.

20.     In each case, by custom and practice, because each joint author owns an *undivided* interest in the *entire* joint work, each will benefit to the extent of his or her percentage (e.g., 50%, 75%, 25%) in the licensing or exploitation of all *or any portion of* the joint work. Thus, in the case of a musical joint work comprised of words and music, even where only the music of the song is licensed for a solely instrumental recording, royalties generated from such license will be shared by each of the joint authors—composer and lyricist—in accordance with their respective undivided interests (e.g., 50/50), rather than going entirely to the composer of the music. *See, Kohn On Music Licensing*, 5th Ed. at 294.

21.     Joint authors, co-owning a copyright in a work, are deemed to be *tenants-in-common*, with each having an independent right to use or license the copyright, subject only to a *duty to account* to the other co-owner for any profits earned thereby.

## IV.  MUSIC INDUSTRY CUSTOMS AND PRACTICES REGARDING QUESTIONS OF JOINT AUTHORSHIP IN MUSICAL WORKS AND SOUND RECORDINGS

22.     As noted, a *joint work* is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. §101. A problem arises when one who merely contributed "some

form of assistance"[8] in the creation of the work—which one court characterized as an "overreaching" contributor[9]—attempts to assert joint authorship (*i.e.,* an undivided interest in the entire work).

23.     The courts have applied various standards for determining when a contributor to a copyrighted work is entitled to be regarded as a joint author. I take no position on which standard the Court should apply to make that determination in this case. Rather, in connection with whatever standard the Court chooses to apply, I first shed light on applicable *music industry* customs and practices that could be helpful to the Court in reaching a conclusion on the ultimate question of whether Bernie Worrell was a joint author of the subject sound recordings. That is followed by my opinions on the factual indicia in the record bearing upon the question of his joint authorship of the subject recordings.

24.     In the previous paragraph, *music industry* is italicized because, in my view, the customs and practices that form the backdrop of the particular entertainment industry involved (e.g., books, plays, music, motion pictures, etc.) are often essential to the determination of the joint authorship question in a particular case.

25.     For example, the customs and practices concerning the joint authorship of *musical works* concerns, in most cases, collaboration among only very few contributors of typically only one of two components—either words or music or both. Under typical circumstances, no one person is indisputably the dominant author of a musical work. And few additional contributors are likely to make a significant contribution at the time of creation.

---

[8] *Childress v. Taylor*, 945 F.2d 500, 504 (2d Cir. 1991).
[9] *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1991).

26.     By contrast, authorship of a musical work differs from that of a *book manuscript* or *stage play*, each of which typically involves a **dominant author**, with contributions potentially coming from one or more research assistants, colleagues, stage directors, stage producers, actors, free lance editors, "readers," agents, book publishing editors, and others. *See*, *Childress v. Taylor*, 945 F.2d 500 (2d Cir. 1991) (stage play); *Thomson v. Larson*, 147 F.3d 195 (2d Cir. 1998) (musical play); *Gaiman v. McFarland*, 360 F.3d 644 (7th Cir. (2004) (comic book characters).

27.     On the other end of the scale, customs and practices concerning the joint authorship of *musical works* is even further removed from those concerning the making of *motion pictures* or *television programs*, which typically involve scores of contributors. This is because, as one court recognized, "as the number of contributors grows and the work itself becomes less the product of one or two individuals who create it without much help, the word ["author"] is harder to apply." *See*, *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000).

28.     Thus, the problem of joint authorship tends to arise in the case of a work with a *dominant author* (*e.g.*, book or play) or a work with no dominant author and *potentially hundreds of contributors* (*e.g.*, motion picture or television program). In each of these circumstances, there is a great potential, in the absence of a written agreement, for one or more "overreaching" contributors to assert an undivided interest in the entire work.

29.     Of these various creative endeavors, the making of a ***sound recording*** is, in my opinion, more akin to songwriting than to book authorship or making a movie. *See*, *Staggers v. Real Authentic Sound*, 77 F.Supp.2d 57 (D.C. 1999) (sound recording); *Forward v. Thorogood*, 985 F.2d 604 (1st Cir. 1993) (sound recording); *Ulloa v. Universal*

*Music & Video Distrib. Corp.*, 303 F.Supp. 2d 409, 418 (S.D.N.Y. 2004) (sound recording); *Morrill v. Smashing Pumpkins*, 157 F.Supp. 2d 1120 (C.D. Cal. 2001) (music video).

30.     Like the creation of a *musical work*, the making of a sound recording involves far fewer contributors than the many hundreds of contributors to a motion picture. Indeed, musical works are often written, during the authorship of the sound recording; conversely, initial drafts of musical works are often partially or entirely rewritten during the sound recording process.

31.     And, not unlike the creation of a musical work, which typically has two well-defined kinds of contributors (*e.g.*, lyricist and composer), the creation of a sound recording also involves, not potentially hundreds, but just a handful of well-defined contributors: typically a *recording artist(s)* (either a *solo artist* or members of the *musical group* or "band") who render performances of the musical work and engage in other aspects of the recording's creation (*e.g.*, writing, arranging, mixing) and a *record producer*. But similar to the authorship of a book or play, there are others who make tangential contributions, such as invited or hired background vocalists and instrumentalists, sound engineers, equipment managers, and other studio technicians.

32.     But, unlike the creation of a book manuscript or stage play, which typically have a dominant author with many kinds of potential overreaching contributors (*e.g.*, research assistant, administrative assistant, colleague, etc.), the contributors to a sound recording, noted above, are relatively well defined, with each contributor bringing to the process a different skill (*e.g.*, songwriting, vocal performance, performance of musical instruments or other sound producing equipment—such as synthesizers and computers—

arranging, sound mixing, sound mastering, etc.) with typically no one person being a dominant contributor (as, for example, the author of a novel or a play would) and few other potential contributors (*e.g.*, staff producers, sound engineers, equipment handlers, *etc.*).

33.     Thus, of the various kinds of customs and practices that arise in connection with the creation of the aforementioned kinds of works, the problem of the "overreaching" contributor would appear (a) least likely in the case of *musical works* (words or music), (b) fairly unlikely in the case of *sound recordings* (typically having one or more performing band members and a producer, each making a singularly different contribution, such as vocal, various instrumental, and mixing, and other contribution to the production) but (c) far more likely in the case of *books, stage plays, or screenplays* (typically having a dominant author of the entire work with many potential significant contributors), and (d) most likely in the case of *motion pictures* or *television programs* (typically having no dominant author, but hundreds of potential contributors).

34.     Indeed, one of the leading cases on this issue implicitly acknowledges these industry-specific customary differences. *See*, *Childress v. Taylor*, cited above. While The Second Circuit in *Childress* recognized that whether "joint authors regarded themselves as joint authors" is especially important "where one person (Childress) is indisputably the dominant author of the work," the Second Circuit also recognized that this concern may be different in a different context. *Id.* Thus, determining whether the joint authors regarded themselves as joint authors "requires less exacting consideration in the context of traditional forms of collaboration, such as between the creators of the words and music of a song." *Id.*

35.     Indeed, consistent with the Second Circuit's observation, Nimmer opines that in some circumstances that the requisite **shared intent to be joint authors may be presumed**.

> "[A]lthough the words and music of a song are separately identifiable, the lyricist and composer, in jointly undertaking the task of creating a song, in the absence of express agreement to the contrary, **may be presumed to have intended that each shall own an undivided interest** in the combined product of their respective efforts."[10] [emphasis added]

Professor Nimmer goes on to explain,

> "**The mere fact that under such circumstances the respective contributions are probably made during the same period will tend to render the separate identification of each contribution difficult or impossible**. Even where each contribution remains separable and identifiable (as where one author works exclusively on lyrics and the other exclusively on music) the fact that **the objective of creating a single work was agreed upon prior to the creation of either contribution suggests that neither contribution would have been made but for an implied (if not express) agreement that each contributor would have an ownership in not only his own contribution, but in the combined work.**" Id. [emphasis added].

---

[10] Nimmer §6.02. *See*, *Brown v. McCormick*, 23 F. Supp.2d 594, 605 (D. Md. 1998) (Nimmer treatise quoted); see also, *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266, 267 (2d Cir. 1944) (in which Judge Learned Hand observed, "it makes no difference whether the authors work in concert, or even whether they know each other; it is enough that they mean their contributions to be complementary in the sense that they are to be embodied in a single work to be performed as such").

36. Indeed, unlike *musical works* (where words and music are separately identifiable), the respective contributions to *sound recordings (e.g.,* arrangement of vocals, instrumentals, arrangement, harmony, sound mixing) typically made during the same period, tend to render the separate identification of each contribution difficult or impossible. A key characteristic of sound recordings that the "audience appeal" of the work turns on many separate creative or artistic contributions combined such that "the share of each in its success cannot be appraised." *See*, *Aalmuhammed v. Lee*, 202 F.3d at 1234 (quoting *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d at 267.)

37. Thus, the objective of creating a **sound recording,** ***comprised of separate creative or artistic contributions*** agreed upon prior to the recording session, suggests that such contributions would not have been made but not for an implied (if not express) agreement among the contributors of such contributions that each would have an ownership interest in the combined work. In the House Report on the Copyright Act of 1976, the committee observed the music industry custom and practice of recognizing the two kinds of sound recording authorship: performance authorship and production authorship.

"The copyrightable elements in a sound recording will usually, though not always, involve "authorship" both on the part of the performers whose performance is captured and on the part of the record producer responsible for setting up the recording session, capturing and electronically processing the sounds, and compiling and editing them to make the final sound recording. There may, however, be cases where the record producer's contribution is so minimal that the performance is the only copyrightable element in the work, and there may be cases

(for example, recordings of birdcalls, sounds of racing cars, et cetera) where only the record producer's contribution is copyrightable."[11]

38.    It is apparent from this passage that the "producer" envisaged by the committee is one who engages in artistically supervising and editing the production.[12] The performer of a musical work is the author, as it were, of the performance.[13]

39.    Professor Nimmer observed this music industry custom and practice when opining in his treatise that, in the absence of an agreement otherwise, a sound recording will be a joint work of either the **performing artists** or the **performing artists and their record producer**.

> "Absent an employment relationship or an express assignment of copyright from the performers to the record producer, **the resulting ownership of the sound recording copyright may either belong exclusively to the performing artists** [citation omitted] **or** (assuming an original contribution by the sound engineers, editors, etc., as employees of the record producer) [citation omitted], **joint ownership between the record producer and the performing artists**."[14]

40.    I concur that there has been a long-standing music industry custom and practice that, in the absence of an agreement to the contrary, joint authorship of a sound

---

[11] H. Rep. No. 94-1476, 94th Cong., 2d Sess. 56 (1976).

[12] *See*, Nimmer §2.10[A](2)(b); *Forward v. Thorogood*, 985 F.2d 604, 605-606 (1st Cir. 1993) (finding that plaintiff was not joint author of sound recording where he had arranged and paid for the recording session and requested that specific songs be recorded, but did not make any musical or artistic contribution to the recording, such as serving as the engineer or directing the manner in which the songs were played or sung).

[13] Nimmer §2.10[A](2)(a).

[14] Nimmer §2.01[A][3] [emphasis added]. See, *Morrill v. Smashing Pumpkins*, 157 F. Supp. 2d 1120, 1126 (C.D. Cal. 2001) (treatise quoted) (applying same standard to music video); *Staggers v. Real Authentic Sound*, 77 F. Supp. 2d 57, 63 (D.D.C. 1999) (treatise quoted).

recording is accorded to the *performers* (e.g., solo artist or members of a band) or to the *performers* and the *record producer*. This custom and practice appears to have been recognized by at least one court as "clear" law.[15]

41.     This does not mean the contribution of a vocalist or instrumentalist spontaneously invited to participate in a recording session would give rise to joint authorship. Nimmer §2.10 (citing *Ulloa v. Universal Music & Video Distrib. Corp.*, 303 F.Supp. 2d 409, 418 (S.D.N.Y. 2004) (Nimmer treatise cited).

42.     Thus, it is not surprising that an industry custom and practice has emerged with respect to identifying joint authors of **sound recordings**, resulting in the separation of (1) the one or more *dominant* contributors to the recording—that is, the **performing artist(s)** (i.e., a sole performing artist, or the several members of a musical group or "band") and the **record producer** from (2) *tangential* contributors (*e.g.*, invited or hired vocalists, instrumentalists, sound engineers, editors, etc.).

43.     But, as the record in this case clearly shows (as discussed below), Mr. Worrell was no mere "sideman" hired to provide keyboard services or sound mixing services. Rather, the record demonstrates—often indisputably—that Mr. Worrell was a full participating member of the musical groups *Funkadelic* and *Parliament* (or other names used to identify the group or groups of which Mr. Worrell was a member, each of which may be referred to herein as "*Parliament/Funkadelic*" or "the band"), one who played a fundamental role in creating the unique "sound" of the band, rendering his singularly

---

[15] *See, Merrill v. Smashing Pumpkins*, 157 F.Supp. 2d 1120, 1126 (C. D. Cal. 2001) (citing Nimmer §2.01[A][3]); *Staggers v. Real Authentic Sound*, 77 F.Supp. 2d 57, 62 (D.C. 1999) (citing Nimmer); *Forward v. Thorogood*, 985 F.2d 604, 605-606 (1st Cir. 1993) (citing Nimmer).

recognizable keyboard and synthesizer performances embodied in the subject sound recordings to create what even Mr. Clinton admitted was the "structural foundation" of the band. He arranged and orchestrated many of the songs performed in the recording sessions that produced the subject sound recordings, played a key rolel in the artistic creative editing,  mixing, dubbing and other post-recording processes, taking on many of the tasks typically performed by a record producer to the point he was considered the "musical director" of the band and "co-producer" of the recordings. These contributions were all essential to producing the "audience appeal" of the subject recordings. Mr. Worrell even wrote or co-wrote about one-third (1/3) of the musical works underlying those sound recordings.

44.    In view of these irrefutable facts, many of which were admitted by Mr. Clinton during his deposition, the record shows, in my opinion, overwhelming indicia of shared intent upon which a Court or trier of fact may reach a conclusion of Mr. Worrell's joint authorship in the subject recordings.

## V. RECORD DEMONSTRATES OVERWHELMING INDICIA OF THE REQUISITE SHARED INTENT FOR JOINT AUTHORSHIP OF THE SUBJECT SOUND RECORDINGS

45.    It is my opinion that the record contains numerous and substantial factual indicia of a shared intent for Bernie Worrell to jointly own the subject sound recordings that should weigh heavily in favor of a Court or trier of fact to conclude that Mr. Worrell was a joint author of such sound recordings. By the same token, the record is devoid of any suggestion that Mr. Worrell's contribution was minimal or merely "some form of assistance" or that would lead the Court or trier of fact to consider him an "overreaching" contributor. On the contrary, the record strongly supports the conclusion that Mr. Worrell

was a true collaborator, if not the lead collaborator, in the creation of the subject sound recordings.

## A. Factors For Determining Joint Authorship

46. While I do not weigh in on the appropriate standard for determining the question of joint authorship in this case, for organizational purposes I believe it may be useful to provide a brief survey of some of the *elements* of joint authorship enunciated by the courts, including decisions relied upon by Defendants in this case in its most recent motion for judgment on the pleadings. By no means have the courts been unanimous in their legal pronouncements, but the following provides some useful guidance as to what kind of evidence one would look for in the record which would bear upon the question of joint authorship in this case.

