# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

ESTATE OF GEORGE BERNARD
WORRELL, JR.,

        Plaintiff,

v.

THANG, INC., and GEORGE
CLINTON,

        Defendants.

Case No. 4:22-cv-11009

District Judge F. Kay Behm

Magistrate Judge David R. Grand

_____/

## DEFENDANTS THANG, INC. AND GEORGE CLINTON'S
## MOTION FOR SANCTIONS

NOW COMES DEFENDANTS, Thang, Inc. and George Clinton, through their attorneys, Schenk & Bruetsch, PLC and for their Motion for Sanctions state as follows:

1. On December 16, 2024 (Ex. 1) defense counsel contacted plaintiff's counsel to ascertain whether he would consent to the relief sought in the present motion for sanctions.  On December 17, 2024 plaintiff's counsel denied concurrence.  Similarly, on December 20, 2024, defense counsel contacted counsel for third parties, Armen Boladian and Westbound Records, Howard Hertz, to ask for his concurrence in the same relief.  On behalf of his client's,

Mr. Hertz similarly declined to concur in the relief sought in this motion. (Ex. 2).

2. On October 11, 2022, at the very beginning of this case, Defendant propounded discovery requests (Ex 3) that sought among other things:

> ### REQUEST TO PRODUCE # 6:
> Please produce any Communication between You and any other Party named as a defendant in Your Complaint.
>
> ### REQUEST TO PRODUCE # 7:
>
> Please produce any communications between Armen Boladian or anyone/any entity acting on his behalf and:
>
> (a) Judy Worrell
> (b) George Bernard Worrell
> (c) Any attorney at Dickenson Wright law firm concerning George Clinton and/or the allegations in the Complaint.
>
> ### REQUEST TO PRODUCE # 11:
>
> Please produce any agreement between You and Armen Boladian or any entity in which he has or had an ownership interest.

3. Thirteen months later, on November 15, 2023, Plaintiff finally responded to those document requests, producing very little in the way of documentation and relying almost entirely on boilerplate objections and, in some instances, indicating that the estate was not in possession of responsive or relevant information. (Ex. 4)

4. Plaintiff's Rule 26 initial disclosures, filed a month earlier, on October 16, 2023 similarly contained none of the relevant information requested above.

5.  Plaintiff had a continuing duty to supplement both of these filings upon which Defendants relied in responding to this suit.

6.  That duty to supplement, to say nothing of the original duty to disclose, became critically important on December 27, 2023 when Plaintiff executed a settlement agreement with third party Armen Boladian and his company Westbound Records that, among other things, assigned her interest, if any, in the most valuable sound recordings at issue in this suit. It also released "from the beginning of the world to present" *__all__* employees of Westbound. According to records produced in this case bearing Boladian's signature, Westbound explicitly claimed Clinton as an employee.

7.  As set forth more fully in the attached brief (pages 8-9; 12-15), at several other points in the course of this litigation, Plaintiff was required to disclose the existence of the Settlement Agreement and, not only failed to do so, but actively hid its existence through Judy Worrell's perjured testimony. Compounding these lies and deceit was the briefing and argument before this Court in response to Defendants' motion to compel third party production.

8.  Plaintiff's and Boladian Parties' efforts to conceal highly relevant discovery was willful and wanton warranting the severest of sanctions, including dismissal.

9. Although the consideration Plaintiff received is redacted for its interest in what are the most valuable sound recordings here at issue, one can presume it adequately compensates it for whatever it is seeking in this litigation (unless the counsel reviewing the agreement was not acting in its best interests). Dismissal, in other words, only hurts the assignee, the Boladian Parties who themselves actively deceived the court both in their pleadings and in open court.

10. As fully set forth in the attached brief, the discovery abuse that occurred here was pervasive, deliberate, and irreparably damaged Defendants' ability to answer the serious claims they have spent hundreds of thousands of dollars defending.   The actions recounted here are hardly open to dispute or interpretation.  These actions were malicious and part of a long-term effort to malign and financially destroy Defendants.  Plaintiffs and Boladian Parties, in fact, undertook this litigation knowing that a dispute in the ownership of copyrights would embargo Clinton's stream of income from royalties and cripple him financially, forcing him to surrender if, as here, litigation became protracted.

11.  In short, if there was ever a case to impose severe sanctions, this is the case. Either the rules requiring disclosure and candor have meaning or they don't. Either parties and their counsel are held to a higher standard of conduct than

that outlined herein and in the attached brief or they are free to lie, cheat, and

subvert, not only the Federal Rules which demand open discovery and

disclosure, but the fair administration of justice.

For the foregoing reasons and those stated in the attached brief in support of this

motion, Defendants respectfully request that this Honorable Court severely sanction

Plaintiff and Boladian Parties for their outrageously deceptive conduct.

Respectfully submitted:

SCHENK & BRUETSCH PLC
By: /s/ James P. Allen, Sr.
James P. Allen, Sr. (P52885)
Peter E. Doyle (P81815)
211 W. Fort Street, Suite 1410
Detroit, MI 48226
(313) 774-1000
james.allen@sbdetroit.com
peter.doyle@sbdetroit.com
*Attorneys for Defendants*

December 27, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2024, I electronically filed the foregoing paper
with the Clerk of the Court using the ECF system, which will send notification of
such filing to the attorneys of record.

/s/Veronica Sanford

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

ESTATE OF GEORGE BERNARD
WORRELL, JR.,

          Plaintiff,

v.

THANG, INC., and GEORGE
CLINTON,

          Defendants.

Case No. 4:22-cv-11009

District Judge F. Kay Behm

Magistrate Judge David R. Grand

_____/

## **BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SANCTIONS**

Defendants, THANG, INC. and GEORGE CLINTON, through their attorneys, SCHENK & BRUETSCH, PLC, by JAMES P. ALLEN, SR. and for their BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SANCTIONS, states the following:

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iii

STATEMENT OF QUESTIONS PRESENTED .................................................... vii

I.   INTRODUCTION .........................................................................................1

II.   FACTUAL BACKGROUND .........................................................................2

   A.   The Relationship Among the Parties and Relevant Third Parties ...................2

   B.   Initial Stages of this Case: Complaint and Discovery .....................................5

   C.   The Settlement Agreement: Secret Transfer of Most of the Sound

   Recordings at Issue in This Case ...........................................................................6

   D.   Worrell's Deposition: Feigned Ignorance of Settlement Agreement..............8

   E.   Further Discovery and Third-Party Discovery Against Boladian ..................8

III.   LEGAL ARGUMENT ...................................................................................11

   A.   Plaintiff, the Boladian Parties, and their Counsel All Engaged in

   Sanctionable Conduct ...........................................................................................11

     1.   Failure to produce the Settlement Agreement contrary to the Federal Rules

     and Court Order entailed sanctionable conduct.................................................11

     2.   Worrell's deposition sanctionably concealed the transfer of ownership....12

3.   The Boladian Parties and Plaintiff acted individually and in concert to

violate the Federal Rules to try to conceal the Settlement Agreement.............16

B.   Defendants Were Profoundly Prejudiced by the Conduct............................19

C.   The Court Should Impose Sanctions on Plaintiff, the Boladian Parties, and

Their Counsel..................................................................................................23

1.   The Court can impose sanctions under multiple legal theories. ...............24

a.   The Court has the power to impose sanctions under Federal Rules of Civil

Procedure 26 and 37. ........................................................................24

b.   The Court has the inherent authority to sanction. ......................................24

c.   The Court has sanctions authority under 28 U.S.C. § 1927......................26

2.   Defendants are entitled to several different forms of relief..........................27

a.   The Court should extend the discovery period. .........................................27

b.   The Court should award monetary sanctions............................................28

c.   In the event of a trial, the Court should bar Plaintiff from introducing

evidence related to the violations. ....................................................29

d.   The Court should dismiss with prejudice..................................................31

e.   At an absolute minimum, this Court should dismiss with prejudice claims

related to the sound recordings conveyed in the Settlement Agreement..........36

IV.    CONCLUSION..............................................................................................36

CERTIFICATE OF SERVICE ................................................................................37

# TABLE OF AUTHORITIES

## CASES

*Abrahamsen v. Trans-State Express, Inc.,*
    92 F.3d 425 (6th Cir. 1996) ............................................................ 24

