# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ESTATE OF GEORGE BERNARD WORRELL, JR., | Case No. 4:22-cv-11009 |
| Plaintiff, | District Judge F. Kay Behm |
| v. | Magistrate Judge David R. Grand |
| THANG, INC., and GEORGE CLINTON, | |
| Defendants. | |

_____/

# REPLY TO THE BOLADIAN PARTIES' RESPONSE TO DEFENDANTS' MOTION FOR SANCTIONS

## I. THE BOLADIAN PARTIES HAVE CONCEDED THEIR SANCTIONABLE CONDUCT

The Boladian Parties assert that "Defendants seek sanctions based on the Nonparties' supposed failure to produce a settlement agreement." ECF 116, PageID.2673. But that was Plaintiff's failing. The Boladian Parties misled the Court on relevance to evade a subpoena. The Court should sanction them for *that*.

Completely absent from the responses is even the barest attempt to dispute what is now incontrovertible: the Boladian Parties and Plaintiff operated in concert to ply the Court with knowingly false statements that third-party discovery was irrelevant, unnecessary and "harassing." Plaintiff and the Boladian Parties joined in opposition memos asserting the subpoenas were "untethered from any relevance." ECF 88-8, PageID.1150. Orally, counsel even asserted his clients "***don't pay anything on sound recordings, because they don't own them***." ECF 107 at 51, PageID.1763. They claimed Boladian/Westbound "have no dog in this fight" (ECF 93, PageID.1622), and "the potential value of the information sought is negligible." These were intentional misrepresentations. ECF 112, PageID.2002-09.

The falsehoods were costly in terms of time/expense, and successful in limiting Boladian's deposition in time (3 hours) and scope (*id.*, PageID.2008) and to a single deponent who disavowed all knowledge beyond signing what was put in front of him. It cannot be emphasized enough that both Plaintiff and the Boladian

1

Parties engaged in this false claim of irrelevance, and now neither has uttered a word to justify it except their *continued*, joint claims of irrelevance.[1]

## II. THE AGREEMENT WAS AND IS RELEVANT

This case presents two counts – one to establish Worrell as a co-owner of copyrights and the other for an accounting. The Agreement, related documents, and testimony of both parties thereto (Westbound/the Estate) bear directly on both.

Count I seeking to declare Worrell a co-creator and co-owner of multiple sound recordings was already hamstrung by Plaintiff's discovery failures. As recounted, Worrell produced essentially no documents (claiming to have lost them) and repeatedly testified that she could not recall key facts. *Id.,* PageID.1998-01. The Agreement–and the related documents and institutional/personal testimony–can potentially fill in the missing links for Count I. Evidence bearing on this count includes such things as Bernie Worrell's contractual and personal relationship to the

---

[1] Moreover, the timestamps on the Boladian Parties' production belie their false claims of irrelevance. The Boladian Parties downloaded the emails for production on "9/18/24" -- one week after receiving Defendants' subpoenas. ECF 112-6, PageID.2076. Plaintiff's production contains the exact same time stamps. Thus, the Boladian Parties initially recognized that the Settlement Agreement and correspondence were clearly relevant and discoverable in this litigation and began downloading those emails to produce. But after seemingly conferring with Plaintiff, the Boladian Parties reversed course and issued a blanket objection to the subpoenas on September 23, 2024. ECF 88-8, PageID.1150. The Boladian Parties falsely asserted that the subpoenas were "untethered from any relevance," were "designed to harass" Mr. Boladian, and were not in furtherance of any "legitimate goals in the pending *Worrell* litigation." *Id*. The Boladian Parties' misrepresentations forced Defendants to incur the expense of moving to compel production and have continued to deny Defendants discovery of relevant information.

recordings and relation to certain songs. The evidence goes back to the 1970s, and Judie Worrell has lost it. But Westbound stepped up in 2023 to buy Worrell's rights. Westbound is a sophisticated industry insider whose principal (Boladian) was around and involved with Clinton, Parliament and Worrell in the 70s and beyond. Westbound was privy to some of the last, best information on Worrell's status. Westbound, through apparently its agents, purchased Worrell's putative copyright interests for some recordings, but not others. It is a fair inference that the documents leading to the Agreement and knowledge of Westbound's agents bear upon the relative strength of the claims in each work. It is, thus, a fair inference that Westbound acquired rights from Worrell that it had reason to believe might be vindicated, and left other rights for fear they would not.

