# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

ESTATE OF GEORGE BERNARD
WORRELL, JR.,

               Plaintiff,

v.

THANG, INC., and GEORGE
CLINTON,

               Defendants.

Case No. 4:22-cv-11009

District Judge F. Kay Behm

Magistrate Judge David R. Grand

_____/

## DEFENDANT THANG, INC.'S AND CLINTON'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P 56

Defendant Thang, Inc. and Clinton through their attorneys, Schenk & Bruetsch, PLC, move this Honorable Court pursuant to FED.R.CIV.P 56 and for their motion rely upon the accompanying brief.

              Respectfully submitted:
              SCHENK & BRUETSCH PLC

              By: /s/ James P. Allen, Sr.
              Peter E. Doyle (P81815)
              James P. Allen, Sr. (P52885)
              211 W. Fort Street, Suite 1410
              Detroit, MI 48226
              (313) 774-1000
              james.allen@sbdetroit.com
              peter.doyle@sbdetroit.com
              *Attorneys for Defendants*
              March 26, 202

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

ESTATE OF GEORGE BERNARD
WORRELL, JR.,

               Plaintiff,

v.

THANG, INC., and GEORGE
CLINTON,

               Defendants.

Case No. 4:22-cv-11009

District Judge F. Kay Behm

Magistrate Judge David R. Grand

_____/

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      Defendants, THANG, INC. and GEORGE CLINTON, through their attorneys, SCHENK & BRUETSCH, PLC, by JAMES P. ALLEN, SR. and for their BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMERY JUDGMENT, states the following:

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT OF QUESTIONS PRESENTED ................................... vii

MOST CONTROLLING AUTHORITIES ........................................ ix

I.   STATEMENT OF MATERIAL FACTS ...................................... 1

  PART 1—The Contracts .............................................................. 1

  Part II  Ownership of Sound Recordings ...................................... 5

  Part III   No Mutual Intent ........................................................ 6

  Part IV Settlement between Plaintiff and Westbound ..................... 7

II.   STANDARD: SUMMARY JUDGMENT ................................... 7

III.   ARGUMENT ......................................................................... 8

  A.   THE COPYRIGHT ACT'S THREE-YEAR STATUTE OF
  LIMITATIONS BARS PLAINTIFF's CLAIMS .............................. 8

  B.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
  BECAUSE PLAINTIFF FAILED TO ADDUCE EVIDENCE OF AN
  INTENT THAT WORRELL BE CONSIDERED A CO-CREATOR AT THE
  TIME EACH INDIVIDUAL RECORDING WAS CREATED ........................ 27

  C.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT FOR
  WORKS TRANSFERRED IN THE SETTLEMENT AGREEMENT ......... 34

   **D.  PLAINTIFF RELEASED DEFENDANTS FROM LIABILITY** ...........**37**

**IV.  CONCLUSION** ...........................................................................**40**

**CERTIFICATE OF SERVICE** ................................Error! Bookmark not defined.

# TABLE OF AUTHORITIES

CASES

*Aalmuhammed*,
  202 F.3d ................................................................... 14, 15, 18, 31, 32

*Brand v. RMM*,
  2011 WL 1496344 (S.D.N.Y. Apr. 18, 2011) .................................................... 18

*Brownstein v. Lindsay*,
  742 F.3d 55 (3d Cir. 2014) ................................................................ 15

*Burgess v. Fischer*,
  735 F.3d 462 (6th Cir. 2013) ............................................................. 8

*Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.h. & Co. KG*,
  510 F.3d 77 (1st Cir. 2007) .............................................................. 17

*Childress*,
  945 F.2d ................................................................................ 30, 31

*Cochran v. Ernst & Young*,
  758 F. Supp. 1548 (E.D. Mich. 1991) .................................................... vii, 39, 40

*Corwin v. Quinonez*,
  858 F. Supp.2d 903 (N.D. Ohio 2012) ............................... vii, 29, 30, 33, 34, 35

*Diamond v. Gillis*,
  357 F. Supp.2d 1003 (E.D. Mich. 2005) ........................................................ 18

*Dorchen/Martin Assocs. v. Brook of Cheboygan, Inc., No. 11-10561*,
  2012 U.S. Dist. LEXIS 177940 (E.D. Mich. Dec. 17, 2012) ..................... vii, 33

*Erickson v. Trinity Theatre, Inc.*,
  13 F.3d 1061 (7th Cir. 1994) ............................................................. 31

*Everly v. Everly*,
  958 F.3d 442 (6th Cir. 2020) .......................................... vii, 9, 12, 13, 14, 15, 23

*Ford v. Ray*,
    130 F. Supp.3d 1358 (W.D. Wash. 2015) ........................................... 18

*Garza v. Everly*,
    59 F.4th 876 (6th Cir. 2023) ............................................... vii

*Howard v. Weston*,
    354 F. Appx. 75 (5th Cir. 2009) ........................................ 36

*Kwan*,
    634 F.3d ......................................................................... 15

*Mahan*,
    634 F. App'x ............................................................... 15

*Margo v. Weiss*,
    213 F.3d 55 (2d Cir. 2000) ................................. 11, 24, 25, 26, 27, 28

*Margo v. Weiss*,
    1998 WL 2558 (S.D.N.Y. Jan. 5, 1998) ........................... 18

*Merchant v. Levy,*
    92 F.3d 51 (2d Cir.1996) ..................................... 9, 14, 15

Merchant v. Levy, Supra. ........................................... 11

*Peffer v. Stephens*,
    880 F.3d 256 (6th Cir. 2018) ........................................ 7-8

*Ritchie v. Williams*,
    395 F.3d 283 (6th Cir. 2005) ............................... vii, 14, 15

*Roberts v. Gordy*,
    359 F. Supp.3d 1231 (S.D. Fla. 2019) ........................ 36-37, 37

*Rodríguez-García v. Municipality of Caguas,*
    354 F.3d 91 (1st Cir. 2004) ................................... 11

*Roger Miller Music v. Sony/ATV Publ'g*,
    477 F.3d 383 (6th Cir. 2007) ................................. 8

*Roomska v. Opper*,
   234 Mich. App. 512 (1999) ................................................................. 40

*Saenger Org., Inc., v. Nationwide Ins. Licensing Assocs., Inc.*,
   119 F.3d 55 (1st Cir. 1997) ................................................................. 18

*Santa-Rosa v. Combo Records*,
   471 F.3d 224 (1st Cir. 2006) ............................................ vii, 11, 14, 17, 18

*Shay v. Aldrich*,
   487 Mich. 648 (2010) ........................................................................ 40

*Stone v. Williams*,
   970 F.2d 1043 (2d Cir. 1992) ............................................................... 9

*Straughter v. Concord Music, No. ED CV 19-1360-JFW*
   (SHKx), 2020 WL 6821313 (C.D. Cal. Oct. 13, 2020) ............. 18, 19, 21, 22, 23

*Tang v. Putruss*,
   521 F. Supp.2d 600 (E.D. Mich. 2007) ........................................ vii, 29, 30, 32

*Thomson v. Larson*,
   147 F.3d 195 (2d Cir. 1998) .......................................................... 29, 30

*Vástago Producciones, LLC v. Heaven Publ'g LLC, No. 4:23-cv-01432*,
   2024 U.S. Dist. LEXIS 15273 (S.D. Tex. Jan. 4, 2024) ............................ vii, 36

*Warrick v. Roberts*,
   34 F. Supp.3d 913 (N.D. Ill. 2014) ...................................................... 18

*White v. Taylor Dist. Co.*,
   289 Mich. App. 731 ......................................................................... 40

*Willsea v. Theis*,
   1999 WL 595629 (S.D.N.Y. Aug. 6, 1999) ............................................. 18

*Zuill v. Shanahan*,
   80 F.3d 1366 (9th Cir. 1996) .......................................................... 14, 15

STATUTES

17 U.S.C. § 101 ........................................................................................ 29

17 U.S.C. § 507 ................................................................................. vi, 8, 10

RULES

FED.R.CIV.P 56 ................................................................................. i, vi, 7

## STATEMENT OF QUESTIONS PRESENTED

I.   ARE PLAINATAIFF'S CLAIMS TIME BARRED WHERE (1) THEY WERE BROUGHT MORE THAN THREE YEARS AFTER THEY ACCRUED; (2) PLAINTIFF WAS PRESENT FOR THEIR CREATION DECADES AGO; (3) THOSE CLAIMS WERE REPUDIATED IN MULTIPLE WAYS; and (4) PLAINTIFF AND ITS REPRESENTATIVES EXPRESSLY ACKNOWLEDGED ACCRUAL OF THEIR CLAIMS?