47. In *Childress*, cited above, the court attempted to strike a balance between "ensuring that true collaborators in the creative process are accorded the perquisites of co-authorship," while at the same time, "guarding against the risk that a sole author is denied exclusive authorship status simply because another person renders some form of assistance," *Childress v. Taylor*, 945 F.2d 500, 504. Defendants in this case contend that joint authorship requires the putative co-authors made "objective manifestations of a shared intent to be coauthors" of the work, citing *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000). *See*, ECF 81 at 9.

48. The Ninth Circuit's *Aalmuhammed* decision lists three criteria for determining, in the absence of a contract, whether a contributor should be considered an "author" for the purpose of joint authorship: (1) whether the "putative coauthors ma[de]

objective manifestations of a shared intent to be coauthors," (2) whether the alleged author "superintended the work by exercising control," control often being the most important factor, and (3) whether "the audience appeal of the work" can be attributed to both contributors, and whether "the share of each in its success cannot be appraised." See, *id.*

49.    While these factors are helpful in determining whether a contributor should be considered a joint author of the work, the *Aalmuhammed* court noted that "the factors articulated in this decision . . . cannot be reduced to a rigid formula, because the creative relationships to which they apply vary too much." *Id. Aalmuhammed*, 202 F.3d at 1235.

50.    With respect to "objective manifestations of shared intent," the Second Circuit later noted that "*Childress* and its progeny, however, do not explicitly define the nature of the necessary intent to be co-authors." *Thomson v. Larson*, 147 F. 3d 195, 201 (2d Cir. 1998). The Second Circuit continued,

> "The intention standard is not strictly subjective. In other words, co-authorship **intent does not turn solely on the parties' own words or professed state of mind.** *See, id*. [*Childress*, 945 F.2d at 508] ('Joint authorship can exist without any explicit discussion of this topic by the parties'). Rather, **the *Childress* court suggested a more nuanced inquiry into <u>factual indicia of ownership and authorship</u>, such as <u>how a collaborator regarded herself in relation to the work in terms of billing and credit</u>, <u>decision making</u>, and the <u>right to enter into contracts</u>.** See *id.* at 508-09. In this regard, the court stated that 'though **joint authorship does <u>not</u> require an understanding by the co-authors of the legal consequences of their relationship,** obviously **some <u>distinguishing</u>**

**characteristic of the relationship** must be understood for it to be the subject of their intent.' Id. at 508." *Thomson v. Larson*, 147 F. 3d at 201 (emphasis added).

51.     Bearing in mind these elements of joint authorship as enunciated by the courts, I turn to the evidence in the record bearing upon the question of joint authorship in this case.

**B.     Factual Indicia in the Record of Shared Intent for Joint Authorship**

52.     The record is replete with evidence—much of it undisputed—that would support, in my opinion, the Court or trier of fact reaching a conclusion that Mr. Worrell meets the criteria for determining that he jointly authored the subject sound recordings as a member of the band.

> *1.     Distinguishing Characteristics of the Relationship that Weigh In Favor of the Requisite Shared Intent*

53.      "Though joint authorship does not require an understanding by the co-authors of the legal consequences of their relationship, obviously some distinguishing characteristic of the relationship must be understood in order for it to be the subject of their intent." *Childress* at 507. Defendants would have the Court believe that Mr. Worrell is an "overreaching" contributor, his distinguishing characteristic being a mere a musician brought in as a "sideman" to play an instrument for a few recordings or a recording engineer who turned knobs at the behest of others. But this is all belied by the record—including most notably Mr. Clinton's own deposition testimony, in which he admits Mr. Worrell was much more to him, to the band, and especially to the sound recordings they created together. In sum, the record shows that Mr. Worrell was a founding member of the band, was considered by Mr. Clinton's own testimony to have provided the "structural foundation" of the band in both his keyboard and synthesizer performances, which

"revolutionized keyboard playing in popular music," and Mr. Worrell's substantial post-production and sound mixing contributions, which all contributed to the "audience appeal" of the recordings.

### a.    Personal History

54.    The story begins when George Clinton met Bernie Worrell in 1960 and began working with each other musically when Mr. Worrell was in high school.

> **Q.  When did you first meet Bernie Worrell?**
>
> **A.  Probably 1960.**
>
> **Q.  When did the two of you do anything together musically?**
>
> **A.  Musically probably '62 in high school.  He played with us in Plainfield, New Jersey, as a doo-wop singing group.  He sat in with us. He was still a kid, very young, and he sat in with us.**
>
> **Q.  How did it evolve from there, the two of you working together?**
>
> **A.  Around Plainfield he would play with us at school events and everything. He went off to college and come home every summer.  We saw him every now and then, and all the way up to whenever we put our first record out was '67. We had a hit record about halfway in. About a year into that, he came back with us and met us on the road.**
>
> **Q.   Somewhere around 1968?**
>
> **A.   Around 1968, yeah.**

Clinton Depo. at 5:10-6:3.

55.    Bernie Worrell went off to college, attending the Juilliard School of Music and earning a degree from the New England Conservatory of Music in 1967.  In his deposition, Mr. Clinton acknowledged how Worrell's education had an impact on the band's recordings.

> **Q.  Mr. Worrell, as a classically trained musician, brought that to Parliament and Funkadelic, right?**
>
> **A.  Yes.**

Clinton Depo. at 99:17-19.

56.     As to whether Mr. Clinton regarded Mr. Worrell as a performing member *of the band* at the time the recordings were created, that issue would appear to be settled indisputably by Mr. Clinton's own admissions, including by his deposition testimony, pronouncements made on Mr. Clinton's own website, and statements made to the press by Mr. Clinton upon Mr. Worrell's death.

### b.     Founding Member of the Band

57.     According to Mr. Clinton, Mr. Worrell began performing on recordings for the band beginning with the **first album** released by *Funkadelic*. Clinton Depo. at 98:1-4. Indeed, the first sentence of the page containing Bernie Worrell's biography on George Clinton's official website ([www.georgeclinton.com](www.georgeclinton.com)), as that website existed on the date of Mr. Clinton's deposition, stated that "**Bernie Worrell first came to prominence as a founding member and musical director of Parliament Funkadelic**." *Id*. at 96-97; *id*. (Exhibit 8).

58.     When shown this webpage at his deposition, Mr. Clinton denied that Mr. Worrell was a "founding" member of *Funkadelic* but did not deny that he was a member and conceded that Mr. Worrell did perform on recordings on the *first album* released by the band. Clinton Depo at 97:15-22; Exhibit 7, two pages from a website owned by Mr. Clinton—www.georgeclinton.com—bearing the copyright notice "©1968-2024 George Clinton Parliament Funkadelic."

> **Q. In 1969 about you said <u>Mr. Worrell started performing in studio sessions</u>, correct? Yes?**
>
> **A.   I think so, yes.**
>
> **…**
>
> **Q.   This would have been Parliament or Funkadelic?**

  **A. It would have been both. By '69 it was both of them. It was**

   **Parliament from '57 on until, like, '67.**

 **Q. So by '69 it would have been Funkadelic?**

 **A. And Parliament, yes.**

Clinton Depo. at 9:6-25; 10:1.

  59. Upon Mr. Worrell's death, Mr. Clinton was quoted in the press, "**Bernie's influence and contribution – not just the funk but also rock and hip hop — will forever be felt.**" When asked whether he meant those words, Mr. Clinton replied, "**I meant it, yes.**" Mr. Clinton's testimony regarding Mr. Worrell's "influence and contributions" were not that of a sideman musician or an engineer who turned knobs at the request of others. Nor that of an "overreaching" contributor, but one, as further discussed below, who supervised and exercised control over one or more parts of the entire recording process— in song selection, performing, arranging, and mixing the sounds—resulting in the creation of the subject recordings.

   **b. Co-Writer of the Songs Underlying the Subject Recordings**

  60. As noted below, the *Funkadelic/Parliament* band released over thirty albums comprising about 265 *sound recordings*, which contain about 240 different *musical works*. Of those musical works, Mr. Worrell wrote or co-wrote over 80 of them, or about 33% of all the songs underlying such sound recordings. *See*, Exhibit B hereto.[16] Moreover, as noted below, where Mr. Worrell and Mr. Clinton collaborated on such songs, Mr. Worrell's songwriting share of authorship credit on each of these songs was **equal to that**

---

[16] Exhibit B, provided to me by plaintiff's counsel, which lists many of the songs written or co-written by Mr. Worrell, though it may not include all of the songs written or co-written by Mr. Worrell embodied in the subject sound recordings.

**of Mr. Clinton's**. And each of the subject sound recordings embodying such songs is a *derivative work* of the songs written or co-written by Mr. Worrell.

61. Because songs are customarily written, partially written, or re-written during the studio sessions in which they are first recorded, it strains credulity to believe that these contributions were simply those of a "sideman" making tangential instrumental contributions to the recordings. On the contrary, Mr. Worrell's contribution appears to be one of a dominant author of the recordings, especially in light of his authorship of many of the songs underlying such recordings, the significant musical arrangements he made of those songs (and for songs he did not co-write) for the recorded performances, his own renowned instrumental performances, and post-recording sound mixing contributions made by Mr. Worrell, all discussed further below.

### c.    Billing and Credit as Member of the Band

62. In discerning how parties viewed themselves in relation to a work, *Childress* considered that the way in which the parties bill or credit themselves could be significant. *See, Childress*, 945 F.2d at 508 ("Though 'billing' or 'credit' is not decisive in all cases and joint authorship can exist without any explicit discussion of this topic by the parties, consideration of the topic helpfully serves to focus the fact-finder's attention on how the parties implicitly regarded their undertaking)."

63. If one of the indicia of shared intent of joint authors is how a collaborator regarded himself in relation to the work in terms of billing and credit, then how Mr. Worrell and Mr. Clinton were **billed** and **credited** weighs heavily in favor of a shared intent of joint authorship.

64.     Mr. Clinton, by Mr. Clinton's own testimony, chose to bill and credit Mr. Worrell as being a "member" of the band *Funkadelic/Parliament.* (As noted, Mr. Clinton's own website recognizes Mr. Worrell as a "founding member" of that band. Mr. Clinton does not dispute Mr. Worrell was a *member* of the band only that he was not a "founding" member at the time of the recording of *Funkadelic's* first album, even though Mr. Worrell performed on that first album).

> "Though keyboard player Bernie Worrell had played on the original Funkadelic album, his first credit with the conglomeration appeared on Funkadelic's second album, 1970's *Free Your Mind...And Your Ass Will Follow*."[17]

65.     Likewise, Mr. Clinton, of course, was **also** billed and credited as a member of musical group or band *Parliament/Funkadelic*. In this regard, it is telling that Mr. Clinton did not, by contrast, *bill* or *credit* himself as a "**solo artist**," as did James Brown, Jimi Hendrix, Marvin Gaye, Barry White, Lou Rawls, Al Green, and others. Rather, he chose to bill himself **as a member of a group**. Mr. Clinton did not begin recording albums as solo artist until about 1983 when he recorded the album "Computer Games" for Capitol Records.

66.     Today, Mr. Clinton claims otherwise, testifying that "**I was Funkadelic and I was Parliament.**" Clinton Depo. at 27:8-9. But Mr. Clinton was no more *Funkadelic* than Mick Jagger was the *Rolling Stones*. Mr. Clinton's celebrity, stemming from his "freaky costumes and themes inspired by '60s acid culture and science fiction," may have made him an ideal "front man" for the band, but his musical talent and contributions to the

---

[17] John Bush, "Parliament Biograghy," *allmusic.com.*
https://www.allmusic.com/artist/parliament-mn0000129775

band's performances and recordings appeared to music historians as overshadowed by those of Mr. Worrell. Indeed, on *allmusic.com*, Mr. Worrell is accorded—as a member of the group *Parliament*—billing or credit that is **above** that of Mr. Clinton.

> **Group Members**      **Bernie Worrell, George Clinton, Bootsy Collins, Prakash John, [etc.]**

*Id.* [accessed November 13, 2024].

67.      Yet, Mr. Clinton in his deposition tries to distance himself from the other members of the band, including Mr. Worrell, testifying **"Even the guys in the band, they were side people like any other regular musician. They were side people."** *Id.* at 27:5-7. As noted below, Mr. Clinton directly contradicted himself in his deposition when he spoke of the towering role Mr. Worrell played in the authorship of the subject recordings. Mr. Worrell was far from a side man.

68.      And not only were these bands known publicly as "groups," but even Mr. Clinton's lawyers referred to *Funkadelic* and *Parliament* as "recording groups." The unsigned agreement dated January 1, 1976, which Mr. Clinton's corporation presented to Mr. Worrell, states,

> **"Artist may be required to render his services with others for the making of master recordings including master recordings of the recording groups known as 'Funkadelic' or 'Parliament'."**

Judith Worrell Depo., Exhibit 1 at pg. 1.

69.      Thus, it is clear that Mr. Worrell worked as, and was ***billed*** and ***credited*** as, a member of the band. And so was Mr. Clinton, though he may have also been considered the band's "front man" for obvious public relations reasons. By the same token, Mr.

Worrell, in addition to being a member of the band (and arguably *founding* member), was also considered the band's "musical director." Clinton Depo at 94:11-16.

67.     During his deposition, Mr. Clinton was presented with a page from a website owned by him: www.georgeclinton.com, bearing the copyright notice "©1968-2024 George Clinton Parliament Funkadelic." Clinton Depo, Exhibit 7. The first sentence of the website's biography page regarding Bernie Worrell states, "**Bernie Worrell first came to prominence as a founding member and musical director of Parliament Funkadelic**." When asked if this was true, Mr. Clinton replied it wasn't.

> **Q.  What part of it's not true?**
> **A.  He wasn't a founding member.**

Clinton Depo. at 97:11-12.

68.     Even though Mr. Clinton admitted that Mr. Worrell performed several of the songs on the first album (by *Funkadelic*), he testified that it wasn't until the second album that he considered Mr. Worrell as a member of the band.

> **Q.  Second album?**
> **A.  Second album.  Second album, second -- third – I mean second album, third record.  We did a record in '58. [sic]**
> **Q.  But the second album for Parliament he was there for, so he just wasn't on the first one?**
> **A.  The second album for Parliament he was there, but not Funkadelic.**
> **Q.  When was the first Funkadelic?**
> **A.  '68.**
> **Q.  He didn't perform on that?**
> **A.  Maybe a song, I'm not sure, on the first album. The second album I got -- he was on.  But the first album, he was probably on some of the songs in the first album, yes.**

Clinton Depo. 97:15-25; 98:1-4.

69.     In my opinion, that both Mr. Clinton and Mr. Worrell were each credited and billed as, and were regarded as members of the group, *Funkadelic/Parliament* **as a band** rather than for "George Clinton" **as a solo artist,** and together with the other reasons herein, weighs in favor of a shared intent for joint authorship.

2.      ***Mr. Worrell Contributed both Performance Authorship and Production Authorship of the Subject Sound Recordings, Superintending by Exercising Control Over Key Aspects of Such Authorship.***

70.     If one of the indicia of shared intent of joint authors is whether a collaborator superintended essential aspects of the work's creation, the record contains substantial evidence of the **control** Mr. Clinton ceded to, or shared with, Mr. Worrell, over key creative aspects of authorship of the recordings, including song selection, arranging, performing, and mixing for the subject recordings.

71.     By way of background, key aspects of creating a sound recording during the 1960's to at least the early 1980's, stated in the most general terms, are (1) writing or selecting the song to record, (2) arranging or orchestrating the song (*i.e.*, the process of assembling different musical elements—including vocals, musical instruments, and rhythm—and the ordering, structuring and harmonizing of these elements), (3) performing the songs and recording the tracks that make up the recording, and (4) editing, combining, and mixing the tracks into the final recording master.