*Adams v. Penn Line*,
    620 F. Supp.2d 835 (N.D. Ohio 2009) ............................................ 25

*Am. Trust v. Sabino,*
    No. 99-4214, 2000 WL 1478372 (6th Cir. Sept. 28, 2000) ............... 25

*Arthur v. Atkinson,*
    164 F.R.D. 19 (S.D.N.Y. 1995) ...................................................... 10

*AVX Corp. v. Cabal Corp.,*
    251 F.R.D. 70 (D. Mass. 2008) ...................................................... 10

*Bank One of Cleveland, N.A. v. Abbe,*
    916 F.2d 1067 (6th Cir. 1990) .................................... 21, 22, 27, 35

*Bass v. Jostens, Inc.,*
    71 F.3d 237 (6th Cir. 1995) ...................................................... 31, 32

*BDT Prods. v. Lexmark Int'l, Inc.,*
    602 F.3d 742 (6th Cir. 2010) ........................................................ 32

*Boladian v. Clinton*,
    2017 Cal. App. Unpub. LEXIS 4394 (Cal Ct.App. June 27, 2017) ................... 3

*Boladian v. Clinton, No. 261746,*
    2005 Mich. App. LEXIS 2933 (Mich. Ct. App. Nov. 22, 2005) ........................ 3

*Boladian v. UMG Recordings, Inc.*,
    123 Fed. Appx. 165 (6th Cir. 2005) ............................. 3, 5, 6, 7, 8, 10

*Bradbury v. Township of Plymouth,*
    1997 WL 76187 (6th Cir. Feb. 20, 1997) ................................... 34-35

*Bridgeport Music, Inc. v. Clinton,*

2006 U.S. Dist. LEXIS 48513 (M.D. Tenn. July 17, 2006) ............................... 3

*Carpenter v. City of Flint*,
723 F.3d 700 (6th Cir. 2013) ............................................................. 21

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) ....................................................................... 25

*Clinton v. Boladian*,
54 Fed. Appx. 684 (11th Cir. 2002) ..................................................... 3

*Dickenson v. Cardiac and Thoracic Surgery of Eastern Tenn.*,
388 F.3d 976 (6th Cir. 2004) ............................................................. 30

*Freddie v. Marten Transport, Ltd.*,
428 Fed. Appx. 801 (10th Cir. 2011) ................................................... 33

*Grange Mut. Cas. Co. v. Mack*,
270 Fed. Appx. 372, 2008 WL 744723 (6th Cir. Mar. 17, 2008) ..................... 23

*Harmon v. CSX Transportation, Inc.*,
110 F.3d 364 (6th Cir. 1997) ............................................................. 33

*Jones v. Illinois Central R.R. Co.*,
617 F.3d 843 (6th Cir. 2010) ............................................................. 24

*Laukus v. Rio Brands, Inc.*,
292 F.R.D. 485 (N.D. Ohio 2013) ....................................................... 33

*Link v. Wabash R.R.*,
370 U.S. 626 (1962) ....................................................................... 25

*Metz v. Unizan Bank*,
655 F.3d 485 (6th Cir. 2011) ............................................................. 25

*Regional Refuse Sys. v. Inland Reclamation Co.*,
842 F.2d 150 (6th Cir. 1988) ................................................... 20, 32, 35

*Rentz v. Dynasty Apparel Indus.*,
556 F.3d 389 (6th Cir. 2009) ....................................................... 26, 27

*Robert Bosch LLC v. A.B.S. Power Brake, Inc.,*
  2011 WL 179022 (E.D. Mich. May 10, 2011) .................................................. 33

*Roberts v. Galen of Virginia, Inc.,*
  325 F.3d 776 (6th Cir. 2003) .............................................................. 23

*Samos Imex Corp. v. Nextel Co.,*
  194 F.3d 301 (1st Cir. 1999) .............................................................. 30

*Southern Elec. Supply Co., Inc. v. Lienguard, Inc.,*
  2007 WL 2156658 at *3 (S.D. Ohio July 25, 2007) ........................................ 23

*SPX Corp. v Bartec USA, LLC,*
  574 F. Supp.2d 748 (E.D. Mich. 2008) ................................................... 30

*Stamtec, Inc. v. Anson,*
  195 Fed. Appx. 473 (6th Cir. 2006) ................................................. 20, 21

*Tech. Recycling Corp. v. City of Taylor,*
  186 Fed. Appx. 624 (6th Cir. 2006) ............................................... 22, 29, 34

*Tung-Hsiung Wu v. T.W. Wang, Inc.,*
  420 F.3d 641 (6th Cir. 2005) .............................................................. 32

*United States v. Moss-American, Inc.,*
  78 F.R.D. 214 (E.D. Wis. 1978) ........................................................... 25

*United States v. Reyes,*
  307 F.3d 451 (6th Cir. 2002) ......................................................... 31, 32

*Valley Eng'rs Inc. v. Electric Eng'g Co.,*
  158 F.3d 1051 (9th Cir. 1998) ............................................................. 33

*Victor v. Reynolds,*
  649 F. Supp.3d 499 (E.D. Mich. 2023) .................................................... 29

*Wittman v. Wilson,*
  95 Fed. Appx. 752 (6th Cir. 2004) ........................................................ 20

STATUTES

28 U.S.C. § 1927 ..................................................... 26

RULES

Fed. R. Civ. P. 37 ......................................................... 24, 29, 36
FRCP 19 ....................................................... 12, 13, 14, 15, 16, 17, 18, 19
FRCP 26 .................................................................... 11, 24
Rule 11 ........................................................................ 25
Rule 26 .................................................................. 24, 30, 34
Rule 34 ........................................................................ 24
Rule 37 ..................................................... 24, 27, 29, 30, 31, 35-36

## STATEMENT OF QUESTIONS PRESENTED

1. Should the Court issue discovery sanctions against Plaintiff Estate, Third-Party Deponent Boladian/Westbound or their respective counsel for delaying/resisting the production of the Settlement Agreement between them and related discovery misconduct?

   Defendants Clinton and Thang, Inc. answer:          **Yes**
   Plaintiff and Third Party Boladian Parties answer:   **No**


2. Assuming the Court should issue sanctions against one or more parties or counsel, are sanctions including dismissal, extended discovery, evidentiary preclusion, and monetary sanctions warranted?

   Defendants Clinton and Thang, Inc. answer:          **Yes**
   Plaintiff and Third Party Boladian Parties answer:   **No**


3. Regardless of the entry of punitive sanctions, should the Court alter or amend the discovery schedule to permit Defendant to take further discovery in light of the late-discovered Settlement Agreement?

   Defendants Clinton and Thang, Inc. answer:          **Yes**
   Plaintiff and Third Party Boladian Parties answer:   **No**

## I.        INTRODUCTION

Eighty-three-year-old George Clinton ("Clinton") has spent his last forty years litigating with George Bernard Worrell, Jr. ("Worrell") and Armen Boladian ("Boladian") about the financial legacy of his music. Suits cause clearinghouses to withhold his financial lifeblood – royalties. Clinton and counsel were skeptical when the Worrell Estate ("Estate") sued using one of Michigan's most prestigious firms, suing him and Boladian's Westbound Records, Inc. ("Westbound"), over ownership of sound recordings. They sensed that Boladian was putting (another) old bandmate up to challenging decades-old and settled issues. But they forged ahead, scouring initial disclosures, document requests and depositions, and seeking third-party discovery from Westbound when the Estate settled them out.

These efforts were undercut by the Estate, Boladian, and Westbound. The suit is about ownership of certain sound recordings, and the discovery targeted that. Imagine, then, Clinton's surprise when, shortly after discovery closed and only after overcoming the Estate's and Boladian's false irrelevance objections to subpoenas, the Estate on November 25 produced a redacted Settlement Agreement. **Ex. A**. It showed that a year earlier, the Estate had settled with Westbound for an undisclosed sum and transferred ownership of the Estate's putative share of many of the sound recordings at issue (the valuable ones) ***to Westbound***.

This document, which still has not been fully produced (it remains redacted on critical points) is not just relevant, but ***critical***. It shows who has a claim (if any) to royalties. It had to be disclosed: i) as an immediate supplement to initial disclosures; ii) pursuant to document requests; iii) in deposition testimony; iv) in candid practice for the third-party discovery. But it wasn't, and Clinton has wasted massive fees, costs and time chasing a party that had secretly transferred most of the most valuable rights at issue, misleading him and the Court.