But Plaintiff and the Boladian Parties thwarted such inquiry by repeatedly claiming that Westbound "had no dog in the hunt." Instead of the relevant documents, Defendants got some old letters from Bernie Worrell asking for advances and a few emails with Judie Worrell.[2] Instead of a full 8 hours of unlimited deposition, Defendants got 3 hours of subject-constrained questions. And, instead of a deponent with knowledge, Defendant got Mr. Boladian, who promptly disavowed

---

[2] The Boladian Parties also attempted to withhold information regarding payments Westbound made to Plaintiff for sound recording royalties on the Works purchased by Westbound. **Exhibit A**. The Boladian Parties eventually produced limited sound recording royalty information a day before Mr. Boladian's deposition. *Id.*

3

any role in the Agreement beyond signing what his lawyers put in front of him and stated that he didn't "care." ECF 112, PageID.2008. There were unproduced relevant documents and unanswered questions concerning knowledge of Worrell's copyright claims and how Westbound acted upon them to buy the rights in certain sound recordings, to forego others, and what and how they paid or will pay. There are also unanswered questions regarding standing to pursue copyright and how or why Westbound has not intervened but instead relies upon the Estate to pursue claims for rights it has sold.

      The Agreement, related documents and testimony are also directly relevant to accounting. The Agreement is relevant to damages. *Id.*, PageID.1993. In response, Plaintiff asserts that "Plaintiff does not seek damages." ECF 115, PageID.2597. Actually, the Complaint expressly seeks "[a] judgment in favor of Plaintiff and against Defendants for the amount of damages proven at trial." ECF 1, PageID.21, ¶ 67a. This is not a mistaken insertion of boilerplate. Plaintiff's damages expert submitted a report on November 15, 2024 stating that he was retained "to calculate the damages suffered by Worrell." ECF 113-2, PageID.2546. He had been paid $400/hour to do so. *Id*. In an e-mail sent on December 17, 2024, counsel for Plaintiff informed Defendants that he was withdrawing the report, suggesting that damages would become relevant later: "Since an accounting is a proper remedy once co-ownership is adjudicated, there is no need for Plaintiff to prove damages ***at this***

4

*point*." ECF 113-5, PageID.2569. Thus, damages were quite relevant for the year that Plaintiff withheld the Agreement and are threatened to become so again.

Be that as it may, the Agreement is also centrally relevant to any potential accounting proceedings. Most critically, the Agreement establishes that ***only Westbound has the right to seek an accounting*** to the sold Works.³ This, in turn, puts in play all the facts regarding ***Westbound's*** (not Worrell's) jurisdictional contacts and litigation disabilities. Accounting sounds in equity and state common law, meaning equitable defenses such as unclean hands, laches and statutes of limitations, *inter alia*, may run based on facts from Westbound – ***not*** Worrell. Those facts have yet to be developed and will require further documents/deponents beyond someone who disavows any interest in, let alone knowledge of, the Agreement.

Even if an accounting could be maintained by the Estate, the Agreement and related documents/testimony would still be directly relevant. Plaintiff/Boladian Parties treat accounting as if it would just force Mr. Clinton to open his books and records. But accounting has ***each*** co-owner account for its profits. If the Estate turns

---

³ *See, e.g.*, 1 Melville B. Nimmer *et al.*, Nimmer on Copyright § 6.12(C)(1) (2023); *Howard v. Weston*, 354 F. Appx. 75 (5th Cir. 2009) (plaintiff denied accounting because he transferred his interests and "cannot bring an action to enforce the copyright rights he no longer owns"); *Vástago Producciones, LLC v. Heaven Publ'g LLC*, No. 4:23-cv-01432, 2024 U.S. Dist. LEXIS 15273, at *9 (S.D. Tex. Jan. 4, 2024) (party who transferred rights "retained no right to force an accounting"); *Roberts v. Gordy*, 359 F. Supp.3d 1231, 1239 (S.D. Fla. 2019) (quoting *Fathers & Daughters v. Lingfu Zhang*, 284 F. Supp.3d 1160, 1164 (D. Or. 2018) ("After a copyright owner has fully transferred an exclusive right, it is the transferee who has standing to sue for that particular exclusive right….The former copyright owner no longer has standing to sue for the rights that have been transferred.")).