Plaintiff answers: No

Defendants answers: Yes

II.   ARE DEFENDANTS ENTITLED TO SUMMARY JUDGMENT WHERE THEY HAVE FAILED TO ADDUCE SUFFICIENT EVIDENCE OF THE PARTIES' MUTUAL INTENT TO BE CONSIDERED CO-CREATORS AT THE TIME EACH INDIVIDUAL RECORDING WAS CREATED?

Plaintiff answers: No

Defendants answers: Yes

III.   ARE DEFENDANTS ENTITLED TO SUMMARY JUDGMENT FOR WORKS TRANSFERRED IN THE SETTLEMENT AGREEMENT BETWEEN PLAINTIFF AND DISMISSED DEFENDANT WESTBOUND RECORDS, INC?

Plaintiff answers: No

Defendants answers: Yes

IV.   IS DEFENDANT CLINTON ENTITLED TO SUMMARY JUDGMENT ON THE BASIS OF THE RELEASE OF "ALL EMPLOYEES" OF WESTBOUND RECORDS, INC. WHERE THE RECORD SHOWS THAT CLINTON WAS BRIEFLY EMPLOYED BY WESTBOUND IN FEBRUARY AND MARCH OF 1974?

Plaintiff answers: No

Defendants answers: Yes

# MOST CONTROLLING AUTHORITIES

**COURT RULES**

FRCP 56

**STATUTE**

17 U.S.C. § 507(b)

**COURT DECISIONS**

*Everly v. Everly*, 958 F.3d 442 (6th Cir. 2020)

*Ritchie v. Williams*, 395 F.3d 283 (6th Cir. 2005)

*Garza v. Everly*, 59 F.4th 876 (6th Cir. 2023)

*Santa-Rosa v. Combo Records*, 471 F.3d 224 (1st Cir. 2006)

*Corwin v. Quinonez*, 858 F. Supp.2d 903 (N.D. Ohio 2012)

*Tang v. Putruss*, 521 F. Supp.2d 600 (E.D. Mich. 2007)

*Dorchen/Martin Assocs. v. Brook of Cheboygan, Inc.*, No. 11-10561, 2012 U.S. Dist. LEXIS 177940, at *10 (E.D. Mich. Dec. 17, 2012)

*Vástago Producciones, LLC v. Heaven Publ'g LLC*, No. 4:23-cv-01432, 2024 U.S. Dist. LEXIS 15273, at *9 (S.D. Tex. Jan. 4, 2024)

*Cochran v. Ernst & Young*, 758 F. Supp. 1548 (E.D. Mich. 1991)

**TREATISES:**

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.05[C][1] (2024)

1 Nimmer on Copyright § 6.07

1 Melville B. Nimmer *et al*., Nimmer on Copyright § 6.12(C)(1) (2023

# I.    STATEMENT OF MATERIAL FACTS

## PART 1—The Contracts

1.    Defendant George Clinton ("Clinton") founded The Parliaments in 1956 when Plaintiff's decedent, Bernie Worrell ("Worrell") was twelve years old. Ex. I, Clinton Decl., ¶ 3.

2.    About thirteen years later, Worrell began playing keyboards for some bands George Clinton founded. ECF No. 1, PageID.11. His wife, Judie Worrell, was his manager and negotiated his first contract with Clinton's company, Thang, Inc. Ex. A, Judie Worrell Dep. Tr. at 10-12. Neither party found an executed copy of it. Plaintiff conveniently claims it "lost a significant amount of documentation in 2015 when a tree came down in a storm and several boxes of files were destroyed." ECF No. 89-1, PageID.1178, Plaintiff offered no accounting of the contents of the boxes allegedly lost in 2015 but in May 2017 claimed she found some materials related to Clinton while "cataloging and unpacking *more* boxes." Ex. B, May 28, 2007 Judie Worrell Facebook post. And yet, she testified the documents Defendants requested--what she described as "business documents" -- had "disintegrated" after a tree smashed an RV where they were and got them wet. ECF No. 88-3, PageID.1067.

3.    The oldest evidence of a written agreement involving Worrell came from union contracts which, according to their plain meaning, make clear that Worrell was regularly hired as a union employee of the record companies that presently have title

1

to most of the sound recordings at issue. The contracts, all from American Federation of Musicians, Local 5 ("AFM") cover some of the bands' work in Detroit studios for a period from at least 1974 to 1978. Contractual records from other AFM jurisdictions were not located, but the ones that have been state Worrell was an employee hired by the various record companies like Westbound Records ("Westbound"), holder of many of the copyrights at issue here. It states in standard "work-for-hire" language:

> [T]he employer hires the employees as musicians severally on the terms and conditions below and as further specified on the reverse side [which applied only to pension payments]. The leader represents that the employees already designated have agreed to be bound by said terms and conditions. Each employee yet to be chosen shall be so bound by said terms and conditions upon agreeing to accept his employment. Each employee may enforce this agreement. The employees severally agree to render collectively to the employer services as musicians. . ." ECF No. 88-7, PageID.1119-1148.

4.     In 1979, Worrell audited Thang to account for all money due and owing to him from Clinton based upon the existence of a contract. Worrell's audit references a 1976 contract and claimed a less than 1% of artist's royalty for him. Ex. C, Audit.

5.     In 1981, Worrell sued Clinton and others for money the above audit claimed had not been paid according to the 1976 contract. Ex. D. The verified complaint in that action claimed he entered into a written contract covering his compensation with Clinton and his various bands. *Id.* at 2. Although the extant copies of that complaint do not have the attached contract, Worrell swore under oath that a contract, in fact,

existed and that it used work-for-hire language similar to the AFM agreements. Significantly, Worrell's verified complaint alleges Thang "engaged [Worrell] to render certain phonographic recordings" and that Worrell "render[ed] such artistic musical services to Thang," again, classic work-for-hire language. *Id.*

6.    In 1982, Worrell entered into another agreement to settle the 1981 litigation which Clinton and Worrell both signed. Ex. E, 1984 Complaint with attached agreements, at 16. That agreement references a "General Release Agreement between Bernie Worrell, Defendants" and another record company. *Id.* This agreement reconciled the parties' respective accounts through 1982 reinforced the notion that the AFM and 1976 contracts compensated Plaintiff for the provision of his musical services (*i.e.*, status as a work-for-hire musician). It gives Plaintiff no interest in the sound recordings in this case.

7.    Another verified complaint, filed in 1984, also contains several breach of contract claims, alleging Worrell had not received compensation for contractual services he rendered to Clinton and his companies. *Id.* at 1-13.

8.    In 1994, as part of litigation between two record companies over many of the same sound recordings at issue in this case, the Court appointed a special master to oversee distribution of royalties to Clinton and other band members while the record companies battled. *See*, *Tercer Mundo Inc v. Boladian, et al*; Case No. 93-cv-04106-R, (C.D. Cal.). In correspondence to the special master, Mrs. Worrell made many of

the same allegations the Estate is making in this case blaming Armen Boladian, owner of many copyrights at issue in this litigation. ECF No. 88-4, PageID.1078. Boladian testified he could not remember paying Clinton royalties in the last 14 years. ECF No. 112-8, PageID.2472.

9.     Boladian's long-time Nashville law firm, King & Ballow, represents Plaintiff in Whatcom County, Washington, hired Plaintiff's proffered expert witness, Robert Kohn, filed suit in New York on behalf of the estate in 2019, and has acted as both the estate's counsel in settling with former defendant Westbound, and finally as Boladian's counsel, defending his deposition in this case. ECF No. 112-6, PageID.2061; ECF No. 112-8, PageID.2387; ECF No. 1-2, PageID.33.

10.    In 2019, Worrell filed another lawsuit, again asserting the breach of a January 1, 1976 recording contract between Worrell and Defendant Thang. ECF No. 1-2, PageID.33. Worrell swore it was a "true and correct copy of the Agreement." *Id*., PageID.35. It states he was a paid "individually, or as a member of a group, in the production of phonographic records under the Agreement." *Id.* Worrell claimed a small share of royalty payments (3/4 of one percent) "for his participation in the creation of the phonographic records" at issue in the present case. *Id.*

11.    Mrs. Worrell testified in this case, consistent with her many public statements, that, as Worrell's manager (Ex. A, at 10-12), she negotiated his first and subsequent contracts, a fact which squares, at least in part, with a billing entry produced in this

lawsuit from one of Mr. Clinton's former attorneys, alluding to a conference this lawyer had with the Worrells to negotiate a contract. Ex. F, Meibach Invoice.

12.     Numerous payment records and vouchers establish that Worrell was paid consistent with the terms of the contract he had with Defendants. Ex. G.