72.     The record shows that Mr. Worrell had exerted "creative control over separate and indispensable elements of the completed product." *See*, *Aaluhammad* at 1124. That is, over one or more separate and indispensable aspects—including performance and production—of creating the subject sound recordings. These included (a) song selection, (b) arranging, (c) performance, and (d) sound mixing. Indeed, as noted below, during his

deposition, Mr. Clinton testifies as to the extraordinary contributions Mr. Worrell as a member of the band made to the subject sound recordings, demonstrating that Mr. Worrell was not only one of the **dominant performers** on the subject recordings, but one of the **dominant production** contributors to the recordings.

73.     Indeed, Mr. Worrell was involved in so many aspects of the creation of the subject recordings, it could be said that he **co-produced** them, though he might not have been given billing or credit for having performed the duties of a "record producer." A *record producer* is one typically who oversees some or all of the key aspects in the making of an artist's sound recording, including pre-recording (*e.g.*, assembling talent, equipment), recording (*e.g.*, supervising sessions, providing creative input), and post-recording process (*e.g.*, supervising mixing, editing, overseeing mastering, *etc.*). *See*, H. Rachlin, *The Encyclopedia of Music* at 344-347 (Harper & Row, 1981). As Ms. Worrell testified,

> **Q.  He worked as if that contract was in place, correct?**
> **A.  He worked like he always worked. He co-produced, he arranged. He did everything.**

Worrell Depo. at 17:1-2. Her testimony is corroborated by the undisputed testimony of Mr. Clinton on the wide range of Mr. Worrell's contributions to the subject recordings. Indeed, Mr. Worrell's essential and extensive contributions to the band's recordings has been recognized by rock historians. For example,

> "Worrell soon became the most crucial cog in the P-Funk machine, working on arrangements and production for virtually all later Parliament/Funkadelic releases. His strict upbringing and classical training (at the New England Conservatory and Juilliard), as well as the boom in synthesizer technology during

-32-

the early '70s, gave him the tools to create the synth runs and horn arrangements

that later trademarked the P-Funk sound."

John Bush, "Parliament Biograghy," *allmusic.com.*[18]

### a.    Song Selection and Songwriting

74.    Not only was Mr. Worrell as a member of the band involved in helping the

band select the songs to be recorded, arranging the songs, performing them, and mixing

the resulting tracks, but he was the co-writer of many of the songs underlying the subject

sound recordings. Exhibit B attached hereto is a list of over 80 songs written or co-written

by Mr. Worrell that were selected for inclusion in over 30 albums that contain the subject

recordings. Typically, songs are written, partially written, or re-written, during the

recording session.

75.    The scope and breadth of Mr. Worrell's songwriting contributions in

connection with the authorship of the recordings—which themselves are derivative works

of the songs he wrote or co-wrote—and the fact that songs are commonly written or

rewritten during studio sessions, weighs heavily in favor of considering Mr. Worrell a

dominant author of the recordings—especially those in which his own songs are

embodied— while also considering his significant contributions as an arranger of songs he

did not co-write, as a lead instrumental performer, and in his post-recording production

contributions (*e.g.*, editing, mixing, overdubbing).

76.    Moreover, the record shows that, where Mr. Clinton and Mr. Worrell were

both credited with authoring a song, Mr. Worrell was almost always credited no less than

---

[18] https://www.allmusic.com/artist/parliament-mn0000129775

Mr. Clinton. For example, the following are representative co-writing shares for many of these songs:

| *Song* | *Songwriter* | *Shares* | *Music Publishing Agt* |
|---|---|---|---|
| *Chocolate City* | George Clinton | 25% | GCTHANG01344 |
| | William "Bootsie" Collins | 50% | |
| | Bernie Worrell | 25% | |
| *Much Thrust* | George Clinton | 45% | GCTHANG01509 |
| | Bernie Worrell | 45% | |
| | Jim Vitti | 10% | |
| *Mothership Connection (Star Child)* | William Collins | 33 1/3% | GCTHANG00049 |
| | George Clinton | 33 1/3% | |
| | Bernie Worrell | 33 1/3% | |

77.    Thus, with respect to about 80 of the musical works underlying the recordings, Mr. Clinton and Mr. Worrell were considered at least equal contributors.

### b.    Musical Arranging

78.    Not only was Mr. Worrell involved in song selection and the actual writing of the songs to be embodied in many of the subject sound recordings, Mr. Worrell served as a *musical arranger* for many of the subject recordings. An *arranger* is one who "prepares and adapts a previously written musical composition for presentation in other than in its original form." H. Rachlin, *The Encyclopedia of Music* at 37 (Harper & Row, 1981). Moreover, Mr. Worrell superintended and exercised control over the musical arrangements he created which when performed produced the sounds fixed in the subject recordings.

79.     An *arrangement* of a musical work is considered a derivative work of the **musical work.** The arrangement only becomes part of a sound recording while the arrangement of the song is being performed, the sounds of which are fixed in a tangible medium of expression. Being a derivative work of the musical work, the arrangement itself is owned by the owner of the musical work (unless the owner agrees otherwise). *See*, 17 U.S.C. § 106 ("the owner of copyright under this title has the exclusive rights . . . (2) to prepare derivative works based upon the copyrighted work"). The arrangement is authorized to become part of the sound recording pursuant to a mechanical reproduction license—compulsory or voluntary—granted by the owner of the musical work to the maker of the sound recording. *See*, 17 U.S.C. § 115(a)(2)("Musical arrangement.—A compulsory license includes the privilege of making a musical arrangement of the work to the extent necessary to conform it to the style or manner of interpretation of the performance involved, but the arrangement shall not change the basic melody or fundamental character of the work, and shall not be subject to protection as a derivative work under this title, except with the express consent of the copyright owner").

80.     Accordingly, the band did not own the resulting musical arrangements, but only had a license to use them in connection with reproducing and distributing the musical works as part of the recordings. But the work *Mr. Worrell* performed in *directing the performances of such arrangements* was an essential part of authoring the subject sound recordings.

81.     At his deposition, Mr. Clinton testified that Mr. Worrell, in addition to his own contributions as a performer on such recordings, served as an *arranger* for musical material performed by other musicians for many of the subject recordings. Moreover, in

making these contributions, while outside arrangers were used by the band in many instances, Mr. Worrell was the **only** *member of the band* producing the musical arrangements. According to Mr. Clinton's testimony, decisions in regard to creating the musical arrangements appear to have been completely within Mr. Worrell's control.

> **Q.** **At this point in time, was Mr. Worrell the only person who was doing arranging for other musicians to that extent? Was anybody else going out and not only playing with the synthesizer, but arranging the horns and arranging the strings and arranging the harp and doing all of that?**
>
> **A.** **We acquired arrangers from Motown on a lot of those records. I forget the guys' names. There's a couple of them that wrote charts for us, wrote horns and strings. We used outside arrangers on a lot of the songs, yes.**
>
> **Q.** **I'm talking about any of your band members. Did anybody else do it to the extent that Mr. Worrell did?**
>
> **A.** **Not to the extent of Mr. Worrell. Junie Morrison was very capable of doing it and did do it on certain songs. So we had people that could do it, but that was -- Bernie pretty much had that.**

Clinton Depo. at 23:2-22.

82.   According to Mr. Clinton, Mr. Worrell was paid for his arranging work.

> **Q.** **As he continued to do these arranging, these arrangements, did you have discussions with him about how he was going to be recognized or paid with him?**
>
> **A.** **He got raises on arrangements, the arrangements between him and Fred both extremely after we got The Mothership Connection. It was him and Fred started charging more for the arrangement. We started doing more of those. He got more for that, yeah.**

Clinton Depo. 24:3-12.

83.     In his deposition, Mr. Clinton testified that he believed that the payments Mr. Worrell received for his work on these arrangements was "different" from "his regular playing on sessions"—

> **Q.  So when you say arranger's credits, that's a writing credit?**
>
> **A.  No, arranger's credit is different. That's when we had horns or strings. He got another check for that from the union.  That's a big check that was — he wrote the arrangement, so he got paid for that by itself separate from his regular playing on the sessions.  His arrangement was the horns and strings.  The rhythm section, he just did that off the top of his head.  He was good like that.**

Clinton Depo. at 13:1-5.

84.     Accordingly, while the *musical arrangements* Mr. Worrell created were owned by the owner of the applicable underlying musical works, this was separate from the *sound recordings,* which were **jointly authored** by members of the band.

### c.        Performing

85.     Little need be said here of the legendary performance talent that Mr. Worrell brought to the subject recordings. RollingStone magazine summed it up in an article appearing shortly after Mr. Worrell's death,

> "One of the most wildly innovative and technically dazzling musicians in pop music history, Parliament-Funkadelic's Bernie Worrell was **like 'Jimi Hendrix on the keyboards,'** according to one-time bandmate Bootsy Collins, and that's not a hyperbolic estimation. . . . By his early twenties, he was a full-fledged P-Funkateer, and soon became **de facto musical director, organizing and**

**orchestrating the anarchic collective's sprawling jams and riffs into iconic compositions and performances."**[19] [emphasis added].

86.     And this from music historian and scholar Rickey Vincent, in his ASCAP award winning book, the foreword to which was written by Mr. Clinton:

> "In perhaps the most powerfully symbolic union of the Funk Era, Worrell's competence in classical European musical forms collided and combined with the band's [P-Funk's] twisted black urban sensibilities to generate a bizarre dichotomy of perspectives … As new keyboard technologies were made available to musicians in the 1970s, Worrell mastered a vast array of effects, **almost single-handedly producing the late-seventies sound of Parliament.**"[20] [emphasis added].

87.     During his deposition, Clinton offered only the highest appraisal of the significance of Mr. Worrell's contributions to the band and its subject recordings—in not just his keyboard performance, but his innate musical talent, use of emerging technology, and classical training.

> **Q.  The next sentence says, "While this massively influential super group was radically altering the course of music, <u>Bernie was radically charting the course of emerging keyboard technology during the golden age of analog synthesis</u>." Do you agree with that?**
>
> **A.  <u>Right</u>.**
>
> **Q.  Next sentence, "<u>Among the key ingredients in his sonic stew were perfect pitch and a well-honed facility with a classical canon</u>."**
>
> **A.  <u>Agree</u>.**

Clinton Depo at 98:20-23 [emphasis added]; Clinton Depo, Exhibit 7).

---

[19] C. Aaron & M. Reeves, "Bernie Worrell: 10 Essential Tracks From The P-Funk Keyboardist," *Rolling Stone* (June 24, 2016).
[20] R. Vincent, *Funk: The Music, the People, and the Rhythm of The One* (St. Martins Griffin, 1996).

-38-

88.   Moreover, Mr. Clinton admitted that Mr. Worrell had a freehand in decision-making over his own performances (as well as his post-recording mixing, discussed below) for the subject sound recordings.

> **The rhythm section, [Bernie] just did that off the top of his head.  He was good like that.**

Clinton Depo at 13:3-5.

89.   Moreover, Mr. Clinton confirmed how Mr. Worrell's contributions had an impact upon the success of the band, providing the band—and by implication its sound recordings—a "structural foundation" that was "ever present."

> **Q.  In the third paragraph, I'll just read the sentence to you. "Worrell then proceeded to provide this freewheeling collective with the structural foundation, which while occasionally implied, was ever-present.**
>
> **A.  Say that again.**
>
> **Q.  Sure.  Says <u>this is referencing Parliament Funkadelic</u>, okay? "Worrell then proceeded to provide this <u>freewheeling collective with a structural foundation</u>, which while occasionally implied, was <u>ever-present</u>."  Do you agree with that?**
>
> **A.  <u>Yes</u>.**

Clinton Depo at 99:5-16 [emphasis added]; Clinton Depo, Exhibit 7.

90.   Mr. Clinton continued his evaluation of Mr. Worrell's contributions:

> **Q.  The next sentence, quote, "At the same time, <u>he explored and expanded his own musical ideas in every conceivable direction with a brazenness which was both revolutionary and evolutionary</u>. Would you agree with that?**
>
> **A.  <u>Yes</u>.**
>
> **Q.  Next sentence, quote, "<u>From fanciful forays on clavinet which leaped without warning from guttural gulps to squiggly squeals to liquid</u>**

**<u>Minimoog baselines which herded listeners to the dance floor.  It all
represented new musical language.</u>**

**A.  <u>Yes.</u>**

Clinton Depo. 100:4-10; Clinton Depo, Exhibit 7.

### d.      Editing, Overdubbing, and Mixing

91.     During his deposition, Mr. Clinton testified to Mr. Worrell's contributions, not only as a songwriter, arranger, and performer of the subject sound recordings, but as to Mr. Worrell's significant role in the **post-recording** aspects of creating the final sound recording or "master" recording, including editing, overdubbing, and mixing the recorded tracks. In other words, Mr. Worrell was not only performing duties of *performance authorship*, but many aspects of *production authorship*, as well.

92.     By way of background, the music industry recognizes two types of *sound recording* authorship: (a) performance authorship and (2) production authorship. *See*, *Compendium of Copyright Office Practices* §803.3. Examples of **performance authorship** include playing an instrument, singing, speaking, or creating other sounds that are captured and fixed in the sound recording. Id. §803.3[A]. Examples of **production authorship** in a sound recording include (i) capturing and manipulating the sounds that are embodied in the sound recording, and (ii) compiling and editing those sounds to make the final recording. Id. §803.3[B].

93.     Mr. Clinton testified as to his high appraisal and confidence in not only Mr. Worrell's performance authorship, but his production authorship, including his contributions to the creative post-recording aspects of the record-making process, starting in 1969 when Mr. Worrell first began contributing to the recording sessions:

> **Q.** **And in these early studio sessions, was he playing music that somebody else had written or was he coming up with what he was playing?**
>
> **A.** **Coming up with what he was playing. Like I said, we would lay the tracks down basically. We would have Bernie come in and overdub them. Once I put voices on them, he would come in and color them according to all the music that was already there. If I'm not mistaken, he majored in accompanying, so he knew how to merge everything. The basic tracks were done, he learned how to merge that together and he did it very well.**

Clinton Depo. at 11:20-25; 12:1-7.

94.    Mr. Clinton testified that Mr. Worrell's contributions to the mixing aspects authoring sound recordings were not limited to his contributions with respect to the arrangements of his individual keyboard contributions but pertained to "the whole record."

> **Q.** **I asked you earlier about Mr. Worrell's work in terms of mixing. Were you aware of Mr. Worrell working with the sound engineers?**
>
> **A.** **Yes.**
>
> **Q.** **Can you describe that for me, please?**
>
> **A.** **Mixing?  How high or how low to put his keyboards and -- to put the volume of his keyboards or mix in the mix, the suggestions of what sounded good to him.**
>
> **Q.** **And his efforts with regard to mixing, is it your testimony that it only related to his keyboard parts or other parts of the arrangements?**
>
> **A.** **It could be pertaining to the whole record really.**

Clinton Depo. at 109:5-24.

95.    Finally, during his deposition Mr. Clinton displayed an understanding of the difference between, on the one hand, the ***dominant*** contributors to a sound recording—such as the vocal and instrumental performers, producers, and others who are essential to

the creative process—and, on the other hand, important but *tangential* contributors, such as sound engineers and equipment managers.

96.     For example, in describing how the band worked with the sound engineers, Mr. Clinton made it clear that that Mr. Worrell didn't actually set "levels" himself. Rather Mr. Worrell would suggest to the engineer **"what sounds good to him.  Not turning the knobs or going over there, no."** Clinton Depo. at 110:8-17.