Sanctions should issue under any one or all of a number of sources of authority. The remedies are laid out below (at 27-36) but include an extension of the discovery period, fees/costs, evidentiary exclusion, production of the unredacted settlement documents, and dismissal with prejudice.

## II.    FACTUAL BACKGROUND
### A. The Relationship Among the Parties and Relevant Third Parties

The relationship among Clinton, Worrell, and Boladian began 50 years ago. Clinton is an American bandleader who formed the Parliaments in the 1960s. He created Thang, Inc. ("Thang"), which contracted with record companies to produce sound recordings to distribute/sell. They included Boladian entities, like Westbound. Around 1969, Thang hired keyboardist Worrell. He performed for the Parliaments and other Clinton acts.

Clinton, Worrell, and Boladian had contentious dealings for decades, spawning litigation. Plaintiff's counsel, at the Motion to Compel, noted a "decades-

long scrum between the so-called Boladian parties and Mr. Clinton that has spawned litigation all over the country." ECF No. 110, PageID.1919.

A full review of the history between and among Worrell, Boladian and Clinton is space-precluded. But, in 1996, Boladian, Bridgeport, and Westbound sued Clinton in Lenawee Circuit Court over property. *See Boladian v. Clinton*, Case No. 96-007197-CK. Clinton's counterclaim/appeals, alleged "corporate entities formed by Boladian" fraudulently claimed ownership of property "and large amounts of royalties ." *Boladian v. Clinton*, No. 261746, 2005 Mich. App. LEXIS 2933, at *1-2 (Mich. Ct. App. Nov. 22, 2005). State and federal courts nationwide hosted similar suits.[1]

The same law firm has often represented Boladian and his companies. Specifically, in the late 1990s, Richard Busch of King & Ballow began "representing Detroit music industry executive Armen Boladian and Bridgeport Music in a series of disputes over George Clinton's recordings." ECF No. 88-10, PageID.1155.[2] It was

---

[1]     *Bridgeport Music, Inc. v. Clinton*,  2006 U.S. Dist. LEXIS 48513, at *2 (M.D. Tenn. July 17, 2006); *Boladian v. Clinton*, 2017 Cal. App. Unpub. LEXIS 4394 (Cal Ct.App. June 27, 2017); *Clinton v. Boladian*, 54 Fed. Appx. 684 (11th Cir. 2002).

[2]     King & Ballow also represented Boladian, Bridgeport, and Westbound in "a long-running dispute" against "'funk' musician George Clinton" in which Boladian alleged "that the lyrics of a song performed by Clinton" were defamatory. *Boladian v. UMG Recordings, Inc.*, 123 Fed. Appx. 165, 166 (6th Cir. 2005). There, Plaintiff's current counsel represented Defendant UMG Recordings, Inc. (one of the record company defendants Plaintiff dismissed herein)).

no accident that his Nashville-based law firm would appear all the way in Washington State's Whatcom County Probate Court for the modest Worrell Estate. Indeed, Boladian's long-time aide, Joel Martin, previously advised Mrs. Worrell to use Boladian's counsel when, in 2019, Plaintiff unsuccessfully sued Clinton in New York, the precursor to this litigation. **Ex. B**, Judith Worrell Dep. Tr. at 193:16-195:16.

Last December it was Busch representing the Estate ***against*** Boladian, in the negotiation of the long-hidden Settlement Agreement. In fact, Busch is listed in the notice provision of that Agreement, not as Boladian's counsel, but rather as counsel ***for the Estate***. *See* Ex. A at 7, ¶ 9. In August of this year, with no prior appearance on file and no notice to defense counsel, Busch sent an associate to attend the party depositions. Defense counsel, reasonably believing this associate to be a member of Dickinson Wright, asked during a break how long he had been at Dickinson Wright. To counsel's surprise, the associate admitted that he was actually Busch's associate.[3]

When defense counsel served discovery on Boladian, Busch again faded into the background, hiring a long-time compatriot, Howard Hertz, to object to the third-party subpoenas. Then, after the ruse was exposed with the disclosure of the hidden Settlement Agreement, the gloves came off, and Hertz took the backseat for

---

[3] Plaintiff previously claimed that "[n]othing was hidden" because the "Boladian Parties are represented by Hertz Schram … not King & Ballow." ECF No. 90, PageID.1200. This of course was proven to be false when King & Ballow appeared as counsel for Boladian at his deposition.

Boladian's deposition as Busch, supposedly *the Estate's* attorney, jumped into the first chair to defend Boladian's deposition, interposing dozens of speaking and leading objections in a transparent effort to further cover up the truth. Copyright expert Hertz's role was reduced to asking for a bathroom break. *See* **Ex. C,** Boladian Dep. Tr. at 78.

### B. Initial Stages of this Case: Complaint and Discovery

On May 10, 2022, Worrell's Estate ("Estate" or "Plaintiff") filed the Complaint, suing Thang and Clinton, as well as a variety of so-called "Record Label Defendants" including Boladian's Westbound, ECF 1, PageID.1-96; *id*. at 2. The Complaint alleges co-ownership of the copyrights of various audio and audiovisual recordings of musical and/or vocal performances of Clinton's musical groups ("Works"). *Id*. at 2-8. It seeks (1) declaratory relief that Worrell was a co-creator and joint owner in the musical recordings of the Works and that the Estate therefore owns a share of the copyrights to the Works, and (2) an accounting, as between co-owners, of any royalties. *Id*. at 18-21.

Plaintiff served initial disclosures on October 16, 2023. *See* **Ex. D**. Defendants propounded discovery, including several requests for documents. *See* **Ex. E.** Among them, Request for Production ("RFP") No. 6 requested any communication between Plaintiff and any defendant. RFP No. 7 requested communications between Boladian or any of his related entities and Mrs. Worrell, Bernie Worrell, or any of their

attorneys concerning Clinton or the Complaint. RFP No. 11 requested any agreement between Plaintiff and Boladian or any entity in which he has or had an ownership interest.

### C. The Settlement Agreement: Secret Transfer of Most of the Sound Recordings at Issue in This Case

On December 27, 2023, the Estate entered into a Settlement Agreement with Westbound. Ex. A. It is, by its terms, a settlement of the Estate's claims against Westbound. *Id*. at 1. The Estate agreed "to take the steps necessary to request and effectuate a voluntary dismissal of the Action, solely as to Westbound, with prejudice." *Id*. at 1, ¶ 1. It agreed to "from the beginning of the world" "release, discharge and hold harmless" Westbound "and all of Westbound's representatives, agents, affiliates, subsidiaries, officers, directors, stockholders, ***employees***, attorneys, executors, administrators, successors, licensees and assigns" from any and all suits or claims. *Id*. at 1-2 (emphasis added). Westbound has claimed Clinton as an employee. *See, e.g.*, ECF No. 88-7, PageID.1122. The Settlement Agreement expressly provides that the Clinton defendants are not parties related to or affiliated with the Estate. *See* Ex. A at 2, ¶ 2(d)(ii). No similar exclusion is made providing that the Clinton defendants are not parties related to or affiliated with Westbound. Thus, inadvertently or not, the agreement appears to release Clinton. The agreement excludes any rights related to ownership, control, or rights associated with the musical compositions embodied in the sound recordings. *Id*. at 2-3, ¶ 2(d)(iii).

The agreement requires a payment. *Id*. at 3, ¶ 3. Although the payment is denominated a "settlement payment" that would clearly be relevant to the Estate's damages claim, the amount was redacted in the version produced to Defendants.

Critically, the agreement also contains a transfer of a substantial portion of Plaintiff's interest in this litigation to Westbound. It provides

> "[t]o the extent that Worrell Estate owns and/or controls, or shall own or control, or otherwise deemed to own or control, any rights, title and interests in and to the Subject Recordings, in whole or in part (collectively, 'Worrell's Share'), Worrell Estate hereby irrevocably grants, assigns, and transfers to Westbound all of Worrell Estate's present and future rights, title, interests, control, and benefits in and to Worrell's Share of the Subject Recordings . . . ." *Id*. at 3, ¶ 4(b).