5

out to be a co-owner, it too must account to Clinton for monies it has received from exploiting the copyrights. The Agreement contains information about what the Estate received and therefore – ***under its own theory of the case*** – the unredacted Agreement is essential evidence for any accounting.

### III.   PREJUDICE IS PLAIN AND FURTHER DISCOVERY AND OTHER REMEDIES ARE WARRANTED

Plaintiff and the Boladian Parties portray this Motion as a harassing and illegitimate attempt to get more discovery.[4] These are bold words coming from litigators who have not even ***attempted*** to explain to the Court how/why they resorted to outright falsehoods in writing and orally to claim that Defendants were seeking irrelevant information from parties with "no dog in the hunt." If the information were so worthless, why are two highly respected and long-time members of the bar unable to defend the grossly improper tactics to which they resorted seeking concealment? Indeed, the opposite is true: whatever other remedies are ordered, the case for limited follow-on discovery is clear. Plaintiff/Boladian Parties have also denied the existence of prejudice, ignoring both that they bore the burden of proving harmlessness – a showing they have not even attempted – and that

---

[4] Their concerted actions continue to prejudice Defendants. At the conclusion of the parties' unsuccessful January 10, 2025 facilitation, the facilitator disclosed that there were two lawyers on Plaintiff's side: counsel of record and an unannounced attorney from King & Bellow. Defendants did not know that they were negotiating with Boladian/Westbound's attorneys and thus wasted multiple hours in facilitation. Westbound, of course, had an interest in scuttling any settlement offer it viewed as an unfavorable return on its purchase of the Estate's claims.

prejudice can consist of difficulty in obtaining information to which a litigant is entitled. Nor did counsel "mock" Mr. Boladian.[5]

At bare minimum, discovery needs to be taken from Ms. Worrell and someone at Westbound with actual knowledge. Plaintiff tries to avoid this, citing delay. Even if this concern were cognizable – it isn't because it is the wrongdoers' fault – it can nonetheless be minimized by modest additional discovery. Such curative relief is imperative, and fully consistent with the Sixth Circuit's ratio of prejudice to sanctions relief. *Wittman v. Wilson*, 95 Fed. Appx. 752, 754 (6th Cir. 2004); *Regional Refuse v. Inland Rec.*, 842 F.2d 150, 155 (6th Cir. 1988). *A fortiori*, limited, curative discovery is a remedial ***floor***, ***not*** the ceiling sought by Plaintiff by invoking the delay they caused. *See also* Reply to Pl. Resp. at p. 5-7.

The Court should grant the relief specified in Defendant's Motion.

Respectfully submitted:
By: /s/ James P. Allen, Sr.
*Attorneys for Defendants*

January 16, 2025

---

[5] Instead of responding to the charge that they plied the Court with falsehoods, the Boladian Parties claim that counsel somehow "mocked" Mr. Boladian's blindness. Boladian repeatedly invoked this yet seems to have read and authored computer documents. When counsel asked if his blindness went away then, he was raising a legitimate question – how/when does this disability limit Boladian? There was nothing "mocking"; just a genuine need to know. Defendants are sorry for his difficulties; we need to know how it affects his day-to-day interaction with the facts. When avenue after avenue of discovery is cut off by failed memories or lost documents (or, with Mr. Boladian, neither knowing nor caring about the critical document he signed), it requires tough, and, at worst, indelicate questions.

**CERTIFICATE OF SERVICE**

I hereby certify that on January 16, 2025, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to the attorneys of record.

/s/ Peter E. Doyle