**Part II       Ownership of Sound Recordings**

13.     Clinton owns sound recordings for only four albums. In a lawsuit involving Clinton, a former manager, and other members of Parliament-Funkadelic about those albums originally released by Warner Brothers, U.S. District Judge Manuel Real found:

> Clinton created the master recordings for the Funkadelic albums "Hard Core Jollies," "One Nation under a Grove," "Uncle Jam Wants You," and "Electric Spanking of War Babies" and certain live performances of said albums, pursuant to the Warner Bros. agreement. Ex. H.

14.     Judge Real also found that Clinton:

> entered into a settlement with Warner Bros. which provided, among other things, that Warner Bros. would relinquish its ownership and control of the Masters to Clinton if a third party distributor agreed in writing to pay Warner Bros. a royalty of 5% of net sales of albums that embodied the Masters; the settlement further provided that, when Warner Bros. had received a total of $283,333.34, the royalty payments would cease. *Id.* at 2.

15.     Finally, with regard to the timing of his acquisition, Judge Real ruled "Clinton is the sole owner of all rights in and to the Masters, and the live performances of said albums, and has been the sole owner of said rights since 1993." *Id.* at 8, ¶ 13.

5

16.     While Boladian could not remember when his companies stopped paying Clinton for the tracks over which Boladian claims ownership, he did recall that Clinton is not currently and has not for "quite a while" been receiving any such payments from Boladian's companies. ECF No. 112-8, PageID.2472.

**Part III   No Mutual Intent**

17.     Clinton had final authority on creative issues for the bands he founded. Ex. I, ¶ 8. He hired musicians for the band and made personnel decisions about who would play on the bands' records.  He was also responsible for the business affairs of the bands and had ultimate legal and financial responsibility for those decisions. He negotiated and entered into the bands' various recording agreements. *Id.* ¶ 10, 11.

18.     At no time did Clinton award or intend to award ownership interests in sound recordings.  Indeed, he only received title to some of those master recordings after years of litigation and negotiation that he alone financed. *Id.*; Ex. H.

19.     Some time between 1972 and 1974, the bands' various members, including Worrell, received letters advising them that they were employees hired to provide his bands their musical services. Ex. I, ¶ 15.  No member of the band received any interest in sound recordings that Clinton himself is still some fifty plus years trying to obtain. *Id.* ¶ 13.

20.     Clinton and Worrell had a discussion shortly before Worrell died in which Worrell requested, among other things, an ownership interest in the sampling

revenue from the bands' sound recordings.  Clinton told Worrell that he could not and would not honor that request, offering instead to assist in other ways. *Id.* ¶ 15.

**Part IV Settlement between Plaintiff and Westbound**

21.    In December 2023, Plaintiff entered into a Settlement Agreement ("Agreement") with Westbound Records in this case assigning the estate's interest in many of the most valuable tracks at issue here. ECF No. 112-6, PageID.2061.

22.    The Agreement releases "***all***" employees of Westbound "from the beginning of the world to present." *Id.*, .2062. Clinton did not have extensive employment with Westbound. Boladian signed AFM contracts (ECF No. 88-7, PageID.1121-.1125, 1127, 1128) in February/March 1976  that claim Clinton as a Westbound employee.

23.    Boladian and related parties specifically preserved their right to sue Clinton, but Plaintiff made no such reservation of its right to sue Clinton, rather agreeing to release "all" Westbound employees "from the beginning of the World." ECF No. 112-6, PageID.2061-2062.

## II.    STANDARD: SUMMARY JUDGMENT

Summary judgment is appropriate when "no genuine dispute as to any material fact" exists, and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986)). At the summary judgment stage, "the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party." *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013) (citation omitted).

### III.  ARGUMENT

#### A. THE   COPYRIGHT   ACT'S   THREE-YEAR   STATUTE   OF LIMITATIONS BARS PLAINTIFF's CLAIMS

##### 1. Introduction: Statute of Limitations – Three Years from Accrual of a Co-Author's Claim

The Estate sued because Bernie Worrell "collaborated with Clinton as a songwriter, musician, producer, and performer on the majority of songs that were recorded in the 1970s and 1980s." DE1 at ¶3, PageID.2. Attached to the Complaint as Exhibit D is a listing of albums and songs for which the Estate is claiming co-authorship – it is 264 songs long, and those songs span roughly from 1969 to 1982. DE1 at Exh. , PageID.55-63. The Complaint alleges "Worrell was at all times a joint owner of the master recordings of the Works whose interest therein now rightfully belongs to Plaintiff." DE1 at ¶16, PageID.7. Thus, the Estate brought suit in 2022 claiming that it is and always has been a co-author of Sound Recordings produced decades prior. The Copyright Act's three-year statute of limitations bars them all.

17 U.S.C. § 507(b) provides: "[n]o civil action shall be maintained ... unless… commenced within three years after the claim accrued." Ownership claims "accrues only once, and if an action is not brought within three years of accrual, it is forever barred." *Roger Miller Music v. Sony/ATV Publ'g*, 477 F.3d 383, 390 (6th Cir. 2007). The question is when, during the half century since creation of the recordings, did

Worrell's claims accrue? Under all approaches to accrual, the answer, as a matter of law, is ***before 2019***, making the 2022 filing untimely.

Co-authorship accrual doctrine has three archetypes, two of them relevant here. In one, an artist is present ***at the outset of creation*** and put on notice of the need to assert co-authorship by that fact. *See Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir.1996) ("[N]o ... uncertainty exists as to co-ownership rights based on co-authorship. A co-author knows that he or she jointly created a work from the moment of its creation."). Another archetype, not relevant, is that of a lost heir to an artist asserting rights upon learning of their ancestor's co-authorship--the heir would not have been present at creation.  <u>See,</u> *Stone v. Williams*, 970 F.2d 1043, 1050 (2d Cir. 1992) (Hank Williams's illegitimate daughter sued for share of his renewal copyright royalties). Finally, there is the archetype of artists, both present at creation ***and*** apparently agreeing to co-authorship for a period, but suffering a falling-out leading to one artist repudiating the other's status as co-author. The leading (and binding) case is *Everly v. Everly*, 958 F.3d 442 (6th Cir. 2020). The Everly Brothers, longstanding musical collaborators, apparently shared co-authorship of the song *Cathy's Clown*, then suffered a falling-out leading one to assert sole authorship.

As demonstrated below, there have been many events over the last half century that independently show accrual of Plaintiff's time-barred claims:

- The copyright registrations of the Sound Recordings themselves, none of which reflect Worrell as a co-author

- The royalty payments – none of which reflect Worrell being compensated as a co-author
- The Audits – none of which reflect unpaid sound recording royalties that would have been due Worrell as a co-author
- The 1982 Novation – which settled all claims then existing between the parties *which necessarily includes any claim by Worrell that he was a co-author of the Sound Recordings*
- Clinton's 2014 Autobiography – which attributes authorship of Sound Recordings to Clinton with Worrell as one of many accompanying artists

Any *one* of these facts constitutes accrual, as a matter of law under binding precedent, making the 2022 filing barred under 17 U.S.C. § 507(b).

### 2. Worrell Was Present for the Creation of the Sound Recordings Thereby Accruing Co-Authorship Claims in the 1970s and 1980s

This case is the archetype of a performer contributing to a *contemporaneously* copyrighted and commercially sold recording *without* ever contemporaneously securing copyright credits or royalties. The Complaint itself alleges "Mr. Worrell *performed, wrote, and produced* on all albums by the groups Parliament and Funkadelic." DE1 at ¶44 (PageID.14) (emphasis added). Plaintiff did not just wake up one day and become aware that Mr. Worrell's work was included in sound recordings as to which he was not being attributed co-author status. Bernie and Judie Worrell were aware – on a song-by-song and album-by-album basis – when his work was included on sound recordings that are the subject of this action.

Thus, the three-year statute of limitations for these recordings started running – depending upon the song – *in the 70s and 80s when Worrell contributed to them*. It expired for *all* songs listed in Exhibit D *well before 1990*. A claim accrues when

"the plaintiff 'knows or has reason to know of the injury which is the basis for the claim.'" *Rodríguez-García v. Municipality of Caguas*, 354 F.3d 91, 96-97 (1st Cir. 2004) (quoting *Rodríguez Nárvaez v. Nazario*, 895 F.2d 38, 41 n.5 (1st Cir. 1990)). Thus, a claim for declaratory judgment of ownership accrues when plaintiff "knew of the alleged grounds for the [ownership] claim." *Margo v. Weiss*, 213 F.3d 55, 60-61 (2d Cir. 2000). *See also*, *Merchant v. Levy*, <u>Supra</u>., at 56  ("[N]o ... uncertainty exists as to co-ownership rights based on co-authorship. A co-author knows that he or she jointly created a work *from the moment of its creation*.") (emphasis added).