> **Q. Was Bernie actually over there turning the knobs?**
> **A.  No.**
> **Q.   What about working with the sound engineers? First of all, what's a sound engineer?**
> **A.  The sound engineer is the one that do the turning of the knobs.**

*Id.*

97.     And, as noted, Mr. Worrell's in-studio performance and post-recording contributions were essential to the audience appeal of the recordings.

> **Q. Was Mr. Worrell ever called the musical director of Parliament Funkadelic?**
> **A.  Yes.**

Clinton Depo at 94:11-13.

98.     When asked what that meant, Mr. Clinton testified, **"He's directing the band."** *Id.* Indeed, the record shows that in the studio Mr. Worrell's arranging of songs to be performed, performing post-recording tasks, such as editing, overdubbing, and mixing of tracks, and his overall control of such tasks, were such that would make him a *de facto* **"co-producer"** of the recordings. Indeed, Ms. Worrell repeatedly characterized Mr. Worrell as a "**co-producer**" of the recordings. Worrell Depo. at 17:1-2. In the context of a live performances, Mr. Worrell's role in directing the band was to re-create in the live performances as close as possible the sound that had been produced in the studio recording,

a skill that typically requires in depth knowledge of how those sounds were originally produced for the recordings.

### 3. The Audience Appeal of the Sound Recordings Can Be Attributed to Mr. Worrell's Contributions

99. If one of the indicia of shared intent of joint authors is whether the "audience appeal" of the recordings can be attributed to Mr. Worrell's contributions as much as those of any other member, including Mr. Clinton, then, based upon the record—including Mr. Clinton's own testimony— this factor too should weigh heavily in favor of a shared intent to joint author the recordings.

100. Indeed, the record demonstrates that, while the share of success in the various contributions to the recordings cannot always be separately appraised, the audience appeal of many of the subject recordings can be attributed to Mr. Worrell's contributions. During his deposition, Mr. Clinton was asked whether Mr. Worrell's contributions to a number of the sound recordings could easily be identified by the audience and whether they could be the basis of the "**audience appeal**" of such works.

> **Q. Do you agree Mr. Worrell's contributions to a song like Flashlight were not just important, but, I mean, really an intrinsic part of that song?**
>
> **A.   Yes.**
>
> …
>
>   **Q. Clearly if a person is listening to Flashlight, easy to identify Bernie's contributions, right?**
>
> **A.   He's easily identified.  Bootsy and his brother wrote the track prior to us even getting the track, myself or Bernie.  Bootsy and Bernie gave me the track.  I recorded the music.  Bernie put the baseline on.  But it was dynamic.  It made the record.**

-43-

Q.  <u>And so the audience appeal of that work</u>, Flashlight --

A.  <u>Right</u>.  And he got writer's on it for doing that.

…

Q. If you've done a lot of speaking over the years -- panel presentation, interviews, all these different sort of things -- would you give Bernie credit for the <u>audience appeal</u> of any of your other songs other than Flashlight?

A. Yes.

…

Q.  This article goes on to say -- and this is not quoting you just to be clear.  But it says, Worrell, the Jersey native who revolutionized keyboard playing in popular music died Friday, June 24, from lung cancer, and it goes on.  Do you agree with that statement <u>that Mr. Worrell revolutionized keyboard playing in popular music</u>?

A.  Yes.

Q.  It does quote you from an earlier newspaper article as saying, quote, "We took our funk and rock and roll and <u>put Bernie's chops in it, and we had something nobody knew what the hell we were doing</u>," end quote.

A.  I said that.

Q.  And you meant it?

A.  I meant it.

Clinton Depo. at 108:20-25.

101.   It is my opinion, based on the record, including Mr. Clinton's own testimony, Mr. Worrell would not be considered an "overreaching" contributor, a mere a musician brought in as a "sideman" to play an instrument for a few recordings or a recording engineer who turned knobs at the behest of others. On the contrary, Mr. Clinton admits to a close personal relationship with Mr. Worrell, considered Mr. Worrell a key

member of the Parliament/Funkadelic band contributing a profound influence on the sound

of the band and the recordings of those sounds, from his keyboard and synthesizer talents

to his post-recording work (e.g., editing, mixing, etc.), responsibilities often performed by

a *record producer*, all of which are key processes of the authorship of sound recordings.

## VI. Mr. Worrell Received Payments From Mr. Clinton Separate From the Payments He Received From the AFM Union for His Musical Arranging

102.     The record shows that Mr. Worrell received two kinds of periodic payments

for his work as a member of the band. *First*, payments (starting at $200 and later increasing

to $500) made by Mr. Clinton directly to Mr. Worrell. *Second*, it appears from Mr.

Clinton's testimony that payments from the American Federation of Musicians union

("AFM") for Mr. Worrell's creation of *musical arrangements* for many of the musical

works underlying the subject recordings.

### A.     Payments from Mr. Clinton

103.     It is not disputed that Mr. Clinton paid Mr. Worrell payments in the amounts

starting at $200 and later increasing to $500. Ms. Worrell testified that these payments were

for Mr. Worrell's live performances and that he would be paid whether or not he worked.

Worrell Depo at 99:11-16. Mr. Clinton corroborated her testimony.

> **Q.  Okay.  When did he first start playing on studio sessions?**
>
> **A.  '69, I guess, I think.**
>
> **Q.  When he started performing with you live in about 1968, what financial arrangements did you have with him?**
>
> **A.  As far as I can remember, I think we gave him $200 a week.  I think that's what he was getting from whoever he was playing with before. And I think that's what that was for a while.  I don't know when it changed.**

> **Q.** Was that a discussion you had -- Strike that. Do you recall Ms. Worrell testified that she had a discussion with you about $200 per week whether he was playing or not?  Do you recall that?
>
> **A.** That sounded kind of right.
>
> **Q.** And how long did you pay that $200 per week?
>
> **A.** I'm not sure how long that went, but I know it went from two to five later on.

Clinton Depo. at 6:22-25; 7:1-16.

104.   Indeed, it is industry custom and practice that band members get paid separately for their live performances, which payments are distinct from (a) remuneration expected from the authorship of sound recordings of their performances and (b) remuneration expected from joint authorship of musical works and musical arrangements. I could find no evidence in the record that these payments were ever connected with (a) Mr. Worrell's performance or production contributions to the authorship of the subject recordings or (b) with his musical works or musical arrangements.

**B.    Payments from American Federation of Musicians Union**

105.   The series of phonograph recording contracts in the form supplied by the *American Federation of Musicians* union ("AFM") are inconsequential to the question of joint authorship of the subject *sound recordings*. *See*, 10-18-24 DFM's Record contracts.pdf. [AFM000001-45]. Mr. Clinton testified that the union payments to Mr. Worrell were for the latter's work on creating *musical arrangements*, separate from the payments he received directly from Mr. Clinton.

> **Q.** So when you say arranger's credits, that's a writing credit?
>
> **A.** No, arranger's credit is different. That's when we had horns or strings. He got another check for that from the union.

Clinton Depo. 12:20-25.

106.    As noted, musical arrangements are derivative works of the underlying musical works and are only licensed for use in the sound recordings pursuant to mechanical licenses. Based on Mr. Clinton's testimony, it is my opinion that payments from the AFM were compensation for Mr. Worrell's creation of such *musical arrangements*, not for his his work on the *sound recordings*.

107.    I could find no evidence in the record that these payments were ever connected with (a) Mr. Worrell's *performance* or *production* contributions to the authorship of the subject recordings or (b) with his co-writing of any musical works. Even if the AFM agreements could cover some of Mr. Worrell's instrumental performances (noting that some of those agreements also cover Mr. Clinton's contributions) that does not mean either Mr. Clinton or Mr. Worrell could not have been joint authors of the recordings. The AFM agreements would not cover any contributions to the authorship of the sound recordings made outside the scope of the work or outside the specific time frames listed on the contract, and not otherwise. *See*, *Johnson v. Arista Holding, Inc.,* et al, 2006 WL 3511894 (S.D.N.Y. 2006). Thus, none of Mr. Worrell's pre-recording work on the sound recordings (e.g., song-selection, recording setup and supervision), co-production work or band directing, or post-recording work (e.g., editing, overdubbing, or mixing) would be covered by the musician's contract.

### VII. THE RECORD DEMONSTRATES THAT THE RELATIONSHIP BETWEEN MR. WORRELL AND FUNKADELIC AND PARLIAMENT/FUNKADELIC WAS THAT OF A MEMBER OF THE BAND, NOT AN EMPLOYMENT OR WORK FOR HIRE RELATIONSHIP

108.    As noted, it is undisputed that Mr. Worrell was a member of the *Parliament/Funkadelic* band beginning in the 1969 timeframe. Clinton Depo at 9:6-10.

And, as noted, it is undisputed that Mr. Worrell's contributions on the subject recordings were both performance authorship and production authorship. While bands may engage "sideman musicians" or "backup vocalists" for either performance on sound recordings or rendering of live performances, by music industry custom and practice, members of a band are partners in their performance undertakings, both in the recording studio and in live performances. While it is good practice for band members to enter into a formal written agreement governing the conduct of their partnership, many do not follow that practice, and the absence of a written partnership agreement is of no moment with respect to the establishment of joint ownership in musical works and sound recordings.

109.   Mr. Clinton does not recall there being **any** written agreements between him and Mr. Worrell with respect to authorship of these recordings beginning with the first recording Mr. Worrell worked on.

> **Q.   But you didn't sign any written agreement with Mr. Worrell?**
> **A.   No, I didn't.**
> **Q.   Or some entity that you controlled?**
> **A.   No.**

Clinton Depo. at 11:15-19.

110.   As noted, in the absence of an agreement, joint owners share their undivided interest in a copyright equally.

111.   Moreover, it is undisputed that there did not exist a work for hire agreement between Mr. Clinton and Mr. Worrell. Mr. Clinton not only testified that he knew what a "work for hire" agreement was, but that he had no such agreements with Mr. Worrell or any of the other performers in the band.

> **Q.   And you're familiar with the work-for-hire concept?**
> **A.   Yes.**

> **Q.   Did you have any written work-for-hire agreements with anybody by that time?**
>
> **A.   No.**

Clinton Depo. at 10:20-25.

112.     Nor does the record reflect facts that would support a claim Mr. Worrell was otherwise an "employee" of the band or of Mr. Clinton. I do not opine on which standard this Court will used to make a determination on this issue, nor do I opine on the ultimate issue as to whether Mr. Worrell had an employment relationship, but addressing this issue I am guided by the five factors used by the Second Circuit that are "highly probative of the true nature of the employment relationship" in the context of sound recording authorship. *See*, *Ulloa v. Universal Music & Video Distrib. Corp*., 303 F.Supp. 2d 409 (S.D.N.Y. 2004) (citing *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992). These factors are: (1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party.

113.     *First*, regarding control over the manner and means of creation, Mr. Clinton admitted having **ceded or shared control** over the essential aspects of Mr. Worrell's contribution in both his performance contributions (*e.g.* musical arrangements, choice of instruments, style of play, sounds produced) and his production contributions (e.g., mixing and other post-recording authorship). It is undisputed that Mr. Worrell was considered the "musical director" of the band. Indeed, Mr. Worrell's contributions to the recordings were so wide-ranging that Ms. Worrell characterized him a "**co-producer**" of the recordings. Worrell Depo. at 17:1-2.

114.    Thus, with respect to creating and being in control of the musical arrangements for the recording sessions, Mr. Clinton testified "**Bernie pretty much had that.**" Clinton Depo. at 23:3-22. With respect to Mr. Worrell's independence with respect to his instrumental performances, Mr. Clinton testified, **"The rhythm section, [Bernie] just did that off the top of his head.  He was good like that."** Clinton Depo. at 13:3-5. With regard to Mr. Worrell's post-recording "sound mixing" authorship, Mr. Clinton admitted that Mr. Worrell's work not only pertained to Mr. Worrell's "keyboard parts or other parts of the arrangements," but it "**It could be pertaining to the whole record really.**" Clinton Depo. at 109:5-24. Indeed, Mr. Clinton suggested that, with respect to post-recording work, Mr. Worrell was essentially in control of that process. **"Once I put voices on them, [Mr. Worrell] would come in and color them according to all the music that was already there. If I'm not mistaken, he majored in accompanying, so he knew how to merge everything. The basic tracks were done, he learned how to merge that together and he did it very well."** Clinton Depo. at 11:20-25; 12:1-7. There is no evidence in the record indicating whether Mr. Clinton was involved at all in how Mr. Worrell performed his instrument, in making either the musical arrangements, or in post-recording editing, overdubbing, and mixing of the recorded tracks.

115.    *Second*, with respect to the *skills required* to produce the recordings and their audience appeal Mr. Worrell brought far more than the skills typically brought to the recording sessions by studio musicians or hired sidemen. Mr. Clinton admitted that Mr. Worrell brought his **classical training** to the funk sound of the band and its recordings. Clinton Depo. at 99:17-19. Mr. Worrell's intimate familiarity with and groundbreaking use of new "Moog" synthesizer technology at that time, was a rare talent. The unique skills

that Mr. Worrell brought to the recordings weigh heavily against an employment relationship.

116.    *Third*, with respect to the provision of employee benefits, the record does not show any provision to Mr. Worrell of any employee benefits, such as health care, pensions, etc.

117.    *Fourth*, with respect to tax treatment, moneys earned by Mr. Worrell appear that of an independent contractor, not as an employee—with no known tax withholding, payment of social security taxes, etc.—from any payments made to Mr. Worrell.

118.    *Finally*, as to whether Mr. Clinton had the right to assign additional projects to Mr. Worrell, there is nothing in the record to indicate that Mr. Worrell was anything more or anything less than a **member of the band** who independently brought to the recording sessions his unique performance and production skills. As noted, by music industry custom and practice, members of a band are akin to partners in their undertakings in the studio and in touring. Mr. Clinton may have had the *privilege* to assign projects to other band members, but the correlative of that privilege was not a *duty* to perform them. Had Mr. Clinton lost his relationship with Mr. Worrell early in the band's recording endeavors, it remains to be seen whether the band's recordings would have, in words with which Mr. Clinton had no quarrel, have benefited from Mr. Worrell's **"radically charting the course of emerging keyboard technology during the golden age of analog synthesis"** as well as Mr. Worrell's "**perfect pitch and a well-honed facility with a classical canon."** Clinton Depo. at 98:16-22.

119.     Given the record, a Court or trier of fact could reasonably find these circumstances weigh heavily against a finding of an employment relationship, but rather either joint authorship or a partnership with respect to the subject recordings.

### VIII.  PUBLICATIONS AUTHORED BY EXPERT WITHIN THE PRECEDING 10 YEARS

120.     The following is a list of all publications authored by me within the preceding 10 years:

- "How Book Publishers Can Beat Amazon," *New York Times* (May 30, 2014)

- *Kohn On Music Licensing, 5th Edition* (Aspen Law & Business 2019)

- *How to Build a Friendly Robot: A Philosophical Novel* (Theoria Books, 2019)

### IX.  CASES TESTIFIED AT TRIAL OR BY DEPOSITION DURING PREVIOUS 4 YEARS

121.     The following is a list of cases I testified at trial or by deposition the previous four years:

2023     *Eight Mile Style, et. al. v. Spotify USA, Inc.,* Case No. 19-CV-00736 (M.D. Tenn.)

2022     *Hall v. Swift,* Case No. 20-cv-2146-JSC (N.D. CA.)

### X.  FACTS OR DATA CONSIDERED IN FORMING THESE OPINIONS

122.     The facts or data considered in forming these opinions include:

- Complaint
- Answer
- Briefs filed and orders in connection motions to dismiss
- All documents produced by having "bate-stamp" numbers or Exhibit numbers cited herein.
- Court decisions and portions of legal treatises cited herein.