Clearly, Worrell's Share of the Subject Recordings substantially overlaps with the Works that are the subject of the Complaint including, upon information and belief, the most valuable sound recordings. *Compare* ECF 1, PageID.89-96 *with* Ex. A, at 13-15. To make clear that Westbound inherited Plaintiff's litigation rights, the agreement expressly states that

> "for the avoidance of doubt, Westbound shall have the right . . . to initiate, join, pursue, and compromise any action or proceeding, and/or otherwise protect or enforce Westbound's interests in Worrell's Share of the Subject Recordings." *Id*. at 4, ¶ 4(d).

The agreement includes a future royalty stream from Westbound to the Estate calculated in part as a percentage "of the royalties otherwise payable by Westbound to the Clinton Defendants." *Id*. at 5, ¶ 5(a)(i). Notwithstanding its centrality, Plaintiff

did not produce the Settlement Agreement within ten months of execution, waiting until the Court ordered Westbound to produce it.

### D.  Worrell's Deposition: Feigned Ignorance of Settlement Agreement

On August 27, 2024, Defendants deposed Mrs. Worrell, asking about her relationship and contacts with Boladian and Westbound. Worrell's answers were frequently misleading or evasive. *See infra*, pp. 12-15. On the central point, the existence of the Settlement Agreement in which she had just sold a substantial portion of her claims to Westbound, Worrell perjured herself:

> Q. So what agreement do you have with Bridgeport or Westbound Records with respect to the recovery in this case, assuming there is one?
>
> A.  Absolutely nothing.

Ex. B, Judy Worrell Dep. Tr. 196. Plaintiff's counsel, who got the Agreement contemporaneously in December, 2023, said nothing to correct his client's lie. *Id*.

### E.  Further Discovery and Third-Party Discovery Against Boladian

Magistrate Judge Grand held a telephonic status conference on July 8, 2024. Thereafter, the Court issued a minute Order providing, in part, that "[t]he parties and their counsel shall ensure that good faith searches for documents responsive to discovery requests have been performed, and all non-privileged responsive documents within their possession, custody, and control shall be produced by August 2, 2024." Text Only Order, July 8, 2024. Although the Settlement Agreement was

8

plainly responsive to several requests, Plaintiff defied that Order and failed to timely produce the document (and any related documents).

Notwithstanding Plaintiff's malfeasance, with the knowledge that Boladian's counsel were attending every deposition and armed with documents showing (1) that Worrell and Clinton were employees of Westbound, and (2) that Westbound publicly claimed to own 185 of the approximately 260 Works that are the subject of this suit, counsel for Defendants propounded subpoenas seeking documents and testimony from Boladian and his related entities (collectively, "the Boladian Parties"). The Boladian Parties vehemently denied that they had any responsive documents or interest in the suit. Counsel refused to produce any documents, claiming that the subpoenas were "untethered from any relevance." ECF No. 88-8, PageID.1150.

Defendants were therefore forced to bring a Motion to Compel. *See* ECF 88. In opposing that Motion, counsel for the Boladian Parties represented that Boladian and Westbound "have no dog in this fight" between the Estate and Defendants (ECF 93, at 6, PageID.1622), failing to mention that Westbound had acquired and currently owned a large portion of the Estate's alleged rights. The conduct became worse during the hearing on November 20, 2024. Under the Settlement Agreement, Westbound purchased the Estate's share of the sound recordings and set up an ongoing stream of payments to the Estate. Here, however, is what the Boladian Parties told the Court: "But the difference -- if I may, your Honor. The difference is

the Boladian parties don't control -- pick which side of that analogy you like -- the salary. They only control the distribution. They only control the publishing royalties. ***They don't pay anything on sound recordings, because they don't own them***." ECF No. 110, PageID.1953 (emphasis added).

Despite the dissembling, the Court deemed the requested documents relevant and ordered production by December 13. *See id.* at 60; *id.* at 59; *id.* at 54 (parties narrowing scope of one request to "Contracts with Mr. Worrell with respect to those works and communications with Mr. Worrell regarding the ownership of those works 2010 to the present."). The jig was up, and counsel ***for Plaintiff*** (***not*** the Boladian Parties) first produced the ***redacted*** Settlement Agreement on November 25.[4]

---

[4]       During the meet-and-confer, Plaintiff argued it had adverted (albeit belatedly) to the existence of the Settlement Agreement in an e-mail to counsel on October 11, 2024. *See* **Ex. F** ("As to your statements concerning the record companies, we disagree with them, but Mrs. Worrell had no such communications that were not produced, with one exception. The estate did reach a settlement agreement with Westbound and, thereunder, received the aforementioned August 2024 royalty payment. While we do not believe it to be relevant, we are prepared to produce that agreement."). That opaque reference in no way excuses a failure to produce the centrally relevant document without further prompting. The duty to supplement is a continuing one, and a party cannot free itself of its duty by erecting procedural barriers. *See, e.g.*, *AVX Corp. v. Cabal Corp.*, 251 F.R.D. 70, 76 (D. Mass. 2008); *Arthur v. Atkinson,* 164 F.R.D. 19, 20 (S.D.N.Y. 1995).

### III.   LEGAL ARGUMENT
#### A. Plaintiff, the Boladian Parties, and their Counsel All Engaged in Sanctionable Conduct
##### 1. Failure to produce the Settlement Agreement contrary to the Federal Rules and Court Order entailed sanctionable conduct.

After the status conference on July 8, 2024, the Court issued a minute Order providing, in part, that "[t]he parties and their counsel shall ensure that good faith searches for documents responsive to discovery requests have been performed, and all non-privileged responsive documents within their possession, custody, and control shall be produced by August 2, 2024." Text Only Order, July 8, 2024. At that time, counsel for Plaintiff had the Settlement Agreement for over six months. Yet, in derogation of the Order, it was not produced. By violating that Order, Plaintiff's counsel concealed critical information from both Defendants and the Court.

Under FRCP 26(b), Defendants were entitled to the Settlement Agreement as a "nonprivileged matter that is relevant to any party's claim or defense." The only excuse Plaintiff's counsel has offered is to cast doubt as to the document's ***relevance***. *See, e.g.*, **Ex. G**, December 7, 2024 email. That cannot pass the laugh test. The agreement is centrally relevant for any number of reasons including, *inter alia*: (1) the full release from liability for ***all*** Westbound employees, and Westbound has identified Clinton as an employee; (2) it contains an amount Westbound paid the Estate to settle, which is plainly relevant to  damages; and (3) it transfers ownership

of the Estate's putative interest in a majority of the sound recordings at issue,[5] raising serious questions about the Estate's ability to prosecute claims it no longer owns, and whether Westbound is a required party under FRCP 19.

Of course, failure to produce the Settlement Agreement itself is almost certainly only the tip of the discovery-violation iceberg. Unless the Agreement was the result of a virgin birth, there are likely relevant and discoverable documents and communications incident to its creation, none of which have been produced in spite of this Court's clear direction.

### 2. Worrell's deposition sanctionably concealed the transfer of ownership.

Mrs. Worrell was deposed on August 27, 2024. The three areas of most intense questioning were: i) document production (or lack thereof); ii) royalty payments to Worrell/the Estate; and iii) communications with Westbound/the Boladian Parties. Inquiry into any one of these areas should have elicited a response disclosing the Settlement Agreement. But none did because Mrs. Worrell offered misleading responses concealing it. When considering her testimony, it is important to

---

[5]     The Complaint defines the "Works" in which the Estate allegedly has a copyright interest as recordings of various of Clinton's bands "including audio and audiovisual recordings, jointly created by Mr. Worrell with Clinton, and/or which contain the results of Mr. Worell's musical and/or vocal performances, or upon which his name, image or likeness appear in connection with Defendants." ECF 1 at 2-3, PageID.2-3. The Settlement Agreement defines the "Subject Recordings" transferred to Westbound in a nearly identical manner. *See* Ex. A, at 1.

remember that she had just signed the Settlement Agreement eight months ago. *See* Ex. A. Her signature is on multiple pages; Boladian's signature is on the others. *Id*.

But, in the series of questions asking broadly for Ms. Worrell's contacts and communications with Boladian, she dissembles. Consider, for example:

> Q:    Are you familiar with a gentleman by the name of Armen Boladian?
> A:    Yes.
> Q:    Okay. Who is Armen Boladian?
> A:    Armen Boladian was head of Westbound Records and Bridgeport Music.
> Q:    And when was the last time you had any form of contact with Mr. Boladian?
> A:    Well, not with him. Years ago but not directly with him.
> Q:    Okay. Then what indirect communications have you had with Mr. Boladian?
> A:    None.
> Q:    So you had no communication with Boladian, to the best of your knowledge, ever?
> A:    Well, yeah, when I first met him.