In words that perfectly fit our facts, the First Circuit emphasized that "[i]t goes without saying that Santa Rosa was present when his performances were recorded by Combo Records, and thus knew from the moment that each recording was created that he had a potential claim for ownership of it." *Santa-Rosa v. Combo Records*, 471 F.3d 224, 228 (1st Cir. 2006). "Thus, there is little question that Santa Rosa's claims for co-ownership accrued as soon as he finished recording each album." *Id*.

This rule – specific to recording artists *present for the creation of master works* – is directly on point and mandates accrual dates spanning the 70s and 80s – decades before the instant filing. Mr. Worrell was not credited on copyrights contemporaneously, and he was aware of this. If he took issue with it, he had three years from each recording to challenge the situation. He did not. These claims fit squarely within the framework of *Santa-Rosa* and its progeny, and they are barred.

### 3. Worrell Was Subject to Multiple Forms of Repudiation of Any Possible Rights

Even if Worrell *had* asserted a co-creator copyright claim when the songs were created, he could still have lost it in ensuing years by the process known as "repudiation." The Sixth Circuit's treatment of the Everly Brothers' falling-out instructs. These Artists had a longstanding and close musical collaboration when they produced "Cathy's Clown." *Everly*, 958 F.3d at 445. To all outward appearances, unlike Worrell, they *shared* copyright credit and royalties for the twenty years following the song's creation (c. 1961-1980). *Id.* at 469. "The original copyrights to the Compositions listed Phil and Don as authors, and the brothers were credited as co-authors, each receiving royalties." *Id.* at 445. They took joint credit in award shows in 1961, 1972 and 1975. *Id*. Then, they had a falling-out, stopped speaking, and testimony had Don demanding that Phil "'take his name off' the song" in 1980. *Id*. With the record on the verbal interactions "unclear," the brothers entered into various termination agreements, and they and their heirs sued. *Id*. at 446-47.

The district court granted summary judgment. The Sixth Circuit reversed, holding "the statutory period for any action to establish ownership begins to run whenever there is a 'plain and express repudiation' of ownership by one party as against the other." *Everly*, 958 F.3d at 450 (quoting *Ritchie v. Williams*, 395 F.3d 283, 288 n.5 (6th Cir. 2005) (quoting *Aalmuhammed v. Lee*, 202 F.3d 1227, 1230-31 (9th Cir. 2000)). The Court's focused on the "plain-ness" that Don repudiated Phil's co-

authorship and concluded "there is a genuine factual dispute as to whether the 1980 Release reflected a repudiation of Phil's authorship or rather a voluntary transfer of certain ownership rights, possibly including the right to receive public credit, for *Cathy's Clown*." *Id*. at 455. On remand, the district court held a bench trial deeming the claims time-barred by a 1980 phone call and memorialization, a judgment upheld on the second appeal. *Garza v. Everly*, 59 F.4th 876, 882 (6th Cir. 2023).

If this case is viewed through the *Everly* repudiation lens – as opposed to the *Santa Rosa* contemporaneous recording lens – Plaintiff's claims still accrued well before 2020 due to the many ways in which any assertion of co-authorship was repudiated in the years between 1970 and 2019. The relevant factual inquiry – and one on which there is no dispute – is the **many** forms and instances in which Worrell's sound-recording co-authorship claims have been repudiated over the years.

Repudiation of co-authorship is universally understood to resemble the process of adverse possession in real property. *See generally* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.05[C][1] (2024); *Everly*, 958 F.3d at 451 ("An ownership claim therefore must be brought within three years after the purported owner's status as such is challenged by a party with a competing claim of ownership."). "The most straightforward means of repudiating a claim is a direct statement from one party to another claiming exclusive rights to the work." *Id*. Illustrating this is *Ritchie*, in which Kid Rock sent a letter to his former promoter

claiming exclusive ownership of his songs, thereby expressly repudiating the promoter's contrary claims. *Ritchie*, 395 F.3d at 289-90. Similarly, in *Zuill*, the creator of "Hooked on Phonics" claimed sole ownership in the compensation agreement between himself and the plaintiff and provided the plaintiff with a copy of the product stating that Zuill's company owned the copyright. *Zuill v. Shanahan*, 80 F.3d 1366, 1368-71 (9th Cir. 1996).

Repudiation also occurs when "the work is published but the plaintiff is not appropriately credited." *Everly*, 958 F.3d at 452. Prototypical is *Aalmuhammed*, 202 F.3d at 1230-31, cited with approval by the Sixth Circuit in *Everly*, 958 F.3d at 452. In *Aalmuhammed*, a plaintiff sought ownership of movie rights as an author. *Id*. at 1230. But the movie's credits only "list[ed] [him] far below the more prominent names, as an 'Islamic technical consultant.'" *Id.* at 1231. This designation in the movie credits was an open challenge to plaintiff's claimed status as co-author and therefore triggered the statute of limitations. *Id.*

Finally, courts have found that a co-owner's claim may be repudiated when she learns she is entitled to royalties she is not receiving. *Everly*, 958 F.3d at 452, citing *Mahan v. Roc Nation, LLC*, 634 F. App'x 329, 331 (2d Cir. 2016); *Merchant v. Levy*, 92 F.3d 51, 56-57 (2d Cir. 1996); *Santa-Rosa*, 471 F.3d at 228.

It is important to note, as the Sixth Circuit pointed out, that these cases involved repudiation of ***ownership***, not ***authorship***. However, the Circuit

simultaneously held that the standard for repudiation was ***identical*** in both situations, while pointing out critical policy rationales that are particularly pertinent here. *Everly*, 958 F.3d at 452-53 ("Allowing authors to sleep on their rights even after they have been repudiated would inject instability into an area of copyright law that calls out for certainty."). Further, "[i]t is inequitable to allow the putative co-owner to lie in the weeds for years after his claim has been repudiated, while large amounts of money are spent developing a market for the copyrighted material, and then pounce on the prize after it has been brought in by another's effort." *Zuill*, 80 F.3d at 1371.

The party claiming sole authorship can repudiate authorship (1) privately in direct communication with rivals, *see Ritchie*, 395 F.3d at 287; *Zuill*, 80 F.3d at 1368, 1371; (2) publicly by asserting sole authorship to the world and plaintiff, including by listed credit on the published work, *see Kwan*, 634 F.3d at 229; *Aalmuhammed*, 202 F.3d at 1230; or (3) implicitly by receiving remuneration for works to which plaintiff is entitled, *see Mahan*, 634 F. App'x at 331; *Merchant*, 92 F.3d at 56-57. To repudiate claims under the latter two theories, the receipt of money and credit must actually be adverse to the plaintiff's authorship status. *See Brownstein v. Lindsay*, 742 F.3d 55, 72 (3d Cir. 2014) ("It follows that, if an action is not hostile to an author's rights, it may not be plain that his authorship rights have been repudiated.").

Here, as a matter of undisputed fact, there are multiple instances of all three forms of repudiation. The pattern of repudiation of Worrell's co-authorship of the

sound recordings is so longstanding, pervasive, distinctive and beyond factual dispute as to independently warrant summary judgment on any one of several bases.

**a.   Clinton stated to Mr. Worrell that Clinton was the sole author of each of the albums and songs at issue.**

Clinton discussed with Worrell the issue of sound recording royalties in one of their final phone calls.  Clinton advised Worrell that he did not recognize Worrell's rights to them, offering instead to help him protect his rights to publishing royalties. Ex I at ¶ 14-15.

**b.  Clinton *publicly* asserted sole authorship to the world and Plaintiff, including the listed credit on Sound Recordings in his autobiography.**

Clinton (or entities to which Clinton assigned ownership) publicly took credit for the recordings here since the 1970s in myriad media. Most fundamentally, copyrights for the recordings at issue were all registered in names other than Plaintiff's, primarily record companies which still retain legal title. And Clinton's autobiography further made plain to the world (and to Plaintiff, who has specific knowledge of it) Clinton openly and notoriously claimed sole authorship of them.

Attached as Exhibit J is a spreadsheet listing available sound recording copyright registration information for many of the albums at issue in this litigation. In each instance, it is a person or entity other than Bernie Worrell. These copyrights have been publicly available for decades. This is public repudiation.

*Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.h. & Co. KG*, 510 F.3d 77, 90-91 (1st Cir. 2007), is instructive. There, the owner of a book brought suit for co-ownership and accounting for sales of related figurines and images. *Id*. at 80. The Court dismissed on statute of limitations grounds because it deemed the claims to have accrued more than three years before filing based on facts also present here. Two facts independently caused the claims to accrue. First "[p]ublicly available documents in the Copyright Office and prior litigation cast doubt on Cermanovic-Kuzmanovic's rights in *Das Hummel–Buch*." *Id*. at 91. Then, too, "Goebel engaged in widespread exploitation of at least some portion of those rights, such as its use of The Merry Wanderer, without remuneration to Cermanovic-Kuzmanovic." *Id*. Both are plainly true of Worrell's claims: i) the copyrights did not list Worrell as a co-author; and ii) Clinton (or his assignees) had been widely exploited some portion of those rights since the 1970s without paying Worrell.