- Portions of the depositions in taken in this case, including Mr. Clinton and Ms. Worrell, and exhibits thereto.
- Responses to discovery requests.
- *Kohn On Music Licensing*, 5th Edition (Wolters Kluwer, 2019)
- *Kohn On Music Licensing*, 4th Edition (Wolters Kluwer, 2010)
- *Kohn On Music Licensing*, 3rd Edition (Wolters Kluwer, 2002)
- *Kohn On Music Licensing*, 2nd Edition (Aspen Law & Business, 1996)
- *Kohn On Music Licensing,* 1st Edition ("The Art of Music Licensing") (Prentice Hall Law & Business, 1992)
- Other documents produced in this action, as well as and other data or information cited or referred to in the body of this report.

## XI. EXPERT WITNESS FEE

122.    My fees for services rendered as an expert witness in this case are $875.00 per hour, except that the hour rate for deposition and trial testimony is $975.00 per hour.

## XII. INTENDED TRIAL EXHIBITS AND SUPPLEMENTATION

123.    At trial, I reserve the right to use all materials considered in preparing this report, including without limitation the materials set forth in the foregoing sections. I understand that additional reports and depositions of experts and other witnesses may be conducted in this matter.  I plan on reviewing their deposition transcripts when they become available and reserve the right to supplement or amend this report after such review. Finally, I reserve the right to supplement or modify this report and the opinions expressed based upon additional facts, documents, or other materials that may be brought to my attention.

This report was executed on the date set forth below in Shelter Island, NY.

Respectfully submitted,

November 15, 2024

_____
Date

_____
Robert H. Kohn

Exhibit A

(Bob Kohn CV)

# BOB KOHN

P.O. Box 581
Shelter Island, NY 11964-0581
408-602-5646      bob@bobkohn.com

## EXPERIENCE

| | |
|---|---|
| 1992-date | AUTHOR, *Kohn On Music Licensing,* Wolters Kluwer (5th Ed. 2019) |
| 2002-date | EXPERT WITNESS IN CUSTOMS AND PRACTICES OF MUSIC INDUSTRY; PRIVATE LAW PRACTICE |
| 2000-date | LAUGH.COM, INC., Los Angeles, CA<br>Founder, Chairman & CEO<br>o   Provides digital distribution services for comedic sound recordings |
| 2005-2014 | ROYALTYSHARE, INC., San Diego, CA<br>Founder, Chairman & CEO<br>o   Provided enterprise services and technology solutions for royalty accounting to record labels, music publishers, and book publishers<br>o   Clients included Sony Music Group, Hachette Book Group, Macmillan, Welk Music Group, Ministry of Sound (U.K.), and Nettwerk (Canada) |
| 2000-2005 | BORLAND SOFTWARE CORP., Cupertino, CA<br>Vice Chairman of the Board; Chairman of the Audit, Corporate Governance, and Compensation Committees |
| 1997-2001 | EMUSIC.COM, INC., Redwood City, CA<br>Chairman & Co-founder<br>o   First legitimate MP3 music download service<br>o   Took public in 1999 (NASDAQ:EMUS). |
| 1996 - 1997 | PRETTY GOOD PRIVACY, INC., San Mateo, CA<br>Vice President, Business Development and General Counsel<br>o   PGP encryption software |
| 1987 - 1996 | BORLAND INTERNATIONAL, INC., Scotts Valley, CA<br>Senior Vice President, Corporate Affairs General Counsel, and Secretary<br>o   Developer of Sidekick, Turbo Pascal, Borland C++, Quattro Pro, Paradox, and dBASE II<br>o   Managed and won *Lotus v. Borland*, 516 U.S. 233 (1996) |
| 1985 – 1987 | CANDLE CORPORATION, Los Angeles, CA<br>Associate General Counsel<br>o   Developer of software for mainframe computers |
| 1983 -1985 | ASHTON-TATE, Culver City, CA<br>Corporate Counsel<br>o   Developer of personal computer software, including dBASE II |

| 1980 -1983 | RUDIN, RICHMAN & APPEL, Beverly Hills, CA |
|---|---|
| | Associate Attorney (1982-1983) |

- o   Entertainment industry clients, including Frank Sinatra, Liza Minnelli, Cher, Frontline Management (Irving Azoff), and Warner Bros. Music.

| 1980 - 1983 | ENTERTAINMENT LAW REPORTER, Santa Monica, CA |
|---|---|
| | Advisory Board (1983-2000); Associate Editor (1980-1983) |

**ACADEMIC BACKGROUND**

| 2016-2018 | VISITING SCHOLAR, COLUMBIA LAW SCHOOL, New York, NY |
|---|---|

| 2016 | COLUMBIA LAW SCHOOL |
|---|---|

- o   LL.M degree – May 2016
- o   James Kent Scholar (highest honors)

| 2014-date | ADMITTED, SECOND CIRCUIT FEDERAL COURT OF APPEALS |
|---|---|

| 1994 – 1996 | MONTEREY COLLEGE OF LAW, Monterey, CA |
|---|---|

- o   Adjunct Professor of Law

| 1981 | ADMITTED, CALIFORNIA BAR, December 1981 |
|---|---|

- o   Member in good standing (2024)

| 1978 -1981 | LOYOLA LAW SCHOOL, Los Angeles |
|---|---|

- o   J.D. degree - June, 1981

| 1974-1978 | CALIFORNIA STATE UNIVERSITY, NORTHRIDGE |
|---|---|
| | B.S. Degree in Business Administration; Major: Finance; Minor: Economics |

**PERSONAL**

Author, Kohn On Music Licensing, 5th Edition (Wolters Kluwer, 2019), cited in:

- o   *Eldred v. Ashcroft*, 537 U.S. 186, fn. 21 (2003) for entertainment-industry business practices concerning the assignment of copyrights;
- o   *Bridgeport Music v. Dimension Films*, 410 F.3d 792, fn. 18 (6th Cir. 2005), concerning industry customs and practices in the use of digital samples of existing sound recordings in new sound recordings;
- o   *Woods v. Bourne Co.*, 60 F.3d 978 (2d Cir. 1995) with respect to music industry practices concerning performance rights administered by ASCAP;
- o   *Boosey & Hawkes Music Publishers, Ltd. v. Buena Vista Home Video*, 145 F.3rd 481 (2d Cir. 1988), with respect to public performance rights;
- o   *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 958 F.Supp. 170 (1997), aff'd 155 F.3d 17 (2d Cir. 1998) with respect to the interpretation of the scope of mechanical licenses issued by the Harry Fox Agency.

Author, *How To Build A Friend Robot* (Theoria Books, 2019)

- o   Novelization of master's thesis to educate the general public on AI ethics issues

Author, *Mind and Brain: The Genius of Fortune*
o   winner of essay contest sponsored by the Encyclopedia Britannica and judged by
    its Editor-In-Chief, Mortimer J. Adler (Great Ideas Today 1994):

Co-inventor, *Web-based Royalty System and User Interface*, Patent No. US
8,712825 (April 29, 2014)
o   patent for a means of tracking revenues and producing royalty
    statements arising from the exploitation of musical works and sound
    recordings.

# Exhibit B

## (Partial List of Musical Works Authored or Co-Authored by Bernie Worrell)

| Album Title | Track Title | SR Copyright Reg. # | PA Copyright Reg. # | Author of Work | SR Claimant |
|---|---|---|---|---|---|
| Uncle Jam Wants You | (Not Just) Knee Deep | SR0000013919 | PA0000542731 | CLINTON GEORGE EVERETT III WYNN PHILIPPE ESCALANTE | Warner Brothers Records, Inc. |
| Motor Booty Affair | (You're A Fish And I'm A) Water Sign | SR0000005450 | PA0000019514 | CLINTON GEORGE JR GRIFFITH RICHARD L MORRISON WALTER AKA JUNIE JS THERACON SHIDER GARRY MARSHALL | Casablanca Record and FilmWorks, Inc. |
| Toys | 2 Dollars & 2 Dimes | N/A | PAu003383209 | DAVIS RAYMOND HASKINS CLARENCE EUGENE NELSON WILLIAM JR ROBERTS ROBERT | |
| America Eats Its Young | A Joyful Process | SR0000138278 | EU0000342503 | CLINTON GEORGE JR WORRELL G BERNARD JR | Westbound Records, Inc. |
| Finest | A Joyful Process | N/A | EU0000342503 | CLINTON GEORGE JR WORRELL G BERNARD JR | |
| Hardcore Jollies | Adolescent Funk | N/A | EU0000740083 | CLINTON GEORGE JR HAMPTON MICHAEL WORRELL G BERNARD JR | |
| Trombipulation | Agony Of Defeet | SR0000023140 | PA0000509877 | CLINTON DONNA LYNN DUNBAR RONALD STERLING DONNIE RAY | Casablanca Record & FilmWorks |
| Standing On The Verge Of Getting It On | Alice In My Fantasies | SR0000318918 | PA0000561616 | CLINTON GEORGE JR HAZEL GRACE COOK | Westbound Records |
| Up For The Down Stroke | All Your Goodies Are Gone | N00000019782 | Eu0000142956 | Clinton George Jr., Haskins, Clarence, Nelson William Jr. | UMG Recordings, Inc. (PWH) |
| America Eats Its Young | America Eats Its Young | SR0000138278 | EU0000482485 | BEANE HAROLD D CLINTON GEORGE JR WORRELL G BERNARD JR | Westbound Records, Inc. |
| Funk Or Walk | Amorous | SR0000004141 | PA0000508363 | CURTIS RODNEY E DUNBAR RONALD SHIDER GARRY MARSHALL | Atlantic Recording Corporation |
| Stretchin Out In Bootsy's Rubber Band | Another Point Of View | N/A | Eu0000697081 | CLINTON GEORGE JR COLLINS PHELPS JR COLLINS WILLIAM | |
| Motor Booty Affair | Aqua Boogie (A Psychoalphadiscobetabioaqu adoloop) | SR0000005450 | PA0000019515 | CLINTON GEORGE JR COLLINS WILLIAM WORRELL G BERNARD JR | Casablanca Record and FilmWorks, Inc. |
| Pleasure Principle | Are You Dreaming? | SR0000003085 | PAu000045953 | BROWN LINDA CLINTON GEORGE JR SHIDER GARRY MARSHALL | Casablanca Record and FilmWorks, Inc. |

| Bootsy? Player of the Year | As In (I Love You) | SR0000000240 | PA0000020293 | CLINTON GEORGE JR<br>COLLINS WILLIAM WORRELL G<br>BERNARD JR | Warner Brothers Records, Inc. |
|---|---|---|---|---|---|
| Let's Take It To The Stage | Atmosphere | SR0000142111 | EU0000832993;<br>PA0000640210 | CLINTON GEORGE JR<br>SHIDER GARRY MARSHALL<br>WORRELL G BERNARD JR | Westbound Records |
| Maggot Brain | Back In Our Minds | N/A | PA0001053071 | HASKINS CLARENCE EUGENE | |
| America Eats Its Young | Balance | SR0000138278 | EU0000341112 | CLINTON GEORGE JR<br>WORRELL G BERNARD JR | Westbound Records, Inc. |
| Let's Take It To The Stage | Be My Beach | SR0000142111 | EU0000832993 | CLINTON GEORGE JR<br>COLLINS WILLIAM EARL<br>WORRELL G BERNARD JR | Westbound Records |
| Let's Take It To The Stage | Better By The Pound | SR0000142111 | PA0000640209 | CLINTON GEORGE JR<br>HAZEL GRACE COOK | Westbound Records |
| Chocolate City | Big Footin' | N00000022497 | PA0000612447 | CLINTON GEORGE JR<br>EMI LONGITUDE MUSIC<br>HASKINS CLARENCE EUGENE<br>SHIDER GARRY MARSHALL | UMG Recordings, Inc. (PWH) |
| America Eats Its Young | Biological Speculation | SR0000138278 | EU0000342501 | CLINTON GEORGE JR<br>HARRIS ERNEST | Westbound Records, Inc. |
| Funk Or Walk | Birdie | SR0000004141 | PA0000508361 | CLINTON GEORGE JR<br>CURTIS RODNEY E<br>DUNBAR RONALD<br>SHIDER GARRY MARSHALL | Atlantic Recording Corporation |
| Trombipulation | Body Language | SR0000023140 | PA0000509881 | CLINTON GEORGE JR<br>JOHNSON RICHARD<br>STERLING DONNIE RAY | Casablanca Record & FilmWorks |
| This Boot Is Made For Fonk-n | Bootsy Get Live | SR0000010778 | PAu000109658 | CLINTON GEORGE JR<br>COLLINS WILLIAM<br>PARKER MACEO JR | Warner Brothers Records, Inc. |
| Bootsy? Player of the Year | Bootsy? (What's The Name Of This Town) | SR0000000240 | PA0000020294 | CLINTON GEORGE JR<br>COLLINS WILLIAM<br>PARKER MACEO JR | Warner Brothers Records, Inc. |
| Bootsy? Player of the Year | Bootzilla | SR0000000240 | PA0000020295 | CLINTON GEORGE JR<br>COLLINS WILLIAM | Warner Brothers Records, Inc. |
| Funkentelechy vs. The Placebo Syndrome | Bop Gun (Endangered Species) | SR0000002190 | PAu000013190;<br>PAu000155522 | CLINTON GEORGE JR<br>COLLINS WILLIAM<br>SHIDER GARRY MARSHALL | Casablanca Record and FilmWorks, Inc. |
| The Electric Spanking of War Babies | Brettino's Bounce | SR0000029223 | PA0000507480 | FRATANGELO LAWRENCE DAVID | Warner Brothers Records, Inc. |
| Tales of Kidd Funkadelic | Butt-To-Buttresuscitation | SR0000138490 | EU0000827381 | CLINTON GEORGE JR<br>HAZEL EDWARD EARL<br>WORRELL G BERNARD JR | Westbound Records, Inc. |