Ex. B, Judy Worrell Dep. Tr. 54. She had, of course, just concluded a deal to dismiss his Westbound company from this case and to transfer ownership of the heart of the Estate's alleged interest in sound recordings to it. Moreover, she regularly communicated with Boladian and his staff regarding royalty payments.

Nor can she claim any confusion over the distinction between Boladian personally and Westbound – she disavowed contact with both:

> Q:    Okay. Have you had any communications with anybody from Westbound Records?
> A:    I don't think so.

*Id*. at 55. When pressed for broader levels of contact with Boladian's agents she was similarly deceptive:

> Q:    What individuals do you speak with that are connected with Mr. Boladian on any sort of basis?
>
> A:    I'm not sure.

*Id*. at 58. When counsel for Defendants tried to make the point that Ms. Worrell has alluded to some contact with individuals in Boladian's circle, and that she must have some means of identifying them, she became even more evasive and combative:

> Q:    Do they show up in a black car with no name identification and just say I'm from Bridgeport and –
>
> A:    No, they flew in on the Batmobile.

*Id*. at 59.

Further, Ms. Worrell was given every opportunity to explain that she had settled with Westbound and Boladian for some payment, but declined:

> Q:    Okay. So did you ever attempt to seek, other than through your efforts with the special master that we've already discussed, have you ever taken any other action to recoup money that you believe your husband is owed from any third party?
>
> A:    Any third party?
>
> Q:    Any record company, ma'am, other than, --
>
> A:    No.

*Id*. at 223. Despite personally signing the Settlement Agreement in multiple places, she disavowed any involvement in the process leading to Westbound's dismissal:

> Q:    Okay. There was a decision made in this case to release the record companies from litigation. What role did you play in making a decision to dismiss the record companies in this case?
>
> A:    I have attorneys.

…

Q (Continuing by MR. ALLEN): What role did you have?

A:     None.

Q:     So Mr. Quick violated the rules of professional conduct and just dismissed a party without consulting you?

A:     I didn't say that.

Q:     Okay. So you had a role, right? He didn't dismiss the case without your approval, did he, against these record companies?

A:     Are you asking me why my attorneys made a legal --

Q:     No, no.

A:     -- decision?

Q:     No, no. I'm asking you what role you played in deciding to release the record companies from this case?

A:     I don't – that's not what I do. I hire the professionals to do their job, then they come back and advise me. I don't instruct them.

Q:     I'm not asking you what Mr. Quick told you. I'm asking whether or not you played any role in the decision to dismiss the record companies?

A:     No.

*Id*. at 91. Finally, when asked the ultimate question about the existence of the

Settlement Agreement, she lied:

Q:     So what agreement do you have with Bridgeport or Westbound Records with respect to the recovery in this case, assuming there is one?

A:     Absolutely nothing.

*Id*. at 196.

Viewed in the aggregate, Ms. Worrell's conduct at her deposition reflects a concerted effort to conceal the existence of the Settlement Agreement and any contacts or communications that led up to that agreement. She dodges, dissembles, and ultimately just lies to keep this information from Defendants and the Court. Her counsel took no step to correct this clearly false testimony.

### 3. The Boladian Parties and Plaintiff acted individually and in concert to violate the Federal Rules to try to conceal the Settlement Agreement.

Counsel for Defendants remained skeptical of the denial of connections between and among the Estate and the Boladian Parties. Regardless of the denials, and based on documents received from other sources, counsel believed that Boladian, his companies and their principals had critical documents and information. Counsel, beginning in September 2024, served subpoenas on the Boladian Parties for documents and testimony. Both Plaintiff and the Boladian Parties resisted. They were permitted to object to breadth and burden, but they both violated their duty of candor in writing and orally when they denied having relevant information (such as the Settlement Agreement).

Chronicling the discovery and motion practice abuse starts with the Boladian Parties' Brief in Opposition to Defendants' Motion to Compel Subpoena Response. ECF 93. That submission opens with the remarkable claim that "[n]onparties Bridgeport, Westbound, Eastbound, Boladian, Bacow, and Catlett have no dog in this fight between the Estate of George Bernard Worrell, Jr. ('Worrell'); Thang, Inc.; and George Clinton ('Clinton')." *Id*. at PageID.1622. The brief went on to assert that "Defendants served third-party discovery that appears to have no purpose other than to bring Clinton's decades long legal feud with Boladian . . . into this case." *Id*. The brief asked that the motion "be denied because the discovery Defendants seek is

unduly burdensome and neither relevant nor proportional to the needs of this case." *Id*. The Boladian Parties then explained their understanding of relevant information: "As far as these Nonparties can tell, this case has nothing to do with royalties paid by Bridgeport, Eastbound, or Westbound and, instead, concerns the parties' ownership of certain sound recordings and their rights in those recordings going forward." *Id.* at PageID.1624. Having acknowledged that this case concerns the very sound recordings they purchased, the Boladian Parties represented:

> For the reasons discussed above, Defendants have not established that their subpoenas seek relevant information. ***Accordingly, the potential value of the information sought is negligible.***

*Id.* at PageID.1627 (emphasis added). All of these claims that Westbound and the other Boladian Parties have no relevant information regarding the sound recordings are plainly false and had to be known to be false when made by counsel.

Plaintiff also filed a Brief in Opposition. ECF 91. It echoes the Boladian Parties' claims, that "Defendants are not pursuing any relevant discovery at all, but rather seem to be pursuing their decades-long dispute with the Boladian Parties by improperly using discovery." *Id*. at PageID.1402. Plaintiff also expressly disavows any relevance of the Settlement Agreement:

> Second, Defendants allege that "Plaintiff also entered into a settlement agreement with Westbound and received an additional royalty payment in August 2024." ***This has nothing to do with the issue of Mr. Worrell's co-ownership of the sound recordings***, and has nothing to do with Defendants accounting to Plaintiff for royalties they received but did not share with Worrell as co-owner of the Works.

17

*Id*. at PageID.1407 (emphasis added).

The Boladian Parties and Plaintiff also coordinated their attack on the subpoenas. Each repeated the false claim that the subpoenas harassingly sought irrelevant information. Plaintiff's counsel claimed "but the punchline on this is, I think that there is a fair case here that, at least in part, this discovery is being sought for an improper purpose and for harassment." ECF No. 110, PageID.1919 (Motion Hearing Tr.). Throughout, both Plaintiff's counsel and counsel for the Boladian Parties try to make it seem as if Defendants are seeking irrelevant information about *publishing* royalties. This deflection reaches its height when counsel for the Boladian Parties lectured Court and counsel on the differences between publishing and sound recording royalties. *Id*. at PageID.1931-33. Of course, the Settlement Agreement ***expressly covers sound recordings***, and everyone agrees this is centrally relevant, making the detour into publishing subterfuge. In places, counsel for the Boladian Parties articulates precisely this understanding of relevance: "But the question here relates solely to the sound recordings, who owns the copyright to the sound recordings, who was it assigned by and, therefore, who should get the royalties for the sound recordings." *Id*. at PageID.1933. Plaintiff's counsel then tries to "narrow" the scope to avoid the recent transfer of the Estate's share of ownership to the Boladian Parties: "So if anything is going to be produced, it -- it -- it ought to be very narrow, as ordered from these parties, maybe regarding the union contracts, if

they exist, and anything regarding sound recording arrangements or ownership arrangements with Mr. Worrell, which, to my knowledge, don't exist from -- *from the era in which these songs were recorded*." *Id*. at PageID.1935 (emphasis added). Elsewhere, the Boladian Parties tried to narrow the issue down to just the "Union Contracts." *Id*. at PageID.1937.

After conceding the scope of relevance, the Boladian Parties falsely deny having any relevant information. "I really think that there just isn't any relevance to all the things they're asking the Boladian parties to produce – . . . other than, perhaps, the union contract," *id*. at PageID.1938, which they have yet to produce. Boladian's counsel then disavowed any connection to the sound recordings:

> But the difference -- if I may, your Honor. The difference is the Boladian parties don't control -- pick which side of that analogy you like -- the salary. They only control the distribution. They only control the publishing royalties. ***They don't pay anything on sound recordings, because they don't own them.***

*Id*. at PageID.1953 (emphasis added). According to the Settlement Agreement, of course, Westbound *did* acquire Worrell's sound recordings rights and *did* pay for them. The representations otherwise were knowingly made, and that is sanctionable.