Nor does this conclusion change because the medium here is sound recordings. In *Santa-Rosa*, 471 F.3d 224, a singer sued Combo Records for the sales of five albums recorded 15 years previously. As a backup to its present-for-creation analysis, the count for co-ownership was deemed time-barred because:

> ***[W]e cannot think of a more plain and express repudiation of co-ownership than the fact that Combo openly, and quite notoriously, sold Santa Rosa's records without providing payment to him***: according to documents provided by Santa Rosa, at least 1,140 of the recordings in dispute were sold during the six month period between January and June of 2000, almost four years before Santa Rosa filed suit in May 2004. Likewise, it is hard to believe that a singer

of Santa Rosa's stature would have been unaware that Combo Records was selling his recordings and thus claiming ownership over them until three years before this action was commenced.

*Id*. at 228 (emphasis added). So here, except there is no need to impute knowledge of the sales to the Worrells – they openly lamented it. *See, Ford v. Ray*, 130 F. Supp.3d 1358, 1361-62 (W.D. Wash. 2015). *See* Ex. Q, 1995 Declaration of Bernie Worrell at ¶ 3 ("Defendants have never provided me with a proper accounting of the royalties which I am owed nor made proper payment to me of those royalties…").

The body of caselaw finding accrual because an artist has been left out of the copyright and royalty process mandates the same result here. "[O]nce an author registers his copyright, any co-author exercising reasonable diligence should be aware that another person has claimed authorship and thus know of his alleged injury." *Willsea v. Theis*, 1999 WL 595629, *5 (S.D.N.Y. Aug. 6, 1999); *see Warrick v. Roberts*, 34 F. Supp.3d 913, 924 (N.D. Ill. 2014); *Diamond v. Gillis*, 357 F. Supp.2d 1003, 1007 (E.D. Mich. 2005); *Margo v. Weiss*, 1998 WL 2558, *5 (S.D.N.Y. Jan. 5, 1998); *Brand v. RMM*, 2011 WL 1496344, *4 (S.D.N.Y. Apr. 18, 2011); *Aalmuhammed*, 202 F.3d at 1231; *Saenger Org., Inc., v. Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55, 66 (1st Cir. 1997); *see also Straughter v. Concord Music*, No. ED CV 19-1360-JFW (SHKx), 2020 WL 6821313, at *4-5 (C.D. Cal. Oct. 13, 2020) (finding clear and express repudiation where a party obtained a copyright registration and a mechanical license for music royalties).

Moreover, Clinton, for decades, has taken credit for the sound recordings at issue as the leader of the P-Funk movement and Parliament-Funkadelic. He has done this openly and notoriously in multiple forms of media, most notably in his Autobiography. In 2014 George Clinton published an autobiography entitled *Brothers Be Yo Like George* that gave credit to Bernie Worrell as a ***member*** of Parliament-Funkadelic, but conspicuously ***not*** as a co-author of any of the Sound Recordings at issue. Atria © 2014. Clinton's autobiography generally tells the story of Clinton forming and leading a series of bands culminating in Parliament and Funkadelic and developing a style of music known as P-funk. Along with Walter "Junie" Morrison, Bernie Worrell was a keyboard player in Parliament and Funkadelic in the 1970s and 80s. *See generally id*. at 125-50, 210. But, critically, the Autobiography tells the story of a ***band*** – a band ***led*** by George Clinton throughout its existence and ***composed*** of many members of which Bernie Worrel was but ***one***. It expressly and implicitly repudiates Worrell's co-authorship claims in 2014.

Contrary to the portrayals in plaintiff's expert reports, Clinton's Autobiography clearly explains Bernie Worrell's role as a talented keyboard artist. It does not credit him as a "co-author" except on special albums/projects that were special and unique to Mr. Worrell. The contrast between the two – Worrell's lack of co-authorship credit for ***general*** Parliament-Funkadelic works and his express credit for his ***solo*** projects – shows the repudiation contained in Clinton's Autobiography.

Appendix A of the Autobiography contains a Selected Discography which lists the disputed albums under a prominent legend reading: "The following recordings include significant contributions from George Clinton, as songwriter, producer, vocalist, bandleader, or some combination of the four. Album titles are in italics. Single titles are in quotation marks." Autobiography at Appendix A. The Albums at issue in this litigation are listed, and *none* of them credit Bernie Worrell. But then, under the year 1978, is listed *All the Woo in the World*, and Bernie Worrell *is* prominently credited.[1] Autobiography at 364. This is express repudiation of any copyrightable credit for the Parliament-Funkadelic albums *not* attributed to Bernie Worrell. It was published to the world in 2014. Clinton's Autobiography plainly, openly and notoriously attributes one album to Bernie Worrell and refuses to do the same for those his Estate claims for now.  This is public, express repudiation of the Estate's current, contrary claims, and it occurred in 2014.[2]

### c. Clinton *implicitly* repudiated Worrell's co-authorship by receiving remuneration for the Sound Recordings and failing to pay Worrell as a co-author – facts made clear to Worrell repeatedly over decades.

Assume, for the sake of argument, that Worrell and/or his Estate were entitled to co-author status of the Sound Recordings when made. The ensuing years saw a

---

[1] Clinton does not contest that Worrell should have an ownership interest in the sound recordings of this album, but Clinton does not hold title to it.

[2] Worrell offered frequent criticisms of the biography and claimed intimate familiarity with its contents at her deposition where she was able to quote the page number of a certain passage related to her contribution to lyrics in two songs. Ex. A.

simply staggering amount of litigation and audits of royalty rights by, between and among Clinton, Worrell, and related music companies. Any one of these events would suffice to demonstrate to Worrell that Clinton – or Clinton's assignees – were receiving the sound recording royalties now being claimed by Worrell in a manner adverse to Worrell's claims. In *each* instance, Worrell was confronted with a plain statement of his entitlement to any share in the universe of music – including each of the Sound Recordings at issue – and in *none* of them were the rights now being claimed ever acknowledged in *any* way. Each instance is thus plainly a repudiation sufficient to trigger accrual of the three-year statute of limitation.

### i.  The 1981 New York State Suit

In 1981, Worrell sued Thang, Inc., Malbiz Music, Inc., and George Clinton seeking, *inter alia*, damages for breach of contract.  Ex D. The verified Complaint sets forth Worrell's relationship with Clinton and/or Clinton's companies, describing a January 1976 Agreement between himself and Thang and that:

> In accordance with the terms of the said Agreement (Exhibit "A"), among other things, Defendant THANG did engage PLAINTIFF to render certain phonographic recordings and PLAINTIFF did further agree to accept such engagement and did render such artistic musical services to Defendant THANG.

*Id*. at ¶9. This statement is adopted – under oath – by Worrell himself. *Id*. at 10. The Estate, through Judie Worrell, verified the authenticity of the document, the signature, and that it had no evidence to dispute the claims made in it.  Ex A. at 23-

25. As early as 1981, Worrell admitted that his participation in the Sound Recordings was as work-for-hire pursuant to contract, **not** as a co-author.

### ii.     The 1984 California State Court Lawsuit

Worrell sued Clinton and another of his companies in Los Angeles Superior Court in 1984, again using a verified Complaint that Judie Worrell affirmed was true when signed and affirmed remains true today. Ex. E; Ex. A at 45-46. The statements in the Complaint reveal that no one – neither Clinton nor Worrell nor any of the relevant corporations – understood Worrell to have co-author status in the prior decade's worth of sound recordings. Specifically, the Complaint alleges multiple **breach of contract** counts against Clinton, his associates and his corporations. Ex. E. When expressing Worrell's performance, it explains:

> Within the last four years, defendants became indebted to Worrell in the total sum of at least $180,000 *for services performed by Worrell at the special request of defendants*, namely, among others, *as a recording artist, co-producer, session leader, writer/composer/arranger and entertainer*.

Ex. E at ¶26 (emphasis added). The same facts are reasserted at ¶29, and the Complaint also seeks an accounting. *Id.* at 10. Once again, the Worrells acknowledged that Bernie's contribution was as work-for-hire, not a co-author.

### iii.    The 1982 Contract Novation

Attached to Worrell's 1984 verified Complaint in Los Angeles Superior Court is a signed, contractual document that settles all the respective rights and obligations between Clinton and his companies, on the one hand, and Worrell, on the other. Ex.