| | | | | | |
|---|---|---|---|---|---|
| Game, Dames and Guitar Thangs | California Dreamin' | N/A | EU0000918773 | Phillips, M., Phillips, J. | |
| Game, Dames and Guitar Thangs | California Dreamin' (Reprise) | N/A | EU0000918773 | Phillips, M., Phillips, J. | |
| Maggot Brain | Can You Get To That | N/A | PA0001053067 | CLINTON GEORGE JR HARRIS ERNI | |
| Cosmic Slop | Can't Stand The Strain | N/A | EU0000436126; PA0000527436 | CLINTON GEORGE JR HAZEL EDWARD EARL | |
| One Nation Under A Groove | Chant (Think It Ain't Illegal Yet!) | SR0000013099 | | CLINTON GEORGE JR WORRELL G BERNARD JR | Warner Brothers Records, Inc. |
| Live (P. Funk Earth Tour) | Children Of Production | N/A | EU0000717964; PA0000590283 | CLINTON GEORGE JR COLLINS WILLIAM WORRELL G BERNARD JR | |
| The Clones of Dr. Funkenstein | Children Of Production | N/A | EU0000717964; PA0000590283 | CLINTON GEORGE JR COLLINS WILLIAM WORRELL G BERNARD JR | |
| Chocolate City | Chocolate City | N00000022497 | PAu00073715; PA0000515042 | CLINTON GEORGE JR COLLINS WILLIAM EARL WORRELL G BERNARD JR | UMG Recordings, Inc. (PWH) |
| One Nation Under A Groove | Cholly (Funk Getting Ready To Roll!) | SR0000013099 | PAu000120084 | CLINTON GEORGE JR COLLINS WILLIAM EARL MORRISON WALTER AKA JUNIE JS THERACON | Warner Brothers Records, Inc. |
| This Boot Is Made For Fonk-n | Chug-A-Lug (The Bun Patrol) | SR0000010778 | PAu000109654 | Collins, William, Clinton G., Johnson R., Collins P. | Warner Brothers Records, Inc. |
| Hardcore Jollies | Comin' Round The Mountain | N/A | PA543073 | CLINTON GEORGE JR HAZEL GRACE COOK | |
| Pleasure Principle | Cookie Jar | SR0000003085 | EU0000850959 | HASKINS CLARENCE EUGENE | Casablanca Record and FilmWorks, Inc. |
| Cosmic Slop | Cosmic Slop | N/A | EU0000436131; PA0000527433 | CLINTON GEORGE JR WORRELL G BERNARD JR | |
| Finest | Cosmic Slop | N/A | EU0000436131; PA0000527433 | CLINTON GEORGE JR WORRELL G BERNARD JR | |
| Toys | Cosmic Slop | N/A | EU0000436131; PA0000527433 | CLINTON GEORGE JR WORRELL G BERNARD JR | |
| Hardcore Jollies | Cosmic Slop (Live) | N/A | EU0000436131; PA0000527433 | CLINTON GEORGE JR WORRELL G BERNARD JR | |
| Trombipulation | Crush It | SR0000023140 | PA0000547781; PA0000549450 | COLLINS WILLIAM EARL SPRADLEY DAVID LEE | Casablanca Record & FilmWorks |
| Motor Booty Affair | Deep | SR0000005450 | PA0000019518 | CLINTON GEORGE JR COLLINS WILLIAM COLLINS WILLIAM EARL MORRISON WALTER AKA JUNIE JS THERACON | Casablanca Record and FilmWorks, Inc. |
| Funk Or Walk | Disco To Go | SR0000004141 | V3463D062 | CLINTON GEORGE JR COLLINS WILLIAM | Atlantic Recording Corporation |

| | | | | | |
|---|---|---|---|---|---|
| Live (P. Funk Earth Tour) | Do That Stuff | N/A | EU0000717966; PA0000590285 | CLINTON GEORGE JR SHIDER GARRY MARSHALL WORRELL G BERNARD JR | |
| The Clones of Dr. Funkenstein | Do That Stuff | N/A | EU0000717966; PA0000590285 | CLINTON GEORGE JR SHIDER GARRY MARSHALL WORRELL G BERNARD JR | |
| Live (P. Funk Earth Tour) | Dr. Funkenstein | N/A | EU0000717960; PA0000590284 | CLINTON GEORGE JR COLLINS WILLIAM WORRELL G BERNARD JR | |
| The Clones of Dr. Funkenstein | Dr. Funkenstein | N/A | EU0000717960; PA0000590284 | CLINTON GEORGE JR COLLINS WILLIAM WORRELL G BERNARD JR | |
| Live (P. Funk Earth Tour) | Dr. Funkentstein's Supergroovalisticprosifunkstication Medley | N/A | | | |
| The Electric Spanking of War Babies | Electro-Cuties | SR0000029223 | PA0000507482 | ALI JIMMY CLINTON GEORGE JR | Warner Brothers Records, Inc. |
| Free Your Mind And Your Ass Will Follow | Eulogy And Light | N/A | PA0000620729 | HARRIS ERNIE MOORE | |
| America Eats Its Young | Everybody Is Going To Make It This Time | SR0000138278 | EU0000342502 | CLINTON GEORGE JR WORRELL G BERNARD JR | Westbound Records, Inc. |
| The Clones of Dr. Funkenstein | Everything Is On The One | N/A | PA0000590287 | CLINTON GEORGE JR COLLINS WILLIAM WORRELL G BERNARD JR | |
| Live (P. Funk Earth Tour) | Fantasy Is Reality | N/A | EU0000785475; PAu000120736 | CLINTON GEORGE JR WARE LEON WORRELL G BERNARD JR | |
| Live (P. Funk Earth Tour) | Featuring, Vocals [Lead Snore] – Mike Hampton* | N/A | | | |
| Live (P. Funk Earth Tour) | Featuring, Vocals [Lead Snore] – Mike Hampton* | N/A | | | |
| Uncle Jam Wants You | Field Maneuvers | SR0000013919 | PA0000535692 | CLINTON DARRYLL L CLINTON DONNA LYNN | Warner Brothers Records, Inc. |
| Funkentelechy vs. The Placebo Syndrome | Flash Light | SR0000002190 | PAu000013194; PAu000155542 | CLINTON GEORGE JR COLLINS WILLIAM EARL WORRELL G BERNARD JR | Casablanca Record and FilmWorks, Inc. |
| Uncle Jam Wants You | Foot Soldiers (Star-Spangled Funky) | SR0000013919 | PA0000535696 | CLINTON GEORGE JR VITTI JAMES A | Warner Brothers Records, Inc. |
| Game, Dames and Guitar Thangs | Frantic Moment | N/A | V3485D541 | CLINTON GEORGE JR COLLINS WILLIAM WORRELL G BERNARD JR | |

| Uncle Jam Wants You | Freak Of The Week | SR0000013919 | PA0000535693 | BISHOP PETER CLINTON GEORGE JR MC KNIGHT DEWAYNE STEPHEN | Warner Brothers Records, Inc. |
|---|---|---|---|---|---|
| Free Your Mind And Your Ass Will Follow | Free Your Mind And Your Ass Will Follow | N/A | EU0000301832; PA0000620724 | CLINTON GEORGE JR HAZEL EDWARD EARL ROSS LUCIOUS | |
| Free Your Mind And Your Ass Will Follow | Friday Night, August 14th | N/A | PA0000620725 | CLINTON GEORGE JR HAZEL EDWARD EARL NELSON WILLIAM JR | |
| The Electric Spanking of War Babies | Funk Gets Stronger (Killer Millimeter Longer Version) | SR0000029223 | PA0000507479 | CLINTON GEORGE JR STEWART SYLVESTER | Warner Brothers Records, Inc. |
| The Electric Spanking of War Babies | Funk Gets Stronger (Part I) | SR0000029223 | PA0000507481 | CLINTON GEORGE JR STEWART SYLVESTER | Warner Brothers Records, Inc. |
| Funkentelechy vs. The Placebo Syndrome | Funkentelechy | SR0000002190 | PAu000155543; PAu000013195 | CLINTON GEORGE JR COLLINS WILLIAM EARL WORRELL G BERNARD JR | Casablanca Record and FilmWorks, Inc. |
| The Clones of Dr. Funkenstein | Funkin' For Fun | N/A | PA0000590282; PA0000612440 | CLINTON GEORGE JR GOINS GLENN LA MONTE SHIDER GARRY MARSHALL | |
| Finest | Funky Dollar Bill | N/A | EU0000268846; PA0000620726 | CLINTON GEORGE JR DAVIS RAYMOND HAZEL EDWARD EARL | |
| Free Your Mind And Your Ass Will Follow | Funky Dollar Bill | N/A | EU0000268846; PA0000620726 | CLINTON GEORGE JR DAVIS RAYMOND HAZEL EDWARD EARL | |
| Osmium | Funky Woman | N/A | EU0000164961 | MARINO FRANK | |
| The Clones of Dr. Funkenstein | Gamin' On Ya | N/A | PA0000590288; EU0000717963; PAu000155539 | CLINTON GEORGE JR COLLINS WILLIAM WORRELL G BERNARD JR | |
| Live (P. Funk Earth Tour) | Gamin' On Ya! | N/A | PA0000590288; EU0000717963; PAu000155539 | CLINTON GEORGE JR COLLINS WILLIAM WORRELL G BERNARD JR | |
| Finest | Get Off Your Ass & Jam | N/A | PA0000640213 | CLINTON GEORGE JR | |
| Let's Take It To The Stage | Get Off Your Ass And Jam | SR0000142111 | PA0000640213 | CLINTON GEORGE JR | Westbound Records |
| Live (P. Funk Earth Tour) | Get Off Your Ass And Jam | N/A | PA0000640213 | CLINTON GEORGE JR | |
| The Clones of Dr. Funkenstein | Getten' To Know You | N/A | PA0000590281; PA0000612438 | CLINTON GEORGE JR SHIDER GARRY MARSHALL | |
| Live (P. Funk Earth Tour) | Give Up The Funk (Tear The Roof Off The Sucker) | N/A | EU0000667282 | BRAILEY JEROME EUGENE CLINTON GEORGE JR COLLINS WILLIAM EARL | |
| Mothership Connection | Give Up The Funk (Tear The Roof Off The Sucker) | N/A | EU0000667282 | BRAILEY JEROME EUGENE CLINTON GEORGE JR COLLINS WILLIAM EARL | |
| Funkadelic | Good Old Music | N/A | PA0000627685 | CLINTON GEORGE JR | |

| Standing On The Verge Of Getting It On | Good Thoughts, Bad Thoughts | SR0000318918 | PA0000561621 | CLINTON GEORGE JR HAZEL GRACE COOK | Westbound Records |
|---|---|---|---|---|---|
| Let's Take It To The Stage | Good To Your Earhole | SR0000142111 | PA0000640208 | CLINTON GEORGE JR HASKINS CLARENCE EUGENE HAZEL GRACE COOK | Westbound Records |
| One Nation Under A Groove | Groovallegiance | SR0000013099 | PAu000120089 | CLINTON GEORGE JR MORRISON WALTER AKA JUNIE JS THERACON WORRELL G BERNARD JR | Warner Brothers Records, Inc. |
| Mothership Connection | Handcuffs | N00000030292 | EU0000667283 | CLINTON GEORGE JR MORRISON WALTER AKA JUNIE JS THERACON WORRELL G BERNARD JR | UMG Recordings, Inc. (PWH) |
| All The Woo In The World | Happy To Have (Happiness On Our Side) | SR0000006372 | PA0000508349 | CLINTON GEORGE JR IVY ARCHIE RAY WORRELL G BERNARD JR | Arista Records, Inc. |
| Hardcore Jollies | Hardcore Jollies | N/A | EU0000740081 | CLINTON GEORGE JR WORRELL G BERNARD JR | |
| Toys | Heart Trouble AKA You Can't Miss What You Can't Measure | N/A | EU0000438657 | BARNES SIDNEY ALEXANDER CLINTON GEORGE JR | |
| Finest | Hit It & Quit It | N/A | EU0000274895; PA0001053136; PA0001053068 | CLINTON GEORGE JR NELSON WILLIAM JR | |
| Maggot Brain | Hit It And Quit It | N/A | EU0000274895; PA0001053136; PA0001053068 | CLINTON GEORGE JR NELSON WILLIAM JR | |
| All The Woo In The World | Hold On | SR0000006372 | PA0000508347 | CLINTON GEORGE JR WORRELL G BERNARD JR | Arista Records, Inc. |
| Uncle Jam Wants You | Holly Wants To Go To California | SR0000013919 | PA0000535694 | CLINTON GEORGE JR WORRELL G BERNARD JR | Warner Brothers Records, Inc. |
| Bootsy? Player of the Year | Hollywood Squares | SR0000000240 | PA0000020296 | CLINTON GEORGE JR COLLINS WILLIAM WADDY FRANK CLIFFORD | Warner Brothers Records, Inc. |
| Tales of Kidd Funkadelic | How Do Yeaw View You? | SR0000138490 | EU0000791507 | CLINTON GEORGE JR COLLINS WILLIAM EARL WORRELL G BERNARD JR | Westbound Records, Inc. |
| Funkadelic | I Bet You | N/A | PA0000627689 | T. Clinton, P. Lindsey, S. Barnes | |
| Osmium | I Call My Baby Pussycat | N/A | EU0000147701 | CLINTON GEORGE JR HAZEL EDWARD -SM US ONLY NELSON WILLIAM JR | |

| Up For The Down Stroke | I Can Move You (If You Let Me) | N00000019782 | PA0000612428 | CLINTON GEORGE JR<br>COLLINS WILLIAM EARL<br>MOSSON CARDELL JR<br>WORRELL G BERNARD JR | UMG Recordings, Inc. (PWH) |
| Finest | I Got A Thing, You Got A Thing, Everybody Got A Thing | N/A | PA0000627684 | HASKINS CLARENCE EUGENE | |
| Funkadelic | I Got A Thing, You Got A Thing, Everybody's Got A Thing | N/A | PA0000627684 | HASKINS CLARENCE EUGENE | |
| Up For The Down Stroke | I Just Got Back (From The Fantasy: Ahead Of Our Time In The Four Lands Of Ellet) | N00000019782 | PA0000612429 | CLINTON GEORGE JR<br>COLLINS WILLIAM EARL<br>HAZEL EDWARD<br>MOSSON CARDELL JR<br>WORRELL G BERNARD JR | UMG Recordings, Inc. (PWH) |
| Chocolate City | I Misjudged You | N00000022497 | EU0000807256 | CLINTON GEORGE JR<br>HARRIS ERNEST<br>HASKINS CLARENCE | UMG Recordings, Inc. (PWH) |
| Let's Take It To The Stage | I Owe You Something Good | SR0000142111 | PA557896 | CLINTON GEORGE JR | Westbound Records |
| Finest | I Wanna Know If It's Good To You | N/A | EU0000239099;<br>PA0000620727 | CLINTON GEORGE JR<br>HASKINS CLARENCE EUGENE<br>HAZEL EDWARD<br>NELSON WILLIAM JR | |
| Free Your Mind And Your Ass Will Follow | I Wanna Know If It's Good To You | N/A | EU0000239099;<br>PA0000620727 | CLINTON GEORGE JR<br>HASKINS CLARENCE EUGENE<br>HAZEL EDWARD<br>NELSON WILLIAM JR | |
| Game, Dames and Guitar Thangs | I Want You (She's So Heavy) | N/A | EU0000147720 | Lennon John, McCartney Paul | |
| Stretchin Out In Bootsy's Rubber Band | I'd Rather Be With You | N/A | Eu0000697079 | CLINTON GEORGE JR.<br>COLLINS WILLIAM<br>COOPER GARY | |
| All The Woo In The World | I'll Be With You | SR0000006372 | PA0000508346 | LAMPKIN TYRONE<br>MORRISON WALTER AKA JUNIE<br>JS THERACON<br>WORRELL G BERNARD JR | Arista Records, Inc. |
| Finest | I'll Bet You | N/A | EP0000264117 | Barnes Sidney<br>CLINTON GEORGE JR<br>Lindsey Theresa | |
| Standing On The Verge Of Getting It On | I'll Stay | SR0000318918 | PA0000561617 | CLINTON GEORGE JR<br>HAZEL GRACE COOK | Westbound Records |
| Tales of Kidd Funkadelic | I'm Never Gonna Tell It | SR0000138490 | EU0000791500 | CLINTON GEORGE JR<br>WORRELL G BERNARD JR | Westbound Records, Inc. |