### B. Defendants Were Profoundly Prejudiced by the Conduct

Defendants have now been litigating against a party – the Estate – that sold the majority of the sound recordings at issue a year ago. During this year, Defendants doggedly pursued expensive discovery seeking information and documents bearing on the relationship between the Estate and the purchaser, Westbound. They were met

with delay and deception, including false deposition testimony. When Defendants sought the information from the counterparty – Boladian and Westbound – both the Estate and the Boladian Parties improperly objected on relevance grounds, causing expensive motion practice and a limited deposition. All of this happened as discovery expired. Prejudice at the level that will support the most extreme sanction – dismissal – is that which "undermined a defendants' ability to defend [the] case." *Wittman v. Wilson*, 95 Fed. Appx. 752, 754 (6th Cir. 2004). It is easily present. Further, prejudice may be found where a party needlessly expends time and money obtaining information to which it is entitled. *Regional Refuse Sys. v. Inland Reclamation Co.*, 842 F.2d 150, 155 (6th Cir. 1988); *Stamtec, Inc. v. Anson*, 195 Fed. Appx. 473, 481 (6th Cir. 2006).

In terms of expense and undermined ability to defend, the Estate's non-production has been particularly costly. Preparation and review-of-results for the document requests that should have yielded the Settlement Agreement was costly and frustrating. Worse was Mrs. Worrell's deposition which lasted some 7.5 hours and in which she repeatedly denied pertinent contacts with the Boladian Parties and repeatedly deflected inquiry into the status of documents by explaining that she had lost them all to an extreme weather event several years ago. *See* Ex. B at 63-67. The time and money wasted on these dead ends should have been spent on serious inquiry into the Settlement Agreement and what was uncovered about the Estate's initial

ownership of the rights it sold to Westbound, how they were valued, and all the other myriad details of that transaction. Now, even further inquiry runs into the problem that Mrs. Worrell's memory was already bad – she invoked her inability to remember repeatedly[6] – and another year will have passed since the transaction. Defendants were entitled to this information contemporaneously and to secure the documents and testimony while they were fresh. The Sixth Circuit commented on precisely this situation when it observed that a defendant is prejudiced by a plaintiff's dilatory conduct if the defendant is "required to waste time, money, and effort in pursuit of cooperation which [the plaintiff] was legally obligated to provide." *Carpenter v. City of Flint*, 723 F.3d 700, 707 (6th Cir. 2013). The Circuit understands prejudice as substantial difficulty in obtaining information to which a litigant is entitled. *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1079 (6th Cir. 1990).

As poor as Mrs. Worrell's memory was, and as problematic as her document preservation proved, the situation with the Boladian Parties was worse on two fronts. First, both the Estate and the Boladian Parties put Defendants to considerable expense just to secure the right to subpoena them, including evading service. Both the Estate and the Boladian Parties interposed relevance objections and at oral

---

[6]     Mrs. Worrell invoked her poor memory and/or testified that she didn't know the answers to basic questions repeatedly, doing so at least 14 times during approximately the first third of her deposition. *See, e.g.*, Ex. B at 21, 22, 23, 32, 33, 36, 44, 74, 76, 83, 92, 94, 97. She even testified that she couldn't remember royalty payments **for 2023**. *Id*. at 68.

argument pressed their joint contention that the Boladian Parties had "no dog in the fight." In fact, the Settlement Agreement secured to Westbound the majority of the "dog," leaving the Estate with only the tail, and making the irrelevance objections, and specific disavowals of ownership, false. Then, Defendants' counsel had to prepare for and take a time-shortened deposition of Boladian on short notice that counsel for Boladian treated as limited in scope (*i.e.*, he prevented inquiry into certain areas, *see* Ex. C Boladian Dep. Tr. at 70:5-6 ("MR. BUSCH: This has no relevance. I'm instructing him not to answer."). All this in the face of a deponent who was 90 years old, claims to be blind, and disavowed knowledge of much of the critical transaction. *Id.* at 41:7-25 ("I don't even know [what is in the settlement agreement] and don't even care."); 43:23-24. Defendants didn't get a chance to depose the individuals with the most/best knowledge of the transaction, or document production of related documents.

It is not clear if memories, documents and lifespans will permit accurate discovery into the Settlement Agreement now. Even if they would, the delay and expense has been extreme. And prejudice does not need to be irremediable in any event. *See Tech. Recycling Corp. v. City of Taylor*, 186 Fed. Appx. 624, 636 (6th Cir. 2006) ("[P]rejudice includes 'deprivation of information through non-cooperation with discovery' and need not include irremediable harm.") (quoting *Adams v. Trs. of the N.J. Brewery Emps.' Pension Tr. Fund*, 29 F.3d 863, 874 (3d Cir. 1994)).

Furthermore, the delay and expense were made worse because they came at the very end of the discovery period and right up against the motion practice deadlines. "There should be a direct relationship between the time before trial and findings of prejudice—as the trial date gets closer, the Court should be more critical of non-disclosures." *Southern Elec. Supply Co., Inc. v. Lienguard, Inc.*, 2007 WL 2156658 at *3 (S.D. Ohio July 25, 2007). Finally, if the Estate or Boladian Parties even seek to defend the prejudice factor, they bear the burden of proving harmlessness. *Roberts v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003).

### C. The Court Should Impose Sanctions on Plaintiff, the Boladian Parties, and Their Counsel

"Discovery abusers must be sanctioned, because '[w]ithout adequate sanctions, the procedures for discovery would be ineffectual.'" *Grange Mut. Cas. Co. v. Mack*, 270 Fed. Appx. 372, 2008 WL 744723 (6th Cir. Mar. 17, 2008) (quoting 8A Wright, Miller & Marcus, Federal Practice and Procedure § 2281 (2d ed. 1994)). As described above, the conduct engaged in by Plaintiff, its counsel, and counsel for the Boladian Parties certainly constitutes the type of abuse contemplated by the Sixth Circuit. As described below, there are multiple avenues of authority independently authorizing the necessary sanctions, including the Federal Rules, this Court's inherent authority, and Section 1927. Several forms of sanctions are appropriate here, including an extension of the discovery period, compensation to Defendants for the resources wasted by the offending conduct, preclusion of evidence if a trial

is held, and dismissal with prejudice of this action, or at least of the claims related to the subject works transferred in the Settlement Agreement.

### 1. The Court can impose sanctions under multiple legal theories.
#### a. The Court has the power to impose sanctions under Federal Rules of Civil Procedure 26 and 37.

FRCP 26(a)(1) makes all parties responsible for initial disclosures. And while it is true that the Settlement Agreement had not yet been executed when Plaintiff made its initial disclosures, Rule 26(e)(1) imposes a continuing duty to supplement those disclosures. *See, e.g.*, *Abrahamsen v. Trans-State Express, Inc.*, 92 F.3d 425, 428 (6th Cir. 1996) (a party is under a "continuing obligation to supplement discovery"). Rule 26(g) imposes requirements on attorneys signing both disclosures and responses and objections to discovery requests, with Rule 26(g)(3) expressly permitting the imposition of sanctions for improper certification. "The rule requires a court to impose sanctions for any violation occurring without 'substantial justification.'" *Jones v. Illinois Central R.R. Co.*, 617 F.3d 843, 854 (6th Cir. 2010). In addition, of course, the Settlement Agreement was directly responsive to several requests for production under Rule 34. Rule 37(c) authorizes the Court to impose a wide range of sanctions for failure to disclose such documents, up to and including dismissing the action. *See* Fed. R. Civ. P. 37(c)(1)(a); *id*. at Rule 37(b)(2)(A)(i)-(vi).