E at 16. The two-page, typewritten document is dated September 9, 1982 and is signed by Bernie Worrell. It recites that it "shall constitute our understanding with respect to sums owed to you for past services rendered to us, George Clinton and to all Mr. Clinton's related companies." *Id*. It agrees to pay Worrell $130,000. It also addresses "your personal contribution to future recordings and musical activities to George Clinton and related companies…" *Id*. And it cross references "the General Release Agreement between Bernie Worell, Thang, Inc., Malbiz Music Inc. and George Clinton dated September 9, 1982." *Id*.

Assuming either Clinton or Worrell understood Worrell to be a statutory co-author during his tenure with Clinton and his companies, ***the 1982 Novation is a definitive and express repudiation of such status***. It is in writing and signed by both parties, albeit through an agent for Clinton on his side. Nor is there any doubt that statements by those acting on behalf of a putative co-author count for these purposes. *See*, *Everly*, 958 F.3d at 454 & n.10 (discussing actions of third parties on behalf of authors). It is facially a full reckoning of Worrell's entitlement for past services to "George Clinton and related companies," including a General Release. It references "past services rendered to us, George Clinton and to all Mr. Clinton's related companies." Ex. E at 16.  Worrell's argues – *see* Complaint at ¶¶16-18 (DE1) – that Worrell acquired copyrights in certain sound recordings ***because he did not have a contract with Clinton***.  The 1982 Novation ***is such a contract***; it expresses Worrell's

compensation for "services" without granting him any authorship or copyright rights and effectuates a total release of Clinton and his related companies. In effect, it wipes the slate clean of all the past dealings – contractual or otherwise – between Worrell and Clinton and Clinton's related companies without securing any copyrights for Worrell. If Worrell could have reasonably understood himself entitled to co-authorship status in any sound recordings, the September 9, 1982 Novation flatly disabused him of that understanding.

### iv. Regardless of the Triggering Facts, the Worrells Expressly Acknowledged Accrual of Their Co-Authorship Claims

Another way in which co-authorship claims accrue is the express acknowledgment or awareness of a plaintiff more than three years before filing. Both Bernie and Judie Worrell repeatedly expressed not only their *awareness* that Worrell was not credited as a co-author and was receiving no sound-recording/artist royalties but their *indignation* with the situation and George Clinton. *Any one instance* of the Worrells acknowledging that they knew they were not receiving the artist royalties to which a co-creator would have been entitled would be sufficient to cause their copyright claims to accrue. As shown below, the Worrells have over the years raised complaining about their failure to receive such royalties nearly to the levels of an Olympic sport. Plaintiff's claims are barred by the three-year statute of limitations.

Typical of accrual established by announced awareness is *Margo v. Weiss*, 213 F.3d 55 (2d Cir. 2000). There, members of the musical group the "Tokens" sought

co-authorship and co-ownership in the song "The Lion Sleeps Tonight," but their deposition testimony showed that "they had first learned about the dispute between Folkways and the Defendants-Appellees from the public press in 1992," yet brought suit four years later. *Id*. at 57-58. The time-bar was affirmed on appeal. *Id*.

In this case, Judie Worrell, repeatedly and in writing, complained that she and her husband were not receiving royalties for sound recordings. In addition to the 1980s and 90s litigation, Ms. Worrell maintained a website between June 2, 2016 and September 1, 2016 entitled "Wooniversal Truths." Ex. K. The entire thrust of Wooniversal Truths is that as to the performance royalties from Parliament-Funkadelic, "George stole it all and we will show what he did, not only to Bernie but to all members of original Parliament-Funkadelic." *Id.* at 1. In the course of what Worrell views as theft, she recounts various contracts and alleges their breach by Clinton. *See id*. ("It was the first of many contracts/agreements that George would go on to break.").

These complaints are specific to the claims being made in this litigation. In June, 2016, Worrell complained:

> So, now, boys and girls, you see two instances of how Bernie and the original members of Parliament/Funkadelic were (and are) fleeced by George:
>
> Paying Artist Royalties then stopping – with never an explanation and to this day, not a single songwriter, musician, etc. from original P-Funk gets paid Artist Royalties on the work THEY made famous. Not a one. Not Bernie, Not Billy, Not Tiki, Not Eddie's kid(s), not Ray Davis' kids, Not Grady Thomas, Not Calvin Simon, Not Clarence Haskins, Not Tal – ONLY GEORGE.

*Id*. at 3. Worrell insists the public boycott Clinton and "PLEASE stop buying P-funk records, DVDs and CDs because nobody but George ever gets one red cent." *Id*.

Worrell emphasized her point that she told her husband that Clinton was "stealing" the rights at issue here when she advised him to avoid a "reunion" in "October 2014." *Id*. Worrell states that Bernie withdrew from the reunion plans when he proposed a written agreement that "stated that Bernie will share in all ancillary income – from DVDs, CDs, films and any unknown media now or in the future." *Id*. at 5. She further explains that this proposal was intended to remedy what she perceived as the injustice that Clinton was taking all the copyright royalties at issue:

> At that point, George backed off, Management pulled Bernie from the tour (over his vociferous objections until we showed him how much George had already stolen from him by not paying him his fair share of those that had already come out). Yes, ladies & gentlemen: while you are plunking down your hard earned dollars to buy your favorite group, George was busy hauling in the funky dollar bills and NOT sharing with those who made the MUSIC possible.

*Id*. And then, she summarized the rights that Bernie Worrell was missing:

- ***Artist royalties*** [i.e. sound and video]
- All income from DVDs, CDs, etc. betcha YOU thought you were supporting everyone, right? Hell to the no – and THIS is the major reason Bernie needed and needs Benefits performed on his behalf.
- Session monies
- Songwriter royalties/publishing royalties

*Id*. (emphasis added).

On September 1, 2016, Ms. Worrell complained again about Clinton's taking sole credit for the various works at issue and "stealing" royalties from her husband:

And all of this, ladies and gentlemen, added to the loss of his Artist Royalties, is why Bernie needed to have Benefits done. Not because Bernie didn't earn the money, but because it was stolen, misappropriated, misdirected, whatever verbiage floats your boat.

*Id*. at 11.

Bernie Worrell does not appear to have been as prolific a writer as Judie, but he publicly complained he was denied credit and royalties. In a video interview, Bernie Worrell was asked by the moderator about receiving a "nice pension" from sampling royalties. Ex. L Bernie Worrell on Parliament-Funkadelic, Synthesizers and P-Funk, Red Bull Music Academy: May 13, 2015 minute 1:29. He responds that is not the case, but its "one of the things being worked on now," and tells the moderator not to continue because he doesn't want to "get mad." *Id*. In another interview, the interviewer asks him about copyright royalties, and he responds "I was beat" and "I didn't get all the sampling moneys either…" and "resentments can poison you…" Bernie Worrell interview at the ASCAP Expo for Songwriters Vantage Jun 16, 2011 at 6:49-7:41. Ex. M.

In summary, both Bernie and Judie Worrell demonstrated they were well aware their current claims had accrued more than three years before filing this suit. Plaintiff's claims are barred by the statute of limitations.

**B. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF FAILED TO ADDUCE EVIDENCE OF AN INTENT THAT WORRELL BE CONSIDERED A CO-CREATOR AT THE TIME EACH INDIVIDAL RECORDING WAS CREATED.**

Plaintiff asserts joint ownership of over 260 sound recordings made between the late 1960s and the early 1980s. Plaintiff's theorizes Worrell was one of the "integral members of Parliament and Funkadelic" during this period, but did not have a signed work-for-hire contract with Clinton or Thang. ECF 1, PageID.3, 6. On this basis, Plaintiff asserts Worrell should be deemed a "co-creator and joint owner" of the 264 sound recordings listed in the Complaint's Exhibit E. *Id.*, PageID.20.

There is no legal precedent for such a theory of joint ownership. Plaintiff seeks to manufacture one through the purported expert testimony of an attorney, Bob Kohn, who opines that Worrell's bandmember status entitles him to ownership of ***all*** sound recordings created by the band, regardless of Worrell's individual contributions to each song, and even if he had no involvement with a particular song or, recognizing that many of the 264 recordings were performed by bands of which Worrell was not a member, even with the band that performed it. *See* ECF No. 128, PageID.2798.[3] Plaintiff also relies on the expert testimony of Dr. Ellen Exner, a musicologist who opines that Worrell was "essential" to the success of "every track" at issue in this litigation, based on her analysis of Worrell's contributions on ***two of***

---

[3] Plaintiff's theory also ignores the fact that the sound recordings at issue includes works by several bands besides Parliament and Funkadelic, and there is no evidence that Bernie Worrell was ever a member of these bands. These include Eddie Hazel's solo project *Game, Dames and Guitar Thangs*; albums by the all-female bands the *Brides of Funkenstein* and *Parlet*; and Bootsy Collin's *Bootsy's Rubber Band*. ECF No. 1-6; Ex. J.