| The Clones of Dr. Funkenstein | I've Been Watching You (Move Your Sexy Body) | N/A | PA0000612439; PA0000590280 | CLINTON GEORGE JR GOINS GLENN LA MONTE SHIDER GARRY MARSHALL | |
|---|---|---|---|---|---|
| The Electric Spanking of War Babies | Icka Prick | SR0000029223 | PA0000507483 | CLINTON GEORGE JR SHIDER GARRY MARSHALL | Warner Brothers Records, Inc. |
| Chocolate City | If It Don't Fit (Don't Force It) | N00000022497 | PA0000612446 | CLINTON GEORGE JR COLLINS WILLIAM EARL WORRELL G BERNARD JR | UMG Recordings, Inc. (PWH) |
| America Eats Its Young | If You Don't Like The Effects, Don't Produce The Cause | SR0000138278 | EU0000434873 | CLINTON GEORGE JR SHIDER GARRY MARSHALL | Westbound Records, Inc. |
| Hardcore Jollies | If You Got Funk, You Got Style | N/A | EU0000740084 | CLINTON GEORGE JR COLLINS WILLIAM EARL WORRELL G BERNARD JR | |
| All The Woo In The World | Insurance Man For The Funk | SR0000006372 | PA0000508350 | CLINTON GEORGE JR COLLINS WILLIAM EARL WORRELL G BERNARD JR | Arista Records, Inc. |
| One Nation Under A Groove | Into You | SR0000013099 | PAu000120088 | CLINTON GEORGE JR COLLINS WILLIAM EARL MORRISON WALTER AKA JUNIE JS THERACON | Warner Brothers Records, Inc. |
| This Boot Is Made For Fonk-n | Jam Fan (Hot) | SR0000010778 | PAu000109655 | CLINTON GEORGE JR COLLINS PHELPS CATFISH COLLINS WILLIAM | Warner Brothers Records, Inc. |
| Standing On The Verge Of Getting It On | Jimmy's Got A Little Bit Of Bitch In Him | SR0000318918 | PA0000561620 | CLINTON GEORGE JR HAZEL GRACE COOK | Westbound Records |
| Funk Or Walk | Just Like You | SR0000004141 | PA0000508364 | CLINTON GEORGE JR SHIDER GARRY MARSHALL | Atlantic Recording Corporation |
| Let's Take It To The Stage | Lead Guitar [Uncredited] – Paul Warren | N/A | | | |
| Let's Take It To The Stage | Lead Guitar [Uncredited] – Paul Warren | N/A | | | |
| Live (P. Funk Earth Tour) | Lead Vocals – Glen Goins | N/A | | | |
| Live (P. Funk Earth Tour) | Lead Vocals – Glen Goins | N/A | | | |
| Chocolate City | Let Me Be | N00000022497 | PA0000612445 | CLINTON GEORGE JR LEWIS VIVIAN | UMG Recordings, Inc. (PWH) |
| Cosmic Slop | Let's Make It Last | N/A | PA0001050781 | CLINTON GEORGE JR HAZEL EDWARD EARL | |
| Trombipulation | Let's Play House | SR0000023140 | PA0000509879 | CLINTON LUSHAWN COLLINS WILLIAM MORRISON WALTER AKA JUNIE JS THERACON | Casablanca Record & FilmWorks |
| Tales of Kidd Funkadelic | Let's Take It To The People | SR0000138490 | EU0000791505 | CLINTON GEORGE JR HAZEL EDWARD EARL SHIDER GARRY MARSHALL | Westbound Records, Inc. |

| | | | | | |
|---|---|---|---|---|---|
| Finest | Let's Take It To The Stage | SR0000142111 | PA0000640212; PA0001068281 | CLINTON GEORGE JR COLLINS WILLIAM EARL SHIDER GARRY MARSHALL | Westbound Records |
| Let's Take It To The Stage | Let's Take It To The Stage | SR0000142111 | PA0000640212; PA0001068281 | CLINTON GEORGE JR COLLINS WILLIAM EARL SHIDER GARRY MARSHALL | Westbound Records |
| Live (P. Funk Earth Tour) | Let's Take It To The Stage | SR0000142111 | PA0000640212; PA0001068281 | CLINTON GEORGE JR COLLINS WILLIAM EARL SHIDER GARRY MARSHALL | Westbound Records |
| Motor Booty Affair | Liquid Sunshine | SR0000005450 | PA0000019519 | BISHOP PETER BROWN LINDA CLINTON GEORGE JR VITTI JAMES A | Casablanca Record and FilmWorks, Inc. |
| Osmium | Little Ole Country Boy | N/A | | | |
| Osmium | Livin' The Life | N/A | V3485D541 | WORRELL G BERNARD JR | |
| Trombipulation | Long Way Around | SR0000023140 | PA0000549452 | BISHOP BARBARELLA FORD RONALD JOHNSON ROBERT LEE WORRELL G BERNARD JR | Casablanca Record & FilmWorks |
| America Eats Its Young | Loose Booty | SR0000138278 | EU0000404429 | BEANE HAROLD D CLINTON GEORGE JR | Westbound Records, Inc. |
| Finest | Loose Booty | N/A | EU0000404429 | BEANE HAROLD D CLINTON GEORGE JR | |
| Pleasure Principle | Love Amnesia | SR0000003085 | PAu000045952 | CLINTON GEORGE JR DUNBAR RONALD NELSON WILLIAM JR | Casablanca Record and FilmWorks, Inc. |
| Stretchin Out In Bootsy's Rubber Band | Love Vibes | N/A | V2810P112 | Leslyn Bailey, William Collins | |
| One Nation Under A Groove | Lunchmeataphobia (Think! It Ain't Illegal Yet!) | SR0000013099 | PA0000659861 | CLINTON GEORGE JR WORRELL G BERNARD JR | Warner Brothers Records, Inc. |
| Maggot Brain | Maggot Brain | N/A | EU0000274892; PA0001053066 | CLINTON GEORGE JR HAZEL EDWARD EARL | |
| One Nation Under A Groove | Maggot Brain | SR0000013099 | EU0000274892; PA0001053066 | CLINTON GEORGE JR HAZEL EDWARD EARL | Warner Brothers Records, Inc. |
| Finest | Maggot Brain (Live) | N/A | EU0000274892; PA0001053066 | CLINTON GEORGE JR HAZEL EDWARD EARL | |
| Toys | Magnifikunk | N/A | PAu003383209 | DAVIS RAYMOND HASKINS CLARENCE EUGENE NELSON WILLIAM JR ROBERTS ROBERT | |
| Cosmic Slop | March To The Witch's Castle | N/A | PA0001050780 | CLINTON GEORGE JR | |
| Bootsy? Player of the Year | May The Force Be With You | SR0000000240 | PA0000020297 | CLINTON GEORGE JR COLLINS WILLIAM COOPER GARY LEE | Warner Brothers Records, Inc. |

| | | | | | |
|---|---|---|---|---|---|
| America Eats Its Young | Miss Lucifer's Love | SR0000138278 | EU0000341107 | CLINTON GEORGE JR<br>HASKINS CLARENCE EUGENE | Westbound Records, Inc. |
| Pleasure Principle | Misunderstanding | SR0000003085 | PA0000511314 | CLINTON GEORGE JR<br>FORD RONALD<br>WORRELL G BERNARD JR | Casablanca Record and FilmWorks, Inc. |
| Funkadelic | Mommy, What's A Funkadelic? | N/A | EU0000232642;<br>PA0000627688 | CLINTON GEORGE JR | |
| Osmium | Moonshine Heather | N/A | EU0000164962 | CLINTON GEORGE JR<br>COLLINS WILLIAM EARL<br>WORRELL G BERNARD JR | |
| Live (P. Funk Earth Tour) | Mothership Connection (Star Child) | N/A | EU0000667284 | CLINTON GEORGE JR<br>COLLINS WILLIAM EARL<br>WORRELL G BERNARD JR | |
| Mothership Connection | Mothership Connection (Star Child) | N00000030292 | EU0000667284 | CLINTON GEORGE JR<br>COLLINS WILLIAM EARL<br>WORRELL G BERNARD JR | UMG Recordings, Inc. (PWH) |
| Pleasure Principle | Mr. Melody Man | SR0000003085 | PAu000045950 | COOPER GARY LEE<br>DUNBAR RONALD | Casablanca Record and FilmWorks, Inc. |
| Motor Booty Affair | Mr. Wiggles | SR0000005450 | PA0000019512 | CLINTON GEORGE JR<br>HAMPTON MICHAEL<br>WORRELL G BERNARD JR | Casablanca Record and FilmWorks, Inc. |
| All The Woo In The World | Much Thrust | SR0000006372 | PA0000508348 | CLINTON GEORGE JR<br>VITTI JAMES A<br>WORRELL G BERNARD JR | Arista Records, Inc. |
| Funkadelic | Music For My Mother | N/A | PA0000627683 | CLINTON GEORGE JR<br>HAZEL EDWARD EARL<br>NELSON WILLIAM JR | |
| Osmium | My Automobile | N/A | EU0000164960 | Clarence Haskins & George Clinton | |
| Funk Or Walk | Nappy | SR0000004141 | PA0000508360 | CLINTON GEORGE JR<br>SHIDER GARRY MARSHALL<br>VITTI JAMES A<br>WORRELL G BERNARD JR | Atlantic Recording Corporation |
| Cosmic Slop | Nappy Dugout | N/A | PA0000527432 | CLINTON GEORGE JR<br>MOSSON CARDELL JR<br>SHIDER GARRY MARSHALL | |
| Trombipulation | New Doo Review | SR0000023140 | PA0000509878 | CURRY LIGE GRANT<br>FORD RONALD<br>GREEN SAM<br>JOHNSON ROBERT LEE<br>SHIDER GARRY MARSHALL | Casablanca Record & FilmWorks |
| Live (P. Funk Earth Tour) | Night Of The Thumpasorus People | N/A | EU0000683347 | CLINTON GEORGE JR<br>COLLINS WILLIAM EARL<br>SHIDER GARRY MARSHALL | |

| Mothership Connection | Night Of The Thumpasorus Peoples | N00000030292 | EU0000683347 | CLINTON GEORGE JR COLLINS WILLIAM EARL SHIDER GARRY MARSHALL | UMG Recordings, Inc. (PWH) |
|---|---|---|---|---|---|
| Cosmic Slop | No Compute | N/A | PA0000527434 | CLINTON GEORGE JR SHIDER GARRY MARSHALL | |
| Let's Take It To The Stage | No Head, No Backstage Pass | SR0000142111 | EU0000827382 | BYKOWSKI RON CLINTON GEORGE JR | Westbound Records |
| Osmium | Nothing Before Me But Thang | N/A | EU0000147700 | HARRIS EDDIE HAZEL EDWARD WORRELL G BERNARD JR | |
| This Boot Is Made For Fonk-n | Oh Boy Gorl | SR0000010778 | PAu000109657 | William Collins, George Clinton, Gary Cooper & Ron Dunbar | Warner Brothers Records, Inc. |
| Osmium | Oh Lord, Why Lord / Prayer | N/A | EFO000133551 | Theophilus Trim a.k.a Phil Trim | |
| The Electric Spanking of War Babies | Oh, I | SR0000029223 | PA0000507477 | CLINTON GEORGE JR CURTIS RODNEY E SHIDER GARRY MARSHALL | Warner Brothers Records, Inc. |
| One Nation Under A Groove | One Nation Under A Groove | SR0000013099 | PA0000019672; PAu000120086 | CLINTON GEORGE JR MORRISON WALTER AKA JUNIE JS THERACON SHIDER GARRY MARSHALL | Warner Brothers Records, Inc. |
| Motor Booty Affair | One Of Those Funky Things | SR0000005450 | PA0000019516 | BANKS RONALD CLINTON GEORGE JR GREEN EDWARD ANTHONY | Casablanca Record and FilmWorks, Inc. |
| Live (P. Funk Earth Tour) | P-Funk (Wants To Get Funked Up) | N/A | EU0000667281 | CLINTON GEORGE JR COLLINS WILLIAM EARL WORRELL G BERNARD JR | |
| Mothership Connection | P. Funk (Wants To Get Funked Up) | N00000030292 | EU0000667281 | CLINTON GEORGE JR COLLINS WILLIAM EARL WORRELL G BERNARD JR | UMG Recordings, Inc. (PWH) |
| One Nation Under A Groove | P.E. Squad / Doo Doo Chasers | SR0000013099 | PAu000120087 | BROWN LINDA CLINTON GEORGE JR SHIDER GARRY MARSHALL | Warner Brothers Records, Inc. |
| Trombipulation | Peek-A-Groove | SR0000023140 | PA0000509880 | ALI JIMMY CLINTON DARRYLL L FORD RONALD JOHNSON ROBERT LEE | Casablanca Record & FilmWorks |
| America Eats Its Young | Philmore | SR0000138278 | EU0000341106 | COLLINS WILLIAM EARL | Westbound Records, Inc. |

| Game, Dames and Guitar Thangs | Physical Love | N/A | Eu0000697077 | CLINTON GEORGE JR COLLINS WILLIAM COOPER GARY LEE SHIDER GARRY MARSHALL | |
| Stretchin Out In Bootsy's Rubber Band | Physical Love | N/A | Eu0000697077 | CLINTON GEORGE JR COLLINS WILLIAM COOPER GARY LEE  SHIDER GARRY MARSHALL | |
| Funkentelechy vs. The Placebo Syndrome | Placebo Syndrome | SR0000002190 | PAu000013192 | CLINTON GEORGE JR NELSON WILLIAM JR | Casablanca Record and FilmWorks, Inc. |
| Pleasure Principle | Pleasure Principle | SR0000003085 | PAu000045951 | CLINTON GEORGE JR FORD RONALD WORRELL G BERNARD JR | Casablanca Record and FilmWorks, Inc. |
| The Clones of Dr. Funkenstein | Prelude | N/A | PA0000590286; PA0000612437 | CLINTON GEORGE JR WORRELL G BERNARD JR | |
| Up For The Down Stroke | Presence Of A Brain | N00000019782 | PA0000612430 | CLINTON GEORGE JR SHIDER GARRY MARSHALL SIMON CALVIN EUGENE | UMG Recordings, Inc. (PWH) |
| One Nation Under A Groove | Promentalshitbackwashpsychosis Enema Squad (The Doo Doo Chasers) | SR0000013099 | PAu000120087 | BROWN LINDA CLINTON GEORGE SHIDER GARRY MARSHALL | Warner Brothers Records, Inc. |
| Stretchin Out In Bootsy's Rubber Band | Psychoticbumpschool | N/A | Eu0000697080 | CLINTON GEORGE JR COLLINS PHELPS JR COLLINS WILLIAM WORRELL G BERNARD JR | |
| America Eats Its Young | Pussy | SR0000138278 | | CLINTON GEORGE JR HAZEL EDWARD EARL NELSON WILLIAM JR | Westbound Records, Inc. |
| Osmium | Put Love In Your Life | N/A | EU0000164964 | George Clinton & Vivian Lewis | |
| Funkadelic | Qualify & Satisfy | N/A | PA0000627686 | CLINTON GEORGE JR HAZEL EDWARD EARL | |
| Finest | Red Hot Mama | N/A | EU0000248255 | George Clinton Jr, Bernard G Worrell Jr, Edward E Hazel | |
| Standing On The Verge Of Getting It On | Red Hot Mama | SR0000318918 | EU0000248255 | George Clinton Jr, Bernard G Worrell Jr, Edward E Hazel | Westbound Records |
| This Boot Is Made For Fonk-n | Reprise (Get Live) | SR0000010778 | PAu000109658 | William Collins, George Clinton & Maceo Parker | Warner Brothers Records, Inc. |
| All The Woo In The World | Reprise: Much Thrust | SR0000006372 | PA0000508348 | Bernard G. Worrell, George Clinton | Arista Records, Inc. |