#### b. The Court has the inherent authority to sanction.

In addition to the authority to impose sanctions granted by the Federal Rules, all federal courts have the inherent power to impose sanctions to prevent the abuse

of the judicial process. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991); *Link v. Wabash R.R.*, 370 U.S. 626, 629-30 (1962) (federal trial courts have the inherent power to manage their own dockets). Notably, the Court's inherent authority to sanction reaches both parties and non-parties. *See, e.g.*, *Am. Trust v. Sabino*, No. 99-4214, 2000 WL 1478372, at *1, 2000 U.S. App. LEXIS 25404, at *1 (6th Cir. Sept. 28, 2000) ("A federal court has the inherent power to impose sanctions against a party ***or non-party*** who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.") (emphasis added) (citing *Chambers*, 501 U.S. at 46-50).

A court may exercise its inherent power to sanction when a litigant has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," or when the conduct was "tantamount to bad faith." *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011). The Court's authority to sanction "is an independent basis aside from Rule 11 or § 1927 for sanctioning bad faith litigation conduct." *Adams v. Penn Line*, 620 F. Supp.2d 835, 839 (N.D. Ohio 2009). Under this authority, the Court may impose a wide variety of sanctions up to and including dismissal. *See, e.g.*, *United States v. Moss-American, Inc.*, 78 F.R.D. 214, 216 (E.D. Wis. 1978) ("it is within the inherent equitable powers of this court to dismiss an action when a just determination of the action has been seriously thwarted by a plaintiff's willful misconduct").

### c. The Court has sanctions authority under 28 U.S.C. § 1927.

Under 28 U.S.C. § 1927, an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred." The Sixth Circuit has held "that a court may sanction an attorney under § 1927 for unreasonably and vexatiously multiplying the proceedings 'despite the absence of any conscious impropriety.'" *Rentz v. Dynasty Apparel Indus.*, 556 F.3d 389, 395 (6th Cir. 2009) (quoting *Jones v. Cont'l Corp.*, 789 F.2d 1225, 1230 (6th Cir. 1986)).

An attorney is subject to sanctions under Section 1927 "without a finding of bad faith, 'at least when an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims.'" *Rentz*, 556 F.3d at 396 (quoting *Jones*, 789 F.2d at 1230). However, "'[t]here must be some conduct on the part of the subject attorney that trial judges, applying the collective wisdom of their experience on the bench, could agree falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.'" *Rentz*, 556 F.3d at 396 (quoting *In re Ruben*, 825 F.2d 977, 984 (6th Cir. 1987)). Under the Sixth Circuit's objective standard, "§ 1927 sanctions require a showing of something less than subjective bad faith, but something more than negligence or

26

incompetence." *Rentz*, 556 F.3d at 396 (quoting *Red Carpet Studios v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006)). Thus, although Section 1927 sanctions are limited to financial relief against attorneys, it is ideal for cases where, as here, attorneys have knowingly engaged in deceptive conduct resulting in unnecessary costs. What's more, Plaintiff has accepted consideration for her claims, consideration her attorneys, whichever ones want to claim responsibility, presumably believed was fair value. Allowing this case to continue, benefits only a third party who lied and concealed his way into being an undisclosed real party in interest.

### 2. Defendants are entitled to several different forms of relief.

Trial courts have broad discretion in selecting a sanction proportionate to the particular violations. *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir. 1990) (recognizing the "well-established" abuse of discretion standard applies to the review of a district court's decision to dismiss under Rule 37(b)(2)(C)) (quoting *Regional Refuse Systems, Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 153-54 (6th Cir. 1988)). Here, given the pervasiveness and wide variety of sanctionable conduct, several species of sanctions are appropriate. including an extension of discovery, financial compensation, preclusion of evidence, preclusion of claims for the sound recordings in the Settlement Agreement, and dismissal of the case in its entirety.

### a. The Court should extend the discovery period.

The sanctionable conduct prevented Defendants from learning about the Settlement Agreement until after discovery ended, effectively precluding follow up on this bombshell. Information about how the sound recordings to be transferred were selected, how they were valued and the royalty payments, and the Boladian Parties' control of the litigation has been effectively shielded from inquiry because of the skullduggery engaged in by Plaintiff, the Boladian Parties, and their counsel.

Extending the discovery period is not truly a sanction, in that it is not punitive in any sense. It is merely a procedural remedy preventing Defendants from being prejudiced from the sanctionable conduct. In an Order issued on December 4, 2024, this Court denied a motion to extend discovery ***without prejudice***, ruling that the necessity and/or scope of any follow-on discovery "is not clear because the Boladian Parties discovery permitted by Judge Grand has not yet been completed." ECF 106, PageID.1712. It is now clear that additional time for discovery is needed. The Court should permit Defendants an additional three months of discovery to pursue the discoverable information in and suggested by the Settlement Agreement and any related documents and communications. Plaintiff should also be ordered to produce an unredacted Settlement Agreement.

### b.  The Court should award monetary sanctions.

The form of sanction that is lightest, yet absolutely necessary, is an order requiring the parties engaging in malfeasance and their counsel to pay the

incremental costs and attorney's fees directly traceable to their misconduct. Both Section 1927 and the Court's inherent authority permit this. Rule 37 makes such an award effectively mandatory, providing that "the court ***must*** order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C); *see also, e.g.*, *Tech. Recycling Corp. v. City of Taylor*, 186 Fed. Appx. 624, 638 (6th Cir. 2006) ("Pursuant to Rule 37(b)(2), the district court was required to award defendants the fees they incurred as a result of plaintiffs' failure to obey discovery orders, unless one of the stated exceptions applied."); *Victor v. Reynolds*, 649 F. Supp.3d 499, 506 (E.D. Mich. 2023).

Defendants incurred great expense as a result of the discovery misconduct. For example, Defendants spent a great deal of time and resources to obtain the Order for discovery against the Boladian Parties notwithstanding Plaintiff's failure to produce the document showing that Westbound was already a *de facto* party to the case and notwithstanding counsel for Plaintiff and the Boladian Parties repeatedly falsely asserting that the Boladian Parties had no relevant documents or information. The Court should award an order allowing Defendants to recover the costs and fees incurred as a result of that and other misconduct.

### c. In the event of a trial, the Court should bar Plaintiff from introducing evidence related to the violations.

It is more than likely that there will not be a trial. As discussed below, the Court should dismiss the case with prejudice as a sanction here. Even failing that remedy, the Settlement Agreement by its express terms releases Westbound employees such as Clinton from any liability, and that is merely one of the several bases on which Defendants will be entitled to summary judgment, if necessary. But for the sake of completeness, sanctions here should include evidentiary preclusion.

Rule 37(c)(1) authorizes the Court to exclude from a trial information that was, in violation of Rule 26(a) or (e), withheld without "substantial justification," unless the failure to disclose was "harmless." In fact, the language of Rule 37 suggests that exclusion is **_mandatory_** in these circumstances, and the Sixth Circuit has cited with approval a Seventh Circuit decision to that effect. *See Dickenson v. Cardiac and Thoracic Surgery of Eastern Tenn.*, 388 F.3d 976, 983 (6th Cir. 2004) (citing *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 756 (7th Cir. 2004)); *see also Samos Imex Corp. v. Nextel Co.*, 194 F.3d 301, 305 (1st Cir. 1999) (explaining that "as amended, the civil procedure rules make clear that exclusion of evidence [such as an expert's testimony] is a standard sanction for a violation of the duty of disclosure under Rule 26(a)"); *SPX Corp. v Bartec USA, LLC*, 574 F. Supp.2d 748, 755 (E.D. Mich. 2008).

Because the full extent of Plaintiff's perfidy cannot be known until Defendants determine the universe of information that was illegitimately withheld,

the scope of the evidentiary preclusion cannot presently be determined with precision. It would certainly prevent Plaintiff from introducing the Settlement Agreement itself and would likely extend to damages calculations regarding any of the sound recordings conveyed in the agreement. Defendants respectfully ask the Court to grant evidentiary preclusion as a sanction, with the scope of the preclusion determined once the full scope of the violations are ascertained.

### d. The Court should dismiss with prejudice.

Dismissal with prejudice is admittedly a severe sanction. But abuses happen frequently enough that clear standards have evolved concerning when such a sanction is appropriate. And the conduct here rises to that level.

In the Sixth Circuit, when deciding whether to impose the sanction of dismissal with prejudice under Rule 37(b)(2)(C), the court must consider:

> (1) whether the party's failure to comply with the discovery rules is due to willfulness, bad faith, or fault;
> (2) whether the adversary was prejudiced by the party's noncompliance;
> (3) whether the party was warned that failure to comply could lead to dismissal; and
> (4) whether less drastic sanctions were imposed or considered before dismissal was ordered.