*the 264* Works listed in the Complaint. ECF No. 129-2.[4] Neither expert analyzed each of the Works at issue; instead, they both rely on the general assertion that Worrell provided Parliament and Funkadelic with a "structural foundation" that was "ever-present." *See* ECF No. 128-2, PageID.2845; ECF No. 129-2, PageID.3166.

A party claiming joint authorship has a higher legal and factual burden than the one Plaintiff presents. A "joint work" is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Courts in the Sixth Circuit require "a party claiming joint authorship to show that (1) each party intended to be joint authors, and (2) each party made an independently copyrightable contribution to the work." *Corwin v. Quinonez*, 858 F. Supp.2d 903, 910 (N.D. Ohio 2012) (citing *Childress v. Taylor*, 945 F.2d 500, 505-06 (2d Cir. 1991)); *Thomson v. Larson*, 147 F.3d 195, 202 (2d Cir. 1998). *See also Tang v. Putruss*, 521 F. Supp.2d 600, 606 (E.D. Mich. 2007). As explained below, this showing must be made with respect to each individual Work. Plaintiff cannot satisfy these requirements.

### 1. There is no evidence of mutual intent.

To establish requisite intent, "it is not enough that the parties intend their contributions to be merged into inseparable or interdependent parts of a unitary

---

[4] Neither expert report can survive *Daubert* scrutiny. Defendants have moved to strike the reports and preclude the testimony of both experts. ECF Nos. 128, 129.

whole." *Corwin*, 858 F. Supp.2d at 912 (citation omitted). Rather, the "parties must entertain in their minds the concept of joint authorship." *Id.* (quoting *Childress*, 945 F.2d at 508). "This requirement of mutual intent recognizes that, since co-authors are afforded equal rights in the co-authored work, the equal sharing of rights should be reserved for relationships in which ***all participants fully intend to be joint authors.***" *Thomson*, 147 F.3d at 201. Courts consider (1) how parties regarded themselves in relation to specific works; (2) contributor's decision-making authority; (3) the authority to enter contracts with third parties; and(4) other additional pertinent evidence. *Tang*, 521 F. Supp.2d at 606 (citing *Thomson*, 147 F.3d at 202); *Childress*, 945 F.2d at 508.

Plaintiff has no evidence that Worrell, Clinton, and the dozens of other musicians who performed on the Works intended to share authorship at any point in time. Over the relevant period, Clinton worked with "hundreds of artists" who performed on songs by Parliament, Funkadelic, and related bands. Ex. I, ¶ 7. Take, for example, the 1980 Parliament album *Trombipulation.* Plaintiff claims joint ownership of all eight sound recordings on this album. ECF No. 1-6, PageID.63. Yet Worrell is only credited on three of these songs. . Bedrosian, *The Authorized P-Funk Song Reference: Official Canon of Parliament-Funkadelic*, 1956-2023 (Rowman and Littlefield: New York, 2024. On the song "Long Way Around," Worrell performed piano and synth bass, alongside twenty other individually credited

musicians, ***and the entire Detroit Symphony Orchestra***. *Id.* The assertion Worrell and each of these musicians intended to be joint authors with equal rights in the recording is both unsupported and logically absurd. The only possible conclusion – which is supported by the evidence – is that Clinton/Thang employed the musicians (including Worrell) to perform on each of the Works, with no intent of equally sharing the rights.

Additionally, courts have held that there is no mutual intent where one party exerts final decision-making authority over the creative input in a work. *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1071 (7th Cir. 1994). The "absence of control is strong evidence of the absence of co-authorship." *Aalmuhammed*, 202 F.3d at 1235.

The record establishes that Clinton, not Worrell, had final decision-making authority over the Works. In 1978, Worrell stated that "George [Clinton] is a genius, the creative center. ***He takes the ideas of thirty musicians and they are molded into the One***." Ex. N (emphasis added). Likewise, in an interview about Parliament's *Mothership Connection* album, Worrell stated that Parliament-Funkadelic's albums "all depend on what concepts were in George's head. ***Once he made a decision, we went with it.***" Ex. O at 6 (emphasis added). Clinton himself testified that it was "his responsibility to exercise final creative control over all the acts". Ex. I, ¶ 8. Gary Shider, a Parliament-Funkadelic guitarist and Rock and Roll Hall of Fame inductee, confirmed this: "***George basically writes all the lyrics and helps us arrange it.*** He

doesn't play an instrument; he plays ears. … ***He's the overseer, the man with the concept.***" Ex. P (emphasis added). Worrell was not a co-author; he was an individual who may have musically contributed to some unestablished number of the Works, but that does not entitle him to co-ownership of all these sound recordings. *See Aalmuhammed*, 202 F.3d at 1235 ("What [plaintiff's] evidence showed, and all it showed, was that, subject to [defendant's] authority to accept them, he made very valuable contributions to the movie. That is not enough for co-authorship of a joint work.").

Also relevant is Clinton's authority to enter into contracts on behalf of the band. *Tang*, 521 F. Supp.2d at 606. The Complaint expressly alleges that it was Clinton who signed each recording contract on behalf of Parliament, Funkadelic, and "his various groups." ECF No. 1, PageID.19.  Worrell credited Clinton's contractual control as "genius." Ex. L. He stated that the contracts were "George's way of tricking the record companies to record Parliament on this label, Funkadelic on another label, but the companies didn't know at the time until it was too late. Same guys. …  And then spreading it out, the other offshoot groups on other labels." *Id.*

**2.  There is no evidence that Worrell made independent copyrightable contributions to each of the Works.**

As described above, Plaintiff makes no attempt to identify the specific independent copyrightable contributions that Worrell allegedly made to each of the Works at issue. Absent this showing, Plaintiff cannot establish co-ownership.[5]

A purported joint author **must identify specific contributions** that were fixed in a tangible medium." *Dorchen/Martin Assocs. v. Brook of Cheboygan, Inc.*, No. 11-10561, 2012 U.S. Dist. LEXIS 177940, at *10 (E.D. Mich. Dec. 17, 2012) (citing *Erickson*, 13 F.3d at 1071 (7th Cir. 1994)). *See also* 1 Nimmer on Copyright § 6.07 ("a party who claims to be a joint author **must identify with sufficient specificity the details about its own contribution.**") (emphasis added) (citation omitted).

The court's holding in *Corwin* is instructive. 858 F. Supp.2d at 905. There, the plaintiff was a former bandmember who sought a declaration of co-ownership and an accounting of profits for thirty-one songs across four albums. *Id.* The defendant counterclaimed for a declaration that defendant was the sole author of the songs at issue. In granting summary judgment for the defendant, the court found that the plaintiff's conclusory allegations failed to satisfy the *Childress* test of joint authorship. *Id.* at 911. Importantly, the court noted that the plaintiff did not meet his burden of establishing joint authorship with respect to each individual work. *Id.* at 905 n.6. Like here, the plaintiff did "not make any specific arguments" as to the

---

[5] Plaintiff's own legal expert could not identify any cases where a court found a presumption of co-authorship based on the fact that the plaintiff was a member of the band at the time the sound recording was created. ECF No. 128-3, PageID.3021.

parties' intent and his contributions to certain works and instead relied on "sweeping assertions about all thirty-one disputed songs." *Id.* And unlike the Worrell Estate, the plaintiff even submitted an affidavit "which purport[ed] to enumerate the contributions Plaintiff made to each of the disputed songs." *Id.* But that affidavit "only list[ed] contributions for eighteen songs, and [did] not even mention" all of the works. *Id.* The defendant provided a "song-by-song description of [defendant's] authorship," which satisfied the burden of establishing sole authorship. *Id.* at 913.

Here, the Estate does not attempt to enumerate Worrell's independent copyrightable contributions on any of the works. There is no evidence that Worrell performed on or somehow contributed to each of the 264 songs at issue, let alone that each of those contributions went beyond mere "ideas, refinements, [or] suggestions." *Id.* at 910 (citing *Erickson*, 13 F.3d at 1071). Notably, the record is bereft of evidence of mutuality of intent, especially where, as here, the Complaint itself rather explicitly accuses Clinton of cheating his bandmates and unfairly reserving unto himself the financial benefits of his bands' work. If Plaintiff's decades of slander and character assassination are to be believed, it beggars the imagination that George Clinton could have intended anyone but himself to be regarded as a co-author of the works at issue. The Court should reject Plaintiff's "sweeping assertions" of co-ownership and grant summary judgment in favor of Defendants.