| Chocolate City | Ride On | N00000022497 | PA0000612441 | CLINTON GEORGE JR<br>COLLINS WILLIAM DREW<br>WORRELL G BERNARD JR | UMG Recordings, Inc. (PWH) |
|---|---|---|---|---|---|
| Bootsy? Player of the Year | Roto-Rooter | SR0000000240 | PA0000020298 | CLINTON GEORGE JR<br>COLLINS PHELPS CATFISH<br>COLLINS WILLIAM | Warner Brothers Records, Inc. |
| Motor Booty Affair | Rumpofsteelskin | SR0000005450 | PA0000019513 | CLINTON GEORGE JR<br>COLLINS WILLIAM | Casablanca Record and FilmWorks, Inc. |
| Standing On The Verge Of Getting It On | Sexy Ways | SR0000318918 | PA0000561618 | CLINTON GEORGE JR<br>HAZEL GRACE COOK | Westbound Records |
| The Electric Spanking of War Babies | She Loves You | SR0000029223 | EFO000094632 | John Lennon & Paul McCartney | Warner Brothers Records, Inc. |
| This Boot Is Made For Fonk-n | Shejam (Almost Bootsy Show) | SR0000010778 | V2810P127 | CLINTON GEORGE JR<br>COLLINS WILLIAM<br>Dunbar Ronald | Warner Brothers Records, Inc. |
| The Electric Spanking of War Babies | Shockwaves | SR0000029223 | PA0000507476 | DUNBAR RONALD<br>MC KNIGHT DEWAYNE STEPHEN | Warner Brothers Records, Inc. |
| Chocolate City | Side Effects | N00000022497 | PA0000612443 | CLINTON GEORGE JR<br>COLLINS WILLIAM EARL<br>HILSON ANNEVA LOUISE | UMG Recordings, Inc. (PWH) |
| Funkentelechy vs. The Placebo Syndrome | Sir Nose D'Voidoffunk (Pay Attention - B3M) | SR0000002190 | PAu000155523;<br>PAu000013193 | CLINTON GEORGE JR<br>COLLINS WILLIAM<br>WORRELL G BERNARD JR | Casablanca Record and FilmWorks, Inc. |
| Toys | Slide On In (2nd Tune Olympic) | N/A | PAu003383209 | DAVIS RAYMOND<br>HASKINS CLARENCE EUGENE<br>NELSON WILLIAM JR<br>ROBERTS ROBERT | |
| Hardcore Jollies | Smokey | N/A | EU0000740085 | CLINTON GEORGE JR<br>SHIDER GARRY MARSHALL | |
| Game, Dames and Guitar Thangs | So Goes The Story | N/A | V3485D541 | CLINTON GEORGE JR<br>COLLINS WILLIAM<br>WORRELL G BERNARD JR | |
| Free Your Mind And Your Ass Will Follow | Some More | N/A | PA0000620728 | CLINTON GEORGE JR<br>HARRIS ERNI | |
| Hardcore Jollies | Soul Mate | N/A | EU0000740082 | CLINTON GEORGE JR<br>HAZEL GRACE COOK | |
| Finest | Standing On The Verge Of Getting It On | N/A | EU0000562238;<br>PA0000561619 | CLINTON GEORGE JR<br>HAZEL GRACE COOK | |
| Standing On The Verge Of Getting It On | Standing On The Verge Of Getting It On | SR0000318918 | EU0000562238;<br>PA0000561619 | CLINTON GEORGE JR<br>HAZEL GRACE COOK | Westbound Records |

| Toys | Stink Finger | N/A | PAu003383209 | DAVIS RAYMOND HASKINS CLARENCE EUGENE NELSON WILLIAM JR ROBERTS ROBERT | |
| Stretchin Out In Bootsy's Rubber Band | Stretchin' Out (In A Rubber Band) | N/A | V2810P132 | William Collins | |
| Let's Take It To The Stage | Stuffs & Things | SR0000142111 | EU0000791502 | CLINTON GEORGE JR HAZEL GRACE COOK | Westbound Records |
| Maggot Brain | Super Stupid | N/A | PA0001053070 | CLINTON GEORGE JR HAZEL EDWARD EARL NELSON WILLIAM JR ROSS LUCIOUS | |
| Mothership Connection | Supergroovalisticprosifunkstication | N00000030292 | EU0000683346 | CLINTON GEORGE JR COLLINS WILLIAM EARL SHIDER GARRY MARSHALL WORRELL G BERNARD JR | UMG Recordings, Inc. (PWH) |
| Live (P. Funk Earth Tour) | Swing Down, Sweet Chariot | N/A | EU0000785474; PAu000155540 | CLINTON GEORGE JR COLLINS WILLIAM WORRELL G BERNARD JR | |
| Live (P. Funk Earth Tour) | Take Your Dead Ass Home (Say Sam'n Nasty) | N/A | EU0000791501 | CLINTON GEORGE JR GOINS GLENN LA MONTE SHIDER GARRY MARSHALL WORRELL G BERNARD JR | |
| Tales of Kidd Funkadelic | Take Your Dead Ass Home! (Say Som'n Nasty) | SR0000138490 | EU0000791501 | CLINTON GEORGE JR GOINS GLENN LA MONTE SHIDER GARRY MARSHALL WORRELL G BERNARD JR | Westbound Records, Inc. |
| Tales of Kidd Funkadelic | Tales Of Kidd Funkadelic (Opusdelite Years) | SR0000138490 | EU0000827383 | CLINTON GEORGE JR WORRELL G BERNARD JR | Westbound Records, Inc. |
| Toys | Talk About Jesus | N/A | EU0000232646 | WORRELL G BERNARD JR | |
| Live (P. Funk Earth Tour) | Tear The Roof Off The Sucker Medley | N/A | | | |
| Up For The Down Stroke | Testify | N00000019782 | | | UMG Recordings, Inc. (PWH) |
| America Eats Its Young | That Was My Girl | SR0000138278 | EU0000342500 | BARNES SIDNEY ALEXANDER CLINTON GEORGE JR | Westbound Records, Inc. |
| The Electric Spanking of War Babies | The Electric Spanking Of War Babies | SR0000029223 | PA0000507478 | BISHOP BARBARELLA CLINTON GEORGE JR MORRISON WALTER AKA JUNIE JS THERACON | Warner Brothers Records, Inc. |
| Up For The Down Stroke | The Goose | N00000019782 | PA0000612427 | CLINTON GEORGE JR HAZEL EDWARD EARL | UMG Recordings, Inc. (PWH) |
| Toys | The Goose That Laid The Golden Egg | N/A | V3498D007 | CLINTON GEORGE JR HARRIS ERNEST HAZEL EDWARD EARL | |

| | | | | | |
|---|---|---|---|---|---|
| Live (P. Funk Earth Tour) | The Landing (Of The Holy Mothership) | N/A | PA0000612460 | CLINTON GEORGE JR | |
| Motor Booty Affair | The Motor-Booty Affair | SR0000005450 | PA0000019517 | CLINTON GEORGE JR<br>FORD RONALD<br>MORRISON WALTER AKA JUNIE<br>JS THERACON<br>SHIDER GARRY MARSHALL | Casablanca Record and FilmWorks, Inc. |
| Osmium | The Silent Boatman | N/A | EU0000184374 | Ruth Copeland | |
| Let's Take It To The Stage | The Song Is Familiar | SR0000142111 | EU0000832999 | CLINTON GEORGE JR<br>COLLINS WILLIAM EARL<br>WORRELL G BERNARD JR | Westbound Records |
| Live (P. Funk Earth Tour) | The Undisco Kid (This Girl Is Bad!) | N/A | PA0000606551 | CLINTON GEORGE JR<br>COLLINS WILLIAM EARL<br>WORRELL G BERNARD JR | |
| Cosmic Slop | This Broken Heart | N/A | EU0000558991 | William Franklin | |
| Live (P. Funk Earth Tour) | This Is The Way We Funk With You | N/A | EU0000785476 | CLINTON GEORGE JR<br>GOINS GLENN LA MONTE<br>HAZEL EDWARD EARL<br>WORRELL G BERNARD JR | |
| Chocolate City | Together | N00000022497 | PA0000606502;<br>PA0000612442 | CLINTON GEORGE JR<br>COLLINS WILLIAM EARL<br>WORRELL G BERNARD JR | UMG Recordings, Inc. (PWH) |
| Cosmic Slop | Trash-A-Go-Go | N/A | PA0001050782 | CLINTON GEORGE JR | |
| Trombipulation | Trombipulation | SR0000023140 | PA0000549451;<br>PA0000547782 | CLINTON GEORGE JR<br>COLLINS WILLIAM EARL | Casablanca Record & FilmWorks |
| Uncle Jam Wants You | Uncle Jam | SR0000013919 | EU0000292133 | CLINTON GEORGE JR<br>COLLINS WILLIAM DREW<br>SHIDER GARRY MARSHALL<br>WORRELL G BERNARD JR<br>WYNN PHILIPPE ESCALANTE | Warner Brothers Records, Inc. |
| This Boot Is Made For Fonk-n | Under The Influence Of A Groove | SR0000010778 | PAu000109656 | CLINTON GEORGE JR<br>COLLINS WILLIAM<br>PARKER MACEO JR | Warner Brothers Records, Inc. |
| Finest | Undisco Kidd | N/A | PA0000606551 | CLINTON GEORGE JR<br>COLLINS WILLIAM EARL<br>WORRELL G BERNARD JR | |
| Tales of Kidd Funkadelic | Undisco Kidd | SR0000138490 | PA0000606551 | CLINTON GEORGE JR<br>COLLINS WILLIAM EARL<br>WORRELL G BERNARD JR | Westbound Records, Inc. |
| Mothership Connection | Unfunky UFO | N00000030292 | EU0000667285 | CLINTON GEORGE JR<br>COLLINS WILLIAM EARL<br>SHIDER GARRY MARSHALL | UMG Recordings, Inc. (PWH) |

| Up For The Down Stroke | Up For The Down Stroke | N00000019782 | EU0000495416; PA0000612426 | CLINTON GEORGE JR COLLINS WILLIAM EARL HASKINS CLARENCE EUGENE WORRELL G BERNARD JR | UMG Recordings, Inc. (PWH) |
|---|---|---|---|---|---|
| Toys | Vampy Funky Bernie (3rd Tune Olympic) | N/A | PAu003383209 | DAVIS RAYMOND HASKINS CLARENCE EUGENE NELSON WILLIAM JR ROBERTS ROBERT | |
| Stretchin Out In Bootsy's Rubber Band | Vanish In Our Sleep | N/A | Eu0000697082 | CLINTON GEORGE JR COLLINS WILLIAM | |
| Bootsy? Player of the Year | Very Yes | SR0000000240 | PA0000020299 | CLINTON GEORGE JR COLLINS WILLIAM COOPER GARY LEE | Warner Brothers Records, Inc. |
| America Eats Its Young | Wake Up | SR0000138278 | EU0000434869 | BEANE HAROLD D CLINTON GEORGE JR JACKSON JAMES W WORRELL G BERNARD JR | Westbound Records, Inc. |
| Funk Or Walk | War Ship Touchante | SR0000004141 | PA0000508362 | CLINTON GEORGE JR IVY ARCHIE RAY WORRELL G BERNARD JR | Atlantic Recording Corporation |
| Maggot Brain | Wars Of Armageddon | N/A | EU0000301833; PA0001053072 | CLINTON GEORGE JR FULWOOD RAMON TIKI ROSS LUCIOUS WORRELL G BERNARD JR | |
| Toys | Wars Of Armageddon (Karaoke Version) | N/A | EU0000301833; PA0001053072 | CLINTON GEORGE JR FULWOOD RAMON TIKI ROSS LUCIOUS WORRELL G BERNARD JR | |
| America Eats Its Young | We Hurt Too | SR0000138278 | EU0000341111 | CLINTON GEORGE JR | Westbound Records, Inc. |
| Game, Dames and Guitar Thangs | What About It? | N/A | V3498D007 | CLINTON GEORGE JR HAZEL EDWARD EARL | |
| Chocolate City | What Comes Funky | N00000022497 | PA0000612444 | CLINTON GEORGE JR COLLINS WILLIAM EARL WORRELL G BERNARD JR | UMG Recordings, Inc. (PWH) |
| Funkadelic | What Is Soul | N/A | PA0000627687 | CLINTON GEORGE JR HAZEL EDWARD EARL NELSON WILLIAM JR | |
| Up For The Down Stroke | Whatever Makes Baby Feel Good | N00000019782 | PA0000515086 | CLINTON GEORGE JR HAZEL EDWARD EARL NELSON BILLY | UMG Recordings, Inc. (PWH) |
| Funk Or Walk | When You're Gone | SR0000004141 | PA0000508365 | COOPER GARY LEE DUNBAR RONALD | Atlantic Recording Corporation |

| One Nation Under A Groove | Who Says A Funk Band Can't Play Rock?! | SR0000013099 | PA0000535695 | CLINTON GEORGE JR HAMPTON MICHAEL MORRISON WALTER AKA JUNIE JS THERACON | Warner Brothers Records, Inc. |
|---|---|---|---|---|---|
| Hit It And Quit It B Side | Whole Lot Of BS | N/A | PA0000557900 | CLINTON GEORGE JR WORRELL G BERNARD JR | |
| Funkentelechy vs. The Placebo Syndrome | Wizard Of Finance | SR0000002190 | PAu000013191 | CLINTON GEORGE JR FORD RONALD GOINS GLENN LA MONTE | Casablanca Record and FilmWorks, Inc. |
| All The Woo In The World | Woo Together | SR0000006372 | PA0000508345 | CLINTON GEORGE JR CURTIS RODNEY E MORRISON WALTER AKA JUNIE JS THERACON SHIDER GARRY MARSHALL | Arista Records, Inc. |
| Finest | You & Your Folks, Me & My Folks | N/A | EU0000301826; PA0001053069 | CLINTON GEORGE JR HASKINS CLARENCE EUGENE NELSON WILLIAM JR WORRELL G BERNARD JR | |
| Maggot Brain | You And Your Folks, Me And My Folks | N/A | EU0000301826; PA0001053069 | CLINTON GEORGE JR HASKINS CLARENCE EUGENE NELSON WILLIAM JR WORRELL G BERNARD JR | |
| Cosmic Slop | You Can't Miss What You Can't Measure | N/A | PA0001050779 | BARNES SIDNEY ALEXANDER CLINTON GEORGE JR | |
| Finest | You Can't Miss What You Can't Measure | N/A | PA0001050779 | BARNES SIDNEY ALEXANDER CLINTON GEORGE JR | |
| America Eats Its Young | You Hit The Nail On The Head | SR0000138278 | EU0000434870 | CLINTON GEORGE JR HASKINS CLARENCE EUGENE WORRELL G BERNARD JR | Westbound Records, Inc. |
| Hardcore Jollies | You Scared The Lovin' Outta Me | N/A | V3485D541 | CLINTON GEORGE JR GOINS GLENN LA MONTE | |

| SR Claimant | Assumed Current/Parent Entity | Source of info | Notes |
|---|---|---|---|
| Warner Brothers Records, Inc. | Warner Records Inc. | https://en.wikipedia.org/wiki/Warner_Records | |
| Casablanca Records | Universal Music Group | https://en.wikipedia.org/wiki/Casablanca_Records | |
| Westbound Records, Inc. | Westbound Records Inc. | Known | |
| UMG Recordings, Inc. (PWH) | Universal Music Group N.V. | https://en.wikipedia.org/wiki/Universal_Music_Group | |
| Atlantic Recording Corporation | Warner Music Group | https://en.wikipedia.org/wiki/Atlantic_Records | |
| Arista Records, Inc. | Sony Music Entertainment | https://en.wikipedia.org/wiki/Arista_Records | |
| FilmWorks, Inc. | Universal Music Group | https://en.wikipedia.org/wiki/Casablanca_Records | In 1976, the label [Casablanca] merged with indie-film company Filmworks, Inc. headed by founder, Peter Guber to form Casablanca Record and FilmWorks, Inc. |