*Bass v. Jostens, Inc.*, 71 F.3d 237, 241 (6th Cir. 1995) (citing *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir. 1990)). Notably, these are not requirements that must be met but rather factors to be considered. "[N]o one factor is dispositive," *United States v. Reyes*, 307 F.3d 451, 458 (6th Cir. 2002), except that

Sixth Circuit cases hold that the sanction of dismissal may not be used in the absence of the first factor – "willfulness, bad faith, or fault."

Considered in the aggregate, the factors here militate in favor of dismissal, particularly given the primacy of the first factor. *See Regional Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 153-54 (6th Cir. 1988) (citing *Patton v. Aerojet Ordnance Co.*, 765 F.2d 604, 607 (6th Cir. 1985)) (dismissal may be "imposed only if the court concludes that a party's failure to cooperate in discovery is due to willfulness, bad faith, or fault."). "Harassing the opposing party, delaying or disrupting litigation, hampering the enforcement of a court order, or making improper use of the courts are all examples of the sorts of conduct that will support a finding of bad faith or improper purpose[.]" *BDT Prods. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 754 (6th Cir. 2010). *See also Tung-Hsiung Wu v. T.W. Wang, Inc.*, 420 F.3d 641, 643 (6th Cir. 2005) ("conduct must display either an intent to thwart judicial proceedings or a reckless disregard for the effect of [the] conduct on those proceedings.") (internal quotes omitted). In *Bass v. Jostens, Inc.*, 71 F.3d 237 (6th Cir. 1995), the Sixth Circuit held that "a willful violation ... is any conscious or intentional failure to comply." *Id.* at 241. It is the non-complying party who has the burden "of showing that his failure to comply was due to inability and not to willfulness, bad faith or fault." *United States v. Reyes*, 307 F.3d 451, 458 (6th Cir. 2002) (citing *Regional Refuse Sys.*, 842 F.2d 150, 154 (6th Cir. 1988)).

The sanctionable conduct has been described above at length. *See supra*, \_\_-\_\_. Suffice it to say there is nothing inadvertent or accidental about withholding critical documents and lying in pleadings, in court, and at depositions. That type of conduct is fully in line with the type of conduct found to be sufficiently willful or bad faith to justify dismissal. *See, e.g.*, *Harmon v. CSX Transportation, Inc.*, 110 F.3d 364, 368-69 (6th Cir. 1997) (dismissal proper where party willfully failed to fully respond to discovery requests); *Freddie v. Marten Transport, Ltd.*, 428 Fed. Appx. 801, 804 (10th Cir. 2011) (dismissal as sanction for willfully withholding highly relevant evidence and providing false deposition testimony); *Valley Eng'rs Inc. v. Electric Eng'g Co.*, 158 F.3d 1051, 1054-56 (9th Cir. 1998) (dismissal appropriate where defendants withheld the "smoking gun" document); *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 489 (N.D. Ohio 2013) (dismissing complaint and awarding costs where, *inter alia,* plaintiff and his counsel "knowingly offered (or allowed to be offered) arguments before this Court and on appeal that were not supported by -- and contrary to -- the record" and "failed to correct discovery responses they knew to be inaccurate, misleading or false"); *Robert Bosch LLC v. A.B.S. Power Brake, Inc.*, 2011 WL 179022 (E.D. Mich. May 10, 2011) (striking certain affirmative defenses, dismissing certain counterclaims and awarding expenses where defendants submitted a declaration later proven by discovery to be false); *EEOC v. Dolgencorp, LLC*, 196 F. Supp.3d 783, 795 (E.D. Tenn. 2016) (courts are more "likely to

determine that a party violated Rule 26(e) when the party supplemented disclosures or responses after the discovery deadline in the case").

The second factor is prejudice. That has also been treated at length above. *See supra*, at 11-19. Defendants have suffered the necessary prejudice while the nominal Plaintiff here has received fair compensation for the most valuable of its claims.

The third factor is whether the party was warned that failure to comply could lead to dismissal. Ordinarily this factor refers to situations where a party's failure is known early enough that motion practice can take place during the discovery period. Where, as here, there is a concerted campaign to conceal the violation until the discovery period has lapsed, by definition no warning specific to the conduct could take place. But Plaintiff, the Boladian Parties, and all counsel involved were certainly on notice that defying discovery orders, lying to the Court, and intentionally withholding critical documents could result in dismissal.

The fourth factor examines only whether the trial court considered lesser sanctions, not whether the court earlier imposed them. *See Tech. Recycling Corp. v. City of Taylor*, 186 Fed. Appx. 624, 636 (6th Cir. 2006) (affirming dismissal for failure to comply with discovery orders, and stating: "[b]ecause the district court did not impose any sanctions short of dismissal with prejudice, we consider whether the district court at least considered such lesser sanctions"); *Bradbury v. Township*

*of Plymouth*, 1997 WL 76187, at \*4 (6th Cir. Feb. 20, 1997) (a court need not necessarily make ***explicit*** its consideration of lesser sanctions).

In determining whether to dismiss a case due to a discovery violation, the court should consider lesser sanctions. *Regional Refuse*, 842 F.2d at 155-56. But in *Regional Refuse*, the Sixth Circuit noted that "[w]hile it would be inappropriate to dismiss without considering the severity of this sanction and the availability of lesser sanctions, it is not an abuse of discretion to dismiss, even though other sanctions might be workable, if dismissal is supportable on the facts." *Id. See also Bank One*, 916 F.2d at 1079 (affirming court's entry of default judgment against several defendants even though court failed to consider lesser sanctions, because "defendants' lack of response to the court's order to compel discovery ... demonstrates the futility of any lesser sanctions.").

Here, the Court should consider imposition of the full range of available sanctions. But the egregiousness of the conduct, in comparison with other cases in which dismissal was deemed appropriate, would fully justify dismissal. We respectfully submit that is the appropriate penalty here, and it is well within the Court's broad discretion. *See, e.g., Bank One*, 916 F.2d at 1073 (recognizing the "well-established" abuse of discretion standard applies to the review of a district court's decision to dismiss a case under Rule 37(b)(2)(C)) (quoting *Regional Refuse*, 842 F.2d at 153-54); *Natl. Hockey League v. Metropolitan Hockey Club*, 427

U.S. 639, 642 (1976) (stating that it is not whether an appellate court "would as an original matter have dismissed the action; it is whether the [lower court] abused its discretion in so doing.").

> **e. At an absolute minimum, this Court should dismiss with prejudice claims related to the sound recordings conveyed in the Settlement Agreement.**

If the Court is uncomfortable dismissing the case in its entirety but believes a very serious penalty is warranted, it should seriously consider the possibility of dismissing with prejudice the claims related to the Subject Recordings purchased in the Settlement Agreement. *See* Ex. A. They are the primary nexus of the misconduct that occurred. As to those claims, Plaintiff perpetrated an extended fraud on the Court by litigating claims to which it had no ownership interest.[7] The Boladian Parties perpetrated an extended fraud on the Court by litigating through a cat's paw and denying it had any interest in the case. Dismissing these highly tainted claims with prejudice would be the most apt and most proportional response. *See* Fed. R. Civ. P. 37(c)(1)(C) (authorizing sanctions that are "appropriate").

## IV.   CONCLUSION

For the foregoing reasons, the Court should issue an Order dismissing some or all of the claims with prejudice and awarding Defendants the costs they incurred as a result of the sanctionable misconduct. To the extent any claims are not

---

[7]     For that reason, it may be necessary for the Court to determine the extent to which it retains subject-matter jurisdiction over those claims.

dismissed, the Court should extend discovery by three months and bar Plaintiff from introducing evidence related to the misconduct at any trial.

<div style="margin-left: 40%;">

Respectfully submitted:
SCHENK & BRUETSCH PLC

By: /s/ James P. Allen, Sr.
Peter E. Doyle (P81815)
James P. Allen, Sr. (P52885)
211 W. Fort Street, Suite 1410
Detroit, MI 48226
(313) 774-1000
james.allen@sbdetroit.com
peter.doyle@sbdetroit.com
*Attorneys for Defendants*

</div>

December 27, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2024, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to the attorneys of record.

<div style="margin-left: 40%;">

/s/ Peter E. Doyle

</div>