## C. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT FOR WORKS TRANSFERRED IN THE SETTLEMENT AGREEMENT

In a document that Plaintiff withheld from Defendants, plaintiff transferred to Westbound any and all ownership rights the Estate has in a substantial portion of the sound recordings at issue. As a result of that transfer, Plaintiff no longer has the right to obtain the relief it seeks. Defendants are entitled to judgment as a matter of law.

### 1. Under the Settlement Agreement, the Estate Retains No Ownership Interest in the Transferred Works

24.    On December 27, 2023, the Estate and Westbound entered a Settlement Agreement and Release. In it, the Estate agreed to dismiss Westbound from this lawsuit. *See* ECF No. 112-6, PageID.2061, ¶ 1. Critically, the Agreement also contains a transfer of a substantial portion of Plaintiff's interest in this litigation to Westbound. It provides:

> To the extent that Worrell Estate owns and/or controls, or shall own or control, or otherwise deemed to own or control, any rights, title and interests in and to the Subject Recordings, in whole or in part (collectively, "Worrell's Share"), Worrell Estate hereby irrevocably grants, assigns, and transfers to Westbound all of Worrell Estate's present and future rights, title, interests, control, and benefits in and to Worrell's Share of the Subject Recordings, throughout the universe, including, without limitation, any and all undivided copyright ownership rights, title, and interests in and to Worrell's Share of the Subject Recordings, and the rights of copyrights therein and thereto, now or hereafter existing, whether vested, contingent or inchoate, for the full term of the copyrights and any renewals, extensions, continuations, restorations and reversions thereof.

*Id*. at 3, ¶ 4(b). That transfer entitles Defendants to summary judgment as to any of the Works so transferred.

## 2. Defendants Are Entitled to Summary Judgment on Count II as to the Transferred Works

Count II of the Complaint provides that "*[a]s a co-owner of the copyright in and to the Works*, Plaintiff seeks an accounting of the books and records of Defendants and Record Label Defendants related to all royalties, advances, and other monies received for the sale and exploitation of the Works from any and all sources." ECF 1, PageID.20-21 (emphasis added). As Plaintiff pled its case, its entitlement to an accounting derives from its status as co-owner of the Works. But, after the Agreement, Plaintiff isn't a co-owner of those Works any more, if it ever was.

The law is clear that, after a transfer of the kind effected in the Agreement, only the transferee (here, Westbound) has the right to seek an accounting; the transferor (here, Plaintiff) no longer possesses such a right. *See, e.g.*, 1 Melville B. Nimmer *et al*., Nimmer on Copyright § 6.12(C)(1) (2023); *Howard v. Weston*, 354 F. Appx. 75 (5th Cir. 2009) (plaintiff denied accounting  because he transferred his interests and "cannot bring an action to enforce the copyright rights he no longer owns"); *Vástago Producciones, LLC v. Heaven Publ'g LLC*, No. 4:23-cv-01432, 2024 U.S. Dist. LEXIS 15273, at *9 (S.D. Tex. Jan. 4, 2024) (plaintiff who transferred rights "retained no right to force an accounting"); *Roberts v. Gordy*, 359 F. Supp.3d 1231, 1239 (S.D. Fla. 2019) (citing *Fathers & Daughters v. Lingfu Zhang*, 284 F. Supp.3d 1160, 1164 (D. Or. 2018) ("After a copyright owner has fully transferred an exclusive right, it is the transferee who has standing to sue for that

particular exclusive right. . . . The former copyright owner no longer has standing to sue for the rights that have been transferred.")). Under that precedent, Defendants are entitled to summary judgment on Count II as to the transferred Works.

### 3. Defendants Are entitled to Summary Judgment on Count I as to the Transferred Works

Count I seeks a declaratory judgment that Mr. Worrell was a co-creator of the Works. ECF 1, PageID.19-20. Plaintiff seeks such a determination to resolve the continuing dispute "concerning whether or not Plaintiff has a continuing right to receive royalties for the exploitation of the sound recordings containing Mr. Worrell's performances." *Id*. at 19. To the extent there are any rights or benefits of co-authorship other than the financial rights attendant to co-ownership, they are never mentioned in the Complaint, certainly not as any basis for seeking the declaratory judgment. Because Plaintiff no longer owns the financial rights that were the basis for the declaratory judgment it is seeking, Defendants are entitled to summary judgment on Count I as to the transferred Works.

### D. PLAINTIFF RELEASED DEFENDANTS FROM LIABILITY

On December 27, 2023, Plaintiff, on behalf of itself and related parties, entered into the Agreement with Westbound that, among other things:

> forever release[d], discharege[d] and h[e]ld harmless Westbound and ***all*** of Westbound's . . .employees . . . from ***all*** causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims

and demands whatsoever, in law or equity, which the Worrell Parties ever had, now has or hereafter can, shall or may have for, against the Westbound Parties, upon or by reason of any matter, cause or thing whatsoever, ***from the beginning of the world through the date of this Agreement.*** (Emphasis supplied.)

Westbound provided a similar release to Plaintiffs with one very significant exception. Westbound specifically carved out an exception in paragraph 2(d)(ii) that made clear that Clinton and Thang were not to be included among the Parties affiliated with Plaintiff that Westbound released. The parties included no parallel carve out excluding Defendants from parties released by Plaintiff. The Agreement included other exclusions from the release language involving publishing copyrights for the musical compositions or their ability to enforce the agreement. Clearly, then, the parties to the release knew how to include and exclude specific claims and parties from their release. By virtue of his indisputable employment reflected on contracts signed by Westbound's owner in February and March 1974, Clinton is a released party as the release applies to "all" Westbound employees for "***any*** matter, cause or thing whatsoever from the beginning of the world through the date of this Agreement." The language does not apply to any specific category of Westbound employees like "current" or "hourly" or "salaried" or "executive." Rather, the word "all" is used, which necessarily includes past as well as current employees, a fact underlined by the application of the release to acts extending to "the beginning of the world." There is no equivocation in the language the Parties consciously chose.

This Court dealt with a nearly identical set of facts in *Cochran v. Ernst & Young*, 758 F. Supp. 1548 (E.D. Mich. 1991), a case in which plaintiff entered into a settlement and release with the Wayne County Employee Retirement System ("WCERS") in two unrelated state court actions in which WCERS was defendant. The released parties included WCERS, its governing board, and its "associates" and "consultants" from "any and all claims, demands, actions, damages, or liability . . . against RELEASED PARTIES predating the execution. . ." of the release. Subsequently, Plaintiff filed a separate and unrelated action for entirely different claims against the WCER's accounting firm and trustee bank. *Id.* at 1552.

The Court granted Defendant's motion to dismiss for the accounting firm and the trustee bank, finding that both were "consultants" and "associates."[6] In doing so, the Court found the above language unambiguous and, therefore, not open to construction. *Id*. at 1554. Accordingly, the Court enforced the document as written, noting that "[i]f the contract terms are not ambiguous, then contradictory inferences that may be drawn are subjective and irrelevant." *Id.* (citations omitted). The Court also explicitly refused to rely on "supplementation from extraneous sources" of parole evidence. *Id.* The Court further rejected Plaintiff's arguments that he did not intend to release the defendants and that he received no consideration directly from

---

[6]     The Court, however, applied the release to the claims against them on the theory that both were "associates" and "consultants" of WCERS. *Id* at 1553.

them in exchange for his release. *Id.* at 1554-55. In fact, this Court sanctioned Plaintiff for these arguments. *Id.*

*Roomska v. Opper*, 234 Mich. App. 512 (1999) is in accord. It involved a car accident where plaintiff had claims against two drivers and settled with one driver and their insurer, releasing them and "all other parties, firms or corporations who are or may be liable." *Id.,* at 513. The Court of Appeals held that, because this language clearly applied to the other driver and its insurer, they were released and that parole evidence of intent was irrelevant.   *Shay v. Aldrich*, 487 Mich. 648 (2010) overruled *Roomska* only to the extent it could be read to deny the use of parole evidence where a release contained latent ambiguities.  Two weeks later, to erase any doubt as to *Roomska's* continuing validity after *Shay*, the Court of Appeals in *White v. Taylor Dist. Co.*, 289 Mich. App. 731 explicitly relied on it after acknowledging *Shay, Id.,* at 735, affirming that, absent ambiguities, the release applied.

## IV.    CONCLUSION

The Court should grant summary judgment to the Defendants.

Respectfully submitted:
SCHENK & BRUETSCH PLC
By: /s/ James P. Allen, Sr.
Peter E. Doyle (P81815)
James P. Allen, Sr. (P52885)
211 W. Fort Street, Suite 1410
Detroit, MI 48226
(313) 774-1000
james.allen@sbdetroit.com
peter.doyle@sbdetroit.com
*Attorneys for Defendants*
March 26, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2025, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to the attorneys of record.

/s/Veronica Sanford