# EXHIBIT A

1                   UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF MICHIGAN

3

       ESTATE OF GEORGE BERNARD WORRELL, JR.,
4

                    Plaintiff,
5                                   Case No. 4:22-cv-11009-FKB-DRG
       -vs-                         District Judge F. Kay Behm
6                                   Magistrate Judge: David R. Grand

7      THANG, INC. and GEORGE CLINTON,

8                    Defendants.
       _____/
9

10             The deposition of JUDITH WORRELL, a witness in

11     the above-entitled cause, taken before Suzanne Lynn

12     Bonarek, Certified Shorthand Reporter and Notary Public,

13     Wayne County, Michigan, at 500 Woodward Avenue, Detroit,

14     Michigan, on the 27th day of August, 2024 commencing at or

15     about 9:02 a.m., pursuant to the Federal Rules of Civil

16     Procedure.

17

18     APPEARANCES:
            DICKINSON WRIGHT, PLLC
19          2600 West Big Beaver
            Suite 300
20          Troy, Michigan  48084
            BY:  MR. DANIEL QUICK
21               Appearing on behalf of Plaintiff

22          SCHENK & BRUETSCH, PLC
            211 West Fort Street
23          Suite 1410
            Detroit, Michigan  48226
24          BY:  MR. JAMES ALLEN, SR.
                 Appearing on behalf of Defendants

25

2

1          (APPEARANCES CONTINUED):

2

        ALSO PRESENT:    Andrew Davis
3                        Audrey Aldrich
                         George Clinton
4                        Carlon Clinton
                         Archie Ivy
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                      I N D E X
     WITNESS                                    PAGE
2
        JUDITH WORRELL
3
           Examination by Mr. Allen                 7
4

5

6                    E X H I B I T S

7    DESIGNATION          DESCRIPTION          MARKED

8    Exhibit No. 1     1976 Agreement            10

9    Exhibit No. 2   06238/82 Verified Complaint   21

10   Exhibit No. 3   1995 Declaration of G. Bernard

11          Worrell                              33

12   Exhibit No. 4   1979 Thang, Inc. and Malbiz Music

13          Audit                               35

14   Exhibit No. 5    1984 California Complaint   44

15   Exhibit No. 6    2019 Notice of Errata       46

16   Exhibit No. 7    2020 Affidavit of G. Clinton  50

17   Exhibit No. 8    Talking Heads Search        70

18   Exhibit No. 9    Reply to Corrected Memorandum

19          of Points and Conclusions of Law,

20          Declarations of A. Boladian, J. Peterer,

21          N. Johnson, N. Montez               109

22   Exhibit No. 10   1-30-81 Signed Agreement    117

23   Exhibit No. 11   12-29-80 Letter from

24          P. Schindler                        119

25   Exhibit No. 12   12-10-80 Letter from E. Shenkin,

1              1979 and 1980 Statement of Royalty

2              Advances                               121

3      Exhibit No. 13  12-5-1996 Letter from T. Friedman

4              with attachments                       129

5      Exhibit No. 14   3-6-97 Letter from T. Friedman 138

6      Exhibit No. 15   3-7-97 Fax from J. Worrell    138

7      Exhibit No. 16   2-25-97 Letter from J. Weeks  140

8      Exhibit No. 17   2-19-97 Letter from J. Worrell 141

9      Exhibit No. 18     Letter from P-Funk          174

10     Exhibit No. 19  Payments from Thang, Malbiz Music

11             to B. Worrell                          178

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       Detroit, Michigan

2       Tuesday, August 27, 2024

3       At or about 9:02 a.m.

4                    *          *          *

5             J U D I T H   W O R R E L L

6       Having first been duly sworn to tell the truth, was

7       examined and testified upon her oath as follows:

8                    MR. ALLEN:  Good morning, Ms. Worrell.

9       We've met briefly yesterday.  My name is James Allen,

10      I'm the attorney representing defendants in this case.

11      And today is the date that we noticed for your

12      deposition.  And I wanted to make a few introductory

13      statements and go through a few ground rules to get us

14      started today, okay.

15                   This is the deposition of Judith Worrell

16      taken pursuant to Notice, for all applicable purposes

17      under the Federal Court Rules.

18                   Ms. Worrell, have you been deposed before?

19                   THE WITNESS:  I don't think so.

20                   MR. ALLEN:  Well, then let me go through a

21      little bit more of an extensive listing of some of the

22      rules here.

23                   Our court reporter, Sue, is going to be

24      taking down everything that's being said in the

25      deposition, so my questions, your answers.  There may

1    be some objections that Mr. Quick will want to

2    interject.  And it's important in that whole interplay

3    that, one, your answers be verbal because the court

4    reporter can't take down nods and gestures; and it's

5    also important that you listen to the entire question,

6    so give me a chance to finish the question.

7              And Mr. Quick may have some objections to

8    make.  And if he decides to make an objection, let him

9    make his objection before you give your answer, okay,

10   can you do that for me?

11             THE WITNESS:  Yes.

12             MR. ALLEN:  Okay.  We're going to be here

13   for a little bit of time today so we'll break.

14   Mr. Quick will I'm sure have some input on when he

15   wants to break for a quick lunch.

16             But in between all of that if you would

17   like -- you know, this isn't an interrogation with hot

18   lights over you.  We're just here to get information

19   out.  And if you need to take a break, feel free to

20   take a break.  I only ask, as a courtesy, that the

21   break not be taken during the course of a question

22   being pending on the table, okay?

23             THE WITNESS:  To the best of my ability,

24   yes.

25             MR. ALLEN:  Thank you.  And if you don't

1       understand a question that I ask you, I just ask that

2       you ask me for some clarification; otherwise I'm going

3       to assume that you understood my question, okay?

4                    THE WITNESS:  Yes.

5                    MR. ALLEN:  And I have a few preliminary

6       questions about your physical condition today.

7                    Is there anything going on physically that

8       would prevent you from being able to hear and answer

9       my questions truthfully?

10                   THE WITNESS:  No.

11                   MR. ALLEN:  Are you on any form of

12      medication that would prevent you from answering

13      truthfully?

14                   THE WITNESS:  No.

15                   MR. ALLEN:  And you have no medical

16      conditions -- I don't need to know what they are, but

17      you have no medical conditions that would prevent you

18      from being able to speak truthfully today, correct?

19                   THE WITNESS:  No.

20                            EXAMINATION

21  BY MR. ALLEN:

22  Q    Why don't we start with a real simple question.  Can

23       you state and spell your name, for the record.

24  A    Judith, J-U-D-I-T-H, Worrell, W-O-R-R-E-L-L.  But I go

25       by Judie, J-U-D-I-E.

1   Q   Ms. Worrell, where do you live; what state do you live

2       in.

3   A   Washington.

4   Q   And how long you have lived in Washington State?

5   A   Since my husband died in 2016.

6   Q   And prior to that you lived in New Jersey?

7   A   Yes.

8   Q   For how many years?

9   A   Approximately 24.

10  Q   And are you currently employed?

11  A   No.

12  Q   When was the last position you held?

13  A   Bernie's manager and some -- simultaneously as a real

14      estate agent.

15  Q   Let's start with your tenure as Bernie's, your ex --

16      or, I'm sorry, my apologies, your deceased husband,

17      Bernie Worrell, --

18  A   Yes.

19  Q   -- his manager.

20  A   Yes.

21  Q   And as I've seen in some places, that was a fairly

22      long position that you held not only as his wife but

23      as his manager.  For approximately how many years did

24      you manage Mr. Worrell's career?

25  A   I'm not exactly sure but we were together almost 50

9

```
 1           years.  That's five O, not 15, five O.
 2    Q    So that was from 1966 to 2016; passed away in 2016?
 3    A    Roughly.
 4    Q    And you met Mr. Worrell in 1966?
 5    A    I don't remember the date.
 6    Q    And it was Ms. Maxine Brown that introduced you or did
 7           you meet Maxine Brown after you met Bernie Worrell?
 8    A    No, I knew Maxine first.
 9    Q    You went to an event at her home and Mr. Worrell was
10           there and that's where you met Mr. Worrell?
11    A    Not quite but close.
12    Q    And how soon after you met Mr. Worrell do you estimate
13           that you became his manager?
14    A    In the beginning I just helped him with money affairs.
15           I didn't become a person handling everything until
16           after we re-married.  After the divorce when we
17           re-married he told me he wanted me to be his manager.
18    Q    Right.  And what year were you divorced?
19    A    I don't remember.  I'm not good with dates.
20    Q    Okay.  Approximately, was it in the '80's or was it in
21           the '70's?
22    A    Oh, I think it was in the '80's.
23    Q    Okay.
24    A    It was when he started with Talking Heads I think.
25    Q    And I watched an interview you gave last year, a
```

1      podcast called Truth in Rhythm.  Do you recall that?

2  A   Uh-huh.

3  Q   Okay.

4  A   Yes.

5  Q   All right.  You negotiated Mr. Worrell's first

6      contract with Mr. Clinton, correct?

7  A   Yes.

8  Q   All right.  And do you recall what year that was?

9  A   No.

10                          (WHEREUPON Exhibit No. 1

11                          was marked for identification

12                          by the reporter.)

13 Q   (Continuing by MR. ALLEN):  I've handed you what's

14     been marked as Exhibit 1.  And I'll just advise you

15     upfront that there are a few pages that are duplicated

16     because some have some misaligned print.  So you'll

17     see a couple of page twos; one is a partial, the other

18     is the -- is a fuller version of page two, and a

19     couple of other pages like that.

20              Have you seen that document before?

21 A   Yes.

22 Q   Is that the first contract that you negotiated for Mr.

23     Worrell?

24 A   No.

25 Q   Okay.  Do you have copies of the first contract that

1       you negotiated for Mr. Worrell?

2    A   No, it was verbal.

3    Q   So let's start with that first contract, that verbal

4        contract you negotiated on behalf of your husband.  Do

5        you have -- the date on that contract is January 1,

6        1976.  Do you have an idea as to when the first verbal

7        contract was that you negotiated for your husband?

8    A   Not by date but --

9    Q   In relation --

10   A   -- just before Bernie joined he was in --

11   Q   Bermuda.

12   A   -- Bermuda with Maxine.  He called me and told me that

13       George wanted him to come -- would I go meet George at

14       the Apollo.

15              I met George at the Apollo, we talked.  I

16       told him Bernie had to have $200 a week whether or not

17       he worked.  That was the contract, because George --

18       because he told me he couldn't afford it, and I said

19       Bernie needed it period.  And that was how Bernie went

20       out.  And those were performance only.  This was

21       before we even got into writing, publishing.

22   Q   Okay.  So your husband was paid $200 a week to perform

23       on Mr. Clinton's records?

24   A   No, he wasn't -- no, he wasn't actually -- let's back

25       up.  I think I said for performance only.  And the

12

1      fact you're saying that that's what he got, no.  That

2      was what the deal was but that's not what George paid.

3   Q  Okay.  So you negotiated a contract, whether or not --

4      your testimony is that Mr. Clinton complied with the

5      contract or not, the contract was that he was going to

6      be paid a set amount of money per week in exchange for

7      his services as a performing artist on Mr. Clinton's

8      records, correct?

9   A  No.

10               MR. QUICK:  Object to form, --

11  A  No, --

12               MR. QUICK: -- mischaracterizes the

13     testimony.

14  A  -- no.  Live performances.

15  Q  (Continuing by MR. ALLEN):  Live performances, okay.

16     So at some point did the nature of the oral contract

17     evolve to something else?

18  A  You can say it devolved because George didn't live up

19     to the contract.  That was the first of the contracts

20     he never lived up to.

21  Q  In what way was he not living up to the contract?

22  A  Paying Bernie.

23  Q  Okay.  So how long was the oral contract in place

24     where Mr. Worrell was supposed to be paid $200 per

25     week?

13

1     MR. QUICK:  You mean -- when you say in

2  place, you mean how long was Mr. Worrell actually

3  paid?

4 Q (Continuing by MR. ALLEN):  No.  How long, what period

5  of time approximately did the oral contract that

6  you're referencing, what period of time was it in

7  place?

8     MR. QUICK:  I'll object to form, calls for

9  a legal conclusion.

10     MR. ALLEN:  You can answer.

11     THE WITNESS:  Should I answer that?

12     MR. QUICK:  If you're able to.  If you're

13  not, --

14 A Oh, I can answer it.  It was in place as long until

15  Bernie got disgusted that George wasn't paying any.

16 Q (Continuing by MR. ALLEN):  Okay.  So that --

17 A George wasn't living up to the agreement.

18 Q Okay.  So then what happened in terms of the

19  contractual arrangement, is that when this contract

20  was negotiated by you?

21 A No, I didn't negotiate this contract.

22 Q Then what replaced the oral contract for $200 per

23  week?

24 A Nothing really.  I mean you'd have to be more

25  specific.  Nothing replaced the contract that was

1           never lived up to, let me put it that way.

2    Q     Okay.  Well, there were subsequent contracts.  You

3           stated --

4    A     I repeat, that were lived up to.  Bernie did what he

5           was supposed to do, George did not.

6    Q     Ma'am, we understand that your --

7    A     Okay.

8    Q     -- position is that Mr. Clinton didn't live up to his

9           contractual obligations.  What I'm trying to establish

10          is a timeline for what agreements were in place, and

11          to the best of your recollection when they were in

12          place and when -- what periods they applied to.

13   A     I don't know how to answer that question so let me

14          start with the truth.

15                 When Bernie first spoke to George about not

16          getting paid and George told Bernie that he was part

17          of Thang, everybody -- what he was going to do was

18          everybody was going to participate as part of Thang.

19          And when the money started coming in -- because the

20          money that came in from gigs, he was using for hotels

21          and God knows whatever else he said.

22                 And so Bernie agreed to enter into the

23          contract with Thang because it was the only way he was

24          going to get paid.  So like a corporation, he was part

25          of the corporation.

1    Q    So how long under that first contract did that

2         situation endure?

3    A    You mean --

4    Q    The situation where you say there was an oral contract

5         in place to pay him $200 a week, and Mr. Clinton you

6         say was not paying that $200 a week.  What period of

7         time does that situation cover?

8                   MR. QUICK:  I'll object to form, calls for

9         a legal conclusion and vague.

10                  MR. ALLEN:  You can answer the question,

11        ma'am.

12                  THE WITNESS:  Should I answer that?

13                  MR. QUICK:  If you understand the question,

14        you may.  If there's something about the question you

15        don't understand, --

16                  THE WITNESS:  I don't.

17                  MR. QUICK: -- Mr. Allen will clear it up

18        for you.

19                  THE WITNESS:  Okay.

20   Q    (Continuing by MR. ALLEN):  What is it you don't

21        understand about my question?

22   A    I have already told you that I negotiated that George

23        was supposed to, and he agreed, was supposed to be

24        paying Bernie $200 a week for performances and that

25        was to go on.

1              But when Bernie got to Detroit for the

2      first gig at The 20 Grand and then we got stranded in

3      Detroit, it became apparent from the way things were

4      going with George, so it just kind of faded.  In other

5      words, if you have a contract with somebody and they

6      don't live up to it, how can you say when it ends.

7   Q   Okay.  So let me try it this way.  At some point the

8      oral contract for $200 per week was replaced with

9      something else?

10  A   No.  At some point it just faded out because George

11     never lived up to it.  And then he began telling

12     Bernie and the others, but I'm only going to speak for

13     Bernie, about they were all going to participate and

14     this is how they were going to get paid in the future.

15     Again, not lived up to.

16  Q   Okay.  But at some point we know that this contract

17     you say went into effect?

18              MR. QUICK:  You're referencing Exhibit 1?

19              MR. ALLEN:  I'm referencing Exhibit 1.

20  A   We thought it did.

21  Q   (Continuing by MR. ALLEN):  I'm sorry?

22  A   We thought it did.  Bernie worked under the idea that

23     this was a viable contract.  We only found out later

24     that it wasn't.

25  Q   He worked as if that contract was in place, correct?

1    A    He worked like he always worked.  He co-produced, he

2         arranged.  He did everything.

3    Q    What I'm trying to establish, ma'am, was there any

4         other arrangement, written or otherwise, that was in

5         place --

6    A    No.

7    Q    -- between the first oral contract you negotiated and

8         the second?

9    A    No.

10   Q    Okay.  So we just spent 10 minutes for me to get to

11        the point where we are establishing that there was an

12        oral contract that you negotiated at or around the

13        time that your ex -- or your deceased husband left

14        Maxine Brown until the contract that's Exhibit 1 was

15        put in place, correct?

16   A    Yes, yes.

17   Q    Okay.  So there's no other agreements other than that?

18   A    Not that I remember.

19   Q    All right.  And at any point in time -- you said that

20        you negotiated all of your deceased husband's

21        contracts?

22   A    No, I didn't say that because I didn't.  I didn't do

23        this one.

24   Q    Okay.  So you didn't negotiate that contract?

25   A    No.

1    Q    Okay.

2    A    Lawyers did that.

3    Q    Do you recall during your interview on the Truth in

4         Rhythm podcast that you said -- I'm happy to show you

5         the statement if you'd like it -- I negotiated

6         Bernie's first contract with George which was the

7         first of many that he went on to ignore?

8    A    Yes, I --

9              MR. QUICK:  That doesn't contradict what

10        she just said.

11             MR. ALLEN:  I'm asking whether she made the

12        statement, Dan.

13   A    Yes.

14   Q    (Continuing by MR. ALLEN):  Okay.

15   A    I just made it to you --

16   Q    All right.

17   A    -- prior to all of this.

18   Q    All right.  Now you mentioned that there were many

19        others that Mr. Clinton went on to ignore.  What other

20        contracts, other than the contract that's Exhibit 1,

21        did Mr. Clinton go on to ignore?

22   A    I don't remember but I'll put it to you this way.  If

23        there was a contract, George ignored it.

24   Q    Okay.  But sitting here today you have no other

25        evidence of any other contract that you negotiated

1        with Mr. Clinton other than Exhibit 1, correct?

2   A    Not that I remember.

3                MR. QUICK:  Wait, she said she did not

4        negotiate Exhibit 1, Jim.

5                MR. ALLEN:  Okay.

6                MR. QUICK:  You're mischaracterizing

7        testimony.

8                THE WITNESS:  Oh, this is Exhibit 1?

9                MR. QUICK:  Yes.

10               THE WITNESS:  I did not --

11  Q    (Continuing by MR. ALLEN):  Right.  You're not --

12  A    Three times I told I did not do this.

13  Q    Okay.  You're not aware of any other contract that was

14       negotiated by you or anybody else other than Exhibit

15       1, correct, sitting here today?

16               MR. QUICK:  At any point in time?

17               MR. ALLEN:  At any point in time.

18  A    I'm not sure.

19  Q    (Continuing by MR. ALLEN):  Do you have any evidence

20       with you today that there was any other contract other

21       than Exhibit 1 and the oral contract that you

22       referenced earlier in your testimony?

23  A    No.

24  Q    Okay.  I'm going to ask you some questions about your

25       impressions of your husband's reputation for

20

```
 1            truthfulness, okay.  Do you believe that your husband

 2            was a truthful man?

 3     A      Definitely, particularly with me.

 4     Q      Were you ever aware of an instance where your husband

 5            said something to somebody that was untrue?

 6     A      How would I know that?

 7     Q      Well, I'm asking --

 8     A      I'd have to be there.

 9     Q      I'm asking you what you know.  Did you ever --

10     A      No, I don't know that.

11     Q      Okay.  So you've never yourself witnessed your husband

12            being untruthful to anybody is my question?

13     A      It was not Bernie's way.  I can't -- nothing comes to

14            mind.

15     Q      Okay.  So you would describe him today as a truthful

16            person?

17     A      Yes.

18     Q      Okay.  And would you have allowed him -- strike that.

19                    Were you involved in the drafting of a

20            lawsuit advising your husband or discussing with

21            lawyers that was filed in the Supreme Court of the

22            State of New York in 1981?

23     A      I have to see it.

24     Q      Okay.  Let's mark this as 2.  It's the -- 2 is the

25            Verified Complaint.
```

21

1                          (WHEREUPON Exhibit No. 2

2                          was marked for identification

3                          by the reporter.)

4              THE WITNESS:  Now could you ask me that

5       question again?

6                  MR. QUICK:  He hasn't asked a question yet.

7                  THE WITNESS:  Oh.

8                  MR. QUICK:  Oh, yes, he did.  He asked if

9       you were involved in the lawsuit.

10   Q   (Continuing by MR. ALLEN):  Let me ask you a more

11       basic question.  Have you seen that document before?

12   A   I don't know, I saw so many documents I can't isolate

13       which one I saw and when I saw it.  But there's

14       something you need to know about Bernie.

15   Q   Ma'am, this will go --

16   A   I was answering your question but I'll wait.

17   Q   This will go quicker if you answer the questions that

18       I ask.

19   A   I was about to answer a question you asked before.

20   Q   Go ahead, go ahead.

21   A   No, I'll wait for you.

22   Q   You don't recall ever seeing this document before?

23   A   I didn't say that.  I said I can't recall every single

24       document at this point in time.

25   Q   We'll give you that it's been a long time, okay.  If

1       you can confine your answers to the questions I'm

2       asking, that would be -- that will get us out of here

3       in the seven and a half hours that we have.

4  A   Good, just make your questions specific.

5  Q   All right.  So I'm asking -- I think I asked, and I

6       think I got an answer, that you don't -- is it that

7       you don't recall seeing this document?

8  A   Is that the question?

9  Q   Yes.

10  A   I can't recall every document I ever saw pertaining to

11       Bernie.

12  Q   We've given you that, okay?

13  A   All right.

14  Q   This document, however, can you recall -- because it

15       was attached to your 2019 Complaint in the State of

16       New York, or the State's Complaint in New York, as an

17       exhibit.  So I know 2019 was a long time ago, but you

18       have no present recollection of seeing that particular

19       document, Exhibit 2, prior to today, correct?

20  A   I didn't say that.  I said I cannot recall every

21       single document that I ever saw for Bernie, including

22       this one.

23  Q   Okay.  That's the important part of the answer.  You

24       haven't -- you don't recall seeing that document,

25       okay.  Will you take a minute --

1    A    I didn't say I didn't recall seeing it, but I don't

2         recall seeing every single document pertaining to

3         Bernie, including this one.

4    Q    Right.

5    A    Now I may or may not have.

6    Q    I think I have my answer, ma'am.

7    A    There you go.

8    Q    Can you take a quick look and review that document.

9    A    Okay.

10   Q    Okay.  Do you have any reason to doubt, given the fact

11        that you attached it as an exhibit to a Complaint in

12        New York in 2019, the authenticity of this Verified

13        Complaint that's Exhibit 2?

14   A    Not to the best of my knowledge.

15   Q    And is there anything about that document that you

16        find to be improper?

17             MR. QUICK:  Objection, form, foundation.

18             THE WITNESS:  Should I answer that?

19             MR. QUICK:  If you're able to.

20             THE WITNESS:  I'm not.

21   Q    (Continuing by MR. ALLEN):  So you're not what, ma'am?

22   A    When you see a document that is obviously a legal

23        document, that would have been done by lawyers.  Me

24        and Bernie sitting there and they saying whatever

25        they're saying, Bernie telling me whatever.  And then

1       we would proceed from there.  As for me acting in the

2       capacity of a lawyer, I never did that.

3   Q   That wasn't my question, ma'am.

4   A   That's my answer.

5   Q   All right.  My question was do you have any reason to

6       doubt the authenticity of this document?

7   A   Not to the best of my knowledge.

8   Q   All right.  Specifically the stamp up at the top right

9       hand corner it says page 11 of 11, it's the last page

10      of the document.  It purports to -- yes.

11  A   That page, yeah.

12  Q   It purports to bear the notarized signature of George

13      Bernard Worrell.

14  A   Right.

15  Q   Does that appear to be your husband's signature?

16  A   That's Bernie's signature.

17  Q   And you understand -- you testified about your

18      husband's reputation for truthfulness as it relates to

19      you.  You have no reason to believe that he signed

20      this document in duress?

21  A   No.

22  Q   And he's certifying that the statements in this

23      document are true, okay.  Do you have any reason to

24      believe that he would falsely certify that the

25      statements in the --

1  A    No.

2  Q    -- document were true?

3            So he believed the document was -- or the

4       statements in the document were true in 1981 when he

5       signed it.  Do you believe that they're true today?

6            MR. QUICK:  Form and foundation.

7  A    I have no way of knowing that.

8  Q    (Continuing by MR. ALLEN):  Okay.  You don't have any

9       evidence to suggest that there's anything in the

10      document that your husband swore to was true was in

11      any way false, do you?

12 A    No.

13 Q    Okay.  Now I want to try to understand your claim a

14      little bit better.  And as I understand the evolution

15      of how it got here was there was a ruling in 2019 from

16      the New York court that invalidated the document or

17      ruled that it was unenforceable, that's Exhibit 2.

18      And that on the basis of non-existing --

19            MR. QUICK:  Exhibit 1.

20            MR. ALLEN:  I'm sorry, you're right, Dan,

21      Exhibit 1.

22 Q    (Continuing by MR. ALLEN):  And on the basis of that

23      conclusion that there was an absence of a written

24      contract covering your husband's services, that that

25      makes him a co-owner of the sound recordings in this

1       case, correct?

2   A   I'm not sure what you're asking me.

3   Q   Is it your position that the absence of a signed

4       written contract provides you -- provides the estate

5       with an interest in the sound recordings that your

6       husband performed on?

7   A   Well, as George says he never signed a contract, what

8       other -- what else could we come to as a conclusion.

9   Q   Okay.  So that is your conclusion, correct?

10  A   Uh-huh.

11  Q   All right.  And you would agree with me that if there

12      is a signed contract that covers your husband's

13      performances on those sound recordings, or an

14      enforceable contract I should say, that that would

15      have a material adverse impact on your theory of this

16      case, correct?

17              MR. QUICK:  Form, foundation, legal

18      conclusion and facts not in evidence.

19  A   What he said.

20  Q   (Continuing by MR. ALLEN):  Ma'am, I'm not here to

21      give you instruction but your counsel can make

22      objections.  The rule in the Eastern District of

23      Michigan is that the objections are noted, and that

24      unless I'm asking you about a matter of privilege,

25      that you have to answer through the objection.

1        MR. QUICK:  But it doesn't mean that if you

2    get a question that you don't understand or that

3    you're not able to answer, that you have to somehow

4    make something up.

5        THE WITNESS:  Okay.

6        MR. ALLEN:  Right.

7        MR. QUICK:  So you just tell Mr. Allen if

8    there's something about the question in order that you

9    can't answer or that you don't understand.

10       MR. ALLEN:  Sue, would you read my last

11   question back for her, please.

12                 (WHEREUPON the reporter read

13                 back the question as follows):

14   QUESTION:  "And you would agree with me that if there

15                 is a signed contract that covers your

16                 husband's performances on those sound

17                 recordings, or an enforceable contract I

18                 should say, that that would have a material

19                 adverse impact on your theory of this case,

20                 correct?"

21   A    No, not correct.  I would not agree with you because I

22        would have to see what other you're talking about in

23        order to agree with you.

24   Q    (Continuing by MR. ALLEN):  Okay.  Your case is, as

25        you said, absence of contract means that Mr. Worrell

1      has an interest in sound recordings.  That was your

2      testimony, --

3   A  Yes.

4   Q  -- was it not?

5           Okay.  So if that statement was not true --

6   A  Which statement?

7   Q  The statement that the absence of a --

8   A  Oh.

9   Q  -- contract -- the statement that if there was a

10     contract, then that would have a impact on your case?

11         MR. QUICK:  Asked and answered.

12  A  I can't respond to a hypothetical.

13  Q  (Continuing by MR. ALLEN):  Okay.  Well, actually we

14     are entitled to ask you hypothetical questions.

15  A  Okay.

16  Q  If you don't feel that you understand my question, I'm

17     more than happy to rephrase it.

18  A  I understand it but I can't respond to it the way it's

19     put.  I mean you're asking me to compare something

20     I've never set eyes on to something else.  I can't do

21     that.

22  Q  No, I'm not asking you to do that, ma'am.  My

23     question, and I'd appreciate it if I could get a

24     direct answer to it, is your case would be different

25     if there was a signed contract in place, correct?

1              MR. QUICK:  Form, foundation, legal

2      conclusion.  And her inability to answer your

3      question, counsel, is an answer.

4              MR. ALLEN:  Dan, you can give your

5      objection without speaking and leading your witness,

6      okay.

7              MR. QUICK:  I'm not.

8              MR. ALLEN:  I didn't do that to you

9      yesterday.  I didn't do that to you yesterday and I

10     won't do that throughout the case, all right.  So

11     let's quit with that or we're going to be -- you're

12     not going to filibuster me here so I don't get to my

13     questions, okay, because I'll stop the deposition

14     today and tomorrow and go to the judge.

15             MR. QUICK:  Counsel, you can raise your

16     voice and you can do whatever you want.

17             MR. ALLEN:  I'm not raising my voice, Dan.

18             MR. QUICK:  My comment --

19             MR. ALLEN:  I'm not rising my voice, but

20     you can interpose your objections without leading your

21     witness.  You know it.  I've been around a lot longer

22     than you have and I'm not going to sit here and allow

23     you to lead your witness with your objections.

24             MR. QUICK:  My objection is proper.  Move

25     on.

1              MR. ALLEN:  Object to form and don't lead

2       your witness, okay.  It's improper.  It's improper and

3       you know it.

4              MR. QUICK:  Then do something about it.

5              MR. ALLEN:  I will if it continues, all

6       right.

7              THE WITNESS:  There's some questions I'm

8       going to look to him for if I should answer or not,

9       whether you like that or not.  He's my attorney.

10             MR. ALLEN:  That is your right.  Ma'am,

11      that is your right and not I'm here to argue with you.

12             THE WITNESS:  You definitely are not.

13             MR. ALLEN:  You can ask, you can ask your

14      counsel for all the advice you like --

15             THE WITNESS:  Thank you.

16             MR. ALLEN: -- so long as there's not a

17      question pending on the table.

18             THE WITNESS:  So the next time I want to

19      ask you a question, I'm going to say to you can I ask

20      you a question and that should relieve his anxiety

21      over there, right?

22             MR. ALLEN:  Ma'am, I have no anxiety.

23             THE WITNESS:  I'm not asking you, I'm

24      asking you him.

25             MR. QUICK:  Let's start with a fresh

1      question.

2                    THE WITNESS:  Okay.

3                    MR. ALLEN:  I'd like my last question to be

4      re-asked to the witness.

5                           (WHEREUPON the reporter read

6                            back the question as follows):

7      QUESTION:  "My question, and I'd appreciate it if I

8                 could get a direct answer to it, is your

9                 case would be different if there was a

10                signed contract in place, correct?"

11                    MR. QUICK:  Same objection.

12  A   I don't know.

13  Q   (Continuing by MR. ALLEN):  That's an appropriate

14      answer, ma'am.

15  A   I'm glad you approve.

16  Q   So you made a statement that Mr. Clinton never paid

17      your husband under the oral contract?

18  A   I didn't say never.

19  Q   Okay.  So tell me in terms of the 200 -- $200 a week

20      you said?

21  A   That's right.

22  Q   All right.  How many payments did Mr. Clinton miss, as

23      you say, under the oral contract for $200 a week?

24  A   I don't know.  Enough of them to cause concern to me

25      and Bernie.

1    Q    Okay.  Was it more than 10?

2    A    Maybe.

3    Q    Okay.  Do you have any evidence that Mr. Clinton,

4         sitting here today other than your testimony, that

5         your deceased husband was not paid as agreed?

6    A    Do you have any proof that he was?

7    Q    I do and we'll get to that.

8    A    Okay, great.  Well, I don't have that.

9    Q    Okay.  Well, your counsel does.  Maybe he should have

10        shared it with you before --

11   A    We'll get to that.

12   Q    -- your deposition.

13             So your answer is you have no evidence that

14        your husband was not paid the $200 a week?

15   A    That is not what I said.  I said I don't remember.

16        Bernie was doing gigs, okay.  And sometimes George

17        would pay him and sometimes George wouldn't.  We

18        didn't keep track of that back then because we didn't

19        realize what he was like.

20   Q    Okay.  And you have no recollection sitting here today

21        how many times that occurred?

22   A    No, I don't.

23   Q    Okay.  So could be one, it could be a hundred, you

24        just don't remember?

25   A    That's what I said.

1    Q    Okay.

2                                    (WHEREUPON Exhibit No. 3

3                                    was marked for identification

4                                    by the reporter.)

5    Q    (Continuing by MR. ALLEN):  Ready?

6    A    Yes.

7    Q    Ma'am, have you seen the document marked as Exhibit 3

8         previously?

9    A    Maybe.

10   Q    Okay.  Is there anything that would refresh your

11        recollection as to whether or not you've seen it?

12   A    No, your -- no.

13   Q    Okay.  Turning to the third page of that exhibit,

14        there is a signature block that purports to have

15        Mr. Worrell's signature, I declare under penalty of

16        perjury under the laws of the United States of America

17        that the above is true and correct.  Executed this 2nd

18        day of October in Plainfield, New Jersey, 19 -- 2nd

19        day of October 1993 in Plainfield, New Jersey, I

20        apologize.  It's a little blurry on my copy.

21             Did you live in Plainfield, New Jersey in

22        1993 that you recall?

23   A    Yes.

24   Q    And is that your deceased husband's signature on the

25        signature line there?

1    A     Yes.

2    Q     And so he's declaring under penalty of perjury that

3          the statements in the Complaint are true.  Do you have

4          any reason to dispute that the statements that were

5          made in that Complaint were true?

6                    MR. QUICK:  Statements or the declaration?

7                    MR. ALLEN:  Well, he's certifying, he's

8          certifying in -- yes, that's correct, in the

9          declaration, that the statements are true.

10   A     Not based on his available knowledge at the time.

11   Q     (Continuing by MR. ALLEN):  I don't understand your

12         answer, ma'am.

13   A     Okay, repeat your question.

14   Q     I said -- go ahead.

15                             (WHEREUPON the reporter read

16                              back the question as follows):

17   QUESTION:  "And so he's declaring under penalty of

18                      perjury that the statements in the

19                      Complaint are true.  Do you have any reason

20                      to dispute that the statements that were

21                      made in that Complaint were true?"

22   A     Not based on Bernie's available knowledge at the time.

23   Q     (Continuing by MR. ALLEN):  Okay.  So you believe that

24         he believed that the statements in that Complaint --

25         or in that declaration, Exhibit 3, were true?

35

1    A    Yes.

2    Q    All right.

3                              (WHEREUPON Exhibit No. 4

4                              was marked for identification

5                              by the reporter.)

6    Q    (Continuing by MR. ALLEN):  Have you seen that --

7    A    Yes.

8    Q    -- document before?

9              Can you tell us what it is?

10   A    It's an audit.

11   Q    And audit of what, ma'am?

12   A    On the first page it tells you, Audit of Thang,

13        Incorporated and Malbiz Music.

14   Q    Now there are, as you can see, a number of

15        calculations that were made of royalties due to your

16        husband according to Herzog and Straus.  Do you see

17        the calculations towards the end of the document?

18   A    I've seen them.

19   Q    And who's Herzog and Straus?

20   A    Ira Herzog is a, I guess they call him a forensic

21        accountant.

22   Q    And I'm trying to understand where Mr. Herzog -- who

23        engaged the services of Mr. Herzog?

24   A    I did.

25   Q    And what was the reason why you engaged the services

1        of Mr. Herzog?

2   A    Because Bernie was very loyal to George and he would

3        not believe that George was cheating him, so I had to

4        find a way to prove it and that's what I did.

5   Q    Okay.  Did you consult with Mr. Worrell prior to, --

6   A    Always.

7   Q    -- prior to asking for the audit?

8   A    Always.

9   Q    So walk me through that discussion that you had with

10       your deceased husband.

11  A    I can't -- you want me to recount a conversation that

12       happened over what, 40 years ago?

13  Q    Ma'am, you filed the lawsuit covering the period so

14       I'm asking the questions regarding the period of time

15       that is covered in your lawsuit.  So if you recall,

16       you can answer my question.  If you don't recall --

17  A    I don't recall the specific conversation.

18  Q    Okay.  Then what do you recall generally about the

19       conversation?

20  A    Bernie, I had a audit done because George Clinton is

21       not who you think he is.

22  Q    Ma'am, it would be helpful -- what I think of my

23       client is immaterial to the case.

24  A    I'm not talking --

25                   MR. QUICK:  You asked her --

1  A    You asked me what I said to Bernie.

2           MR. ALLEN:  I don't need the

3     editorialization about my client.

4           MR. QUICK:  She's recounting the

5     conversation that you directly asked her about.

6           THE WITNESS:  Yes, I am.

7           MR. ALLEN:  I wasn't in the conversation, I

8     was 10 years old when the audit was -- I have nothing

9     to do with the conversation.

10          THE WITNESS:  I wasn't talking about you.

11          MR. ALLEN:  So the characterization of

12    Mr. Clinton not being the person who -- it's

13    immaterial to this case what I think of my client.

14          THE WITNESS:  Then don't ask me what I said

15    to Bernie because that's what I said to Bernie.

16          MR. ALLEN:  Well, I'm sure in 1980 when you

17    had the conversation you didn't ask him or tell him

18    anything about Jim Allen because Jim Allen was still

19    collecting baseball cards.

20          THE WITNESS:  When did you name come up in

21    my conversation with Bernie years ago.

22          MR. ALLEN:  You said --

23          MR. QUICK:  Don't argue with the lawyer.

24          MR. ALLEN:  You used the word you, what I

25    think of Mr. Clinton.  It has nothing to do with what

1          I think of Mr. Clinton.

2                    MR. QUICK:  I have no idea what you're

3          talking about, counsel.

4                    THE WITNESS:  Neither do I.

5                    MR. QUICK:  She was trying recount to you

6          the conversation.

7                    MR. ALLEN:  Read the -- Dan, your speaking

8          objections --

9                    THE WITNESS:  That's what I was doing.

10                   MR. ALLEN:  -- are not welcome, okay.  You

11         are --

12                   MR. QUICK:  It's not a speaking objection.

13                   MR. ALLEN:  You are -- no, your role here,

14         as I'm sure you've read the local rules, is to place

15         your objection on the record, not to guide the

16         witness's answers here.  And that's exactly what

17         you're doing.  I didn't do it to you, it's not what I

18         do because I follow the rules.  I'd ask for the same

19         respect and courtesy from you.

20                   MR. QUICK:  You're incorrect.  Do you have

21         a question?

22                              (WHEREUPON the reporter read

23                              back as follows):

24         QUESTION:  "Then what do you recall generally about

25                    the conversation?

1    ANSWER:    Bernie, I had a audit done because George

2              Clinton is not who you think he is."

3  Q   (Continuing by MR. ALLEN):  Okay.  What else?

4  A   What else what?

5  Q   What else did you say and what did he say in the

6      conversation that you recall as a general matter?

7  A   Basically Bernie was against it.  He said George

8      wouldn't do me like that.  I said he did it to the

9      Parliament, he'll do it to you too.

10 Q   Okay.  What do you mean he did it to the Parliament?

11 A   That goes into the history.  You want to know about

12     that?

13 Q   I'd like to know what that statement means.

14 A   What that statement meant was we -- there was an

15     agreement that everybody was going to share in Thang,

16     Incorporated.  George continuously pushed Parliament

17     away to the point where they weren't even coming into

18     the studio anymore.

19              And so I was explaining to Bernie that that

20     schism or whatever that George did to Parliament, he

21     would do, and was in the process of doing, to Bernie.

22 Q   Okay.  So who provided the information to Herzog and

23     Straus for the audit?

24 A   I don't know.  I hired Ira and Ira did what Ira did.

25 Q   Okay.  And --

40

1    A    That's why I wanted a professional.

2    Q    Okay.  So Ira being the person who did the audit?

3    A    Ira Herzog, Herzog and Straus.

4    Q    Right.

5    A    He did the audit and he was a principal in his

6         company.

7    Q    Who else assisted you in providing Mr. Herzog with the

8         information in the audit?

9    A    I don't remember.  I don't think anybody.  That's what

10        he did.

11   Q    Okay.  So you didn't give Mr. Herzog any information?

12   A    I had none to give him.  I was looking for him to give

13        me information.

14   Q    Okay.  So walk me through the conversation you had

15        with Mr. Herzog when you asked him to do the audit, to

16        the best of your ability.  What did you ask him to do?

17   A    I need you to do an audit because I need to prove to

18        my husband what's going on because he won't believe

19        me.

20   Q    Okay.  And did Mr. Herzog ask you for any information

21        about what was the basis of your --

22   A    No.

23   Q    -- suspicions?

24   A    Uh-uh.

25   Q    No.  So you had no role in what Mr. Herzog put

1      together in the audit?

2  A   No, absolutely not.

3  Q   All right.  You gave him no information?

4  A   I think I just said I didn't have any information to

5      give him.

6  Q   Okay.  So you had no information to give him and you

7      don't know what information he based his audit on?

8  A   I hire a professional to do something.  I expect them

9      to do what I hire them to do.  I don't come behind hem

10     and micromanage.

11  Q   Okay, ma'am, but typically when somebody does an

12     audit, they audit on the basis of information.  It's

13     not --

14  A   I have no knowledge --

15  Q   -- just a guess.

16  A   -- of what people typically do.

17  Q   Okay.  So for all you know he could have pulled it out

18     of a cereal box, the information; you don't know where

19     he got the information from that's in this audit?

20           MR. QUICK:  Facts not in evidence.

21  Q   (Continuing by MR. ALLEN):  Was that not your

22     testimony, ma'am?

23           MR. QUICK:  Objection to form.

24  Q   (Continuing by MR. ALLEN):  Was that not your

25     testimony?

1    MR. QUICK:  It mischaracterizes her

2       testimony.

3  Q  (Continuing by MR. ALLEN):  I'm asking was that not

4       your testimony?

5  A  Was what not my testimony?

6  Q  You don't know what information he used in order to

7       come up with the audit?

8  A  I don't know where he obtained his information.  It

9       was not of importance to me.  The fact that he was a

10       professional in doing his job is what was important to

11       me.

12  Q  Okay.  But he could have gotten the information from a

13       garbage can, you don't know?

14  A  He could have pulled it out of the sky, yeah, if you

15       want to go that route.

16  Q  So sitting here today you can't tell us what the basis

17       of his conclusions were?

18  A  They are in the document.

19  Q  I'm talking about the underlying basis for the

20       conclusions that are in the document.

21  A  Such as what?

22  Q  Well, you didn't give him any documents?

23  A  That I remember.

24  Q  Okay.  You didn't tell him what to do?

25  A  Definitely not.

1    Q    And you didn't give him any other information --

2    A    No.

3    Q    -- you just testified to?

4    A    I couldn't, no.

5    Q    Are there any other people that you're aware of who

6         would have given Mr. Herzog information about this

7         audit that you can remember today?

8    A    No.

9    Q    Okay.  Is it because there weren't other people

10        involved in giving him information or you just don't

11        remember who?

12   A    I don't remember.

13   Q    Okay.  Now it's addressed to Mr. Bernie Worrell, the

14        audit, correct?

15   A    Yes.

16   Q    All right.  And there's a statement in the second

17        paragraph that says we were informed by you that a

18        royalty of three quarters of one percent is due you

19        with reference to the artist royalties of Parliament.

20        Thang, Inc.'s representatives had orally confirmed

21        that factor during the course of our review, okay.

22             So you gave him the information that there

23        was three quarters of one percent due with reference

24        to the artist royalties.  Was it you or your husband

25        that gave him that information, because it says we

1        were informed by you?

2    A   I don't know.  It could well -- I don't know.

3    Q   And there's a reference to Thang, Inc.'s

4        representatives.  Do you know who those

5        representatives were?

6    A   No.  They changed constantly.

7    Q   Do you know whether that's a true statement in the --

8    A   No, I don't know that either.

9    Q   Okay.

10                            (WHEREUPON Exhibit No. 5

11                             was marked for identification

12                             by the reporter.)

13               THE WITNESS:  I'm going to need to take a

14        break in the next five minutes to go to the bathroom.

15               MR. ALLEN:  Okay, let's get you to identify

16        this.

17   Q   (Continuing by MR. ALLEN):  I want to direct your

18        attention to the page that looks like this.  It says

19        verification at the top.

20   A   Okay.

21   Q   Have you seen that document, the verification page?

22   A   I don't remember.

23   Q   All right.  I want you to look down about a quarter of

24        the way, you'll see that it was -- claims to be

25        executed on April 20, 1984, Plainfield, New Jersey.

1        Again we've established that you lived in Plainfield,

2        New Jersey at that time, correct?

3    A   Yes.

4    Q   And there's a signature that purports to be G. Bernard

5        Worrell, Junior.  Does that appear to be your

6        husband's signature?

7    A   Yes.

8    Q   So you believe that to be an authentic signature of

9        your husband?

10   A   Yes.

11   Q   And in that verification it says -- there's a box

12       checked, first box, I am a party to this action.  The

13       matters stated in it are true of my own knowledge,

14       except as to those matters which are stated on

15       information and belief, and as to those matters I

16       believe them to be true.

17           Do you understand what that means?

18   A   Yes.

19   Q   Okay.  So your husband is attesting to what he

20       believes to be the truth of the allegations in the

21       Complaint that was filed Worrell versus Tercer Mundo,

22       et al in the Superior Court for the State of

23       California, County of Los Angeles, correct?

24   A   Yes.

25   Q   Okay.  So is it your belief, as we sit here today,

1       that your husband believed the statements in Exhibit 5

2       are true?

3   A   Yes.

4   Q   Do you believe those statements are true?

5   A   To the best of my knowledge.

6                   Okay, I got to go.

7                   MR. ALLEN:  Go.  Off the record at 9:57.

8                           (WHEREUPON a short pause was

9                           had in the proceedings 9:57

10                          a.m. to 10:05 a.m.)

11                  MR. ALLEN:  Back on at 10:05.

12                          (WHEREUPON Exhibit No. 6

13                          was marked for identification

14                          by the reporter.)

15  Q   (Continuing by MR. ALLEN):  Ma'am, I've handed you

16      what's been marked as Exhibit 6, and I just ask you to

17      take a quick look at that for me.  Let me know when

18      you're finished.

19  A   Excuse me?

20  Q   Let me know when you're finished.

21  A   You want me to read 72 pages right now?

22  Q   I need you to read it to familiarize yourself with it,

23      ma'am, but you can take as much time as you'd like

24      with it.

25  A   Okay.

1   Q   Just let me know when you're finished reviewing it.

2   A   Okay.

3   Q   So do you recognize this document?

4   A   No.

5   Q   Okay.  This purports to be a Complaint that was filed

6       in 2019 in the State of New York.  It's the same

7       parties that are in this case here except there's no

8       -- the same parties that are now in the case are in

9       this caption.  The estate of George Bernard Worrell,

10      Junior versus Thang, Inc. and George Clinton.

11              Now in 2019 who was the -- I'm not sure

12      what the terminology is in Washington, but here it's

13      the personal representative of the estate.  Who's

14      appointed personal representative?

15  A   Of Bernie's estate?

16  Q   Uh-huh.

17  A   Me.

18  Q   So this Complaint had to be authorized by you prior to

19      it being filed?

20  A   Yes.

21  Q   And you would have reviewed the Complaint for accuracy

22      prior to it being filed?

23  A   To the best of my ability.

24  Q   If there was any material misstatement that was

25      contained in a draft of the Complaint prior to it

1       being filed, you would have corrected it, correct?

2    A  To the best of my ability.

3    Q  The second allegation in the Complaint is on or about

4       January 1, 1976, while in the State of New York,

5       Mr. Worrell signed a recording contract, hereinafter

6       the agreement, with Clinton. The parties to the

7       agreement, which was drafted by Clinton's New York

8       counsel, is by and between Worrell and a company

9       called Thang, Inc. Defendant Thang was registered as

10      a New York corporation in 1982.

11             On information and belief Clinton entered

12      into numerous agreements prior to 1982 on behalf of

13      defendant Thang. On information and belief, at all

14      times relevant to the claims asserted herein, Clinton

15      is and has been the sole owner of Thang.

16             Do you see that?

17   A  I see that.

18   Q  Okay. Do you agree with that statement?

19   A  To the best of my ability.

20   Q  Okay. So again you're agreeing that there was a

21      contract that was in place on January 1, 1976 between

22      Mr. Worrell and Thang, correct?

23   A  To the best of my knowledge, yes.

24   Q  Okay. And it's still your belief that there was a

25      contract that was signed on January 1, 1976 between

1           your deceased husband and Thang, Inc., correct?

2     A     I'm sorry, say that again.

3                            (WHEREUPON the reporter read

4                             back the question as follows):

5           QUESTION:  "And it's still your belief that there was

6                       a contract that was signed on January 1,

7                       1976 between your deceased husband and

8                       Thang, Inc., correct?"

9     A     Are you asking me do I believe that now or did I

10          believe that then?

11    Q     (Continuing by MR. ALLEN):  Well, let's start with

12          then.

13    A     Yes.

14    Q     Okay.  Now there was a subsequent ruling by a New York

15          State judge that said that the contract was

16          unenforceable, correct?

17    A     Not really.  That's not what I was given to believe.

18    Q     Okay.  Well, tell us what your belief is today.

19    A     I was given to believe that George Clinton stated that

20          he never signed the contract and, therefore, the judge

21          under the dead man's statute couldn't proceed with it.

22    Q     Okay.  Now are you referring to a declaration that

23          Mr. Clinton made in that case?

24    A     No.

25    Q     Okay.  What is it that you're referring to?

1    A    The court case itself when it was found that Clinton

2         alleged he had never signed it.

3    Q    Okay.  But I believe it's attached to your current

4         Complaint.  I apologize, I don't have additional

5         copies of it but, yeah, here it is.  I don't need a

6         copy of it.

7                   Dan, can you be kind enough to show your

8         client.  I'm sure I have it in here somewhere.

9                                 (WHEREUPON Exhibit No. 7

10                                 was marked for identification

11                                 by the reporter.)

12                   MR. QUICK:  I'm sorry, if there was a

13        question, I missed it.

14   Q    (Continuing by MR. ALLEN):  Okay.  Have you seen that

15        document before, ma'am?

16   A    No.

17   Q    Okay.  Is that the basis of your conclusion that

18        Mr. Clinton said he didn't sign the Complaint?

19   A    No.

20   Q    Okay.  What is the basis for your conclusion that

21        Mr. Clinton stated that he did not sign the

22        Complaint -- or sign the January 1, 1976 contract?

23   A    That's what my attorney at the time told me.

24   Q    Okay.  And did your attorney tell you that he based

25        his decision -- strike that.

1              Is it your belief that your attorney based

2        his conclusion on that document?

3              MR. QUICK:  Objection, foundation.  Plus

4        obviously I don't want to get into a waiver of a

5        privileged situation.

6              MR. ALLEN:  I'm just asking whether she

7        believes that today.  I'm not asking on the basis of

8        any communication.

9    Q   (Continuing by MR. ALLEN):  Do you believe that your

10       attorney's conclusion which he conveyed to you, that

11       Mr. Clinton did not sign the Complaint -- or did not

12       sign the January 1, 1976 agreement, emanates from that

13       document which is Exhibit Number 7?

14             MR. QUICK:  Foundation.

15   A   I think I answered it when I said that the attorney,

16       when I asked what was going on with the case, told me

17       what the judge had decided; based on the fact that

18       George alleged that he did not sign the contract and

19       that Bernie was deceased.  And under the dead man's

20       statute, therefore, could not testify on his behalf.

21       And that's when I knew irrespective of all of this.

22   Q   (Continuing by MR. ALLEN):  So let me ask the question

23       this way.  You don't have any evidence for this case

24       that your attorney concluded that Mr. Clinton did not

25       sign the document, the contract, January 1, 1976,

1      other than what's in that document; you possess no

2      other information about where he got his information?

3  A   To the best of my knowledge, no.

4  Q   Okay.  Now I would like you to read the document and

5      tell me where Mr. Clinton said that there was no

6      contract between your husband and Thang.

7  A   Which one, this one or this one?

8  Q   Exhibit Number 7.

9  A   Which is seven?

10             MR. QUICK:  This.  I'll object to form as

11     she said she hasn't seen it before but...

12             MR. ALLEN:  I'm asking her to read it now.

13 A   Okay, I read it.

14 Q   (Continuing by MR. ALLEN):  Okay.  What in that

15     document do you read that says that Mr. Clinton said

16     there was no contract between you and Mr. Worrell --

17     or between Mr. Worrell or Mr. Clinton or Thang?

18 A   Number four.

19 Q   Okay.

20 A   I did not sign the original or a copy of the document

21     either on behalf of Thang, Incorporated or for myself.

22 Q   Is that your conclusion?

23 A   That is what's written right here.

24 Q   Okay.  But you conclude from that that Mr. Clinton was

25     repudiating the contract between your husband and

53

1             Thang, correct?

2   A    Is that a question?

3   Q    Yes, that is a question.

4             MR. QUICK:  Objection, form, foundation.

5   Q    (Continuing by MR. ALLEN):  I'm just asking you.

6   A    No.

7   Q    Then what other information do you have, other than

8        what's in Exhibit 7, what evidence do you have other

9        than what's in Exhibit 7 that Mr. Clinton repudiated

10       the January 1, 1976 contract?

11            MR. QUICK:  Same objection.

12  A    It's what I said before.  When you have all these

13       papers like this and you've hired an attorney, they're

14       not going to stand there and make you read 78 pages.

15       They're going to synopsize.  That's what was done.

16       The basic result duty is bladda, bladda, bladda.

17  Q    (Continuing by MR. ALLEN):  Okay.  So do you have any

18       other evidence that Mr. Clinton repudiated the 1976

19       contract between your husband and Thang other than

20       what's in Exhibit 7?

21  A    Not to the best of my knowledge.

22            MR. QUICK:  Same objection.

23  Q    (Continuing by MR. ALLEN):  Thank you, thank you.

24       These aren't trick questions.  I'm trying to get

25       through the facts and understand what your

```
 1            understanding is, ma'am.  I'm not trying to trick you.
 2                      Are you familiar with a gentleman by the
 3            name of Armen Boladian?
 4    A       Yes.
 5    Q       Okay.  Who is Armen Boladian?
 6    A       Armen Boladian was head of Westbound Records and
 7            Bridgeport Music.
 8    Q       And when was the last time you had any form of contact
 9            with Mr. Boladian?
10    A       Well, not with him.  Years ago but not directly with
11            him.
12    Q       Okay.  Then what indirect communications have you had
13            with Mr. Boladian?
14    A       None.
15    Q       So you had no communication with Boladian, to the best
16            of your knowledge, ever?
17    A       Well, yeah, when I first met him.
18    Q       When did you first meet him?
19    A       When Bernie first joined P-Funk and he went around and
20            Armen came over.
21    Q       Came over where?
22    A       Wherever Bernie was.
23    Q       Okay.  And when was the next time you remember
24            Mr. Boladian?
25    A       Same thing.
```

1    Q    Since your husband has passed away have you had any

2         form of communication from Mr. Boladian or his

3         representatives?

4    A    I don't know representatives but I have not had with

5         Armen.

6    Q    Okay.  So do you recall approximately when the last

7         time you spoke with Mr. Boladian?

8    A    No.

9    Q    Okay.  Are you aware of Mr. Boladian having any

10        communication with any of your representatives?

11   A    No.

12   Q    Okay.  Have you had any communications with anybody

13        from Westbound Records?

14   A    I don't think so.

15   Q    Okay.  I notice that you receive some royalties from

16        Bridgeport Music; is that correct?

17   A    Yes.

18   Q    Okay.  And Bridgeport Music is owned by whom?

19   A    Armen.

20   Q    Okay.  And do those payments just show up whenever

21        they show up, or does somebody call you or provide you

22        with information that the royalties are coming?

23   A    Usually I'm calling them because I'm desperate for

24        money; when's the royalties coming.

25   Q    Okay.  So who do you call at Westbound Records when

 1          you're --

 2    A     Sarah.

 3    Q     Who's that?

 4    A     Sarah.

 5    Q     And who's Sarah?

 6    A     Well, back -- you mean when, when -- who do I call

 7          when, now or years ago or what?

 8    Q     I'm going to confine my questioning to the period of

 9          time from 2016, June of 2016 when your husband passed,

10          to the present.

11    A     Okay, Sarah, Sarah.  You want to know who I speak to?

12    Q     Yes.

13    A     Sarah.

14    Q     Sarah, is that S-A-R-A-H or --

15    A     Yes.

16    Q     Okay.  And what's Sarah's last name?

17    A     Catlett, C-A-T-L-E-T-T.

18    Q     And who is she?

19    A     I don't know what her title is but she's who I call

20          when I'm trying to get some money, get an advance from

21          Armen, whatever.

22    Q     Okay.  And is she with Bridgeport or is she --

23    A     I'm not sure.

24    Q     Okay.  How do you know to call Sarah?

25    A     Because I used to call Helen and then all of a sudden

1          Helen wasn't there anymore and Sarah picked up the

2          phone, so I started talking to Sarah.

3     Q    Okay.  And approximately how long has Sarah been in

4          the picture?

5     A    I have no idea.

6     Q    Did you deal with Helen after your husband passed

7          away?

8     A    No.

9     Q    Okay.  So it's been Sarah since your husband passed

10         away that you communicate with?

11    A    Yes.

12    Q    Okay.  Walk me through a typical conversation that you

13         have with Tara -- or Sarah, I'm sorry.

14    A    I have to like -- typical conversation.  Sarah, can

15         you give me an idea, can you give me an idea when the

16         checks are going out.  Hey, Sarah, can you contact

17         Armen, I need an advance.  Those would be the two

18         conversations we would have.

19    Q    Okay.  And has Mr. Boladian ever responded to any of

20         those requests for advances?

21    A    To me?

22    Q    Yeah.

23    A    Outside of advancing the money?

24    Q    Uh-huh.

25    A    No.

58

1    Q    Did he advance you any money for this litigation?

2    A    No.

3    Q    Is he providing any support in this litigation for

4         you?

5    A    No.

6    Q    At all?

7    A    No.

8    Q    Have you discussed this litigation with anybody from

9         Bridgeport?

10   A    Not to my knowledge.

11   Q    Okay.  Who have you discussed this litigation with

12        other than your attorney?

13   A    Various people.  It has been -- various people.

14   Q    Okay.  Are any of those people connected to

15        Mr. Boladian?

16   A    I don't -- maybe.

17   Q    Okay.  Who might be connected to Mr. Boladian that you

18        discussed litigation with?

19   A    I'm not sure.  Your question would have to be more

20        specific.

21   Q    What individuals do you speak with that are connected

22        with Mr. Boladian on any sort of basis?

23   A    I'm not sure.

24   Q    Well, you testified just a minute ago that you may

25        have spoken with representatives of Mr. Boladian at

```
 1          some point in time.  You don't know who those people
 2          are?
 3    A     No.
 4    Q     Do they show up --
 5    A     It's been many, many years.
 6    Q     Do they show up in a black car with no name
 7          identification and just say I'm from Bridgeport and --
 8    A     No, they flew in on the Batmobile.
 9    Q     Okay.  So on these occasions when the Bridgeport
10          personnel have flown into Washington on the Batmobile,
11          Washington State or New Jersey?
12    A     Nobody flew to Washington.
13    Q     Okay.  Well, you just testified that there were
14          representatives from Bridgeport that have flown in to
15          see you on a Batmobile so I'm --
16                MR. QUICK:  Counsel.
17    Q     (Continuing by MR. ALLEN):  -- wondering when that
18          took place.
19    A     No, you --
20                MR. QUICK:  You don't have respond to that.
21                MR. ALLEN:  Well, I --
22                MR. QUICK:  Counsel, she was responding to
23          your smart aleck remark with her own smart aleck
24          remark.
25                THE WITNESS:  That's right.
```

1          MR. ALLEN:  I didn't think my remark was

2      smart aleck at all.

3          THE WITNESS:  I did.

4  Q   (Continuing by MR. ALLEN):  I'm asking you how and you

5      weren't able to give me any ideas.  And I was trying

6      to refresh your recollection by giving you

7      possibilities because you don't remember the names of

8      the people.  So I'm curious as to what it would be

9      that I could refresh your recollection to help you

10     remember who those representatives of Bridgeport or

11     Westbound were.

12          MR. QUICK:  Objection as to form,

13     mischaracterizes the testimony.

14  Q   (Continuing by MR. ALLEN):  There's a question on the

15     table, ma'am.

16  A   I don't know what you could say to help my

17     recollection.

18  Q   What other form of communications have you had with

19     representatives of Bridgeport Music other than to

20     request your payments?

21  A   I don't recall.

22  Q   Have you ever discussed Mr. Clinton?

23  A   With who?

24  Q   With representatives of, let's start with Bridgeport.

25          MR. QUICK:  Since Mr. Worrell passed away.

```
 1   A   I'm forever ranting over what George did to Bernie to

 2       anybody who will listen.

 3   Q   (Continuing by MR. ALLEN):  You're not very happy with

 4       Mr. Clinton, are you?

 5   A   If somebody had taken 50 years of your spouse's

 6       whatever, how happy would you be?

 7   Q   Well, I don't know that that's happened, ma'am, so --

 8   A   I do.

 9   Q   -- I would just ask you to try to confine your answers

10       to the questions I'm asking.

11   A   I did.  You asked me the question, I answered you.

12   Q   Have you had any conversations with Joel Martin?

13   A   Yes.

14   Q   Okay.  Who's Mr. Martin?

15   A   I don't know what his title is.

16   Q   And who does he work for?

17   A   I'm not sure.

18   Q   How is he related to Mr. Boladian?

19   A   I don't know.

20   Q   Is he a lawyer?

21   A   I don't think so.

22   Q   Is he a business manager?

23   A   I don't know.

24   Q   Okay.  Tell me what your conversations with Mr. Martin

25       have entailed.
```

1   A   I was calling Sarah and this guy answered the phone

2       and identified himself and asked could he help.  But

3       Sarah wasn't in or she was at lunch or whatever, and I

4       told him that I needed to ask for an advance against

5       royalties.  And he's like, well, I can arrange that

6       for you.  And so that's what we did.

7   Q   Okay.  And how much was that advance?

8   A   Oh, I don't know.  It varies.  I try not to get too

9       much because then when the money came, we would be at

10      a deficit all over again.

11  Q   So when did you call Mr. Martin?

12  A   I don't know.  I didn't call him, I called Sarah.

13  Q   Okay.  When did that phone conversation happen?

14  A   After Bernie died.

15  Q   In 2016?

16  A   Yes.

17  Q   What happened during the conversation?

18  A   He said he would get back to me or Sarah would.

19  Q   Okay.  And did Mr. Martin get back to you?

20  A   Sarah did.

21  Q   And what did Sarah say?

22  A   We sent the wire transfer.

23  Q   And how much was the wire transfer?

24  A   I don't remember.

25  Q   Was it more than a hundred thousand dollars?

63

```
 1   A    Oh, hell, no.  No.

 2   Q    Was it more than $50,000?

 3   A    No.

 4   Q    Was it more than $20,000?

 5   A    No.

 6   Q    Was it more than $10,000?

 7   A    No.

 8   Q    Was it more than $5,000?

 9   A    Yes.

10   Q    Okay.  And did you have to sign any form of paper in

11        order to get that advance?

12   A    I don't think so because it was an e-mail.

13   Q    Okay.  Has that e-mail been produced in this case?

14   A    I wouldn't have it.

15   Q    Who would have the e-mail?

16   A    I have no idea.

17   Q    What happened to the e-mail?

18   A    Once I get the money I don't care.

19   Q    So you are in the habit of getting -- when you get

20        money from something, you get rid of receipts or just

21        e-mails?

22   A    Can you be more specific, you mean in general or do

23        you mean with this?

24   Q    In general, yeah.

25   A    It depends.
```

1   Q   Okay.  What does it depend on?

2   A   Okay, let's suppose that somebody sent me $1500, it

3       was somebody I knew.  I wouldn't be keeping receipts

4       for that.

5   Q   Okay.  What if later on there's a question about what

6       it is that you did receive; it's an advance, right?

7   A   From my friend?

8   Q   No, no, I'm talking about you got -- you received an

9       advance.

10  A   Are we talking the $1500 that I just hypothetically

11      brought up or before?

12  Q   No, we're talking about the advance that you received

13      from, was it Bridgeport or Westbound?

14  A   Wire transfer, I think that was Bridgeport.

15  Q   How long did you keep the e-mail from Bridgeport

16      memorializing --

17  A   I don't.

18  Q   So once you got the money you deleted the e-mail?

19  A   Not necessarily.  It went off into wherever e-mails

20      go.  I have moved so much due to all this craziness, I

21      don't know where a lot of stuff is.  And I wouldn't

22      keep something that wasn't that critical to me.

23  Q   Right.  So I notice in your discovery responses that

24      you lost a number of documents at some point due to a

25      storm?

65

1    A    Is that a question?

2    Q    Yeah.

3    A    I didn't lose them, they were destroyed.

4    Q    Okay.  Tell us about that.

5    A    We had rented a house in Everson, Washington, Bernie

6         was dying.  We had -- I had driven across country in

7         an RV.  The night that we -- or the night -- two

8         nights after we moved in a huge tree fell on the front

9         of the RV where all the documents were and all clothes

10        and a bunch of other stuff was.  The storm was

11        tremendous, it ruined everything.

12   Q    So in terms of the papers that you lost, when you say

13        it ruined the papers, were they wet, were they ripped?

14   A    Huge storm, wet.

15   Q    Okay.  Did you make any effort to recover those

16        documents?

17   A    Of course not.

18   Q    Okay.  So --

19   A    That was impossible.

20   Q    A tree fell on the front of the RV you said and that's

21        where the documents were kept, right?

22   A    They weren't kept there all the time.  When we got to

23        the house and we started moving in, we were moving

24        stuff from the back to the front to make it easier to

25        access because Bernie couldn't help, he was dying --

1   Q   Okay.

2   A   -- and I couldn't lift too much stuff.  So I had to

3       get stuff as close to the front as I could to drop it

4       down onto a pulley thing.  That's why they were where

5       they were.

6   Q   Okay.  And so were they scattered, were they scattered

7       or were they just wet?

8   A   They were soaked.

9   Q   Okay.

10   A   The cardboard boxes had fallen open.  There was water

11       inside of them dripping on down to the floor.

12   Q   Did you make any effort to try to recover them?

13   A   And how would I do that?

14   Q   Well, I mean there are companies that, disaster

15       recovery --

16   A   No.

17   Q   -- companies that --

18   A   Yeah, that requires money and again we didn't have

19       any.

20   Q   Okay.  Did you seek to put those documents anywhere

21       where they could be safely kept until you did have the

22       money to have them restored?

23   A   Again, they were soaked.

24   Q   Okay.  Well, being from Michigan we're all familiar

25       with flooded basements, and I've had them myself.  And

1        documents that do get wet do dry out and --

2    A   These wouldn't.  They were shredded -- not shredded,

3        disintegrated.

4    Q   All right.  What kind of documents were there?

5    A   Oh, God, all business related documents, bank

6        statements.

7    Q   Do you recall the contents of those documents?

8    A   No.

9    Q   So bank statements, what else?

10   A   Business documents.

11   Q   Tax returns?

12   A   Some.

13   Q   But you haven't had any problems with your tax returns

14       being destroyed in these storms since 2016, have you?

15   A   No.

16   Q   Okay.  I noticed that you've produced five out of the

17       last 10 years of your royalty schedules in your income

18       tax forms.  Where are the other schedules?

19   A   I don't know.

20   Q   How do you keep your tax records, ma'am?

21   A   Now?

22   Q   Uh-huh.

23   A   In a file.

24   Q   And is the file for 2023 missing or --

25   A   I don't know.

68

1    Q    Have you filed taxes for the estate in 2023?

2    A    Well, wait a minute, this is 2024.  Not yet, I'll be

3         filing them.

4    Q    So you're on an extension right now?

5    A    Wait a minute, wait a minute.  I guess.

6    Q    Okay.  But you do have a royalty statement for 2023,

7         correct?

8    A    A royalty statement from who?

9    Q    Well, ma'am, you have a consistent -- you've

10        consistently shown that you're receiving various

11        royalties, your attorney's produced five out of 10

12        years.  I'm wondering whether you received --

13   A    Oh, you want to know if I received -- I'm sorry, I'm,

14        I'm asking a question.  Go ahead and say it again.

15   Q    Yes.  What royalties did you receive in 2023?

16   A    I don't remember all of them.

17   Q    Do you have an approximate amount?

18   A    No.

19   Q    Did you receive any royalties from Mom's Maybelline?

20   A    No.

21   Q    Okay.  How about any royalties for work your husband

22        did with Bill Elliott?

23   A    No.

24   Q    All right.  No royalties for any work your husband did

25        with Dionne Warwick?

69

```
 1   A    That was back when Bernie was in college.
 2   Q    Okay.  I'm just asking, ma'am.  Did you receive any
 3        royalties --
 4   A    No.
 5   Q    -- from his work with --
 6   A    No.
 7   Q    -- Dionne Warwick?
 8   A    No.
 9             MR. QUICK:  Your questions are all about
10        2023?
11             MR. ALLEN:  Yeah.
12             MR. QUICK:  Yeah.
13   Q    (Continuing by MR. ALLEN):  Have you ever received any
14        royalties from Mom's Maybelline?
15   A    I don't know.
16   Q    Okay.  Have you ever received any royalties -- have
17        you, your husband or the estate received any royalties
18        from Dionne Warwick?
19   A    No.
20   Q    Have you or your husband or the estate ever received
21        royalties from Chubby and the Turnpikes?
22   A    No.
23   Q    Okay.  How about any royalties you, your husband, the
24        estate from The Tavares?
25   A    No.
```

1   Q   And you already testified I think that no royalties to

2        you, your husband or the estate from Maxine Brown?

3   A   No.

4   Q   Your husband was a member of the group called The

5        Pretenders for a while, toured with them I think,

6        right?

7   A   Yes, he toured with them.

8   Q   Did he ever -- did you, the estate or your husband

9        ever receive any royalties for his work on -- work for

10       The Pretenders?

11   A   No.

12   Q   I have to ask this because it's one of my favorite

13       groups.

14                     (WHEREUPON Exhibit No. 8

15                     was marked for identification

16                     by the reporter.)

17   Q   (Continuing by MR. ALLEN): Go ahead and take a look

18        at that document.

19   A   I looked at it.

20   Q   Okay. That's a document that purports to set forth

21        the credited artists for a song called Burning Down

22        The House. Are you familiar with that song?

23   A   Yes, yes.

24   Q   It was a pretty popular song back in the 1980's,

25        wasn't it?

1    A    Yes.

2    Q    And I'm no musicologist but the song isn't the song

3         without Bernie playing on the synthesizer on that

4         song, correct?

5    A    His arrangement, yes.

6    Q    In your opinion is it a hit without Bernie's

7         contribution?

8    A    I have no way of knowing.

9    Q    Okay.  Your opinion?

10   A    I don't have an opinion on that.

11   Q    Are you proud of the work that Bernie did for Talking

12        Heads?

13   A    I'm proud of everything Bernie did.

14   Q    But he's not credited at all on that album, is he?

15   A    First of all, I think Burning Down The House was

16        written by somebody else and so he wouldn't be

17        credited for that.

18   Q    Okay.  He's not getting any sound recordings for that,

19        is he?

20   A    No, I don't know.

21   Q    Or sound recording royalties?

22   A    I don't know, I'm not sure.

23   Q    The estate's not getting any sound royalties from

24        that?

25   A    I don't know.

1    Q    How do you feel about Tina Weymouth and David Byrne

2         not providing appropriate credit for Bernie basically

3         putting them on the map?

4              MR. QUICK:  Object to form and foundation.

5    A    I don't have an opinion about that, I don't care.

6    Q    (Continuing by MR. ALLEN):  Are you bitter about the

7         fact that they frequently have spoken about how they

8         created the song with -- amongst themselves?

9    A    I don't know that.

10   Q    Well, do you feel like Bernie was given appropriate

11        credit from that group?

12   A    Oh, yeah.

13   Q    What credit did they give Bernie for that, financial?

14   A    Can I ask my attorney something?

15   Q    Huh?

16   A    Can I ask you something?

17   Q    I prefer that you not do it during the pendency of a

18        question unless it involves an issue of privilege.  Is

19        this something that has to do with something you've

20        discussed with an attorney?

21   A    Okay, never mind, just ask your question again.

22                            (WHEREUPON the reporter read

23                             back the question as follows):

24        QUESTION:  "What credit did they give Bernie for that,

25             financial?"

1  A    Financial credit for the album, is that what you're

2       asking me?

3  Q    (Continuing by MR. ALLEN):  Yeah.

4  A    I don't know, we were divorced.  I divorced him then

5       during that period.

6  Q    Okay.  Are you aware of any credit that he's -- that

7       the estate is getting for that track?

8  A    I don't know.

9  Q    So walk me through how you account for the royalties

10      that the estate is currently receiving.  What happens,

11      do you get a check in the mail, an EFT?

12 A    Royalties from who?

13 Q    Royalties from any source, how do you do the

14      accounting on that, does it go to a third party who

15      keeps track?

16 A    Any royalties that are received are either coming in

17      via wire transfer or a check, very seldom a check.

18      And then the 1099s go to the accountant and that's how

19      they're accounted for.  I'm trying -- that's how

20      they're accounted for.

21 Q    Okay.  So between the time -- I mean do the checks

22      come to you directly --

23 A    Yes.

24 Q    -- when you get them?

25 A    Yes.

1  Q   They come to you at your home?

2  A   Yes.

3  Q   And the EFTs go into your account?

4  A   Yes.

5  Q   One account?

6  A   Yes.

7  Q   Same account for all royalties?

8  A   For now, yeah.

9  Q   Okay.

10 A   Well, what period of time, from 2016, because I've

11     changed banks.

12 Q   2016 to present.

13 A   Well, it's not always the same account.  I changed

14     banks.

15 Q   Okay.  So what banks did you initially use when you

16     opened the estate?

17 A   What was it called, I don't remember.  What's the name

18     of that bank.

19 Q   Was it in Washington State?

20 A   Yes.

21 Q   Okay.  Was it close to your home?

22 A   No.

23 Q   Okay.

24 A   It started with a P.  I don't remember the name of the

25     bank.

1  Q   PNC?

2  A   No, no, they don't have that out in Washington.

3  Q   Approximately when did you open your current account?

4  A   About 20 -- Bernie died in '16, maybe 2019 or 2020

5      maybe.

6  Q   And what bank is that?

7  A   It's a credit union, WECU.

8  Q   WECU, what does that stand for?

9  A   Whatcom Educational Credit Union.

10 Q   Okay.  And you receive royalties in no other account?

11 A   No.

12 Q   What other sources of royalties do you receive other

13     than those that you receive for Mr. Worrell's time

14     working with any of Mr. Clinton's groups?

15 A   I'm sorry, say the question again.  What other

16     royalties do I receive from what?

17 Q   From any other source than the sources that are

18     attributable to Mr. Worrell's work with Mr. Clinton?

19 A   Les Claypool, Bernie -- Bucket of Bernie Brains.

20     Colonel Claypool Bucket of Bernie Brains, that's Les

21     Claypool.  Who else, I can't recall them.  Oh, other

22     royalties, okay, that would also include back then

23     ASCAP and BMI but not anymore.

24 Q   Okay.  But ASCAP and BMI collect royalties for various

25     artists, as I understand it, correct?

76

1   A   That's what I understand.

2   Q   Okay.  So what artists are ASCAP and BMI collecting

3       for that are not a group associated with Mr. Clinton?

4               MR. QUICK:  I just think there was

5       confusion because you were asking currently and she

6       said she's not receiving anything from BMI and ASCAP

7       now.

8   Q   (Continuing by MR. ALLEN):  Okay, all right.  So when

9       did the BMI and ASCAP royalties cease?

10  A   Within the past two or three years.

11  Q   And what were they attributable to, what works were

12      ASCAP and BMI collecting royalties for?

13  A   I -- pages and pages.  I, I, I can't -- I don't know,

14      I can't give you that definition.

15  Q   How many tracks that you know that you're receiving

16      royalties for have a source other than Mr. Clinton's

17      groups?

18  A   There are but I just don't recall off the top of my

19      head which they are.

20  Q   I see that in one of the years, I believe 2016, it's

21      not on the document itself but Mr. Worrell received

22      royalties from AFM and SAG-AFTRA?

23  A   Yes.

24  Q   What are those for?

25  A   Musicians union.

1    Q    Okay.  And so your --

2    A    I get Bernie's, half of his pension.

3    Q    So his full pension would be twice the 3663, correct?

4    A    What's 3663?

5    Q    Thirty-six sixty-three is the amount of royalties that

6         -- or pension that --

7    A    Can you put a period in there somewhere, $36?

8    Q    I'm sorry, $3,663.

9    A    Is that per year?

10   Q    I don't know.  It's listed here on your schedule one

11        1040 line 8Z, other income.

12   A    It's $371.95 per month.

13   Q    Okay.  And what did Mr. Worrell do to earn the pension

14        that he's getting from AFM and SAG-AFTRA?

15   A    He was a member of the union, the musicians union.

16   Q    And that is for in part monies that he received

17        working for Mr. Clinton, correct?

18   A    No.

19   Q    Okay.  So it's your position that your husband was not

20        paid according to union scale during his time working

21        for Mr. Clinton?

22   A    In the beginning, if I remember correctly, George was

23        a signatory with the union and for those times, yes.

24        But after that he was no longer a signatory costing

25        Bernie a lot of money.

78

1   Q   Okay.  And at what point did Mr. Clinton no longer

2       continue with his signatory?

3   A   You'd have to ask him.

4   Q   Was it in the 1970's, do you recall, or was it --

5   A   Probably.

6   Q   -- the 1980's?

7           Okay.  I notice that you've received some

8       royalties from Sound Exchange, Inc.?

9   A   Not very much.

10   Q   And is that attributable to your husband's work with

11       Mr. Clinton?

12   A   It's attributable, attributable to much that Bernie

13       did, Clinton being a part of it.

14   Q   Who else would have been a part of it?

15   A   Oh, good God, whoever Bernie performed with.

16   Q   All right.  What about GEP Talent Services, LLC,

17       what's that?

18   A   I think that is a royalty that comes from Bernie

19       appearing on the Bernie Mac Show.  It's not very much.

20       I mean I get a check for $4.31 or something.  GEP

21       Talent, I don't know, that's a company that pays for a

22       lot of different entities.

23   Q   Okay.  Is any of that income, it's not broken down

24       here, attributable to your deceased husband's work

25       with Mr. Clinton?

1    A    No.

2    Q    All right.  The Film Musicians Secondary, what's that

3         for?

4    A    That's where Bernie lost a lot of money when he

5         stopped being a signatory, because what the union does

6         is they take all the contributions and then with some

7         ratio, only they understand they portion out money to

8         musicians based on the number of sessions that they've

9         done.  So he's lost a lot of money 'cause of that.

10   Q    Have you ever challenged the Film Musicians

11        Secondary --

12   A    Yeah.

13   Q    -- calculations?

14   A    And they're the ones that told me that he's no longer

15        the signatory, therefore, what Bernie did that wasn't

16        a session wasn't, you know, counted for them.

17   Q    Did you do anything to determine whether or not they

18        were telling you the truth?

19   A    Like what?

20   Q    Did you sue them?

21   A    No.

22   Q    Okay.  So --

23   A    I believe them.

24   Q    Okay.  So you just decided to believe what they told

25        you?

80

1    A    Based on George Clinton's behavior towards Bernie

2         financially, yes, I had no reason not to.

3    Q    And you have no concerns about the behavior that

4         record companies and other industry folks do to

5         exploit largely African American musicians that would

6         cause you to have any sort of concern about whether

7         they're telling you the truth?

8    A    Is there a specific question for Bernie in there

9         somewhere?

10   Q    The question's for you, ma'am.  Do you have the same

11        suspicions about other people in the industry who are

12        also ripping people off?

13   A    Well, if they're not ripping Bernie off, I don't care.

14   Q    Okay.  Well, what did you do to ascertain whether or

15        not Film Musicians Secondary was ripping Bernie off

16        other than take their word that go chase George

17        Clinton?

18   A    They didn't tell me to go chase George Clinton.

19        You're putting words in my mouth.  What I said was

20        they had no records of George being a signatory to the

21        union, which is where that money derives from.  And,

22        therefore, that was why Bernie's income, that specific

23        income, went down so low.

24   Q    Okay.  They don't have any records from 1975?

25   A    They who?

1    Q   The people who you just said have no records of Bernie

2        receiving pay -- or the contributions being made?

3    A   No, they said they didn't have any records of George

4        contributing as a signatory to the union.

5    Q   Okay.  Did you do anything to challenge the accuracy

6        of their claim that they have no records?

7                    MR. QUICK:  Asked and answered.

8                    MR. ALLEN:  It's not been asked and

9        answered.

10   A   Why, why would I?  I knew they were telling --

11                   MR. QUICK:  Don't, --

12                   THE WITNESS:  Okay.

13                   MR. QUICK: -- don't argue with him, just --

14                   THE WITNESS:  Okay, okay.

15                   MR. QUICK:  -- yes or no, if you can.

16   A   No.

17   Q   (Continuing by MR. ALLEN):  Thank you.  I see that you

18       receive some royalties from BMG Rights Management.

19       What's that for?

20   A   Miscellaneous sessions Bernie did.

21   Q   Sessions for whom?

22   A   I have no idea.  Bernie did a tremendous amount of

23       work.

24   Q   So some of those -- you have no idea, some of those

25       sessions could have been from Mr. Clinton?

1    A    Oh, no.

2    Q    Well, you said you had no idea.

3    A    Well, they weren't from him.

4    Q    How do you know that?

5    A    Because I would have remembered that name.  And BMG,

6         there isn't that much money.

7    Q    Okay.  But who did he do the sessions for where he --

8    A    I don't remember.

9    Q    Okay.  What about Prawn Song Records, what's that?

10   A    Colonel Claypool Bucket of Bernie Brains.

11   Q    So that's the Les Claypool?

12   A    Yes.

13   Q    And that's only attributable to his work with Les

14        Claypool?

15   A    Yes.

16   Q    All right.  There's a line item here for Sound

17        Exchange, Inc.  Do you know what those royalties were

18        for?

19             MR. QUICK:  Asked and answered.

20   A    Yeah, I did answer that already.

21   Q    (Continuing by MR. ALLEN):  Okay.  But this is a

22        different, this is a different year so --

23   A    The answer would be the same throughout the years.

24   Q    So you don't know what portion of the Sound Exchange

25        royalties are related to work with Mr. Clinton versus

1         other third parties?

2    A    Is that a question?

3    Q    Yes, it is.

4    A    No.

5    Q    Again these are not labeled by year, so I can't tell

6         you what year this relates to, but it says AFM and

7         SAG-AFTRA IP Rights Fund.  Do you know what that's

8         for?

9    A    One Bernie performed and also on a TV show.  If he

10        was performing, that is AFM, American Federation of

11        Musicians.  SAG-AFTRA's Screen Actors Guild.  Would be

12        if he appeared even momentarily and that would

13        probably be the Bernie Mac Show, or any other show

14        that Bernie actually appeared on.

15   Q    Okay.  And none of it -- what if there was an

16        appearance on Soul Train as Parliament-Funkadelic,

17        could that be --

18   A    Yeah, that could be.

19   Q    Okay.  So it's just not Bernie Mac stuff?

20   A    No.  I don't know who all it is.

21   Q    All right.  Who would?

22   A    Or was.

23   Q    Who would?

24   A    Who would?

25   Q    Yeah.

1    A    The box of destroyed papers.

2    Q    Have you made any effort to reach out to AFM and

3         SAG-AFTRA to determine whether or not they're

4         providing their appropriate share of what Mr. Worrell

5         should be getting?

6    A    When Bernie first died, I did.  And that's when they

7         explained to me.

8    Q    Okay.  But in subsequent years what if they shorted

9         you, have you ever questioned whether or not they're

10        shorting you?

11   A    No, I'm too busy getting the person who shorted Bernie

12        the most.

13   Q    And did you request an audit of that information?

14   A    No.

15   Q    Did you request an audit for any of these payors of --

16   A    No.

17   Q    -- royalties?

18   A    No.

19   Q    So you don't know whether you're getting the accurate

20        share from them or not, do you?

21   A    I don't understand the question.

22   Q    Well, are you just assuming what you get in the

23        statements is accurate?

24   A    Yes.

25   Q    Okay.  But when it comes to Mr. Clinton, you

1     automatically question it because you don't like him,

2     right?

3  A  Not because I don't like him.

4  Q  Okay.

5  A  Because I was looking at his history of what he did to

6     Bernie and when he did it and how he did it.

7  Q  Okay.  Well, you've made a lot of statements about

8     what Mr. Clinton did, and I'm just trying to ascertain

9     specifically what it was that you think he did other

10    than not pay him what you think your husband was

11    worth.

12 A  Isn't that enough?

13 Q  Is that it?

14 A  That's basically it.

15 Q  Okay.  So you just think Mr. Clinton should be paying

16    more money?

17 A  I know he should have been paying more money.

18 Q  All right.  Now I'd like to know what is the basis for

19    your conclusion that you know Mr. Clinton should be

20    paying you more -- should have paid your husband and

21    now his estate more money, what is it?

22          MR. QUICK:  I'll object to the extent it

23    calls for a legal conclusion.  Go ahead.

24 A  I really don't know how to answer that because George

25    did so much to Bernie that when I began tracking it,

86

 1          and finally got Bernie to see what was going on,

 2          that's how I know.

 3     Q    (Continuing by MR. ALLEN):   Okay.  So what did you

 4          track specifically?

 5     A    The audit was one example.

 6     Q    So the audit from 1980's, there's been --

 7     A    That's one example.

 8     Q    All right.  What's the second example?

 9     A    There was so many I just -- I mean I don't even know

10          where to start.  That's why I have an attorney.

11     Q    We've got five and a half hours, ma'am, is --

12     A    No, that's not going to jog my memory.  My memory is

13          what it is.

14     Q    Okay.  So sitting here today the only thing that you

15          can point to, the only evidence that will be in this

16          trial that you can provide, is that Mr. Clinton

17          shorted your husband, that's it?

18     A    No, that's not the only evidence.

19     Q    Okay.  Then tell me what other evidence you have to

20          support a claim that Mr. Clinton shorted your husband.

21     A    I think I've sent what I have to my attorney.  I don't

22          remember specifically what everything is.  But based

23          on Bernie's participation and what he did and how

24          valuable he was, --

25     Q    Okay.

1    A    -- a person would have to be a idiot to think that the
2         paltry sums of money he got were what he was supposed
3         to get.
4    Q    Now what it is that makes you conclude that it's
5         Mr. Clinton that shorted your husband money?
6    A    Mr. Clinton is the only person in his camp that makes
7         decisions.  In Bernie's camp I'm the person that makes
8         decisions.  So if Bernie wasn't getting the money for
9         sessions, if he wasn't getting his backpay, if he
10        wasn't getting paid his royalties, that all fell right
11        at the foot of the only person whoever made decisions.
12        Everybody else were minions and whatever.  Only George
13        made those decisions.
14   Q    Okay.  Now who pays these royalties; is Mr. Clinton's
15        name listed as a payor on any of these royalties?
16   A    I have no idea.
17   Q    So what if Mr. Clinton isn't getting the royalties,
18        what --
19   A    Then he should sue them.
20   Q    Okay.  But have you ever considered the possibility
21        that perhaps Mr. Clinton isn't getting the royalties
22        that he should be getting?
23   A    No, not at all.
24   Q    Okay.  Have you ever audited his books?
25   A    Audited whose books?

88

1    Q    Mr. Clinton's books.

2    A    Thang, Incorporated.

3    Q    Okay.  That was again the one time in 1980, correct?

4    A    Uh-huh.

5    Q    All right.  That was 44 years ago?

6    A    Uh-huh.

7    Q    What efforts have you undertaken to ascertain what

8         Mr. Clinton is receiving?

9    A    I don't care what he's receiving.  Why would I look

10        into that?

11   Q    Well, if he's not getting paid royalties, obviously he

12        can't pay you royalties.

13   A    Hmm.  It was obvious he was getting whatever he was

14        getting.  I didn't care.  I only cared about what

15        Bernie was not getting.

16   Q    Okay.  So you've made no effort to determine whether

17        or not the record companies in this case are the ones

18        who are shorting your husband?

19   A    And how would I do that?

20   Q    Well, you sued him in this case, right?

21   A    Ah, I did try.  I was recommended to go see these

22        three attorneys in New York.  And I took some boxes

23        over to them and they called me up and they told me

24        that Bernie did have a case.  He was the only one with

25        clean hands, but George Clinton had the deep pockets.

89

1    And of course lawyers have to pay their mortgages and

2    whatever too so...

3            I did, I did try again.  And at that point,

4    like I said to him, when somebody takes all of your

5    money, you don't have the money to pay the attorney to

6    go back and get the money the person took from you.

7    So that's the answer.

8  Q  Okay.  But you just made a statement that Mr. Clinton

9    took money from you, and I've asked you what evidence

10   do you have?

11 A  Did I say take, then I misspoke.  Did not pay Bernie.

12   I don't want to say he took anything.  He did not pay

13   Bernie.

14 Q  Pay Bernie with what?

15 A  Same thing you get paid with.

16 Q  Okay.

17 A  Wampum.

18 Q  Wampum?

19 A  Wampum, money, whatever.

20 Q  But you would agree that if Mr. Clinton has not

21   received any money that is your husband's money, that

22   he can't use that money to pay you, correct?

23 A  I would not agree to that at all.

24 Q  So what evidence do you have today that Mr. Clinton is

25   holding money that should have been paid to your

1      deceased husband or his estate?

2  A   I don't know.  I don't know how to answer that

3      question.

4  Q   Okay.  Have you looked at his bank statements?

5  A   Whose bank statements?

6  Q   Mr. Clinton.

7  A   Of course not.

8  Q   Have you looked at his income tax form?

9  A   Of course not.

10 Q   Have you audited Thang since 1980?

11 A   Of course not.

12 Q   Okay.  There was a decision made in this case to

13     release the record companies from litigation.  What

14     role did you play in making a decision to dismiss the

15     record companies in this case?

16 A   I have attorneys.

17             MR. QUICK:  In answering that don't reveal

18     attorney/client privilege communications.

19             THE WITNESS:  Okay.

20 Q   (Continuing by MR. ALLEN):  What role did you have?

21 A   None.

22 Q   So Mr. Quick violated the rules of professional

23     conduct and just dismissed a party without consulting

24     you?

25 A   I didn't say that.

```
 1    Q    Okay.  So you had a role, right?  He didn't dismiss
 2         the case without your approval, did he, against these
 3         record companies?
 4    A    Are you asking me why my attorneys made a legal --
 5    Q    No, no.
 6    A    -- decision?
 7    Q    No, no.  I'm asking you what role you played in
 8         deciding to release the record companies from this
 9         case?
10    A    I don't -- that's not what I do.  I hire the
11         professionals to do their job, then they come back and
12         advise me.  I don't instruct them.
13    Q    I'm not asking you what Mr. Quick told you.  I'm
14         asking whether or not you played any role in the
15         decision to dismiss the record companies?
16    A    No.
17    Q    Turning to Sound Exchange, Inc., what are those
18         royalties for?
19    A    I'm --
20              MR. QUICK:  Asked and answered three times.
21              MR. ALLEN:  I'm on a different undated page
22         that you gave me of the five of the 10 years that --
23              MR. QUICK:  And she told you previously,
24         when you asked about Sound Exchange the second time,
25         that it applied to all of the years.  Her answer
```

1        applied to all of the years.

2    Q   (Continuing by MR. ALLEN):   Okay.  And how about

3        Mascot-Provogue?

4    A   Who?

5    Q   Mascot-Provogue, P-R-O-V-O-G-E (sic)?

6    A   I have no idea.

7    Q   You don't know what that's for?

8    A   No.

9    Q   American Society of Composers, what's that?

10   A   ASCAP.

11   Q   Okay.  And are there any royalties that you receive

12       from ASCAP that are not attributable to your deceased

13       husband's work with Mr. Clinton or his groups?

14   A   Are you asking me were there other acts that Bernie

15       performed -- wrote -- wait a minute, ASCAP is

16       composing.  Yeah, Bernie worked with other people

17       besides George.

18   Q   Okay.  And is he receiving royalties for that work?

19   A   Yes.

20   Q   Okay.  What groups, other than the groups associated

21       with Mr. Clinton, are part of the royalties $19,132

22       that were from groups not associated with Mr. Clinton?

23   A   I don't know, I'd have to look at the ASCAP list.

24   Q   Okay.  Is it your belief that the majority of the

25       ASCAP money that's represented here on the schedules

1    you've provided is from Mr. Clinton -- the work your

2    husband did with Mr. Clinton?

3  A  Yes.

4  Q  Broadcast Music, Inc. --

5  A  BMI.

6  Q  -- that's BMI, right?

7  A  Yes.

8  Q  There's 18,083 in one of these years.  Is there any

9    work that your husband did for acts other than the

10   ones associated with Mr. Clinton that are reflected

11   here in that 18,083?

12  A  Yes.

13  Q  And which acts are those?

14  A  I don't know, I'd have to see the list.

15  Q  Okay.  Same question as before, is the majority of

16   that $18,083 attributable to work with groups

17   associated with Mr. Clinton?

18  A  I think so.

19  Q  All right.  Film Musicians Secondary Market, what's

20   that for?

21  A  I told you about that, that's where the AF of M,

22   American Federation of Musicians, takes all of the

23   monies that come in from musicians who've done

24   sessions with people who are signatories.  And at the

25   end of the year -- well, actually around July 1st,

94

1           they take that money and buy a phono known only to

2           them, they divide it between those working musicians

3           who did those sessions.

4   Q   Okay.  Do you have any idea as to whether or not any

5           of those royalties are associated with groups other

6           than the ones associated with Mr. Clinton?

7   A   For, for the last one you asked me about, --

8   Q   Uh-huh.

9   A   -- they're not associated with George.  He wasn't a

10          signatory of the union.  They were other people.

11   Q   Okay.  But this is for films in which musicians --

12   A   That's what they call it, Films -- M -- FSM something

13          or other.

14   Q   Right.  So is it your understanding that the tracks

15          that the Film Musicians Secondary Market is paying

16          royalties on are tracks that were created with

17          Mr. Clinton?

18   A   No, they were sessions Bernie did with other people.

19   Q   Got it, okay, that's all I wanted to know.

20                  How about GEP Talent Services?

21   A   I don't remember who they are.

22   Q   And you don't have any evidence that that line item

23          involves people other than -- or acts other than those

24          associated with Mr. Clinton?

25   A   George has nothing to do with that.

1   Q   Who does?

2   A   I don't remember.  I'd have to see the list of the

3       people who Bernie worked with that year.

4   Q   Well, these are all for periods of time after your

5       husband was deceased, so he wouldn't have been working

6       with any of them in the year that this --

7   A   Well, in the year before he died he would have been

8       working with them.

9   Q   Okay.  Well, --

10  A   The royalties would continue to come in.

11  Q   All right.  Isn't it true that the majority of the

12      royalties that you are receiving -- and I won't go

13      through all of them here because we've got two more

14      pages and I'm getting tired of going through this.

15      But isn't it true that the majority of the royalties

16      that you are receiving are attributable to work that

17      your husband did with Mr. Clinton?

18  A   Which royalties?

19  Q   Well, we can go through the whole list, ma'am.  I'm

20      talking about in general.  You get a certain amount of

21      money every year for royalties.  Is the majority of

22      what you're getting in royalties attributable to time

23      or work that your husband performed with groups

24      associated with Mr. Clinton?

25  A   I don't think any of that has to do with when he

96

1          performed.  That has to do with writing most of that.

2     Q    I'm sorry, ma'am, let me ask it that way then because

3          you're right.

4                    Is a majority of the royalties that you're

5          receiving attributable to work at all that your

6          husband did, not perform but did, with Mr. Clinton?

7     A    Yes.

8     Q    Okay.  Now have you made any effort to ascertain

9          whether Mr. Clinton is receiving a similar amount?

10    A    No.

11    Q    Okay.

12    A    No.

13    Q    Now Mr. Clinton, in his capacity as leader of the

14         bands, creator of the bands, it's not his

15         responsibility to collect the royalties, is it?

16    A    I have no idea.

17    Q    Okay.  Well, you referenced ASCAP, BMI.  Aren't those

18         the organizations that typically collect royalties?

19              MR. QUICK:  Which royalties?

20              MR. ALLEN:  The ones that are listed as

21         ASCAP and BMI here.

22    A    Those are writer royalties and publishing royalties I

23         believe.  And so whoever -- for instance -- I don't

24         know how to explain this about ASCAP.  I would think

25         you'd know this, let me see.

97

1              Sometimes if Bernie was doing a song and I

2       would send in information to ASCAP and BMI, or Kobalt.

3       Other times whoever contracted for Bernie to do the

4       songs would do it.  In the case of sampling, I don't

5       know who did it.

6  Q    (Continuing by MR. ALLEN):  So was that the case for

7       the entire approximately 50 years you were his

8       manager?

9  A    Just about.

10 Q    Did you make any efforts to register any sound

11      recording copyrights that --

12 A    No, I don't remember.

13 Q    Okay.  So in the 50 years that you managed your

14      husband you never registered any sound recordings in

15      his name?

16 A    (A) I didn't manage Bernie for 50 years; and (B) I

17      don't remember if we registered any sound recordings.

18 Q    Okay.  Well, how many years was it?  You said you were

19      together for 50 years.

20 A    Almost 50 years.  Well, in the beginning I just helped

21      him out with -- he called me his business manager so

22      he didn't have to be bothered with money and paying

23      bills.  After we re-married after the divorce is when

24      he wanted me to be his manager.

25 Q    Well, you've represented previously that you were

1      his -- the nature of your duties may have changed but

2      you considered yourself his manager almost from the

3      beginning?

4   A  No, I did not.  I said business manager in the

5      beginning.  I never wanted to be his manager.

6   Q  What does a business manager do as opposed to a

7      manager?

8   A  I told you.  When money came in, bills needed to be

9      paid, I handled that.

10  Q  Okay.  Were those household bills or --

11  A  Any bills.

12  Q  Okay.  And what sort of bills did you pay that were

13     not related to household expenses?

14  A  If Bernie wanted to buy a keyboard, medical, a lot of

15     medical bills for my son, life.

16  Q  Tell us about the first instance in which you met

17     Mr. Clinton.

18  A  I was at the Apollo Theater where I had gone to wait

19     for him to come to negotiate Bernie going out on the

20     road with him.

21  Q  Okay.  So I believe you've said that he walked in in a

22     white sheet and bare feet from --

23  A  Uh-huh.

24  Q  -- the street on New York --

25  A  Into the Apollo Theater.

1    Q    Okay.  And you were in a three piece suit there to do
2         business, right?
3    A    That's what I wore to work.
4    Q    And you were there to work, correct?
5    A    Not really.  At that point I was just doing a favor
6         for Bernie.  I worked for another company and I hadn't
7         gone home to change.
8    Q    But you negotiated his first contract at that point,
9         it was over --
10   A    I negotiated his first performance fees.
11   Q    And what were the terms of that agreement?
12   A    Again, $200 a week whether or not he worked.
13   Q    And that's it?
14   A    Yes.
15   Q    Nothing else in there?
16   A    It was performance.
17   Q    Got it.  Initially you had a positive relationship
18        with Mr. Clinton; you thought he was highly
19        intelligent, gave him some books to read and that sort
20        of thing?
21   A    When I first meet people, I'm generally open to them
22        unless they do something to show me not to be.
23   Q    Okay.  So how long did the period of time where you
24        held Mr. Clinton in somewhat positive light, how long
25        did that period last?

1   A   Until I found out what he was doing to Bernie.

2   Q   And when was that?

3   A   It was in Detroit and George used to walk past me, I'd

4       be sitting reading a book, to go on stage and as he

5       walked past me, he'd put a wad of money in my hand,

6       which I just stuck in my pocketbook.  To this day I

7       don't know how much money it was.  He's come back out,

8       I given it back to him.

9           The group was staying in a place, everybody

10      was very unhappy, nobody was getting paid.  George is

11      living in a house.  Everything with George was

12      wonderful.  Everybody else was going crazy.  They

13      weren't eating.  It got to a point where at the

14      Hollander House I offered to cook for them if they

15      would all pool the money together.

16          And I began thinking to myself how is he

17      doing this and how is he doing that and how is he

18      doing the other and they have nothing and Bernie had

19      nothing.  So I sat back and I watched and listened.

20      And the more I listened, the more I saw how deplorable

21      things were.

22  Q   And you laid the entirety of that state of affairs at

23      the feet of Mr. Clinton, correct?

24  A   You lay the entirety of not getting your money from

25      the person that's supposed to pay you.

1    Q    Okay.

2    A    Whoever that may be.

3    Q    Now if Mr. Clinton wasn't getting paid, did you ever

4         seek to hold to account the people who, promoters,

5         record companies and such, who weren't paying?

6    A    I was never involved in all that.  And if George

7         Clinton can walk by and hand me a wad of money and my

8         hand is this big -- witness indicating -- then he can

9         pay my husband.

10   Q    So this wad of money happened when he was going on

11        stage to perform?

12   A    At The 20 Grand specifically.

13   Q    And were you aware that there were sound engineers

14        that had to be paid?

15   A    Not back then.

16   Q    There was rent to The 20 Grand that had to be paid?

17   A    Rent?

18   Q    Well, there was a fee for using the venue, correct?

19   A    I have no idea.

20   Q    Okay.  So you don't know what that money was

21        attributed -- or was going towards, do you?

22   A    I didn't care.

23   Q    Right.  You never asked?

24   A    No.  What I, what I asked was where's Bernie's money.

25   Q    And if the money was going towards the cost of

1   producing records and paying roadies and other folks

2   on a tour, you wouldn't know that then?

3 A  That's a hypothetical.  You're saying if.

4 Q  That is a hypothetical.  You --

5 A  I have no way of knowing.  Listen, when you hire

6   somebody, you have a hierarchy of how you pay them.

7   Any housewife knows that.  And if you don't put your

8   musicians before your roadies and your drug abuse and

9   all the rest of that, that's your problem.  It comes

10   back to my husband still deserves to get his money.

11 Q  So if the roadies and -- well, let me ask you this

12   question.  You were involved in a music festival a

13   while back in 2015, a festival called We Want the Funk

14   Music Festival, Wall Street International, do you

15   remember that?

16 A  No.

17 Q  Okay.

18 A  Where was that?

19 Q  I believe it was in New York, ma'am.

20 A  What month?

21 Q  Would you like to see the videotape?

22 A  No.  I can't look at pictures of Bernie yet.

23 Q  I'm sorry?

24 A  No.

25 Q  Okay.  Do you recall a situation where there was a

1        music festival that went all day with Bernie

2        headlining at night and he went on stage and the mics

3        were muted and were not unmuted?

4    A   Oh, Philadelphia.

5    Q   It's not clear from the video, ma'am, what city it's

6        in.  I'm happy to show you the video.

7    A   Well, no.  What's your question?

8    Q   Do you recall that occurring?

9    A   Maybe if it was in the -- if it was the one in

10       Philadelphia.

11   Q   Do you recall a situation where your husband showed up

12       to do his gig and the sound musicians would not turn

13       on the sound?

14   A   No.  If it was in Philadelphia, they shut the sound

15       off because they hadn't been paid.

16   Q   Correct.

17   A   That's right.

18   Q   So you do recall it?

19   A   If it's the one in Philadelphia, yes.

20   Q   It's the one in Philadelphia I believe, ma'am.

21              So while there's a hierarchy of payments,

22       if you don't pay certain people, you can't perform.

23       And if you can't perform, you can't get your money and

24       you can't pay your musicians.

25              So you would agree with me that it is

1   important that the people who produce concerts are

2   paid so that the concerts can go forward?

3   A   Theoretically, yeah.

4   Q   So you don't know that that wad of cash that

5   Mr. Clinton stuck in your hand went to taking care of

6   the venue and all the people who --

7   A   It was not my business.  I was only concerned with

8   Bernie getting paid and he did not.  And in that

9   part -- well.

10  Q   And you've stated you don't know how much money was in

11  the wad of cash that day, do you?

12  A   No, that's why he handed it to me.  He knew --

13  Q   You never looked at it?

14  A   -- I was trustworthy.  No.

15  Q   You never looked at it?

16  A   I never looked at it.

17  Q   So you would agree that there's a qualitative

18  difference and a quantitative difference between

19  handing you a wad of one dollar bills versus a wad of

20  one hundred dollar bills?

21  A   Only if you're a comedian.

22  Q   Okay, right.  But you didn't look at it so you don't

23  know how much money was there?

24  A   No.

25  Q   But you assumed that it was Mr. Clinton being

1           dishonest and deceitful to the members of his band?

2      A    I never said that.

3      Q    Okay.  Then maybe I'm not using the specific words

4           that you used, but what was your assumption that

5           Mr. Clinton was doing with the money?

6      A    When he handed me that money?

7      Q    Yeah.

8      A    Well, being as he was performing in a sheet with no

9           underwear I figured that he was, you know, bereft of

10          any pockets, so he knew that I was trustworthy and he

11          handed it to me.

12     Q    You said that at one point that all you did, as time

13          went by, was to facilitate his being able to play.

14          And when he asked you to be his manager, it was your

15          job to make sure the paperwork was correct.  Is that a

16          true and accurate statement?

17     A    No.

18     Q    Okay.  So would you like me to play for you the

19          statement that you made in the interview that you gave

20          in the Truth in Rhythm podcast?

21     A    No, you can just read it.  I don't want to hear it.

22     Q    Okay.

23     A    What am I supposed to --

24     Q    So there's a statement attributed to you that said,

25          and I heard it, all I did as time went by was

1    facilitate it.  And the it it's referring to was --
2    let me start with the previous sentence.
3              You're referring to Mr. Clinton in this
4    statement.  On the artistic side you could see
5    something was there, but on the business side
6    obviously left a lot to be desired.  When it came to
7    the music, artist's side or anything like that at all,
8    I didn't do anything.
9              So you didn't have anything to do with the
10   music side?
11   A   Oh, no.
12   Q   All right.  That was always Bernie's.  If Bernie
13       wanted to play something, Bernie did it?
14   A   Right.
15   Q   All I did as time went by was to facilitate it and
16       then when he asked me to be his manager and make sure
17       paperwork was correct, period.  The only time I had
18       any input at all was, in the music, was when I
19       co-wrote two songs, okay.
20              So my question is --
21   A   Do I mention those two songs?
22   Q   Red Hot Mama and the second track on Osmium.
23   A   Livin' The Life.
24   Q   Yes.  Great lyrics.  Somebody who writes lyrics, I
25       appreciate your lyrics.

1   A   Well, I was particularly proud of Livin' The Life.  We

2       got a good review.  It said basically the first time

3       combining religion and, --

4   Q   And ecology.

5   A   -- and ecology.

6   Q   Right.

7   A   But I was never credited or paid either.

8   Q   And you didn't ask?

9   A   Why should I ask?

10  Q   Well, plenty of people contribute a lyric or two that

11      don't get credited.

12  A   A stanza is not a lyric or two.  And on page 18 of

13      George's bio he admits Bernie's wife, Judie, as a

14      co-writer of Red Hot Mama.  So why am I going to go

15      make a big deal out of it.  It was more important to

16      get Bernie's situation sorted out.

17  Q   Okay.  But you're not suing Mr. Clinton over --

18  A   Two songs, --

19  Q   -- a stanza and --

20  A   -- no.

21  Q   Okay.

22  A   No.

23  Q   So again, and maybe I'm having a little difficulty in

24      understanding the change in your role pre-divorce and

25      post-divorce, but you said when Bernie asked you to be

1          his manager, are you talking to -- you're talking

2          about the period of time post-divorce?

3     A    Post-divorce.

4     Q    Okay.  And it was your job to make sure that the

5          paperwork was right?

6     A    My job was to do whatever it need -- Bernie needed to

7          have done.

8     Q    Okay.  And that would include making sure that his

9          contracts were accurate?

10    A    Maybe.  It would depend on the contract.  Are we

11         talking gig contracts?

12    Q    Talking about any contract.

13    A    It would depend on the contract.

14    Q    Okay.  So if you weren't in charge of making sure that

15         the contract was accurate, who was, anybody?

16    A    Anybody that I decided to ask to do it.  I would have

17         to know which contract you're talking about to see to

18         whom I gave it to or to get information.

19    Q    Okay.  Well, let's talk about the January 1, 1976

20         contract.

21    A    January 1, oh, back to that, okay.

22              MR. QUICK:  That's not post-divorce.

23    Q    (Continuing by MR. ALLEN):  Well, was it still your

24         job at that point to --

25    A    1976, no.

1    Q    -- make sure that it was accurate?

2    A    No.

3    Q    But you believe it was accurate today, correct?

4    A    I have no way of knowing.  I think I answered that

5         already anyway.

6                    MR. QUICK:  Let's take a break.

7                    MR. ALLEN:  Go ahead.

8                         (WHEREUPON a short pause was

9                         had in the proceedings 11:27

10                        a.m. to 11:34 a.m.)

11                        (WHEREUPON Exhibit No. 9

12                        was marked for identification

13                        by the reporter.)

14   Q    (Continuing by MR. ALLEN):  Ms. Worrell, I handed you

15        a copy of a pleading that was filed in the Nene

16        Montez, Association Parliament-Funkadelic versus Armen

17        Boladian, et al.  It's a US District Court, Central

18        District of California, case number CV-92-2685R.

19                    It is a pleading purporting to be a number

20        of -- actually it's not a pleading.  It's a number of

21        declarations that were filed, but I would just ask you

22        to turn to the 16th page.  At the bottom of the page

23        it has a Bates stamp I think in this case 00016 or

24        033848.

25   A    Did you find 16?

1   Q    Yeah, it's not numbered --

2   A    Yeah, that I see.

3   Q    -- but it says exhibit --

4                MR. QUICK:  What's the GCFM number?

5                MR. ALLEN:  033848.

6                THE WITNESS:  What's the exhibit?

7                MR. QUICK:  I'll help you.

8                THE WITNESS:  Oh, okay.

9   Q    (Continuing by MR. ALLEN):  That's where we're going

10       to be headed, but I want you to take a look at the

11       entire exhibit and let me know if you recognize it.

12  A    Recognize what?

13  Q    The exhibit, have you seen it before?

14  A    No, I haven't seen this before, none of it.

15  Q    Okay.  My questioning is relatively brief on it.

16       Actually if could turn to the next page, which would

17       be three.

18                This is a itemized accounting of work that

19       was performed by a law firm on behalf of Mr. Clinton.

20       And there is a reference in paragraph 16, as you'll

21       see, Bernie Worrell, negotiation of new agreement

22       between Bernie Worrell and Thang; personal conferences

23       with Judie Worrell, attorney for Bernie Worrell and

24       client.  Correspondence, seven hours at $125 an hour.

25                This is a entry that apparently, according

1          to the first page, I think is attributable to an

2          attorney by the name of Ina Maibach.  Do you remember

3          Ms. Maibach?

4     A    Ina's George's attorney.

5     Q    Right.  Do you recall meeting with her and negotiating

6          a contract, whether or not it actually came into

7          being, but do you recall meeting with her?

8     A    No -- well, I saw Ina from time to time, but I don't

9          recall a meeting with her because she was George's

10         lawyer, not Bernie's.

11    Q    Okay.  But if you were going to negotiate a contract

12         with Mr. Clinton, it would be customary, would it not,

13         to have a lawyer involved for him, right?

14    A    Yes and no.

15    Q    Okay.  But do you have any reason to dispute that you

16         did meet with Ms. Maibach in the furtherance of

17         negotiating a new contract between Bernie Worrell and

18         Thang?

19    A    I don't remember.

20    Q    The date of this letter is April 11, 1980, so

21         obviously quite some time ago.  And do you have any

22         recollection as to ever negotiating any contract with

23         Ms. Maibach on behalf of your husband?

24    A    No.

25    Q    Is it you do not recall it because it didn't happen,

1       or you do not recall because it was 44 years ago?

2    A  Could be either one.

3    Q  Okay.  And you don't know sitting here today which one

4       that -- which one it is, could be one or the other?

5    A  Could be either one.

6    Q  All right.  So are you in a position to dispute that

7       this meeting that's reflected in paragraph 16, Bates

8       number GC-FM033849, do you have any evidence that it

9       didn't happen?

10              MR. QUICK:  Object to form, asked and

11      answered.

12   A  I don't know.

13   Q  (Continuing by MR. ALLEN):  So you don't know whether

14      you have any evidence or you don't know whether it

15      happened?

16   A  Either one.

17   Q  And if you had any evidence that it didn't happen, you

18      would have provided it to your attorney, correct?

19   A  Of course.

20   Q  All right.  And you aren't disputing that it happened,

21      you're just saying you don't know whether it did or it

22      didn't?

23              MR. QUICK:  Objection, mischaracterizes her

24      testimony.

25   A  (Witness nods head.)

1    Q    (Continuing by MR. ALLEN):  You nodded your head, yes,

2         ma'am; is that a yes?

3    A    That's what I said.

4    Q    Thank you.  I just wanted to clarify.

5                   Turning your attention back to, if you

6         allow me to look at the numbers here, I believe

7         Exhibit 1 -- no, I'm sorry, Exhibit 2, which is this

8         one here, ma'am.  Done?

9    A    I'm waiting on you.

10   Q    Okay.  I'm asking you to look at paragraph eight.

11   A    Okay.

12   Q    It says in or about January 1976 defendant Thang and

13        plaintiff entered into an agreement, hereinafter the

14        agreement, whereby and pursuant to which defendant

15        Thang did engage plaintiff to render certain artistic

16        musical services to, and for the benefit of the

17        defendant Thang, in connection with the production of

18        certain phonographic recordings.  A copy of the said

19        agreement is annexed hereto as Exhibit A.

20                   Do you see that?

21   A    I see that.

22   Q    Okay.  Now if you look at the back of the document,

23        there is no Exhibit A.

24   A    I don't see that.

25   Q    Do you have a copy of Exhibit A anywhere?

114

1    A    No.

2    Q    Okay.  Is it your belief sitting here today that

3         Exhibit A is in fact -- I believe we marked it Exhibit

4         2, the --

5                   MR. QUICK:  One.

6                   MR. ALLEN:  Or, I'm sorry, Exhibit 1, yes,

7         sorry.

8    Q    (Continuing by MR. ALLEN):  Is it your belief today

9         that that exhibit that's referenced in paragraph eight

10        is the agreement that should be attached as Exhibit --

11   A    I don't know.

12   Q    Okay.  Was there another agreement that you're aware

13        of, of January 1976?

14   A    I don't know.

15   Q    Okay.  So you don't have any evidence today that there

16        was another agreement other than the one that is

17        Exhibit 1 to this deposition?

18   A    I don't know.

19   Q    No, I mean you don't know whether you have any

20        evidence?

21   A    I said I don't know.

22   Q    Okay.  If you did have any evidence that's relevant,

23        you would have provided it to Mr. Quick, correct?

24   A    Yes, definitely.

25   Q    Paragraph nine says in accordance with the terms of

1              the said agreement, Exhibit A, among other things,

2         defendant Thang did engage plaintiff to render certain

3         phonographic recordings, and plaintiff did further

4         agree to accept such engagement and did render such

5         artistic musical services to defendant Thang.

6                        Do you see that?

7    A    I see that.

8    Q    Do you agree with the statement that's set forth in

9         paragraph nine?

10   A    I don't know.

11   Q    Okay.  Do you have any evidence that would contradict

12        the information in paragraph nine that your husband

13        swore was truthful when he --

14   A    I don't know.

15   Q    -- filed this?

16                  But if you did have evidence to that

17        effect, you would provide it to your attorney,

18        correct?

19   A    Of course.

20   Q    And you would have provided it, right?

21   A    Of course.

22   Q    Okay.  Now I want you to go back and look at the

23        document and tell me -- when I refer to the document,

24        I'm referring to Exhibit 1 -- where in Exhibit 1 do

25        you believe that there is entitlement to the sound

1           recordings that your husband made with -- a interest

2           in the sound recordings that your husband made with

3           Mr. Clinton in his various acts?

4     A     I'm not sure.

5     Q     Okay.  Well, take your time and look at it.

6     A     I'm not sure.

7     Q     Well, I'll give you as much time as you need to read

8           it, ma'am.  I'm asking you to read it and tell me what

9           section of that contract specifies that your husband

10          has an interest in the sound recordings that he made

11          with Mr. Clinton and his associated acts?

12                    MR. QUICK:  Form, foundation, legal

13          conclusion.

14    A     I'm not sure.

15    Q     (Continuing by MR. ALLEN):  Okay.  Were there any

16          other contracts that would have covered your husband's

17          services to Mr. Clinton and in his various acts that

18          have not been discussed today?

19    A     I don't know.  I don't think so.

20    Q     Now the case that your husband filed and verified the

21          Complaint in the early 1980's was eventually settled,

22          was it not?

23    A     I don't know.

24    Q     You don't know?

25    A     I don't remember.

1    Q    Okay.

2                              (WHEREUPON Exhibit No. 10

3                              was marked for identification

4                              by the reporter.)

5    Q    (Continuing by MR. ALLEN):  Did you take a look at

6         that, ma'am?

7    A    Yes.

8    Q    Did you familiarize yourself with it?

9    A    Yes.

10   Q    Is that your signature?

11   A    Yes.

12   Q    So does that refresh your recollection as to whether

13        or not there was a resolution to that dispute?

14   A    I wouldn't call this a resolution.

15             MR. QUICK:  Objection, calls for -- let me

16        get an objection in.

17             THE WITNESS:  Oh, I'm sorry.

18             MR. QUICK:  Form and it mischaracterizes

19        the exhibit.

20   Q    (Continuing by MR. ALLEN):  Okay.  Well, what's your

21        understanding of the exhibit, ma'am?

22   A    That once again we had reached an agreement that was

23        breached, later breached.

24   Q    Okay.  So that was an effort to resolve the litigation

25        in 19 -- the 1980 --

1    A    Uh-huh.

2                    MR. QUICK:  The 1981 agreement was a effort

3         to resolve the 1982 --

4                    MR. ALLEN:  Dan, Dan, Dan, --

5                    MR. QUICK:  -- litigation.

6                    MR. ALLEN:  -- Dan, Dan.  You know the

7         rules.  I asked a question, it's a valid question.

8         It's on the table.  Your client can answer it.  If she

9         doesn't understand it, I'll clarify.

10                   MR. QUICK:  So your view of the rules is

11        that you can ask a question which you know to be false

12        in order to confuse a witness.

13                   MR. ALLEN:  I don't, I don't know it's

14        false.

15                   MR. QUICK:  You don't understand 1981 comes

16        before 1982?

17                   MR. ALLEN:  I don't understand what the

18        document is from your client's perspective.  And I'm

19        asking her what her understanding of the question is.

20        I'm not trying to confuse anybody.

21   A    And I answered you.  I told you it was an agreement

22        that was breached so it never was -- came to fruition.

23   Q    (Continuing by MR. ALLEN):  Okay.  So that payment was

24        never made?

25   A    That's what I just said.

1    Q    That's your testimony, okay, thank you.

2                                    (WHEREUPON Exhibit No. 11

3                                    was marked for identification

4                                    by the reporter.)

5    Q    (Continuing by MR. ALLEN):  Have you ever seen that

6         document before, ma'am?

7    A    I think so.

8    Q    Okay.  Who's Paul Schindler?

9    A    He was Bernie's attorney way back when.

10   Q    Okay.  Do you recall other than 1980 what years he

11        would have been Bernie's attorney?

12   A    No.

13   Q    Is there anything in this letter that you think

14        Mr. Schindler misstated?

15   A    Oh, no.

16   Q    Is there anything in this letter that pertains to

17        sound recordings?

18   A    I don't know.

19   Q    Is there something in the letter that you don't

20        understand that I can help you -- I can help explain,

21        but is there anything --

22   A    No, you asked me is --

23   Q    Is there anything in this letter that references your

24        deceased husband's right to sound recordings?

25   A    I don't know.

1              MR. QUICK:  Objection.  Excuse me,

2        objection, form and foundation.

3    Q   (Continuing by MR. ALLEN):  Is the word sound

4        recording anywhere listed in the document?

5    A   No.

6    Q   Okay.  Would you agree with me that Mr. Schindler is

7        not pursuing anything related to sound recordings in

8        this letter?

9              MR. QUICK:  Objection, form and foundation.

10   A   I don't know.

11   Q   (Continuing by MR. ALLEN):  And is the term sound

12       recording mentioned in this letter?

13             MR. QUICK:  Asked and answered.

14   A   I don't know.

15   Q   (Continuing by MR. ALLEN):  Ma'am, it's written in

16       plain English so you have to know whether or not the

17       words sound recording are in the document.  It's not

18       in the document, is it?

19   A   I don't know.

20   Q   Ma'am, there are approximately 60 words in here.  Is

21       the word sound, S-O-U-N-D, on this paper?

22   A   It says royalty advances.

23   Q   Okay.

24   A   And that could well have been any entity so I don't

25       know.

1   Q    Okay.  But what Mr. Schindler appears to be saying is

2        that the payments as royalty advances are not royalty

3        advances, isn't that what it says?

4   A    Yes.

5   Q    It says --

6                 MR. QUICK:  I'll object to form.  Go ahead.

7   Q    (Continuing by MR. ALLEN):  And it says that the

8        payment of the royalty advance -- or characterizing

9        things as royalty advances is erroneous I believe is

10       the word, or erroneously?

11  A    Oh, yeah.

12  Q    And it's the position of Mr. Schindler apparently that

13       your husband was to receive payments for something

14       other than royalty advances, correct?

15  A    I don't know.

16                              (WHEREUPON Exhibit No. 12

17                              was marked for identification

18                              by the reporter.)

19  Q    (Continuing by MR. ALLEN):  Have you had a chance to

20       look at it, ma'am?

21  A    Yes.

22  Q    This Exhibit Number 12 is a document bearing the date

23       of December 10, 1980 from an individual named Emily

24       Shenkin who appears to be an attorney at Rosenfeld,

25       Kassoy and Kraus.  And this is a letter to

1        Mr. Schindler, who is Mr. Worrell's lawyer, enclosing

2        a schedule setting forth monies paid to Mr. Worrell in

3        1979 and '80.  Have you looked at the attachments,

4        ma'am?

5    A   Yes.

6    Q   Do you have any evidence sitting here today that the

7        figures that are set forth in these last two pages,

8        the handwritten statement of royalty advances for 1980

9        and '79, that these are inaccurate?

10   A   Do I have any evidence?

11   Q   Yes.

12   A   Do they have any evidence that they paid it?  Because

13       if you'll notice, I'll draw your attention to where it

14       says total advance royalties, and that's what Paul's

15       talking about.  Checks would come in and the bottom

16       would say advance against royalties, or they'd be

17       sessions checks or whatever, and they called

18       everything advance against royalties.

19   Q   Okay.

20   A   And they were not.

21   Q   Regardless of how they were characterized, ma'am, my

22       question to you is do you have any evidence that the

23       figures contained on these two statements are

24       inaccurate?

25               MR. QUICK:  In terms of the amounts?

1   Q    (Continuing by MR. ALLEN):  In terms of the receipt or
2        the amounts?
3   A    I would have no way of knowing for the reasons I just
4        told you.
5   Q    So you're not in a position to dispute the accuracy of
6        the --
7   A    Oh, I do dispute.
8   Q    Okay.  What evidence are you relying upon to dispute
9        the figures set forth on the document here?
10  A    I'm relying on them providing proof that they actually
11       made these payments.
12  Q    Okay, ma'am.  So do you have any proof that the
13       payments were not made?  That's my question to you.
14            MR. QUICK:  I don't know how you prove a
15       negative.  I'll object to form.
16            MR. ALLEN:  I can name about 12 ways to
17       prove a negative here, Dan.  We can go through some of
18       them if you'd like.
19  Q    (Continuing by MR. ALLEN):  My question's still
20       pending, ma'am.  Do you have any evidence to dispute
21       the accuracy of these figures, and that the payments
22       were -- let's start with the accuracy of the figures?
23  A    I don't have no idea if the figures are accurate.
24  Q    Okay.  Let's try to break it down a little here.
25       What's Bezerk Malformations?

1  A   That was one of Bernie's companies when we first got

2      together.

3  Q   Okay.  And was Mr. Worrell to receive $400 on a

4      regular or on any regular interval that you can

5      recall?

6  A   I don't know.

7  Q   You were his business manager?

8  A   I was handling certain things.

9  Q   Okay.  So at this --

10  A   That he asked me to handle.  This I wasn't handling.

11  Q   So you don't know what these payments --

12  A   No.

13  Q   -- were for?

14  A   I'm not even sure they were made.  That's what -- you

15      have to prove that to me.

16  Q   And you're not sure that they weren't made?

17  A   I'm not sure they were.

18  Q   Okay.  Then if you -- are you sure that they weren't

19      made?

20  A   If I'm not sure that they were, then I'm not sure that

21      they weren't.

22  Q   Thank you.  And you don't have any evidence sitting

23      here today that they weren't made, other than the fact

24      that you don't like Mr. Clinton?

25  A   Would you stop saying that.

1    Q    Well, you said it.

2    A    This is not personal.  This is business.

3    Q    Okay, all right.

4    A    How I feel about George has never been asked.

5    Q    Well, I think we did earlier today but...

6    A    No.  Anyway...

7              MR. QUICK:  Stick to what's relevant.

8    A    Yeah.  I can't say that any of this was received.  I

9         have no knowledge.  We're talking about what, 1979.

10        Where are we now, 2024.  The easiest way to know is to

11        have them prove that they made the payments.

12   Q    (Continuing by MR. ALLEN):  Okay.  But you would agree

13        that a regularly kept business record is one way to

14        prove that a payment was made, would you not?

15   A    Not necessarily.

16   Q    What efforts did you undertake to challenge the

17        accuracy of any of this?

18   A    I never saw these so I couldn't challenge it.

19   Q    Did you ever -- did you communicate with -- you

20        regularly communicated with your -- I'm not asking you

21        what you communicated, but you regularly communicated

22        with your attorney?

23   A    I expressed my frustration to Paul that when monies

24        came in, they were wrongly attributing them to

25        Bernie's royalties.  And that's what prompted Paul to

1           write that letter.

2    Q   So do you have any reason to doubt that Mr. Schindler

3           would have kept information from you?

4    A   Oh, no.

5    Q   Okay.  So was Mr. Schindler received information, it

6           was his practice to share it with you, was it not?

7    A   Of course.

8    Q   And any important information, you're sure he shared

9           it with you, correct?

10   A   He was an extremely good lawyer so of course, yes.

11   Q   Extremely good lawyer, very thorough, correct?

12   A   Yes, all of that.

13   Q   So if there was a claim that he had to make in a case

14          that was a valid claim, you don't have any reason to

15          believe that he wouldn't have lodged that valid claim,

16          would you?

17                  MR. QUICK:  Form.

18   A   That's a hypothetical.

19   Q   (Continuing by MR. ALLEN):  Is there anything about

20          your experience with Mr. Schindler that would lead you

21          to believe today that in 19 -- in the early 1980's he

22          would have not included a valid claim in any letter or

23          Complaint that he filed?

24                  MR. QUICK:  Form, foundation and

25          speculation.

1   A   I'm not sure what you're asking me.

2   Q   (Continuing by MR. ALLEN):  I'm asking you whether or

3       not he was -- I believe you said he was a very good

4       lawyer?

5   A   Yes.

6   Q   Is it your opinion that very good lawyers fail to

7       assert valid legal claims when they have the

8       opportunity?

9   A   I said Paul was a very good lawyer.  I didn't say

10      lawyers.  When it comes to Paul, I trusted him, Bernie

11      trusted him.

12  Q   And you trusted him because you believed him to be --

13  A   Because of our experiences with him.

14  Q   Right.  And part of that experience with him was that

15      he was very thorough, and pursued all of the various

16      legal avenues that you had in order to recover monies

17      that you thought you had -- or that your husband

18      thought he had --

19  A   To the best of my knowledge, yes.

20  Q   Okay.  I apologize, I ask you to return to Exhibit 5

21      again.  Go ahead and take a look at it if you need to

22      refresh your recollection to what's there.

23  A   Just ask me your questions, there's so much of this.

24      What do you want to know?

25  Q   I want to know the paragraph in that Complaint where

1        your husband's lawyer made a claim for sound

2        recordings, royalties of sound recordings or ownership

3        of sound recordings.

4               MR. QUICK:  Objection, foundation.

5        Counsel, you're just playing games with a question

6        like that.

7               MR. ALLEN:  You know, Dan, I don't

8        appreciate you trying to mischaracterize.  I'm asking

9        questions that I don't know the answer to or --

10              MR. QUICK:  You don't read English?

11              MR. ALLEN:  -- that I want to find out what

12       her understanding is, okay.  So I'm entitled --

13              MR. QUICK:  You're asking her understanding

14       as to a legal document from 1984?

15              MR. ALLEN:  Yeah.

16   A   I don't know why 'cause I don't remember.

17   Q   (Continuing by MR. ALLEN):  Okay.  That's why I've

18       given you the document to review.

19   A   It doesn't matter if I read this three times.  If I

20       don't remember it, I do not remember it.

21   Q   Okay.  Well, I'm not asking you about your

22       recollection in 1980.  I'm asking you to read it in

23       2024 and tell me whether there is anything in there

24       that makes a claim for sound -- interests in sound

25       recordings?

1   A   Why don't you show me what it is you think does that

2       and then I will say whether or not it's so, because I

3       don't see anything in here.

4   Q   Ma'am, my position is that it's not in there and --

5   A   Okay.

6   Q   -- that I want to know whether you think it is.

7   A   I don't know.

8   Q   And if there is a reference to that, I'd like to know

9       what it is.

10  A   I don't know.

11  Q   Okay.  So you don't know whether your husband sought

12      an interest in any sound recordings when he had the

13      opportunity to do so in 1994 when he sued the

14      defendants, some of whom are defendants in this case?

15  A   I do not know.

16  Q   Okay.

17                              (WHEREUPON Exhibit No. 13

18                               was marked for identification

19                               by the reporter.)

20  Q   (Continuing by MR. ALLEN):  Have you had a chance to

21      look at that, ma'am?

22  A   Yes.

23  Q   Now understanding that the document is not addressed

24      to you, do you ever recall seeing this document?

25  A   No.

1    Q    All right.  Do you recall that there was at one point

2         a special master appointed to administer the royalties

3         that were produced from works that Mr. Clinton and his

4         various groups produced, performed?

5    A    I knew that there was a special master.

6    Q    And do you recall ever having any conversations with

7         Special Master Friedman?

8    A    No.

9    Q    Or Jane Peterer at all, does that name sound familiar

10        to you?

11   A    I may have spoken to Jane one or two times.

12   Q    Okay.  And there was a period of time in 1996 at least

13        where Mr. Friedman was the recipient of the royalties

14        that were being paid out through various record

15        companies.  Do you recall that?

16                  MR. QUICK:  Form and foundation.

17   A    I don't know.

18   Q    (Continuing by MR. ALLEN):  Okay.  Isn't it true that

19        Mr. Friedman was collecting royalties that were also

20        due and owing to other members of the band like your

21        husband?

22   A    I don't know.

23                  MR. QUICK:  Form and foundation.

24   Q    (Continuing by MR. ALLEN):  Do you recall receiving

25        any payments from the offices of Mr. Friedman for your

1   husband's share of royalties?

2 A I don't know.

3 Q Do you dispute the fact that Mr. Friedman, the court's

4   appointed special master, paid you amounts -- or, I'm

5   sorry, paid your husband amounts that he was entitled

6   to for works that he produced with -- that he was

7   involved with Mr. Clinton?

8 A I don't know.

9     MR. QUICK:  Form and foundation.

10 Q (Continuing by MR. ALLEN):  Who would have received

11   payments that would have been made from the special

12   master to your husband?

13     MR. QUICK:  Foundation, calls for

14   speculation.

15 A I don't know.

16 Q (Continuing by MR. ALLEN):  Were you the business

17   manager at this time that had responsibility for

18   financial affairs, or were you just the --

19 A It would depend upon what year.  Remember I divorced

20   Bernie.

21 Q This would have been in 1996, ma'am.

22 A I don't remember when we got back together, '80's,

23   '90's.  I don't know.

24 Q Well, you do recall that you had communications with

25   Mr. Friedman, do you not?

1    A    No, I did not.  I don't think so.

2    Q    You never had any communication with Mr. Friedman?

3    A    I don't think so.

4    Q    You never complained to him that he wasn't providing

5         you with the appropriate royalty amounts?

6    A    I did send him a letter, yes, but I did not speak to

7         him.

8    Q    Okay.  Do you have a copy of that letter?

9    A    No.

10   Q    Do you recall what you put in that letter?

11   A    No.

12   Q    Do you recall whether you made any claim for any

13        interest in sound recordings?

14   A    No.

15   Q    Okay.  And do you dispute that for many years up until

16        today your husband has collected royalties, not for

17        sound recording but royalties for mechanical liens --

18        or, I'm sorry, mechanical royalties and for the

19        compositions; you're getting them today?

20   A    I'm sorry, what?

21                  MR. ALLEN:  Read my question back, please.

22                       (WHEREUPON the reporter read

23                       back the question as follows):

24        QUESTION:  "And do you dispute that for many years up

25                       until today your husband has collected

1                   royalties, not for sound recording but

2                   royalties for mechanical liens -- or, I'm

3                   sorry, mechanical royalties and for the

4                   compositions; you're getting them today?"

5    A    I'm getting what today?

6    Q    (Continuing by MR. ALLEN):  Royalties, ma'am.  We just

7         went through a number of them.

8    A    Oh, some, yes.

9    Q    And those royalties -- does Mr. Clinton send you

10        royalty checks?

11   A    No.

12   Q    Is it his responsibility to send you royalty checks?

13                  MR. QUICK:  For mechanical royalties and

14        compositions?

15                  MR. ALLEN:  For any royalties.

16   A    Is it his responsibility?

17   Q    (Continuing by MR. ALLEN):  Is it his responsibility

18        to cut you a check and send you checks for royalties?

19                  MR. QUICK:  Form, foundation, legal

20        conclusion.  Go ahead.

21   A    If he was going to do the right thing, sure.

22   Q    (Continuing by MR. ALLEN):  Who has the legal

23        responsibility to pay royalties, ma'am?

24                  MR. QUICK:  Same objection.

25   Q    (Continuing by MR. ALLEN):  If you know.

1   A   From where?

2   Q   From record companies, ma'am.

3   A   Whoever the designate.

4   Q   So do you know who the designate is on any of the

5       tracks that you're suing him over today?

6               MR. QUICK:  Same objection.

7   A   Do I know who the designated person in a record

8       company is for tracks who should be paying Bernie?

9   Q   (Continuing by MR. ALLEN):  Yeah.

10  A   No.  It changes so much, particularly through the

11      years.

12  Q   So you would admit that the record companies, either

13      directly or through a third party organization, are

14      charged with the legal obligation to provide you with

15      your royalty payments, right?

16  A   Not necessarily.

17              MR. QUICK:  Form, foundation, legal

18      conclusion.

19  Q   (Continuing by MR. ALLEN):  Then if not them, who do

20      you believe has the legal obligation to disburse

21      payments for royalties?

22              MR. QUICK:  Which royalties?

23              MR. ALLEN:  Let's go with the sound

24      recordings.

25  A   Whoever they designate.

1   Q    (Continuing by MR. ALLEN):  Whoever who designates?

2   A    The company.

3   Q    Which company?

4   A    Whichever company you're referring to.

5   Q    Are you talking about record companies or production

6        companies?

7   A    Is that who you're referring to?

8   Q    You used the term, ma'am, so I'm asking you what you

9        meant.

10  A    Which term?

11  Q    The companies.  When you refer to the companies, what

12       companies are you referring to?

13  A    Any of the companies you mentioned about who pays

14       royalties.

15  Q    Okay.  So that would be record companies?

16  A    If they're the ones paying royalties.

17  Q    That would be like a collection service like BMI,

18       ASCAP, any of those?

19            MR. QUICK:  We're just talking about sound

20       recordings?

21            MR. ALLEN:  We're talking about any

22       royalties.

23            MR. QUICK:  I think the question has been

24       lost over time, counsel, so maybe you could recap.

25            MR. ALLEN:  Yeah, it may have been because

1          we have a --

2                    THE WITNESS:  I have know idea what your --

3                    MR. ALLEN:  -- very illusive witness today.

4                    MR. QUICK:  All right, counsel, --

5                    THE WITNESS:  Don't insult me.

6                    MR. QUICK:  Hold on, hold on, just stop.

7                    MR. ALLEN:  It's beyond a pale to say that

8          a witness is being illusive?  Yeah, I don't think so.

9                    MR. QUICK:  Counsel, you've been raising

10         your voice.  You've been doing --

11                   MR. ALLEN:  No, you're raising your voice.

12                   MR. QUICK:  Don't interrupt me.

13                   MR. ALLEN:  You're raising your voice and

14         interrupting me --

15                   MR. QUICK:  You're raising your voice.

16                   MR. ALLEN:  -- and you've been doing it all

17         day.

18                   MR. QUICK:  You're interrupting.  That

19         was --

20                   MR. ALLEN:  I didn't do that to you

21         yesterday.

22                   MR. QUICK:  -- unprofessional conduct.

23                   MR. ALLEN:  I didn't do that to you

24         yesterday but I can give as good as I get.  So I mean

25         if we want to do this, we can do this or we can go to

1    the judge and we can have the judge referee.  Do you

2    want to do that?

3                    MR. QUICK:  Whatever you --

4                    MR. ALLEN:  Because I don't care that

5    you're the state bar president, Dan.  That doesn't

6    impress me.  If you think you're going to get some

7    extra, extra --

8                    THE WITNESS:  It impresses me.

9                    MR. ALLEN:  -- leeway because you've got

10   some kind of position, I don't, I don't, I don't view

11   it like that.  You've been obnoxious since we started

12   today, you were obnoxious yesterday, and you've been

13   obnoxious --

14                   THE WITNESS:  What was your question?

15                   MR. ALLEN:  -- throughout this proceeding.

16                   THE WITNESS:  What was your question?

17                   MR. ALLEN:  I've had about enough of it and

18   I don't have to put up with it either.

19                   MR. QUICK:  Let's take a break.  Counsel,

20   I'll give you a choice.  We can come back --

21                   MR. ALLEN:  You're not giving me any

22   choice.  You don't get to give choices here, okay.  We

23   are colleagues.  We are equals.  Don't threaten me or

24   try to give me choices, okay.  The only person that's

25   going to give me a choice in this case wears a black

1     robe, and I answer to her, not you.

2           MR. QUICK:  You will either control your

3     behavior or we will cease the deposition and take the

4     transcript to the judge.  So let's take a break, take

5     a breath and come back.

6           THE WITNESS:  Should I leave?

7           MR. QUICK:  Off the record.

8           MR. ALLEN:  Off the record.

9                 (WHEREUPON a short pause was

10                had in the proceedings 12:17

11                p.m. to 12:26 p.m.)

12           MR. QUICK:  Is it all of these pages?  It's

13     like a bunch of different letters combined.

14           MR. ALLEN:  I'm sorry.  We're just dealing

15     with the first two pages.

16                 (WHEREUPON Exhibit Nos. 14-15

17                were marked for identification

18                by the reporter.)

19  Q   (Continuing by MR. ALLEN):  Okay.  The first part of

20     this we've marked as 14.  This is a letter from the

21     Special Master Theodore Friedman to Mr. and

22     Mrs. Bernie and Julie -- it says Julie, sorry --

23     Worrell.  It's dated March 6, 1997.  Have you had a

24     chance to look at that?

25  A   Uh-huh.

139

1    Q    Do you recall ever receiving that letter?

2    A    Yes.

3    Q    He references in the third paragraph a number of

4         grievances that you had raised with him regarding the

5         payments that you were receiving, or that your husband

6         was receiving at the time.  And I'm trying to

7         ascertain, if you can look at 15, I think you're --

8         yeah, right there.  Dan, do you have that?

9              MR. QUICK:  Yes.

10   Q    (Continuing by MR. ALLEN):  I'm trying to ascertain

11        whether the grievances that you made to Special Master

12        Friedman, are those contained in Exhibit 15, which is

13        dated afterwards.  I mean but is this a restatement of

14        the grievances to -- because I don't have the letter

15        that you would have sent to Mr. Friedman that prompted

16        his March 6 letter to you.

17   A    I don't know.

18   Q    Okay.  Do you have any idea today what grievances you

19        would have raised with Judge Friedman, or Special

20        Master Friedman?

21   A    No.

22   Q    Were you complaining about the amount of payments you

23        were receiving?

24   A    Probably.

25   Q    Okay.  What else?

1   A   I don't know.

2   Q   Were you complaining about how they were

3       characterizing the payments at this point?

4   A   I don't know.

5   Q   There's a letter from a James Weeks, CPA, that I'll

6       have marked as Exhibit 16.

7                            (WHEREUPON Exhibit No. 16

8                            was marked for identification

9                            by the reporter.)

10  Q   (Continuing by MR. ALLEN):  Okay.  That's dated

11      February 25th, 1997?

12  A   Yes.

13  Q   Do you recall seeing that?

14  A   Yes.

15  Q   Who is Mr. Weeks?

16  A   He was our accountant then.

17  Q   In 1997?

18  A   Yes.

19  Q   All right.  And in that letter there's a discrepancy

20      that's pointed out of approximately $3,552.53.  Do you

21      see that?

22  A   I see that.

23  Q   Okay.  Was there anything else that you found

24      troubling that was in Mr. Friedman's reporting to you

25      of the royalties that were due to you at the time?

1   A    No.

2                              (WHEREUPON Exhibit No. 17

3                              was marked for identification

4                              by the reporter.)

5   Q    (Continuing by MR. ALLEN):  Now in this letter,

6        February 1997, which is dated -- I'm sorry, which is

7        Exhibit 17.  This is also from Purple Wood

8        Productions.

9   A    PurpleWoo Purple.

10  Q    I'm sorry, PurpleWoo Productions.  Is this the letter

11       that you think Mr. Friedman was responding to in

12       Exhibit Number 14?

13  A    I don't know.

14  Q    Okay.  Well, in any event, whether this is what he was

15       referring to or not, it looks like it is.  He lists

16       the February 18 -- he says February 18 but, in any

17       event, you list a number of issues to Mr. Friedman

18       regarding payments that you think you're owed.

19            You say here we know from firsthand

20       experience that Bernie's name has been forged on

21       songwriter's agreements, and it is our belief that it

22       was done by Armen Boladian?

23  A    Yeah, I don't believe that anymore.

24  Q    You know that there was a court ruling a few years

25       back in which Mr. Boladian --

1   A   Where are you reading from?

2   Q   I'm not.

3   A   Oh, okay.

4   Q   I'm asking you are you aware that there was a court

5       ruling a few years back in a defamation claim that

6       Mr. Boladian filed against Mr. Clinton in which a

7       court found that in fact the statements Mr. Clinton

8       made about forgeries was true?

9   A   I would have no knowledge.  That would be between

10      Armen and George.

11  Q   Got it.  So you're not aware that there's already been

12      a determination in a judicial proceeding that

13      Mr. Boladian had in fact forged agreements?

14  A   No, I'm more concerned about the forgeries George did.

15  Q   Okay.  Well, which forgeries would that be, ma'am?

16  A   Songwriter's agreement where Bernie's name is spelled

17      W-O-O-A-L-L.

18  Q   Okay.

19  A   For one.

20  Q   Had you produced that songwriter's agreement in this

21      litigation?

22  A   I don't know, I might have.

23  Q   Do you have a copy of that agreement?

24  A   I don't know, I might have.  No, I don't have anything

25      at home now.

1    Q    Okay.  And if you had -- if you did have it at some

2         point during the pendency of this litigation, you

3         would have given it to your attorney, correct?

4    A    Of course.

5    Q    And what was the subject of that agreement?

6    A    It was a songwriter's agreement.  I don't remember

7         what the name of the song was.

8    Q    All right.  And what year was it?

9    A    I don't remember.

10   Q    And it related to one song?  I'm asking, I don't know.

11   A    I'm not sure.

12   Q    Okay.

13   A    Hat was one song where Bernie's name was misspelled

14        and it wasn't his signature.  There was another one

15        where it looked like somebody had taken the signature

16        page and attached it to other songwriting agreements.

17        Because when you use a Xerox machine, they have

18        certain marks on them that don't go away.  Those marks

19        were on the signature page.

20   Q    But not on other ones?

21   A    Uh-huh.

22   Q    Okay.  And did you file any kind of action to

23        challenge that forgery?

24   A    It's all part and parcel of what I've been trying to

25        get taken care of for years.

```
1    Q    When did you discover this forgery?

2    A    Oh, I don't know.

3    Q    Was it before your husband died?

4    A    Oh, yes.

5    Q    And did you go to the police?

6    A    For a forgery?

7    Q    Yeah.  It's a crime.

8    A    No.

9    Q    Didn't go to the police?

10   A    No.

11   Q    And you didn't file any lawsuit?

12   A    Against who?

13   Q    Against whomever you thought forged the signature?

14   A    Not specifically for that.

15   Q    Okay.  Who do you believe forged the signature?

16   A    I'm not sure because it could have been George, which

17        I kind of doubt.  It could have been somebody else

18        because one day I was walking past George and he said

19        here, here, here, I want you to sign Gary's name on

20        this, I got to get some money out to him.  And without

21        thinking I went and signed the name -- or maybe I

22        didn't, maybe I told him no.  I don't remember but I

23        didn't do it.

24                 I remember him asking me to do it and

25        that's how I figured out that's how he did it, having
```

1          other people sign this, I got to get it to Bernie.

2     Q    Okay.  So do you have any specific evidence that my

3          client forged your husband's signature on a song that

4          he wrote?

5     A    I don't have any specific proof, no.

6     Q    Okay.  So --

7     A    But who else would benefit.  Don't they say follow the

8          money?

9     Q    Well, I don't know who would have benefited, ma'am.  I

10         wasn't there.

11    A    Well, there you go.  It would have be George.

12    Q    You make some state -- well, did you write this

13         letter, February 19, '97?  It has your signature on

14         it.

15    A    Yes.

16    Q    Okay.  Now when you make this claim at the bottom of

17         the first paragraph that the tracks had been sampled

18         numerous times, and you say Bernie's share would have

19         been in the millions as he is one of the major

20         writers.  You were seeking --

21    A    Where am I saying this?

22    Q    This is at the bottom of the first --

23    A    Oh, okay, all right, I see.

24    Q    -- large paragraph, page --

25    A    It's not the bottom.  Second paragraph, okay.

1    Q    It says again the catalog was widely sampled by too

2         many entities to list here.  Logic alone tells us that

3         during the height of the sampling period that Bernie's

4         share would have had to be in the millions as he was

5         one of the major writers, right?

6    A    Right.

7    Q    You were seeking writers credit?

8    A    I was seeking payment for the songs that were being

9         sampled.  A lot of them, because he's not a musician,

10        a lot of those samplings were being done of the

11        musicians and Bernie never got any money for the

12        sampling.  The sampling CD he put out, Bernie never

13        got any money for.

14   Q    So let me just ask you what do you know about the

15        process, the actual technical process of sampling a

16        track, have you ever done --

17   A    What do you mean?

18   Q    Have you ever done that yourself?

19   A    No.

20   Q    Have you ever overdubbed a track from one performer to

21        another?

22   A    Bernie had.  I don't do music.

23   Q    Okay.  You don't do music?

24   A    I don't do music.

25   Q    Okay.  So you're aware that any track that would have

1        been sampled would have already been processed first

2        by a sound engineer, correct?

3    A   I don't know anything about the process.  Bernie would

4        know that.  I didn't do music.

5    Q   So if the actual track that's sampled is a combination

6        of the artist's work playing the instrument and the

7        sound engineer mixing the sound, that sound engineer's

8        also integral to the sample that's produced, right?

9    A   I have no idea.  I don't even know if that's true.

10   Q   All right.  So you make a statement in the next line,

11       as I am sure you can appreciate now, there was so much

12       subterfuge, to put it mildly, that we were waiting for

13       the dust to settle.  What does that mean?

14   A   I don't know.

15   Q   You wrote it.

16   A   There's so many -- I wrote it back in what, 1997.

17   Q   Okay.  So what dust were you waiting to settle?

18   A   I don't remember.

19   Q   Okay.

20   A   Maybe it was the court case with Tercer, with Nene and

21       George and everybody.

22   Q   And that's been done for 20, 30 years almost, --

23   A   Uh-huh.

24   Q   -- correct?

25                   So you would agree with me that the dust

1          from that settled by now, right?

2     A    That's not what I was talking about in this letter.

3     Q    Okay.  And you don't recall what you were talking

4          about in this letter?

5     A    Not in 1997, no, I don't.

6     Q    All right.

7     A    And, besides, mostly this has nothing do with George,

8          it has to do with Theodore Friedman and Armen

9          Boladian.

10    Q    Okay.  You make a claim that Jane Peterer, in response

11         to your request for songwriting agreements, asked --

12         or told you to get the songwriting agreements from an

13         attorney that you were no longer associated with.  Was

14         that Paul Schindler?

15    A    I don't know.

16    Q    Okay.  Well, what attorneys in 1997 were you no longer

17         associated with?

18    A    I don't remember.

19    Q    So at the time you were seeking these agreements from

20         Mr. Boladian you thought he was responsible for not

21         making payments as he should, right?

22    A    That's what George had told Bernie.  And it wasn't

23         until I did some in-depth investigation that I

24         realized Armen had had nothing to do with it.  It had

25         been our good friend George.

1   Q   And what information did Mr. Boladian give you that

2       led you to that conclusion?

3   A   Nothing.  I didn't talk to Armen, I told you that.

4              MR. ALLEN:  Okay.  Well, can you read back

5       the last answer where she mentioned that she based her

6       information on things that Armen gave her, please.

7                           (WHEREUPON the reporter read

8                           back as follows):

9   QUESTION:  "And what information did Mr. Boladian give

10                  you that led you to that conclusion?

11  ANSWER:    Nothing.  I didn't talk to Armen, I told

12                  you that."

13  Q   (Continuing by MR. ALLEN):  Okay.  So if it wasn't

14      Armen that gave you information to exonerate him, who

15      gave you information that --

16  A   I said I did further investigation.  I'm not sure who

17      I talked to.  I'm not sure what I looked at.  I'm not

18      sure who sent me things.  But when I saw that there

19      were blatant forgeries, I just...

20  Q   You just what, ma'am?

21  A   I waited.

22  Q   Okay.

23  A   Because there was nothing I could do at that time.

24  Q   What about seeing blatant forgeries led you to the

25      conclusion that Mr. Boladian wasn't responsible for

1          the forgeries but my client was?

2    A    Because your client had done it before.

3    Q    Okay.  But he had done it before, according to you,

4          prior to 1997?

5    A    I don't remember when he did it but he did it.

6    Q    You weren't in communication with Mr. Clinton in the

7          1990's about songwriter agreements, were you?

8    A    I don't know.  I don't remember.  All I remember about

9          songwriter agreements and George is that I asked him

10         for copies of them and he never sent them to me.

11   Q    And do you know whether he had those agreements?

12   A    Well, he was -- supposedly had to assign them.  They

13         came from him.

14   Q    Well, your husband would have signed agreements.  Why

15         wouldn't he have them?

16   A    If George Clinton is a co-writer on a song and Bernie

17         Worrell is a co-writer on a song, both of them have to

18         sign the songwriter's agreement.

19   Q    Okay.  So --

20   A    That's why I would go to George.  Bernie didn't

21         generate it, he did.

22   Q    Okay.  But both of them signed it and you said that

23         because Mr. Clinton signed it --

24   A    No.

25   Q    -- he would have a copy of it.  So your husband didn't

1          have a copy of it?

2    A     That's not what I said because -- what I said was if

3          the song was George and Bernie and they both signed

4          it, because the song would come from George, he would

5          have the copies -- he would have the original as well

6          as the copies of the songwriter's agreements which

7          Bernie never got a copy of, and that's what I was

8          asking for.

9    Q     Okay.  But what led you to the conclusion that

10         Mr. Clinton in 1997 had copies of agreements that

11         would have had to have been signed in some instances

12         20 years earlier?

13   A     I just told you, because he was the one that was -- he

14         was the principal.

15   Q     Were you aware of the fact that -- or did you ask

16         Mr. Clinton whether or not a tree fell through his

17         house and wrecked his records?

18   A     No.

19   Q     You would agree that there are a myriad of reasons why

20         a person would possess a document and 20 years later

21         not possess the document, right; people move, people

22         come in and out of areas where there's storage and

23         take things or used in another case.  You would agree

24         with me that those are legitimate reasons why somebody

25         would not have a copy of a document?

1   A    I have no idea.

2   Q    You continue on to say if Armen and Jane want to

3        continue to say that they've advanced Bernie money,

4        please ask them to furnish you with back and front of

5        those cancelled checks.

6               Did you ever receive the back and front of

7        any of those enclosed checks?

8   A    I don't remember.

9   Q    Okay.  But at that time you believed that Mr. Boladian

10       was shorting you money?

11  A    I didn't believe it, George told Bernie that.

12  Q    Okay.  But you put it in words that you constructed on

13       a letter you sent to a --

14  A    And at that point --

15  Q    -- court appointed special master, did you not?

16  A    At that point I believed Bernie.  It wasn't until I

17       did further investigation that I realized George had

18       lied to Bernie.  So, no, I didn't believe that Armen

19       forged it at that point.

20  Q    Step by step walk me through the investigation that

21       you did in order to determine that Mr. Clinton did

22       something improper.

23  A    I just told you.

24               MR. QUICK:  Asked and answered.

25  Q    (Continuing by MR. ALLEN):  You told me that you don't

1       remember anything about your investigation.  You don't

2       remember whether you talked to Mr. Boladian, you don't

3       remember --

4    A  All I do remember is that I inquired of George Clinton

5       to send me copies of the songwriter's agreements and

6       he never did.  That was my further investigation.  To

7       this day he's never sent them.

8    Q  Okay.  So your further -- thank you for answering my

9       question.  Your further investigation was that you

10      asked George Clinton for the documents and he didn't

11      provide them to you?

12   A  That's right.

13   Q  Okay, thank you.

14   A  Songwriter's agreements specifically, not documents,

15      songwriter's agreements.

16   Q  You said if Armen and Jane want to continue to say

17      that they've advanced Bernie money, please ask them to

18      furnish you with the back and front of those cancelled

19      checks.

20              Now you said that I believe you never

21      received the cancelled checks, right?

22   A  That's what I said.

23   Q  Okay.  Did that lead you to suspect that perhaps there

24      wasn't cancelled checks?

25   A  I don't remember.  1997 I don't remember.

1    Q    Was Mr. Clinton in charge of keeping track of

2         Mr. Boladian and Bridgeport Music's cancelled checks?

3    A    No, that's why I'm confused as to why you're following

4         this thing.  It's got nothing to do with the case.

5    Q    It's got a lot to do with the case, ma'am.  And we'll

6         let the judge determine whether --

7    A    Okay, we can let him do that.

8    Q    Okay, her.

9    A    Stupid questions.

10   Q    You say I can -- I'm sorry, I didn't get your, I

11        didn't get your -- did you get that down, ma'am.  I

12        didn't hear it so can you read it back to me.

13                              (WHEREUPON the reporter read

14                              back the question as follows):

15        ANSWER:  "Stupid questions."

16   Q    (Continuing by MR. ALLEN):  Okay, thank you.

17             You then go onto say I can tell you now

18        that Bernie never received any advances; although when

19        sending checks to Bernie, Armen would routinely write

20        on the lower left hand corner advance against

21        royalties, and we would just routinely and justifiably

22        reject that claim.

23             Why would you reject a check that came to

24        you that said advance against royalties?

25   A    Because they were not advances against royalties.

1         They were payments for other things.

2  Q   Like what?

3  A   I don't know way back then.

4  Q   Was it for his services as a musician?

5  A   Could have been.

6  Q   His services as a producer?

7  A   No, because George never credited Bernie for all the

8       production he did.

9  Q   Okay.  Was it --

10  A   Nor paid him.

11  Q   -- for services playing his keyboard?

12  A   Again I do not remember.

13  Q   Okay.  You go onto state the fact of the matter,

14       Mr. Friedman, is that my husband never received any

15       statements until Tercer Mundo filed the lawsuit.

16           Do you believe that to be true today?

17  A   Yes.

18  Q   And Tercer Mundo is what?

19  A   That was Nene Montez company.

20           COURT REPORTER:  I'm sorry, whose company?

21           THE WITNESS:  Nene Montez, M-O-N-T-E-Z.

22       And Nene is N-E-N-E.

23           MR. ALLEN:  And Tercer is T-E-R-C-E-R.

24  Q   (Continuing by MR. ALLEN):  You say we knew that we

25       didn't have the money -- we knew that we didn't have

1      the money for an audit, they knew it too.  Who is the

2      they you're referring to, Nene or Armen or both?

3  A   I don't remember.  Everybody actually.  We didn't have

4      any money.  It had been taken away.

5  Q   And you say it's easy to say why didn't we have an

6      audit done when Armen knew darn well what our

7      circumstances were.

8                    What did you mean by that?

9  A   That we didn't have any money and that I had to keep

10     asking them for advances.

11 Q   You --

12 A   Bernie was taken -- sorry, go ahead.

13 Q   You had to ask Armen for advances?

14 A   That's the only place we ever got any money.

15 Q   All right.  The next sentence, referring to the audit

16     that you did do, we found one person back in the

17     1970's.

18                    Now when you say you found one person, I

19     mean did you look for others and you only found one

20     that was willing to do the audit?

21 A   No, it's, it's -- yeah, I see it.  We found one person

22     and that's Ira Herzog.

23 Q   Okay.  So you found Ira Herzog.  I'm just trying to

24     ascertain, and I don't know this, that's why I'm

25     asking, was he the only one that you were able to find

1       to do the audit?

2  A   I didn't ask for anybody else.  He was highly

3       recommended.

4  Q   Okay, all right.  You say that the audit showed that

5       way back that monies had been diverted from my

6       husband.

7            Okay.  Where were they diverted?

8  A   They never came to Bernie.  I don't know where they

9       went.

10  Q   But to follow-up such an audit with the litigation

11       necessary to secure payment was not financially

12       possible for us.  But you did file a lawsuit, correct?

13  A   We tried.

14  Q   Based on the audit?

15  A   To an extent, yeah.

16  Q   Well, I mean you stated that the Verified Complaint

17       had your husband's signature on it --

18  A   Right.

19  Q   -- from 1981?

20  A   Oh, right, that never -- yeah, right.

21  Q   And you settled that lawsuit eventually, correct?

22  A   I don't think so.  I don't remember.

23  Q   You received a payment?

24  A   I don't remember.

25  Q   Okay.  You don't remember because it didn't happen, or

1        you don't remember because it was 50 -- almost 40 some

2        years ago?

3    A   I don't remember.

4    Q   Okay.  If there was evidence to show that you did

5        receive a payment on that case, the 198 -- I always

6        get mixed up whether it was '81 or '82, my apologies.

7        I believe it's Exhibit Number 2 if I'm not mistaken,

8        yes.

9    A   I'm sorry, what?  I thought he was looking for

10       something.

11   Q   I was.

12                           (WHEREUPON the reporter read

13                           back the question as follows):

14       QUESTION:  "If there was evidence to show that you did

15                  receive a payment on that case, the 198 --

16                  I always get mixed up whether it was '81 or

17                  '82, my apologies.  I believe it's Exhibit

18                  Number 2 if I'm not mistaken, yes."

19   Q   (Continuing by MR. ALLEN):  You don't have any

20       evidence today to dispute that, correct?

21   A   To dispute what?

22   Q   If there is evidence of a check being paid to you in

23       settlement of that lawsuit, not you but your husband,

24       you don't have any -- you wouldn't have any reason to

25       dispute, if I were to provide you with the check, that

1              the case was in fact settled for a sum certain, right?

2                        MR. QUICK:  Form and foundation.

3                        THE WITNESS:  Do I answer?

4                        MR. QUICK:  If you possibly can.

5                        THE WITNESS:  Oh, that's a hypothetical.

6              He's asking me if -- I mean I would have to see the

7              back and front of that check.

8         Q    (Continuing by MR. ALLEN):  Assuming that --

9         A    And, no, I don't remember anything like that.

10        Q    Okay.  You state in the middle paragraph of page two,

11             Armen had and has the benefit of our money to hire

12             lawyers to keep us from getting our money.  Can you

13             understand my frustration when you called.

14                        Did you write that?

15        A    Yes.

16        Q    So you were expressing frustration that Mr. Boladian

17             was using his economic advantage over you to prevent

18             you from getting what you thought he owed you,

19             correct?

20        A    This was based on Bernie telling me --

21        Q    Ma'am, it's a yes or no question.

22        A    No, it's not.

23        Q    It's a very simple question.

24        A    All right, ask the question again.

25        Q    It's not a trick question.

1   A    I don't think I can.

2   Q    It's not a trick question.

3   A    I'm not worried about your questions.  Ask the

4        question again.  Maybe I misunderstood you.

5                   MR. ALLEN:  Go ahead.

6                        (WHEREUPON the reporter read

7                        back the question as follows):

8        QUESTION:  "So you were expressing frustration that

9                   Mr. Boladian was using his economic

10                  advantage over you to prevent you from

11                  getting what you thought he owed you,

12                  correct?"

13  A    Yes, at that time, yes.

14  Q    (Continuing by MR. ALLEN):  Thank you.  I don't

15       suppose you remember sending the e-mail or the article

16       that's referenced in the third paragraph here that

17       says regarding the letter and forwarded e-mail from

18       Jane Peterer that you enclosed with your e-mail to me,

19       first of all, what is her purpose in sending that to

20       you; do you recall the letter that Jane Peterer --

21  A    No.

22  Q    Okay.  And, secondly, she has inserted an article that

23       appeared in a newspaper somewhere in California that I

24       had copied to some e-mail I was sending out.

25                  I take it because you don't remember Jane

1       Peterer's e-mail you don't remember what article you

2       were referring to here?

3   A   No.

4   Q   All right.  So I thought you were not to be involved

5       in the rest of the shenanigans.  Did she tell you that

6       Armen booted Clinton off the ranch.

7               What's that refer to?

8   A   I don't know.

9   Q   Okay.  Do you recall that Mr. Boladian attempted to

10      evict Mr. Clinton from his home in Brooklyn, Michigan?

11  A   No, I didn't pay any attention what was going on with

12      George.

13  Q   So you didn't know whether he had any money at all at

14      that time, do you?

15  A   Of course he did.

16              MR. QUICK:  I'm sorry, who, Mr. Clinton?

17              MR. ALLEN:  Mr. Clinton.

18  Q   (Continuing by MR. ALLEN):  Of course he did?

19  A   Of course he did.

20  Q   What did you do to ascertain whether Mr. Clinton had a

21      dollar to his name in 1997?

22  A   Looked to see whether or not he was on tour.

23  Q   Okay.  And you know what he received for being on

24      tour?

25  A   No.  I know Bernie didn't receive anything.

1    Q    Okay.  So you don't know whether Mr. Clinton received

2         anything?

3    A    Not my business.

4    Q    All right.  And, lastly, why did you send that on to

5         me.

6              Are you referring to the special master

7         report that we've already had marked in this case that

8         is Exhibit 13?

9    A    I don't know.

10   Q    That reminds me, I haven't any intention of sending

11        anything to any attorney for Boladian/Peterer.

12             What was it that you -- what was it that

13        somebody wanted you to send, if you recall, --

14   A    I don't know.

15   Q    -- to Mr. Boladian or Ms. Peterer?

16   A    I don't know.

17   Q    Okay.  While I am not completely naive it is still

18        incomprehensible to me that they can continue to

19        represent an individual who has been proven guilty of

20        forgery, and whose ill-gotten gains were obtained by

21        false dealings with my husband/client.

22             Do you see that?

23   A    I see that.

24   Q    Okay.  Did you write that?

25   A    We've already determined that I wrote this letter so

1      the answer is yes.

2  Q  And you say that you're going to deal with Ms. Peterer

3      in another forum in not too distant future.

4           Can I assume that you didn't deal with

5      Ms. Peterer in the not too distance future from the

6      writing of this letter?

7  A  Yes, I did.

8  Q  What did you do to deal with Ms. Peterer?

9  A  I spoke to her.

10  Q  And what did you say to her?

11  A  We were talking about everything that was going on.

12      Talked about her husband who was a member of --

13      co-founded of Core, and that meant she was going back

14      to Switzerland. And she invited me to come visit her

15      when I could, that kind of thing.

16  Q  So at the time you lacked the resources to hire an

17      attorney to pursue money that at the time you thought

18      Mr. Boladian owed you. And were you sending this

19      letter to Mr. Friedman to set the record straight on

20      what your husband was owed --

21  A  Yes.

22  Q  -- for his -- okay.

23  A  To which -- oh...

24  Q  We definitely disagree with Bridgeport Music's

25      statement and have for years, but what I don't

164

1       understand is why we have to agree with them to

2       receive whatever piddling sum they have decided to

3       send us this time.  So Bridgeport was sending you

4       piddling sums at that time, correct?

5    A  Bridgeport was sending us statements and money.

6    Q  And I can look up the definition of piddling, but I

7       believe it is similar to paltry or inadequate or --

8    A  Not enough.

9    Q  Not enough.

10   A  But still more than your client ever sent.

11              MR. QUICK:  All right, let's just --

12              THE WITNESS:  No, all right.

13              MR. QUICK:  -- answer the questions if you

14       can.

15              THE WITNESS:  Okay.

16   Q  (Continuing by MR. ALLEN):  Now on that subject, how

17       much information do you have today about what

18       Mr. Boladian was paying my client?

19   A  I have no idea.

20   Q  Okay.

21   A  That's not my business.

22   Q  Did you talk to other members of the band in which

23       they --

24   A  Never.

25   Q  -- were not receiving money from Mr. Boladian?

1    A    Never.

2    Q    Is it your belief today that Mr. Boladian was treating

3         other members of the band, including my client,

4         similar to your husband?

5    A    No, I have no knowledge of that.

6    Q    Okay.  We have every intention of getting to the

7         bottom of this but in order to do this we need

8         whatever monies we can manage to get from them.

9              Okay.  What did you think -- what monies

10        did you think you were entitled to that you didn't

11        receive from Mr. Boladian, for what?

12   A    I don't know.

13   Q    Okay.  Now this is copied to Samuel Kramer.  Who's

14        Samuel Kramer?

15   A    I'm not sure.

16   Q    Was he one of your attorneys?

17   A    He might have been, or he might have been somebody who

18        wanted to be one of our attorneys.  I don't know.

19   Q    What about James Weeks?

20   A    I told you, accountant.

21   Q    I'm sorry, a lot of names here, I forgot.

22             Okay.  So you knew when you sent this to

23        Theodore Friedman that it was important for you to be

24        complete in your characterization of the monies that

25        you felt were owed to your husband for the work he did

166

1        with Mr. Clinton, correct?

2             MR. QUICK:  Objection, form.

3  A   That, that had nothing to do with George.  That had

4      only to do with Armen.

5  Q   Ma'am, ma'am, I didn't ask you that question.  The

6      question I asked was did you know that it was

7      important for you to be complete in setting forth your

8      complaints about the money that you were receiving or

9      not receiving from Mr. Boladian at the time?

10  A   You --

11           MR. QUICK:  You said Mr. Clinton the first

12     time you asked the question.

13          MR. ALLEN:  I'm sorry, very sorry, I --

14     mental block.  My apologies, counsel.

15  A   Of course I thought it was important, otherwise I

16      wouldn't have written a letter.

17  Q   (Continuing by MR. ALLEN):  Okay.  And you did your

18      very best to set forth your -- what you thought were

19      your claim to additional monies to Mr. Friedman,

20      right?

21  A   That's what the letter says.

22  Q   Okay.  Did you leave any category of money that you

23      thought your husband was entitled to out of this

24      letter?

25          MR. QUICK:  From Mr. Boladian?

1            MR. ALLEN:  From anyone.

2    A    To the best of my knowledge.

3    Q    (Continuing by MR. ALLEN):  Okay.  We're turning back

4         to Mr. Friedman's response of March 6, 1997.  And it

5         states that there's a letter that's being transmitted

6         for $2,682.62.  It was sent on I believe the same day

7         that you wrote your letter, yes.  And he assumes that

8         basically your letter and that check crossed in the

9         mail.

10            He says as you already know, and as Judge

11        Real told you in court in Los Angeles, songwriters

12        such as yourselves are not parties to this litigation.

13            Do you recall him -- do you recall Judge

14        Real telling the songwriters that --

15   A    I recall him telling me that.

16   Q    Okay.  I do not represent you or them in the

17        grievances against either Bridgeport, Tercer or

18        Boladian, however valid or invalid they may be.

19            You knew that Mr. Friedman wasn't

20        representing you in that case, right?

21   A    When he wrote me that, yes, I did.

22   Q    Okay.  The most I can do is use my best office to have

23        those entities send you the statements and documents

24        you seek, and to make payments provided there is

25        agreement; otherwise I must hold the money in escrow

1    pending the outcome of the litigation.

2         Okay.  First question about that is did

3    Mr. Friedman do as he promised, and send you the

4    statements and documents that you were seeking to

5    substantiate or not the claims you were making in the

6    letter?

7  A  Can I see that a minute?

8  Q  Yeah, sure.  Second paragraph.

9  A  He was going to -- I can -- the most I can do is use

10    my best office to have those entities send you the

11    statements and documents you seek.

12         There were a variety of entities and I

13    don't remember who they were.

14  Q  So my question to you was do you recall whether he

15    honored his promise to get them to send you the

16    documents that you seek?

17  A  I have no way of knowing because if he asked them to

18    do it and they didn't do it, how would I know that.

19  Q  Well, but you would know if you remembered if you

20    received that information subsequent to this letter.

21  A  Oh, I would remember that, yes, and I did not.

22  Q  Okay.  So you don't believe that, regardless of what

23    Mr. Friedman may or may not have done, you don't

24    believe that you ever received the promised statements

25    that Mr. Friedman is referencing here?

1   A    I don't think so.

2   Q    Okay.  And do you recall whether you were ever

3        disbursed any of the money held in escrow by

4        Mr. Friedman at the conclusion of the case between

5        Tercer Mundo and Boladian and Bridgeport Music?

6   A    I think so because Armen released the money to us.

7        That I know.

8   Q    All right.  And were you satisfied with the release of

9        the funds?

10  A    Yes, yes.  Armen was very nice.

11  Q    So you believed at the conclusion of this litigation

12       that you had received what you were entitled to

13       receive from Mr. Boladian?

14  A    Yes.

15  Q    Okay.  So Mr. Friedman did say in the letter that he

16       was copying Ms. Peterer and Bridgeport's attorney --

17       Bridgeport, Boladian's attorneys to send copies of the

18       cancelled checks showing the past asserted advances.

19            And it's your testimony that you never got

20       that information?

21  A    I don't remember.

22  Q    Okay.  You don't remember that that was your testimony

23       or you don't remember whether you got the information?

24  A    I don't remember if I got the information.

25  Q    It's possible that you did, you just don't remember?

1   A   I don't remember.

2   Q   Okay.

3   A   It's possible I didn't.

4   Q   It's possible that you didn't, it's possible that you

5       did and you just forgot because it's been --

6   A   I don't remember.

7   Q   -- 30 years?

8   A   I don't remember.

9   Q   I'm trying to ascertain what it is that you don't

10      remember, ma'am.  Is it that you don't remember the

11      answer to the question you just gave a few minutes

12      ago, or is it that you don't remember whether you

13      received the documents or not?

14  A   Both.

15  Q   Okay.  Is there anything that would refresh your

16      recollection as to whether or not you received those

17      documents?

18  A   Seeing the back and front of the cancelled check,

19      seeing the documents.

20  Q   Is it your position in this case that the failure of a

21      third party, Bridgeport Music, to provide you with

22      cancelled checks is something that should be imputed

23      to my client?

24  A   No.

25  Q   Okay.  Take a look at that.

1    A    Are you speaking to me?

2    Q    Yeah.

3    A    Which one?

4    Q    Fifteen, ma'am.

5    A    Okay.

6    Q    Okay.  We've established that Mr. Weeks is an

7         accountant, correct?

8    A    Yes.

9    Q    And Mr. Kramer you don't -- I think it was

10        Mr. Kramer --

11   A    I remember Sam but I'm not sure he was our attorney.

12        He may have been somebody that I was hoping to be an

13        attorney.

14   Q    Got it, okay.  And George Gilbert?

15   A    He was an attorney.

16   Q    Okay.  Whose attorney?

17   A    Bernie's.

18   Q    Okay.  Was he a good attorney?

19   A    I don't hire anything but good attorneys.

20   Q    Okay.

21                  MR. QUICK:  Thanks.

22   Q    (Continuing by MR. ALLEN):  Did he have any input in

23        helping you draft this Exhibit 15, the March 7, --

24   A    No.

25   Q    -- 1997 document?

1    A    No.

2    Q    Was it your experience that if you left something

3         important out of a communication of this sort, that

4         Mr. Gilbert would say you need to add this, or would

5         he send a communication behind this to say that

6         there's missing information?

7    A    That's not how it was done.

8    Q    How was it done then?

9    A    Certain lawyers I would tell them what I was going to

10        do.  They'd say, well, you're intelligent and

11        articulate, go ahead and do it.  Read it to me first

12        before you send it.  And that's what I would do.

13   Q    Okay.  And was he one of those lawyers?

14   A    Yes.

15   Q    And do you think sitting here today that you would

16        have reviewed the exhibit that we've had marked and

17        just gone through that is 17 and 15?

18   A    That he would have approved it?

19   Q    That he would have read it and said this is good, this

20        is not good?

21   A    Fine, yeah, otherwise I wouldn't have done it.

22   Q    Okay.  So you take issue with a check coming from a

23        Della Maria's office and not yours.  Who's Della

24        Maria, was that Mr. Boladian's lawyer?

25   A    I think so.

1    Q    And you say the promise, obvious we are shorted money

2         again, right?

3    A    That's what I wrote.

4    Q    Did you provide any sort of calculation as to what

5         constituted the shortfall in money?

6    A    No.

7    Q    Sitting here today do you recall what shortfall you

8         were referencing here?

9    A    No, it says it right on the thing.  We was short two

10        thousand some dollars.  Where's it say that?

11   Q    I believe -- it's not in this communication.

12   A    It's in this one.  The correct contract summary from

13        Bridgeport indicates total royalties of two thousand

14        blah, blah, blah.  Please explain the difference of

15        3,552.23.

16   Q    Right, right.  That's Exhibit 16.  So the shortfall of

17        what you just said, 2,000 -- the shortfall of I think

18        it's 3,552.53, right?

19   A    Whatever's written.

20   Q    What was causing the shortfall; what were they not

21        paying you for?

22   A    I have no idea.

23   Q    Okay.  Do you recall whether you ever received the

24        shortfall?

25   A    No, but we probably did because there was no more

1        correspondence involved.

2    Q    Okay.

3             MR. ALLEN:  I want to take a quick break

4        and just check to see you've got everything here, 30

5        second break.  'Cause I've got a stray page three of

6        one of the documents, I want to make sure it I'm not

7        it would have been the February 18th.

8             THE WITNESS:  While he's doing that I got

9        to go to the bathroom.

10            MR. ALLEN:  Off the record at 1:20.

11                          (WHEREUPON a short pause was

12                          had in the proceedings 1:20

13                          p.m. to 1:26 p.m.)

14            MR. ALLEN:  Back on.

15                          (WHEREUPON Exhibit No. 18

16                          was marked for identification

17                          by the reporter.)

18   Q    (Continuing by MR. ALLEN):  Ready, everybody, all

19        right.

20            Ma'am, I've handed you what's been marked

21        as Exhibit 18.  Have you had a chance to look at it?

22   A    Yes.

23   Q    And have you read it?

24   A    Yes.

25   Q    Are you familiar with it?

175

1   A   No.

2   Q   Have you ever seen it before?

3   A   No.

4   Q   Well, I just have a couple of questions for you.  They

5       don't require that you previously read it.

6               Footnote eight, that's on page two.

7   A   Okay.

8   Q   There's reference made to a personal guarantee that my

9       client, George Clinton, signed guaranteeing that the

10      debt that is referenced in the earlier paragraphs of

11      the document.  Just a simple question.  Did

12      Mr. Worrell ever personally guarantee a debt of --

13  A   No.

14  Q   -- any --

15  A   No.

16  Q   -- entity that Mr. Clinton was involved with?

17              MR. QUICK:  Just let him get his question

18      out before you give your answer so our court --

19              THE WITNESS:  Okay.

20              MR. QUICK:  -- reporter can take it down,

21      okay?

22              THE WITNESS:  All right, I'm sorry.

23  Q   (Continuing by MR. ALLEN):  Are you aware of your

24      husband ever personally guaranteeing any debt other

25      than household debt between you and he?

1   A   No.

2   Q   If he had, you would have known about it, right?

3   A   Yes.

4   Q   Who is Amor Montez?

5   A   Nene's daughter.

6   Q   And who is Nene?

7   A   From my opinion or what we were told?

8   Q   I'd like, to the extent you can give it to me, the

9       truth.  I mean who is he?

10   A   The first time I became aware of Nene he was working

11      with George.

12   Q   And what was he doing for Mr. Clinton?

13   A   I have no idea.

14   Q   And what were your interactions with Nene Montez?

15   A   In the beginning, none.

16   Q   Okay.  And did that change at some point?

17   A   Yes.

18   Q   How did it change?

19   A   When Bootsy came to me and asked me to listen to Nene

20      regarding the songwriter agreements and everything

21      that later became the lawsuit against Armen.

22   Q   And what year was that?

23   A   I don't know.

24   Q   Was it prior to the turn of the century, this century?

25   A   I think so.

1   Q   And what were the nature of those conversations?

2   A   With who?

3   Q   With, well, Mr. Montez.

4   A   Are you asking me when Bootsy asked me to talk to

5       Nene, what was the content?

6   Q   Yes.  I'm referring to what you just testified to.

7   A   Okay.  Nene wanted Bernie to be involved in the

8       lawsuit.  And I asked him if I ask Bernie to do it and

9       he agreed, would he return Bernie's publishing to him;

10      because I had asked George if he would do it and he

11      said no.

12              He said I can only return -- I can't return

13      the money that he's been due but I will return his

14      publishing to him.  And at that point I talked to

15      Bernie and he agreed to become part of that lawsuit.

16  Q   Okay.  Which lawsuit?

17  A   The one that Tercer Mundo filed against I think it was

18      Armen.

19  Q   Okay.

20  A   You've got the papers in there somewhere.

21  Q   We've gone through that --

22  A   Uh-huh.

23  Q   -- lawsuit, --

24  A   That's it, uh-huh.

25  Q   -- correct?

1              So your husband's involvement in that

2        lawsuit emanated from a conversation that began with

3        Bootsy Collins approaching you and asking you to speak

4        with Mr. Montez?

5    A   To listen to what Nene had to say.

6    Q   Okay.  And eventually your husband joined Mr. Montez

7        in that lawsuit, correct?

8    A   Yes.

9    Q   All right.  And in that lawsuit you were suing

10       Mr. Boladian for what?

11   A   I'm not sure.

12   Q   Did you assert any claims against Mr. Clinton in that

13       lawsuit?

14   A   Excuse me?

15   Q   Did you assert any claims against Mr. Clinton in that

16       lawsuit; was he a party in that lawsuit?

17   A   I don't think so.  I don't know.

18   Q   So at that time you weren't pursuing Mr. Clinton for

19       anything that you claim your husband was owed,

20       correct?

21   A   Not that I remember.

22                             (WHEREUPON Exhibit No. 19

23                              was marked for identification

24                              by the reporter.)

25   Q   (Continuing by MR. ALLEN):  Have you had a chance to

1       look at that?

2    A  Yes.

3    Q  Exhibit 19 purports to show payments made from Thang

4       to your husband.  And as I understand your --

5               MR. QUICK:  I'm just going to quibble with

6       your characterization of the exhibit because there's a

7       lot of different pieces of paper in here and they're

8       all not related to Thang.

9    Q  (Continuing by MR. ALLEN):  I'm sorry.  First page,

10      simple question.  You see that there are a number of

11      payments that are listed on a ledger that say at the

12      top of the ledger Bernie Worrell payments from Thang.

13      Do you see that there?

14   A  I see that.

15   Q  Okay.  Assuming your testimony is going to be that

16      notwithstanding what's in here, you don't know whether

17      those -- or you don't recall whether those payments

18      were received?

19   A  I do not.

20   Q  Do you have any evidence to demonstrate that the

21      payments were not received?

22               MR. QUICK:  Objection, form.

23   A  How can I prove a negative?  Do they have any proof

24      that they paid it?

25   Q  (Continuing by MR. ALLEN):  Ma'am, I'm asking you

1    questions here and it's a simple yes or no question.

2    Do you have any evidence --

3  A  No.

4  Q  Okay, thank you.  Same question with respect to the

5    second page of that exhibit, which appears to show

6    deposits to Bezerk Music, Bernie Worrell deposits,

7    Bezerk Music.  I can't read that word next to deposits

8    up at the top.

9         MR. QUICK:  Do you know what the question

10    is?

11         THE WITNESS:  No.

12  Q  (Continuing by MR. ALLEN):  I'm saying can you read

13    any better than I can or make out what the second word

14    is on the second line underneath Bernie Worrell?  It

15    says deposits and then it looks like B-E-Z-E-R-K, if

16    I'm reading it correctly.  I'm asking whether you have

17    any insight as to what that word might be?

18  A  Yeah, it looks to me like B-E-Z-U-H or K.  So, no, I

19    don't.

20  Q  Okay.  And you don't have any idea what that entity

21    is?

22  A  No.

23  Q  All right.  Now do you dispute that even the payments

24    that are reflected on this ledger, this second page of

25    the exhibit, were made to your husband?

1    A    I don't know.

2    Q    The third page, you see there are a number of tracks

3         that are listed here?

4    A    Yes.

5    Q    And then there's an amount that was received for the

6         track times the percentage of your husband's interest,

7         and that produces a column royalty earnings on the

8         side.  Do you see that?

9    A    I see that.

10   Q    Do you dispute that the payments that are reflected on

11        this page of the exhibit were made?

12   A    I have no idea.

13   Q    Same question for the next page?

14   A    Same answer.

15   Q    Same question for the third page?

16   A    Same answer.

17   Q    Same question for the fourth page?

18   A    Same answer.

19   Q    Same question for the fifth page?

20   A    Same answer.

21   Q    Okay.  The sixth page I believe starts different font

22        and type, different type of a report.  It's from a

23        company called Segel and Goldman, Inc. of 9200 Sunset

24        Towers and it's for a period ending 6-30-75.  Do you

25        see that?

182

1   A   I see that.

2                MR. QUICK:  I don't know that that's '75

3        but...

4                MR. ALLEN:  Oh, you're right, Dan.  I did

5        see that earlier, it's 79.  You're correct.

6                MR. QUICK:  Can I just ask a question too,

7        counsel?

8                MR. ALLEN:  Sure.

9                MR. QUICK:  The last two pages you went

10       through, they don't have Bates numbers on them.  Were

11       they produced?

12               MR. ALLEN:  I believe so, Dan.

13               Audrey, please make a note to double check

14       that, thank you.

15  Q   (Continuing by MR. ALLEN):  Okay.  I'm sorry if I got

16       an answer to this question, but do you recall who

17       Segel and Goldman were?

18  A   No.

19  Q   Okay.  Do you have any reason to dispute that the

20       payments that are reflected on this royalty statement,

21       which is two pages it looks like, are incorrect?

22  A   I don't know.  I have no way of knowing.

23  Q   Okay.  And do you recall whether you received those

24       payments?

25  A   I don't know.

1    Q    Turning to the next page, there is a Western Union

2         Money Order receipt.

3    A    Oh.

4    Q    Appears to show a wire transfer from Thang, Inc. to

5         Bernard or Judie Worrell in Plainfield, New Jersey.

6    A    Okay.

7    Q    Do you recall receiving that payment from Thang, Inc.?

8    A    No, I don't.

9    Q    Do you have any reason to dispute whether that payment

10        was in fact made?

11   A    No.

12   Q    Next page there are a number of receipts.  Do you

13        recognize -- let's go one by one just so we're clear.

14             In the top left hand corner there's a

15        receipt dated 5-5-79.  Does that have your husband's

16        signature on it for $150?

17   A    Yes, it does.

18   Q    Okay.  What about the next one, upper right hand

19        corner?

20   A    But it says for royalties so that's not right.  The

21        upper what?

22   Q    The upper right hand corner it says -- well, it's

23        partially cut off, but it looks like there was a

24        payment of some amount, the last two digits $50, July

25        3rd, 1979 for travel?

1   A   Yes.

2   Q   All right.  And in the bottom left hand corner is that

3       your husband's signature there, 5-6-77?

4   A   Yes.

5   Q   Okay, session advance.  And then there's one it's just

6       2-23.  There's no year associated with it.

7   A   Where are we, same page?

8   Q   Same page.

9   A   That's Bernie's signature.

10  Q   All right.  Was he in the habit of signing for

11      receipts for money that he didn't receive?

12  A   Of course not.

13  Q   Okay.  There's another royalty statement that's on the

14      next page, again from Segel and Goldman.  Do you have

15      any recollection of receiving the payments that are

16      reflected on this royalty statement?

17  A   No.

18  Q   Do you have any reason to dispute whether the royalty

19      statement -- or whether the payments that are

20      reflected on this royalty statement were in fact

21      received?

22  A   I have --

23              MR. QUICK:  I'll object as to form as to

24      the word payments.  Go ahead.

25  A   I have no idea.

1    Q    (Continuing by MR. ALLEN):  The next page, again

2         another series of receipts.  I just want to ask you

3         one question about all of them.  Are all of these

4         signatures from your husband?

5    A    What page -- oh.

6    Q    The next page.

7    A    The top one is, the one underneath it is, the one

8         underneath that is and the one over here on the side

9         is.

10   Q    And just for purposes of the record we're talking

11        about Bates number GCThang0247.  The prior pages that

12        we were referring to were all in sequence up to 247.

13             Bates number 248, the next page, there's a

14        payment of $2,000, to looks like Bernard Worrell,

15        $2,000, and I don't see a date on it.  Do you have any

16        reason to dispute that that payment was received by

17        your husband?

18   A    I don't know.  I can't even read what it says the

19        sender's name is.

20   Q    Fair enough.  When was the last time you had any

21        conversation with Amor Montez?

22   A    Amor?

23   Q    Yeah.

24   A    Around '16.

25   Q    Okay.

1    A    She came to see Bernie.

2    Q    Okay.  And you've had no discussions with Amor Montez

3         since then?

4    A    No.

5    Q    How about Nene Montez?

6    A    He's dead.

7    Q    When was the last time you had a conversation with him

8         prior to his death?

9    A    When he flew me to Florida because he wanted to give

10        me four albums he was getting back from Priority.  And

11        he asked me would you make sure that all the people in

12        the group got paid and I said definitely.  And then I

13        didn't hear from him again.

14   Q    Okay.  So how is it that you were going to make sure

15        that the members of the group got paid?

16   A    Because he trusted me.

17   Q    So he gave you four albums?

18   A    He did not give them to me.

19   Q    Okay.

20   A    He was asked -- go ahead, I'm sorry.

21   Q    Go ahead, finish what you were going to say.  He was

22        asking you what?

23   A    He was talking about these four albums and asking me

24        would I make sure that everybody got paid; in other

25        words, that Bernie wouldn't just be the only one, and

1        I said of course.

2  Q   So what albums were they?

3  A   I don't know.  There were four albums.  I think

4        Priority Records had them.  I'm not exactly sure.

5  Q   They weren't any other albums other than Priority

6        Records albums?

7  A   I never saw the albums.  I'm assuming from what he

8        said that he was getting them back from Priority.

9  Q   So did he tell you how he expected you to ensure that

10       they were going to get paid or --

11  A   No, he trusted me.

12  Q   He gave you the money in order --

13  A   He didn't give me anything.  It was a conversation.

14  Q   So he wanted you to check with the other members of

15       the band --

16  A   No.

17  Q   -- to find out -- okay, well, I don't understand what

18       it is that -- you said he wanted to make sure the

19       other members of the band got paid.  How were you

20       going to do that?

21  A   Well, again we were having a conversation and I told

22       him, yes, I would.  He didn't ask me how I was going

23       to do it, and I didn't give too much thought to it

24       because it was again a hypothetical conversation.

25       Until it happened I was making no move.

1  Q   Okay.  Did you ever pay anybody anything for these
2      four albums yourself?
3  A   I never got the albums.
4  Q   Okay.  Did Mr. Montez ever pay people for these four
5      albums?
6  A   I have no idea.
7  Q   And you never saw the albums.  What musicians played
8      on the albums?
9  A   I never saw the albums so I don't know which musicians
10     played on them.  I know Bernie was on it.
11 Q   What I'm struggling with, ma'am, is he had an
12     expectation that you were going to see that these
13     members got paid, and that implies that you knew what
14     band members were on the albums.  So I'm trying to
15     discern how you were supposed to ensure that they got
16     paid?
17 A   I don't know.  It was a conversation.  I never got the
18     albums, I don't know who it was on it.  I know Bernie
19     was on them, but it never went any further than.
20 Q   And you don't know whether the albums had anything to
21     do with Parliament-Funkadelic or any --
22 A   I had no idea.
23 Q   -- group associated with Mr. Clinton?
24 A   Oh, yeah, they were all related to Clinton some kind
25     of way.

```
 1   Q   Okay.

 2   A   He would know.

 3   Q   So how long did this conversation last?

 4   A   Between Nene and me?

 5   Q   Uh-huh.

 6   A   Twenty minutes.

 7   Q   Okay.  So he flew you to -- he paid to fly you to

 8       Florida --

 9   A   Yes.

10   Q   -- in order to have a 20 minute conversation with you?

11   A   Uh-huh, and to talk to Maria.

12   Q   Who's Maria?

13   A   His wife.

14   Q   And so what did you and Maria speak about?

15   A   Her colon cancer and certain private matters between

16       her and Nene.  It was a woman-to-woman discussion,

17       nothing to do with business.

18   Q   So it didn't have anything to do with Mr. Clinton?

19   A   No.

20   Q   What else did Mr. Montez have you -- or discuss with

21       you during your 20 minute conversation with him?

22   A   Nothing.

23   Q   Did you stay with the Montezes?

24   A   No.  I turned around that evening and came home.

25   Q   Okay.  So was the purpose of the visit to comfort his
```

1          wife or was the purpose of --

2     A    Partially.

3     Q    Okay.  Was there anything about the conversation that

4          you had with him pertaining to these four albums that

5          required your physical presence in Florida with him?

6     A    Only that I think he preferred to do it face-to-face,

7          eye-to-eye.

8     Q    Okay.  What gives you the idea that he preferred to do

9          things face-to-face versus eye-to-eye?

10    A    With me he did.  I don't know what he did with anybody

11         else.

12    Q    Did he ever fly you to his -- anywhere where he was at

13         before in order to have a conversation with you or was

14         this the only time?

15    A    I only ever had two real conversations with Nene.  One

16         was the one I already described when Bootsy wanted us

17         to talk, and this was the second.  Nene and I were not

18         friends.

19    Q    Do you consider yourself a friend of his daughter

20         Amor?

21    A    Yes.

22    Q    And you have not had a conversation with her in eight

23         years?

24    A    No, I didn't say that.  Well, actually, yes, because

25         she came up when Bernie was dying and that was the

1      last time I saw her.  I think only one other time she

2      called me and just to chit-chat and that's it.

3  Q   And when did that conversation occur?

4  A   Oh, within -- a couple years after she first came up.

5  Q   So within -- sometime in the period between 2016 and

6      2018?

7  A   Yes.

8  Q   To the best of your recollection?

9  A   Yes.

10  Q   Did you ever discuss the lawsuit that you filed in New

11      York with Amor against -- or the estate, I'm sorry,

12      did you ever discuss the lawsuit that the estate filed

13      in New York State against Mr. Clinton in 2019?

14             MR. QUICK:  With her?

15             THE WITNESS:  With Amor?

16             MR. ALLEN:  With Amor.

17             MR. QUICK:  Yeah.

18  A   I might have 'cause she was trying to do some -- I

19      might have.

20  Q   (Continuing by MR. ALLEN):  She was trying to do what,

21      ma'am?

22  A   She was trying to contact George about some tapes that

23      Nene had left behind when he was recording the group

24      near the United Nations, and she wanted to get with

25      George to release it but he never responded to her.

1       So she was asking me to help and I said I'm not the

2       person to get you to George, I'm suing him.  She said

3       oh.

4  Q  So if you had the conversation -- you were suing him

5       at the time that you had the conversation, ma'am?

6  A  I had been suing George every chance I could find

7       somebody to do it.

8  Q  Okay.  So you weren't suing him actively in 2018 so

9       the conversation that you had with Ms. Montez must

10      have been in 20 -- at least since 2019 because you

11      weren't, --

12  A  Could be.

13  Q  -- you weren't suing him in 2018?

14  A  Could be.  I told you I'm not good with dates.

15  Q  So is it possible that you could have spoken with him

16      since this lawsuit was filed?

17  A  Him who?

18  Q  I'm sorry, her, Amor.

19  A  With Nene -- I mean with Amor?

20  Q  Amor Montez?

21  A  No, there's no reason to.  Amor's -- no.

22  Q  Okay.  What did you tell Amor about the lawsuit that

23      you filed against Mr. Clinton?

24  A  I said I wouldn't be of much help, sweetheart, I'm

25      suing George.  That was the extent of the

1    conversation.

2 Q So other than your lawyer or lawyers have you

3    discussed this lawsuit with any other person?

4 A Not that I can think of.

5 Q Pardon for asking a somewhat personal question.  Are

6    you still in contact with your daughter?

7 A My daughter?

8 Q Yes.

9 A Yes.

10 Q Okay.  Have you discussed the lawsuit with your

11    daughter?

12 A No.

13 Q Never?

14 A Only the same thing like I told Amor, that we're suing

15    George for what he did to Bernie.

16 Q How did it come about that the estate of Bernie

17    Worrell retained, I believe the name of the firm was

18    King and Ballow?

19      MR. DAVIS:  Ballow.

20      MR. ALLEN:  Ballow, yeah.

21 A I don't know.  I think I probably asked for a

22    recommendation.  I asked everybody.  This was like

23    such a horrible thing to have done to Bernie.  I was

24    determined that it wasn't going to go -- whatever.

25 Q (Continuing by MR. ALLEN):  Who was it that gave you

1          the recommendation for King and Ballow?

2    A    I'm not exactly sure.  I was talking to a lot of

3          people.

4    Q    Okay.  Well, you know that that law firm represented

5          Mr. Boladian in a prior lawsuit.  Is it possible that

6          Mr. Boladian gave you the recommendation for King and

7          Ballow?

8    A    No, because I wasn't -- I don't talk to Armen.

9    Q    Okay.  So you just, of all the law firms in Washington

10         State, decided to hire King and Ballow, which is

11         located outside of Washington State, to represent your

12         estate --

13   A    No, --

14   Q    -- or to represent your husband's estate?

15   A    -- no.  I think it came about when I was talking to --

16         trying to get some money, and I was asked how come

17         you're always out of money and I said because George

18         Clinton took it all and I said now it's difficult.

19                   And I was asked if I had an attorney and I

20         explained the problem with getting one; when someone

21         has taken away your money, you don't have the money to

22         pay for an attorney.  Well, what do you want.  I said

23         I want every damn dime that's owed Bernie and not a

24         penny more.  And he said, well, let me check around.

25         And then I don't know if he contacted me or one of the

195

1         attorneys did.

2   Q   Who's the he that you're referring to?

3   A   Joel.

4   Q   Who?

5   A   Joel.

6   Q   Joel who?

7   A   Joel Bakow (ph) I think is his last name.

8   Q   Joel Bakow?

9   A   I don't what his last name is.  I always --

10             MR. DAVIS:  Publicly known as Joel Martin.

11   A   Oh, okay.  I always -- that was when I was trying, you

12       know, to get some advances.

13   Q   (Continuing by MR. ALLEN):  Okay.  And who is Joel

14       Martin?

15   A   He's the one that one day when I was calling Sarah he

16       answered the phone.

17   Q   Sarah being?

18   A   Sarah Catlett.

19   Q   And who's Sarah Catlett again?  I'm sorry, been a lot

20       of names here.  Who's Sarah?

21   A   Sarah was the person that I would call when I wanted

22       an advance.  I didn't call Armen, I called whoever

23       answered the phone.  That used to be Helen and then it

24       became Sarah.

25   Q   Okay.  So you called Sarah at Bridgeport Music and

1      told her that you wanted to get every penny that was

2      owed to --

3   A   No, I didn't tell her, I -- no.  What I said was I

4      would call when I needed an advance, when I couldn't

5      wait anymore to pay royalties, when there -- I needed

6      money.  So who answered the phone most of the time

7      would be Sarah.  And then one time Joel answered the

8      phone and he facilitated it.

9   Q   So what agreement do you have with Bridgeport or

10     Westbound Records with respect to the recovery in this

11     case, assuming there is one?

12  A   Absolutely nothing.

13  Q   And it's your testimony that should you prevail in

14     this lawsuit that your only intention is to use

15     whatever that recovery is for your benefit and no one

16     else's?

17  A   My children, all the people who've suffered when

18     George took the money.  All the people that Bernie

19     wanted to do things for; our son, my daughter, my

20     granddaughters.

21  Q   So let's go through the list of people who've suffered

22     that you want to assist with this case -- or that you

23     want to help with the proceeds of this case, assuming

24     there are some?

25  A   Why, why do you need to know who I want to help?

1   Q   Well, it doesn't really matter why I want to know,

2       ma'am.  I think it has to do with the fact that I'm

3       entitled to ask the questions and --

4   A   Okay.

5   Q   -- I'd like to know who they are because that tends to

6       go to issues like credibility.

7               So start with the first person.  You've got

8       your son Bassl?

9   A   Bassl, B-A-S-S-L.

10  Q   B-A-S-S-L.  Your daughter?

11  A   My daughter.

12  Q   Okay.  What's her name?

13  A   Dawn.

14  Q   Dawn.

15  A   My three granddaughters.

16  Q   All right, you'll have to give me their names.

17  A   Stephanie.

18  Q   All right.

19  A   Amber, Taylor.  My great-grandson Christian.  My

20      great-granddaughter Alia.  My brother Craig.  My

21      sister Eleanor if she's still alive.

22  Q   Who else?

23  A   That's basically it.

24  Q   Well, you've made a lot of allegations in this

25      Complaint, and you just said that you wanted to help

1       all the people that George Clinton hurt.  You made a

2       lot of allegations about other people in your lawsuits

3       about who Mr. Clinton has hurt, including

4       Mr. Boladian.  Is he one of the people --

5   A   No.

6   Q   -- that's on your list?

7   A   No, no, no, no, no.  What I meant when I said that was

8       people -- okay, Bernie wanted to move his mother out

9       of the roach infested place she was in.  We wanted to

10      take our families on a cruise.  We wanted to do this

11      with my -- help my daughter pay for my granddaughter's

12      and great-granddaughters' college educations.  All

13      kinds of things that we were not able to do because of

14      your client.

15  Q   So how many other advances have you received from

16      Bridgeport?

17  A   None.

18  Q   I'm talking about since you made the call to Sarah

19      about wanting to --

20  A   Oh, I don't know, whenever I ran out of money.

21  Q   Okay.  And how often is that?

22  A   Almost every year.  As a matter of fact, I'm close to

23      that point right now.

24  Q   So you'll pick up the phone and you'll call Armen and

25      ask him for --

```
 1   A    I don't call Armen.  Will you stop that.  I don't know
 2        Armen that way.
 3   Q    You'll call Sarah?
 4   A    I will call Sarah.
 5   Q    And has Sarah ever turned you down on an advance?
 6   A    Sarah doesn't turn anybody down.  She forwards my
 7        request to Armen.
 8   Q    Okay.  So has Armen ever turned down one of your
 9        requests --
10   A    Never.
11   Q    -- for an advance?
12   A    Never.
13   Q    And approximately how much in advances have you
14        received from Mr. Armen Boladian, or one of his
15        companies since 2016?
16   A    Since 2016, well, I try not to ask for more than like
17        two to 5,000 because like I said, I get Bridgeport
18        royalties in February and in August.  So if I ask for
19        too much money, I'll get less money when the royalties
20        come in so I try very hard not to.
21   Q    So when you say that you ask for 2,000 to $5,000, how
22        often is that?
23   A    Well, maybe once a year, because once Bernie died I
24        couldn't -- maybe once a year.
25   Q    So your testimony is that on average since 2016 you
```

1       have asked for advances from Mr. Boladian in the range

2       of two to $5,000?

3   A   Not every year.

4   Q   Okay.  So in other years you ask for more or other

5       years you ask for nothing?

6   A   In other years it was not necessary.

7   Q   And why was it not necessary?

8   A   Because I sold the BMI and ASCAP royalties.

9   Q   To whom?

10  A   Oh, God, I can't remember.  I have to look it up.  LL

11      -- something something, LLC.

12  Q   And who did you negotiate this deal to sell your BMI

13      and ASCAP royalties to?

14  A   My attorney, Briana Elzey, handled all that.

15  Q   Briana Elzey.  And which firm is she with?

16  A   She was Briana.

17  Q   So she's a solo practitioner?

18  A   She was then, I don't think she is now.  I think now

19      she works for Disney, I'm not sure.

20  Q   Can you spell Briana's name, is it two N's?

21  A   B-R-I-A-N-A, E-L-Z-E-Y.

22  Q   E-L-Z-E-Y.  And you think she works for Disney now?

23  A   I think so.

24  Q   Okay.  So now that she works for Disney who do you

25      have that -- she negotiated the sale of your royalties

1          to BMI and ASCAP?

2     A    Yes.

3     Q    Okay.  Nobody else?

4     A    She was my attorney.  I only needed one.

5     Q    I'm just asking, ma'am.

6     A    Okay.

7     Q    Did you have an accountant that was involved with

8          that?

9     A    No.

10    Q    Did she hire an accountant?

11    A    No.

12    Q    How did she value the royalties that you were selling

13         to BMI and ASCAP?

14    A    Several offers came in.  She asked me which one I

15         wanted, I told her.  And she negotiated to make sure

16         that it was all a good fit for me and my son, 'cause

17         he's my principal heir.

18    Q    And how much did you sell your royalties for, ma'am?

19         Let's start with BMI royalties.

20    A    I don't remember, but I remember the last one was

21         about a hundred thousand.

22    Q    Okay.  Well, let's start with the first one and we'll

23         get to the last one.  What was the first payment you

24         received and from whom for your --

25    A    I don't remember.

1    Q    Where would those records be?

2    A    What records?

3    Q    The records memorializing the transactions?

4    A    Oh, I have them.  You mean the contract between the

5         company that purchased them and myself?

6    Q    Yes.

7    A    I have them.

8    Q    Okay.  And what is the name of the company, to the

9         best of your recollection?

10   A    I remember it's LLC.  I have to look up the -- maybe

11        -- no, wait a minute, I don't have it there.

12                  MR. QUICK:  Don't worry about it, just

13        answer to the best of your ability.

14                  THE WITNESS:  Okay.

15   Q    (Continuing by MR. ALLEN):  And who, what person, if

16        any, did you negotiate with in order to get those

17        royalties sold?

18   A    As I said, Briana handled that.

19   Q    So you had no interaction with the purchaser

20        whatsoever?

21   A    The offers were made.  I sent them to Briana.  Briana

22        looked them over and then negotiated.

23   Q    Okay.  And you made the decision who you wanted to

24        sell the royalties to?

25   A    Definitely.

1    Q    Did you take the highest price or did you have other

2         criteria for selecting who you would sell your

3         royalties to?

4    A    I took the best deal.

5    Q    And to the best of your recollection, let's start with

6         payments, do you have any recollection -- first of

7         all, scratch that.

8                    Do you recall when this transaction

9         occurred?

10   A    The first one?

11   Q    The first one.

12   A    About two, three years ago, somewhere in there.

13   Q    Okay.  So the first time you sold royalties was two to

14        three years ago?

15   A    I think so.

16   Q    And was that ASCAP or BMI?

17   A    That was BMI.

18   Q    And what specifically did you sell?

19   A    I'm pretty sure it was the writer catalog.

20   Q    And do you recall what the compensa -- or the

21        consideration was for selling the writer catalog?

22   A    No.  I remember what it was for ASCAP but I -- two to

23        three years ago, no, I don't remember.

24   Q    Okay.  Let's start with -- let's continue with ASCAP.

25        What did you -- or when did you enter into your

1        arrangement with ASCAP?

2   A    About a year after BMI.

3   Q    Okay.  And what did you sell to ASCAP?

4   A    I think it was around a hundred thousand.

5   Q    No, what --

6   A    Writer's, writer's.

7   Q    So you didn't sell the entire writer's catalog to BMI.

8        Well, if you sold it to BMI a year earlier, what was

9        left for you to sell a year later?

10  A    BMI and ASCAP are two separate entities.

11  Q    I understand that.

12  A    So I sold what ASCAP had and what BMI had.  They're

13       two separate things.

14  Q    Got it.  And it was writer's catalog?

15  A    Yes.

16  Q    And who did you sell your ASCAP -- or the --

17  A    Same person.

18  Q    Same person.  And who was that person?

19  A    I should say same company.  The one that ends in LLC.

20       I'd have to ask Briana.

21  Q    Well, we'll ask Briana for that.

22  A    You can do that.

23  Q    Yeah.  Now let's go through the payments.  Other than

24       the initial $100,000 that I think you said you got

25       from ASCAP?

1    A    Roughly.

2    Q    Okay.  What did you receive from BMI?

3                MR. QUICK:  Asked and answered.  She said

4         she didn't remember.

5    Q    (Continuing by MR. ALLEN):  You don't recall?

6    A    I don't remember.

7    Q    Was it more than a million?

8    A    No.

9    Q    Was it more than 500,000?

10   A    No.

11   Q    Was it more than a quarter million?

12   A    No.

13   Q    Was it more than a hundred thousand dollars?

14   A    It was about a hundred or maybe a little less.

15   Q    What other consideration did you receive from either

16        ASCAP or -- I'm sorry, strike that.

17                What other consideration did you receive

18        from this --

19   A    None.

20   Q    -- LLC?

21   A    None.

22   Q    So it was a straight -- the promise was that you were

23        conveying your interest in the catalog and they were

24        paying you a hundred thousand dollars, there were no

25        other stipulations?

1    A    That's right.

2    Q    So you relinquished all right, title and interest to

3         the writer's catalog that ASCAP and BMI had?

4    A    Yes.

5    Q    Do you understand that there is a section in most

6         commercial contracts of this sort called

7         representations and warranties?  I'm not saying it was

8         in this one, but do you recall -- do you know what

9         representations and warranties are in an agreement of

10        this sort?

11   A    Can you be specific?

12   Q    Okay.  A contract is typically entered into premised

13        upon certain things being true, okay.  And one of the

14        things that somebody who's selling something does is

15        make representations about the condition --

16   A    Oh, yes, right.

17   Q    Do you have any of the representations and warranties

18        that you made in connection with your sale of these

19        catalogs?

20   A    No, just that it satisfied the sellers -- I mean the

21        buyers.

22   Q    Did you work with anyone from Bridgeport Music on the

23        sale of the catalogs?

24   A    Not the Bridgeport, no.

25   Q    With whom did you work other than Briana?

1    A    Nobody, she made the deal.  Deals came to me, I sent

2          them to Briana.  Briana said which one she thought was

3          good, the deal was made.

4    Q    Okay.  So starting with the first deal, BMI, how did

5          it become known that you were interested in selling

6          the catalog?

7    A    A musician named -- he plays in LA a lot.  I, I don't

8          know him personally, but he got in touch with me and

9          he said that he knew I needed money, and did I know

10         that people that were now selling their catalogs, and

11         he recommended this woman.

12               And so I did some investigation, Briana did

13         it.  And then we found out that wasn't going to be a

14         good deal for me.  At the same time more deals were

15         coming in.  It seemed to be something people were

16         doing a couple years ago when I thought finally I can

17         fix my house.  And that's how it happened.

18               MR. ALLEN:  Okay, it's 2:12 and I'm kind of

19         hungry and thirsty.  Can we do a 30 minute break to go

20         to the salad bar downstairs at Plum Market?

21               MR. QUICK:  How much longer do you think

22         you have?

23               MR. ALLEN:  I'm going to go through some of

24         the allegations and the former Complaint and the

25         current Complaint, and perhaps some of the Answers to

1    Interrogatories.  And I don't think I have any further

2    documents that I'll be working with.

3              MR. QUICK:  You don't want to just go on,

4    do you?

5              MR. ALLEN:  I have a blood sugar issue too

6    so I'm kind of crashing here.

7              MR. QUICK:  Okay.

8                        (WHEREUPON a break was had in

9                        the proceedings 2:12 p.m. to

10                       2:45 p.m.)

11   Q   (Continuing by MR. ALLEN):  A couple questions I

12       forgot to ask earlier.  You said that the storm that

13       destroyed the RV occurred when you were in Washington

14       State, correct?

15   A   Yes.

16   Q   Okay.  Do you recall what year you moved to Washington

17       State?

18   A   2015.

19   Q   Do you recall what month you moved to Washington

20       State?

21   A   August.

22   Q   August of 2015.  And is your address in Washington

23       State today the same address that you were at in 2015

24       when the storm occurred?

25   A   No.

209

```
 1   Q    Where was the RV when the storm occurred in August of
 2        2015?
 3                    MR. QUICK:  You mean the address?
 4                    MR. ALLEN:  Yeah.
 5   A    Everson.
 6   Q    (Continuing by MR. ALLEN):  Everson, Washington?
 7   A    Everson, Washington.
 8   Q    And do you have an address for that?
 9   A    I don't remember the street address.  Let me see,
10        something Van Buren Road.
11   Q    Van Buren Road in Everson?
12   A    Yes.
13   Q    All right, thank you.
14   A    You're welcome.
15   Q    And, I'm sorry, you probably told me the city.
16   A    Everson.
17   Q    Everson?
18   A    E-V-E-R-S-O-N.
19   Q    And Van Buren Road, I'm sorry.  And the totality of
20        documents that were located in the -- the totality of
21        the documents that were destroyed, they were all
22        located in the recreational vehicle?
23   A    In the RV, yes.
24   Q    Whose RV was it?
25   A    Ours.
```

1    Q    What type of RV was it?

2    A    How do I describe it?

3    Q    Brand?

4    A    Oh, I don't remember.

5    Q    What year was it?

6    A    I don't remember that either.

7    Q    How long did you have it prior to the storm?

8    A    Probably about two years.  Bernie had used it to tour

9         as the Bernie Worrell Orchestra.  And when that

10        disbanded, we just drove west, I did.

11   Q    And you took the RV with you?

12   A    Definitely.  That's what I was driving to get there.

13   Q    All right.  Was Mr. Worrell with you?

14   A    Of course.

15   Q    Was anybody else with you?

16   A    Our son, two cats, three dogs -- four dogs -- no,

17        three dogs.

18   Q    So did you have a home there at the time or were you

19        just -- was the motor home parked outside the home, or

20        were you living in the motor home on the property?

21   A    No, when we went to the rental house, we lived in the

22        rental house.

23   Q    So when the storm occurred in August of 2015, --

24   A    No, the storm occurred in September.  We moved there

25        in August.

1   Q   Got it, all right.  So the storm occurred in September

2       of 2015.  Was there insurance on the recreational

3       vehicle?

4   A   Yes, of course.

5   Q   Do you recall who was your insurance carrier?

6   A   No.

7   Q   Okay.  Did you make a claim with your insurance

8       carrier?

9   A   Of course.

10  Q   If I were looking for the insurance claim for the RV,

11      would I find any of the information regarding the

12      claim that you made for the damage to the RV?

13  A   Are you asking me if you could figure out who the

14      insurance company was?

15  Q   Yes.

16  A   I don't remember.

17  Q   Okay.  Do you have the same insurance today --

18  A   No.

19  Q   -- that you did then?

20  A   No.

21  Q   Okay.  Was the insurance from a carrier in New Jersey

22      or Washington State?

23  A   Probably New Jersey.

24  Q   Did you have a policy of homeowners insurance on the

25      rental property?

1    A    No.

2    Q    Did you have any other insurance that would have

3         helped to repair any damage created by the storm?

4    A    It was total a loss.  There was no repair.

5    Q    Okay.  And you received a check from an insurance

6         carrier for the loss, correct?

7    A    Yes.

8    Q    Do you recall what kind of storm it was?

9    A    A thunderstorm, lightning, huge, huge.

10   Q    Do you recall when in relation to Labor Day it was?

11   A    No.

12   Q    Is there anything that would --

13   A    It might even have been the last week of August.  I'm

14        trying to remember if Bernie was there or if he had

15        gone out to work.  It was between the last week of

16        August and the first couple of weeks of September, and

17        that's as close as I can get.

18   Q    Okay.  And was Mr. Worrell on tour at that time did

19        you say?

20   A    I just said I don't remember if he had gone off to do

21        some gigs.

22   Q    Was he there when the accident occurred?

23   A    What accident?

24   Q    When the tree fell on the RV.

25   A    That's what I just said, I don't remember if he was

1        out on gigs or where he was.

2    Q   Who else would know about the storm that, you know,

3        that could testify?

4    A   My son.

5    Q   And I don't mean to be indelicate about this.  Your

6        son -- well, your son's coached basketball before,

7        correct?

8    A   Yes.

9    Q   Okay.  He's active?

10   A   Yes.

11   Q   And he is in possession of his faculties, correct?

12   A   Yes.

13   Q   And he was at the time of the accident, correct?

14   A   Yes.

15   Q   So I understand that he has some physical limitations,

16       and I apologize if I've said that incorrectly in

17       politic.  But none of that would impair his ability to

18       testify about that storm, correct?

19   A   My son isn't going to testify.  I'm not going to allow

20       that.

21   Q   Well, ma'am, we have -- well, we'll take that up

22       later.  The judge will have to determine that if you

23       object.

24               But assuming that a judge were to rule in

25       my favor and compel his testimony, is there anything

1    about his, I don't know what the proper terminology --

2    he has cerebral palsy, correct?

3  A   He has what's called right spastic hemiplegia, which

4    affects the whole right side of his body with

5    spasticity.  Does he have a mental problem, no, he

6    does not.

7  Q   Okay.  So he -- I'm sorry for having to ask that

8    question, ma'am.  I don't mean to be impolite or

9    indelicate about it.  It's part of my job.

10              But he's able to accurately recount events

11    that have occurred in his life, correct?

12  A   If he remembers.

13  Q   Yeah, okay.  Did you have to make any telephone calls

14    or contact emergency services in order to provide

15    relief during -- in the aftermath of that storm, fire

16    department, EMS?

17  A   Oh, no, no.

18  Q   Okay.  Who was it that removed the tree from --

19  A   Whoever the insurance company arranged it with.

20  Q   Okay.  And it's your testimony that you do not have

21    any of the records related to that?

22  A   No.

23  Q   Okay.  Now Exhibit 6 purports to be a Complaint, along

24    with some exhibits to the Complaint and lawsuit that

25    the estate of George Bernard Worrell filed versus the

1      same two defendants that I represent, Thang, Inc. and

2      George Clinton.

3              My question to you is have you -- I

4      probably already had you identify it, but I'll have

5      you do it again just for purposes of the record.  Have

6      you seen this Complaint before prior to today?

7   A  I don't think so.

8   Q  Okay.  Are you aware that this is the Complaint that

9      initiated the lawsuit that was filed in 2019 against

10     Mr. Clinton --

11  A  Yes.

12  Q  -- and Thang?

13             And I take it that you had some involvement

14     in drafting this Complaint and providing

15     information, --

16  A  Not draft --

17  Q  -- not the actual drafting, but you provided the

18     information that made its way into the Complaint at

19     least in part, correct?

20  A  Some of it, yes.

21  Q  Did you review a copy of it before it was filed?

22  A  Maybe, I don't remember.

23  Q  Okay.  Is there anything in this Complaint that you

24     recall having a disagreement with as being accurate?

25  A  No.

1   Q   In paragraph two you, or the estate -- and I apologize

2       if sometimes I interchangeably say you.

3   A   What page are you on?

4   Q   Page two of the Complaint.

5   A   Okay.

6   Q   The Complaint references in paragraph two that on

7       information and belief Clinton entered into numerous

8       agreements prior to 1982 on behalf of defendant Thang.

9           What agreements are you referencing in

10      paragraph two that Thang entered into prior to 1982,

11      if you know?

12  A   I don't know.

13  Q   And on what basis do you make the allegation that

14      Mr. Clinton is and has been sole owner of Thang?

15  A   On what basis?

16  Q   Yeah.

17  A   'Cause that's what he said.

18  Q   Okay.  He said that to you?

19  A   I'm pretty sure he was talking to Bernie and I was

20      there.

21  Q   Okay.  And is it true that you alleged that the

22      agreement referenced in paragraph two obligated your

23      husband to render services as a recording artist,

24      either individually or as a member of a group in

25      connection with phonographic records for the term of

1        the agreement?

2   A    I think so.

3   Q    All right.  And it says here in return for his

4        participation in the creation of phonographic records

5        Mr. Worrell is to receive ongoing royalty payments

6        from the records sold on a semi-annual basis to be

7        accompanied by an accounting by Thang.

8                  Do you see that?

9   A    No.  What paragraph are you at?

10  Q    Paragraph three.

11  A    Oh, three, all right.  So what's the question?

12  Q    First question is do you see where I'm reading from?

13  A    Now I do.

14  Q    Okay, thank you.  Do you believe that to be true, that

15       statement that's contained in paragraph three that I

16       just read?

17  A    Yes, I think so.

18  Q    All right.  When you say in the next sentence that

19       Thang is obligated to contract with a third party

20       record company for the distribution of phonographic

21       records embodying Mr. Worrell's performances, it

22       wasn't just Mr. Worrell that was contemplated to be a

23       performer on the records, was it?

24  A    I don't know.  I only deal with Bernie, nobody else.

25  Q    Okay.  But you knew that Mr. Worrell was playing on

1       records with a number of other musicians, right?

2    A   Yes.

3    Q   You watched that happen, right?

4    A   Yes.

5    Q   So the phonographic records certainly embodied

6        Mr. Worrell's performances, but it's your

7        understanding that they also embodied the performances

8        of other artists, correct?

9    A   I only was concerned with Bernie.  I don't know who

10       else did what.

11   Q   I understand that, ma'am, but you listened to the

12       records, you've given interviews about the records so

13       you know that the records embodied not just the

14       performances of your husband, but other musicians?

15   A   Yes, but Bernie didn't just perform them either.

16   Q   Okay.  He composed?

17   A   Bernie composed, he was an arranger --

18   Q   He wrote?

19   A   -- he was a co-producer for which he was never

20       credited or paid.  Anything a musician can do of

21       Bernie's caliber, Bernie did.  He had perfect pitch.

22   Q   Okay, great.  And you represent that the true and

23       accurate copy of the contract is attached as Exhibit A

24       to that Complaint.

25                 And that Exhibit A of the Complaint, I

1    believe we've marked as Exhibit 1 or 2 previously --

2    that would be one, right.  Is that the contract that

3    you're referring to, the one that we've already

4    attached here as Exhibit 1?

5  A  Yeah, if you already attached it to this here.

6  Q  To this deposition?

7  A  I don't know, you have so many papers.

8  Q  Okay.  Why don't I show it to you --

9  A  Why don't you do that.

10 Q  -- if I can find the marked copy.

11             Exhibit 1, is this -- Exhibit 1 to this

12   deposition, is that the Exhibit A referenced in

13   paragraph three of the estate's 2019 lawsuit?

14 A  Yes.

15 Q  Okay.  What evidence do you have to support the

16   allegation in paragraph eight of the Complaint that

17   defendants continually hide the amount of monies

18   received under these agreements in violation of the

19   contractual duties to Mr. Worrell and others?

20 A  One thing would be checks that had been written that

21   said advance against royalties.

22 Q  And some of those checks you received from other third

23   parties like Bridgeport, correct?

24 A  No, I'm only talking about George.  Got nothing to do

25   with Bridgeport.

220

1   Q   Okay.  But we've already gone through previously the

2       fact that you complained to the special master in 1996

3       or '97 that Bridgeport was characterizing things as

4       royalties that Bridgeport shouldn't have, in your

5       opinion, characterized as royalties?

6   A   I thought we were talking about this.  This has

7       nothing to do with Bridgeport.  You asked me about

8       Clinton.

9   Q   Ma'am, I asked you whether or not there were others --

10      whether there's any other evidence that you have to

11      support the fact that there was a hiding of monies

12      received under these agreements.

13              What evidence do you have that Mr. Clinton

14      hid money under the agreements that he entered into

15      with record companies; what is your evidence?

16  A   The evidence is writing advance against royalties on

17      checks when they were not advances against royalties.

18  Q   Okay.  But that has nothing to do with the money that

19      Mr. Clinton received.  That's an issue about how

20      Mr. Clinton's company disbursed money.

21              So I'm asking you what is your evidence

22      that Mr. Clinton received monies from agreements that

23      he entered into with record companies that he hid from

24      your husband?

25  A   The audit.

1    Q    Okay.  And how exactly did Mr. Clinton hide that

2         money?

3    A    I have no idea.  I know it didn't come to Bernie.

4    Q    What is your evidence that the money was hidden?

5    A    The audit showed that X amount of dollars were paid to

6         George Clinton.  George Clinton turned around and paid

7         Bernie less than what he was supposed to get.  That's

8         the evidence.

9    Q    Ma'am, the audit, with all due respect, does not say

10        that Mr. Clinton received money that was owed to your

11        husband.  The audit showed that Mr. -- that the monies

12        received were paid to various entities from various

13        entities.

14   A    When you -- oh, here it is.  Again the audit says it.

15        He was telling us what Bernie was due and didn't get.

16   Q    Okay.  Where in the audit does it show where

17        Mr. Clinton received money?  If you'd like to look at

18        the audit, ma'am, --

19   A    I'm looking at the audit.  I'm trying to find it.

20   Q    I don't think you are.  It's an exhibit here.

21             MR. QUICK:  It's also an exhibit to the

22        Complaint that you're having her look at.

23   Q    (Continuing by MR. ALLEN):  All right.  So tell me

24        where on that audit it says that Mr. Clinton received

25        a penny.

1   A    It says Thang, Incorporated.

2   Q    Okay.  It also says paid to Bernie Worrell?

3   A    What page are you on?

4   Q    If you're looking at the Complaint, it's 65 of 74 at

5        the bottom of the Complaint, for one example.

6   A    Okay.  Okay, and your question again is?

7   Q    Where in the audit does it say that Mr. Clinton

8        received a thing, where?

9   A    It only says Thang.  It doesn't say George's name.

10  Q    Okay.  Where does it say that Thang received money?

11  A    Throughout the whole thing.  Audit of Thang, Malbiz

12       and Parliament.... Funkadelic, Malbiz.  Thang,

13       Incorporated's receipt of cash advances over and above

14       royalties earned as shown.

15             So wherever you see the name Thang or

16       Malbiz, that's George, or Parliament.

17  Q    What evidence do you have that Mr. Clinton never had

18       an interest in Malbiz?

19  A    I, as I said umpteen times, have no interest in

20       anybody but Bernie.  So what George did or didn't get,

21       I don't know.  I know what Bernie didn't get.

22  Q    So you don't know what Mr. Clinton got?

23  A    How would I know?

24  Q    Okay, thank you.  It's very easy.

25  A    I said that to you a couple of times already.

1    Q    All right.  So you understand that you're suing

2         Mr. Clinton on the premise that he received money,

3         right; because he can't pay you what he hasn't

4         received.  If he didn't receive it -- you would agree

5         with me that if Mr. Clinton has never received monies

6         improperly, he can't pay that to you for anything that

7         you're claiming for your husband, right?

8              MR. QUICK:  Objection, form, argumentative,

9         legal conclusion.

10   A    Yeah, I'm not a lawyer.

11   Q    (Continuing by MR. ALLEN):  Okay.  So did you ever

12        attempt to seek, other than through your efforts with

13        the special master that we've already discussed, have

14        you ever taken any other action to recoup money that

15        you believe your husband is owed from any third party?

16   A    Any third party?

17   Q    Any record company, ma'am, other than, --

18   A    No.

19   Q    -- other than the ones you've let out of this case

20        already?

21   A    No.

22   Q    All right.  Have you ever audited the record companies

23        to determine whether or not they're holding money that

24        is what you believe your husband's entitled to?

25   A    No.

1   Q   So you don't have any evidence that the record

2       companies in this case aren't holding money that is

3       your husband's money?

4   A   No.

5   Q   Okay.  Now you make an assertion in paragraph nine,

6       defendants have also failed to make any payments

7       whatsoever under the agreement beginning in the early

8       '80's.

9               That's not true, is it?

10  A   Yeah, it's true.

11  Q   So you've never received any money for your husband's

12      work --

13  A   Well, let's -- I'm sorry, go ahead.

14  Q   Well, the allegation is, is that defendants have also

15      failed to make any, and any is underlined, payments

16      whatsoever under the agreement.

17  A   Is this still paragraph nine?

18  Q   Yes, ma'am.

19  A   I don't have something underlined.

20  Q   Well, it's underlined in the version I have.

21  A   Oh, up here?

22  Q   Yes.

23  A   Okay.

24  Q   The word any is underlined.

25  A   Uh-huh.

1    Q    That's not true, is it?

2    A    I'm not sure.

3    Q    Okay.  Well, it's in your Complaint.

4    A    If I said it, then that's what it was.

5    Q    Okay.  But we've gone through a number of payments

6         that your client -- or that your deceased husband did

7         receive.

8              MR. QUICK:  Objection, form,

9         mischaracterizes the evidence and the testimony.

10        Under the agreement?

11             MR. ALLEN:  Dan, yesterday I made a comment

12        about three words long and you jumped down my throat

13        before I could even explain to you that I wasn't

14        following what you were saying.  I shut up, okay.  I

15        didn't say another word because I know it's

16        inappropriate to lead my witness while she's being

17        cross-examined and suggest answers.

18             Now you've done that continuously today.

19        It's inappropriate.  It's unprofessional and I don't

20        like it.  And if we're going -- if that's going to be

21        the rule of the day, then the rule will continue

22        onward and it will be both sides doing it or we'll go

23        to the judge with it.

24   A    So could you repeat the question about number nine?

25   Q    (Continuing by MR. ALLEN):  Is it not true that

226

1       defendants, plural, have also failed to make any

2       payments whatsoever under the agreement beginning in

3       the early 1980's?

4   A   I'm not sure.

5   Q   Okay, good enough.  What is the current status of the

6       estate, or the probate case in Washington, regarding

7       the administration of the estate?

8   A   I don't understand the question.

9   Q   What have you done recently in terms of filing the --

10      updating the court as to the assets of the estate?

11  A   The will went to probate, they did whatever they did

12      and it's over.  I mean here we are eight years later

13      since Bernie dialed.

14  Q   So your testimony is that the estate, the probate

15      matter pending in I believe it's Whatnot County?

16  A   Whatcom.

17  Q   Whatcom County.

18  A   It's not pending, it's done.

19  Q   Okay.  So that case has terminated, correct?

20  A   It went to probate.  Whatever happens after that, I

21      don't know what the legal terms are, it's done.

22  Q   So are you paying any legal bills --

23  A   No.

24  Q   -- still?

25  A   No, it's done.

```
 1   Q    Who paid the legal bills for that estate in the first
 2        place?
 3   A    What estate?
 4   Q    The estate of Bernie Worrell.
 5   A    I don't understand the question.  You mean who paid
 6        for the house?
 7   Q    No.  Who paid for the legal fees that the estate
 8        incurred in Whatcom County?
 9   A    I did.
10   Q    Okay.
11   A    To have it probated, yes, I did.
12   Q    Okay.  So were you invoiced?
13   A    I probably was.
14   Q    Did the invoices contain a statement of services?
15   A    I don't remember.  Listen, when --
16   Q    Ma'am, if you don't remember, you don't remember.  I
17        understand that you may not remember everything.
18   A    Well, then I don't remember.
19   Q    We don't need a filibuster every time I ask --
20   A    I'm not asking a filibuster --
21              MR. QUICK:  You don't need to raise your
22        voice.
23   A    Don't be nasty to me --
24   Q    (Continuing by MR. ALLEN):  I'm not being nasty to
25        you, ma'am.
```

1   A    -- because I can return that shit.

2   Q    Ma'am, I have not used any profanity at all today.

3   A    Okay, let's just go to what you want because you're

4        going to deny -- I'm annoyed, okay.  You asked me a

5        question.  I told you it went to probate and you asked

6        me who paid for it, I told you I did.

7   Q    Okay.

8   A    Now what else do you want to know?

9   Q    I want to know because if you've paid for it, it's

10       customary that there's a statement of services that's

11       rendered that is provided to the person paying the

12       bill.

13             So my question to you is what do you recall

14       of the invoices, if anything, that you received from

15       the law firm that administered the estate?

16  A    I don't.

17  Q    Thank you.  What law firm did represent you in that

18       case?

19  A    It was not a law firm, it was a lawyer.

20  Q    Okay.  And who was that lawyer?

21  A    His name was Richard.

22             MR. QUICK:  You don't have to look it up.

23             THE WITNESS:  He's not even in practice

24       anymore.  What was his name, oh, God.  He lived around

25       the corner from me.  I don't remember his name.

1    Q    (Continuing by MR. ALLEN):  Okay.  You make an

2         allegation in paragraph 16 of the Complaint in New

3         York that the drafting and negotiation of the

4         contract, that being Exhibit 1, was negotiated in New

5         York County, New York.  Do you recall making that

6         allegation?

7    A    Yes.

8    Q    Okay.  And that's because that's where the contract

9         was in fact negotiated, right?

10   A    Yes.

11   Q    And I've referenced a Ina Maibach earlier in the

12        deposition.  Does this refresh your recollection as to

13        whether Ina was in fact involved in the drafting of

14        that contract?

15   A    Which contract?

16   Q    Well, the one that was attached to your Complaint.

17   A    The 1976?

18   Q    Yeah.

19   A    I have no idea if George was using Ina Maibach at that

20        point.

21   Q    Okay.  You don't recall going to a meeting with Ina

22        Maibach to negotiate the contract?

23   A    Oh, no.

24   Q    Because her records that I've shown to you already

25        indicate that you -- that she and Mr. Worrell met with

1          her regard negotiating of that contract?

2     A    She and Bernie --

3                    MR. QUICK:  It's purposeful and mis --

4          well, I won't say it's purposeful.  It misstates the

5          earlier evidence, counsel, if you want to recall the

6          date of that entry.

7     Q    (Continuing by MR. ALLEN):  Were you present for the

8          negotiation of the contract?

9                    MR. QUICK:  Asked and answered hours ago.

10         Go ahead.

11    A    I don't remember.

12    Q    (Continuing by MR. ALLEN):  You reference in paragraph

13         19 an oral contract.  It says whereby Mr. Worrell was

14         to be paid $200 a week for live performances by

15         Clinton regardless of whether or not Mr. Worrell

16         performed that week or not.

17                    Do you see that?

18    A    Yes.

19    Q    Okay.  So it's your testimony that prior to the

20         January 1, 1976 agreement there was an oral contract

21         in place?

22                    MR. QUICK:  Asked and answered.

23    A    For live performances.

24    Q    (Continuing by MR. ALLEN):  Okay.  Paragraph 20 you

25         reference the initial term of that contract being for

1      one year and then being extended for two years in one

2      year increments thereafter.

3                     Is it your testimony that the January 1,

4      1976 contract was that you continued -- or that your

5      husband continued to perform under that contract at

6      least until 1981 when he signed the --

7   A   I don't remember.

8   Q   At the end of paragraph 23 it says that the royalty

9      rate that you claim he was to receive was to be

10      proportionately reduced depending on the number of

11      other royalty artists on each composition, and the

12      number of compositions upon Mr. Worrell performed on a

13      particular album.

14                     Do you see that?

15  A   I see that.

16  Q   Okay.  And you would agree with me that during the run

17      of the groups that your husband played in, that there

18      were a number of artists that performed on those

19      albums, correct?

20  A   Yes.

21  Q   And is it your testimony that the royalty rate that

22      was due to your husband was appropriately reduced

23      proportionately depending on the number of royalty

24      artists that were part of those --

25  A   I don't know.

1   Q   -- contracts?

2   A   I don't know.

3   Q   I'm asking you whether that's your testimony?

4   A   Yeah, I guess, if that's what is written here.

5   Q   So it would have been appropriate to proportionately

6       reduce his royalty -- the receipt of royalties based

7       upon what other musicians may have gotten for the same

8       tracks, correct?

9   A   No.

10  Q   Okay.  How is that different than the language that's

11      there?

12  A   I don't know how it's negotiated, okay.  So I mean if

13      you're asking me are they -- are there 20 musicians

14      performing, do they all get the same royalty rate?

15  Q   No, I said it's proportionately reduced.

16  A   I don't know.

17  Q   Okay.  And --

18  A   That's not something I would be involved in.

19  Q   So you wouldn't know whether that was appropriate or

20      not?

21  A   No, it's not something I would be involved in.

22  Q   That would be something for your lawyers to determine,

23      correct?

24  A   That's right.

25  Q   All right.  The statement in paragraph 28 that says as

1    discussed in more detail below, Mr. Worrell sued on

2    the agreement in 1980 which was eventually settled for

3    $20,000, that's true, correct?

4  A  I don't remember.

5  Q  Okay.  Is there any evidence that you have to suggest

6    that your lawyer either incorrectly or improperly

7    included that allegation in the Complaint?

8  A  I don't remember.

9  Q  Did you trust Mr. Busch, was he the lawyer that

10   drafted this or did he get it for you?

11 A  I don't -- yes, I trusted him.  He's a lawyer --

12 Q  Great lawyer, right?

13 A  -- that I hired so I trusted him.

14 Q  Great lawyer in your opinion, right?

15 A  Of course, I don't hire anything but great lawyers.

16 Q  And you trusted that what he put into the Complaint

17   was true and accurate, correct?

18 A  Yes.

19 Q  And you still trust that what he put in the

20   Complaint --

21 A  Yes.

22 Q  -- was true and accurate, right?

23         So if he put in the Complaint that

24   Mr. Worrell settled the several hundred thousand

25   dollar claim that he made after the audit for $20,000,

1        you don't have any evidence to suggest that that's

2        false, do you?

3  A   No, I do not.

4  Q   All right.  What evidence do you have to suggest that

5        Mr. Clinton received any remuneration for All The Woo

6        In The World?

7  A   I don't know what Mr. Clinton or did or did not

8        receive.

9  Q   Okay.  So it could have been zero for all you know,

10       right?

11  A   I do not know.

12  Q   Okay.  Are you aware that Mr. Clinton provided

13       services on projects that your husband engaged in and

14       was not compensated for?

15  A   I have no idea what George did or did not get.

16  Q   With respect to any of the works that he created?

17  A   With respect to any of the works that he did --

18  Q   Created.  You don't know what Mr. Clinton got --

19  A   No, of course not.

20  Q   -- to this day?

21             Okay.  Paragraph 34 says that on

22       information and belief Clinton has even sold sample

23       packs of instrumentals containing Mr. Worrell's

24       performances --

25  A   What number?

1    Q    Paragraph 34.

2    A    Okay.

3    Q    For the specific use of being sampled in other artists

4         works.  Mr. Worrell has received zero compensation

5         from the sale of these sample packs, or any use of

6         master recordings contained in his performances and

7         derivative of work.

8                   What is your evidence that Mr. Clinton

9         received money for selling sample packs of

10        instrumentals containing Mr. Worrell's performances?

11   A    I don't know what Mr. Clinton did or did not receive.

12   Q    And you don't know whether Mr. Clinton sold sample

13        packs of instrumentals containing your husband's

14        music?

15   A    Yeah, I do.

16   Q    Okay.

17   A    What was the name of it?

18   Q    What is your evidence that Mr. Clinton sold sample

19        packs that included instrumentals containing your

20        husband's performances?

21   A    Because that's who was selling them.

22   Q    Okay.  What is your evidence that Mr. Clinton was the

23        one that was selling these?

24   A    I have no idea.

25   Q    Okay.  So --

1   A   I don't think George gets out there and sells CDs and

2       DVDs by himself, he doesn't do that.  He has other

3       people do that.

4   Q   Okay.  And what is your evidence that Mr. Clinton

5       directed third parties to sell those instrumentals --

6       sample backs of instrumentals to third parties?

7   A   What is my evidence?

8   Q   Yeah.

9   A   Because they were being sold.

10  Q   Okay.  Did you ever see any contracts --

11  A   No.

12  Q   -- that Mr. Clinton entered into for the sale of --

13  A   I keep telling you I know nothing about George

14      Clinton, what he did or didn't do except as it

15      pertains to Bernie.  If Bernie didn't receive money,

16      then I know.

17  Q   Okay.  So any time your husband didn't receive money

18      for something it's Mr. Clinton's fault, that's your

19      testimony?

20  A   That's who he thought he was contracted with, with

21      Thang so that's who he would go to.

22  Q   All right.  So because of that you believe that

23      Mr. Clinton is the person that sold sample packs to

24      third parties?

25  A   He either -- no.  You says that he did it.  No, I'm

1        not saying he personally did it.  He caused it to be

2        done.

3    Q   Okay.  Well, the allegation, ma'am, is rather clear as

4        you would expect from Mr. Busch.  On information and

5        belief Clinton has even sold sample packs of

6        instrumentals containing Mr. Worrell's performances

7        for specific use.

8                   So again what is the evidence that supports

9        that allegation, documents, statements, whatever?

10   A   I forget the name of the company in Michigan that sold

11       them so maybe you can get that information from

12       George's company that sold the alb -- the CDs.

13   Q   I'm not interested in what Mr. Clinton knows, ma'am.

14       He's not under oath today.  Your lawyer will have

15       plenty of opportunity to ask him the same kinds of

16       questions tomorrow.  I'm asking you --

17   A   What is my proof that Clinton sold them?

18   Q   Uh-huh.

19   A   If he didn't -- oh, wait a minute, proof, you want

20       proof.  They were sold and nobody would sell something

21       of George Clinton's without his permission.

22   Q   Okay.  And what if Mr. Clinton himself didn't have

23       rights at the time to certain things?

24   A   He didn't.  He had no right to sell Bernie's music.

25   Q   Okay.  And which means he didn't have rights to sell

1        his own music, correct?

2  A   Oh, no, I can't speak for what George has the rights

3      to do.  He can't -- he didn't have the rights to

4      Bernie's music, to sample it and then not pay him.

5  Q   Okay.  Ma'am, but if we have no evidence that it was

6      Mr. Clinton himself that sold these, then how are you

7      alleging that it was him that sold them?

8  A   You know what, it should have said on information and

9      belief Clinton or his representatives.  That's what it

10     should have said.

11  Q   Okay.  But it doesn't --

12  A   And/or his representatives.

13  Q   It doesn't say that.  So that begs the question of

14     what representatives are you talking about?

15  A   Whichever ones he designated.

16  Q   Okay.  I would like to know what evidence you have

17     that he had any third party representatives working on

18     his behalf to sell samples packs?

19  A   I don't but they got sold so, you know.

20  Q   Okay.  So the fact they got sold --

21  A   One and one is two.

22  Q   So the fact that they got sold is your evidence that

23     he was the one that sold it and profited from it?

24  A   Yes.

25  Q   Okay, thank you.  Clinton's non-performance of the

1        agreement stems back nearly to its execution,

2        according to paragraph 35 of that Complaint.

3                Are you saying that Mr. Clinton never

4        performed anything and your husband never got anything

5        for his work with Mr. Clinton under these contracts?

6   A    Are you talking about royalties?

7   Q    I'm talking about non-compliance with the agreement

8        from the inception.

9   A    I'm not sure how to answer that.  He did not perform

10       to the agreement, even when he supposedly attempted

11       to, and everybody got cars as royalty payment, they

12       got repossessed.  So I don't know how else to answer

13       that.

14  Q    Okay.  Ma'am, your attorney provided some, not all, of

15       the income tax filings that you made representing to

16       the Internal Revenue Service that you've received --

17       the estate has received payments from, let's start

18       with Bridgeport Music.

19               Did Mr. Worrell do any work for Bridgeport

20       Music that did not involve Mr. Clinton?

21  A    Only if he -- well, Bridgeport, no, not that I can

22       think of.

23  Q    Okay.  So you would agree with me that there was some

24       performance of the agreement bind into the fact that

25       you were still -- till you sold the rights, that you

 1          received royalties from that work, correct?

 2                    MR. QUICK:  Objection, form,

 3          mischaracterizes the evidence and the testimony.

 4    Q    (Continuing by MR. ALLEN):  You can answer, ma'am.

 5    A    I don't know.

 6    Q    So you don't know that your receipt of royalty

 7          payments from Bridgeport Music stemmed from

 8          Mr. Clinton's performance of the agreement that's

 9          Exhibit 1?

10                    MR. QUICK:  Objection, form, foundation.

11    A    I don't know.

12    Q    (Continuing by MR. ALLEN):  So Mr. Boladian's paying

13          this money out of the kindness of his heart, or

14          because Mr. Worrell earned that money according to the

15          agreement that you and he twice before sued on?

16    A    I'm not sure.

17    Q    Okay.  So the conclusion of the Herzog and Straus

18          audit was that for the period it covers, in '78 to

19          '79, was that Mr. Worrell was owed $293,590.58.  And

20          we've already established that that claim was settled

21          for $20,000?

22    A    I don't remember.

23    Q    Okay.  But you remember that your Complaint, which was

24          filed on behalf of the estate that you run, makes the

25          claim that the payment for the damages that are set

1       forth in the audit that Mr. Herzog did, that the

2       result of that was a $20,000 settlement?

3   A   I don't remember.

4   Q   Okay.  Well, then let's look at paragraph 37 and ask

5       whether you have any information that would tend to

6       call the truth of that allegation in question.

7               I'll read the allegation, paragraph 37.  As

8       a result of the Herzog and Straus audit, Mr. Worrell

9       filed suit against Clinton and Thang in October 1981

10      for the money identified as owed in the audit.  There

11      was never a final judgment entered in the case on the

12      merits.

13              On or about September nine, 1982 a

14      settlement agreement was reached where Mr. Worrell

15      accepted $20,000 in exchange for dismissal of the

16      litigation, and generally releasing Thang and Clinton

17      from any claims for monies owed as of the date of the

18      settlement agreement.

19              Is that a true statement?

20  A   I'm not sure we ever got the 20,000.

21  Q   Okay.  Did you ever file a lawsuit for breach of the

22      settlement agreement?

23  A   I don't know.

24  Q   So what did you do for the period -- or what did you

25      or your husband do, more accurately, during the period

| | | |
|---|---|---|
| 1 | | of 1982 until 1996 -- or until the next time you sued |
| 2 | | in I believe 19 -- oh, 1994? |
| 3 | A | What did he do? |
| 4 | Q | What did he do in order to -- if he didn't receive the |
| 5 | | $20,000 that was due under the settlement, what did he |
| 6 | | do to enforce the settlement? |
| 7 | A | I don't remember. |
| 8 | Q | Did he continue to collaborate with Mr. Clinton after |
| 9 | | that -- |
| 10 | A | On and off, but basically he was with Talking Heads |
| 11 | | then.  I mean everybody wanted Bernie. |
| 12 | Q | Right.  Talking Heads that didn't credit Mr. Worrell |
| 13 | | for his masterful work on Burning Down The House? |
| 14 | A | Oh, they did something else. |
| 15 | Q | Okay.  What did they do other than badmouth him during |
| 16 | | the documentary that was done on your husband? |
| 17 | A | Who badmouthed him? |
| 18 | Q | Tina Weymouth and David Byrne. |
| 19 | A | Oh, Tina, Tina -- no, no, the people are David Byrne |
| 20 | | and Jerry Harrison. |
| 21 | Q | So what did they do? |
| 22 | A | They paid Bernie a bonus when the Stop Making Sense |
| 23 | | was re-released. |
| 24 | Q | And what was the bonus? |
| 25 | A | I don't want to say. |

1    Q    Well, ma'am, you're under oath and --

2    A    I know I'm under oath but I promised them I wouldn't

3         say anything.  And unless my attorney or the judge

4         tells me that I have to, I don't want to go back on a

5         promise that I made to somebody.  I'm not that person.

6    Q    Okay.  So you do not want to disclose and you are

7         willfully refusing to answer my question?

8    A    No, I'm not.  I just answered it.

9    Q    No, ma'am, I asked you what was the bonus and you said

10        you would not tell me what the bonus is.  That's

11        refusing to answer my question.

12   A    I didn't want to disclose it because I made a promise

13        to them.  You want me to break a promise, that's not

14        how I do.

15   Q    I'm sorry, ma'am, --

16   A    Now if the judge tells me that I have to do it, then I

17        will.

18   Q    Okay.  She may very well do that.  But was the bonus

19        in the form of a financial compensation?

20   A    Yes.

21   Q    Money?

22   A    Yes.

23   Q    Okay.  And do you recall when that was received?

24   A    About two months ago.

25   Q    About two months ago?

1   A   Yes.

2   Q   Okay.  And what were the circumstances under which

3       that payment was made to you --

4   A   I don't understand.

5   Q   -- 30 years after the song or 40 years after the song

6       was released?

7   A   I'm sorry, say it again.

8   Q   What were the circumstances under which they decided

9       to pay you a bonus for work that your husband had done

10      40 years earlier?

11  A   Well, I just told you a minute ago.  They re-released

12      the documentary.

13  Q   And how did that trigger their decision to pay

14      Mr. Worrell?

15  A   Well, I guess they're good people and they realized

16      what they owed to Bernie and some of the others, which

17      is why I'm not allowed to talk about it because I

18      don't know what they paid the others and I don't want

19      to rock that boat.

20  Q   Okay.

21  A   They recognized Bernie's contributions.

22  Q   Forty years after that.

23  A   Oh, no, they recognized it while he was there, believe

24      me.

25  Q   How many copies did All The Woo In The World sell?

1    A    I don't know.

2    Q    Did it receive a gold record?

3    A    I don't know.

4    Q    You don't have a platinum record or gold record

5         hanging in the house; if you did, you wouldn't know

6         it?

7    A    I do not have one hanging in the house.  I don't know

8         if we ever received them.  When I called them and

9         asked to speak to them, they refused to speak to me

10        because they said the deal was between them and

11        George.  And even though Bernie was the artist, they

12        would not talk to me.

13   Q    So you don't know how many copies All The Woo In The

14        World has sold?

15   A    I just said no.

16   Q    And you've already testified that you don't know

17        whether Mr. Clinton ever received anything for it?

18   A    I know nothing about what Mr. Clinton did or did not

19        receive.

20   Q    Is it your position that if a third party, not

21        connected to Mr. Clinton, stole or improperly used --

22        let's start with stole.  Improperly stole samples and

23        was paid for it, is it your position that Mr. Clinton

24        should be responsible for payments that a third party

25        received for those samples --

1  A   I don't know.

2  Q   -- inappropriately?

3          MR. QUICK:  Objection, form, legal

4      conclusion, hypothetical.

5          MR. ALLEN:  I'm asking -- not asking a

6      legal conclusion.

7  A   I said I don't know.

8  Q   (Continuing by MR. ALLEN):  You don't know whether you

9      think it would be inappropriate to go after

10     Mr. Clinton for money that somebody else stole from

11     your husband?

12         MR. QUICK:  Same objection.

13  A   I don't know.

14  Q   (Continuing by MR. ALLEN):  Okay.  As a general

15     proposition, ma'am, if someone steals money from you

16     today, is there any recourse that you have against

17     Mr. Clinton if he had no involvement in that?

18  A   I don't know.  That's a hypothetical.

19  Q   Would you feel it appropriate -- would you sue

20     Mr. Clinton if somebody stole your car?

21  A   Oh, my God.  No.

22  Q   Okay.  And you would agree with me that it is a poor

23     practice to sue somebody for the acts of another

24     person, right?

25  A   Not necessarily, if they were tied in some kind of

1          way.

2     Q    Okay.  I'm asking the question if they weren't tied

3          in.

4     A    I have no idea.

5     Q    You have no idea about what, whether it would be

6          appropriate --

7     A    Whatever you just asked me.

8     Q    Whether it would be appropriate to sue somebody for

9          something they didn't do?

10    A    That's a strange question.  If a person believes that

11         somebody did something, even though they subsequently

12         found out they didn't, there's two different examples

13         there.  So what are you asking me?

14    Q    I'm asking you whether or not it's appropriate for you

15         to pursue a claim against Mr. Clinton for the wrongful

16         acts of others?

17                   MR. QUICK:  Same objection.

18    Q    (Continuing by MR. ALLEN):  Would you agree with me

19         that that's inappropriate?  And there's no problem --

20    A    It may not be, I don't know.

21    Q    Okay.  If your lawyer does something inappropriate to

22         you, would it be appropriate for you to sue me, in

23         your opinion?

24    A    It would depend if you were complicit.

25    Q    If I wasn't complicit, ma'am.

```
 1   A   Well, who's to say that.  You're giving me an example
 2       that makes no sense to me.
 3   Q   I'm saying the Lord Jesus Christ comes down onto the
 4       earth and says Jim Allen had nothing to do with what
 5       Mr. Quick did to you, would that be sufficient for you
 6       to conclude that it would be inappropriate to sue me
 7       for something he did to you?
 8   A   Probably not.  Jesus and I have never met.
 9   Q   Okay.  At paragraph 38, eventually Mr. Worrell refused
10       to work with defendants because he had written,
11       composed, produced and performed on nearly all of
12       Clinton's albums and received zero compensation for
13       any of the work.
14                  That's not true, right?
15   A   Some of it is.
16   Q   Okay.  But the statement itself is false; he did
17       receive compensation for his work?
18   A   Not all of it.
19   Q   Ma'am, the word zero is in there, okay.
20   A   And so is the word for any of the work.  And I'm
21       saying --
22   Q   Right.  So --
23   A   -- that's not true.
24   Q   -- we agree --
25   A   No, we don't agree.
```

1  Q  -- the statement in 38 is false?

2  A  No, I don't agree with that.

3  Q  Okay.  So did you falsely report to the Internal

4     Revenue Service that you received royalties from

5     Bridgeport Music?

6  A  What?

7  Q  Ma'am, your attorney has provided us with statements

8     and schedules to your income tax filings --

9  A  Right.

10 Q  -- that demonstrate that you've received compensation

11    for -- or from many others, but we'll go with

12    Bridgeport here.

13 A  Yeah.

14 Q  Okay.  So you would agree with me that that didn't

15    come to you as a gift from Sanna (ph) Boladian, did

16    it?

17 A  They're two different things.  You're talking apples

18    and oranges.

19 Q  No, ma'am.  Is it a false statement that your husband

20    received zero compensation for any of the work?

21 A  He received zero compensation for co-production.  He

22    received -- sometimes he didn't receive compensation

23    so...

24 Q  Okay.  But --

25 A  Sometimes he did.

1   Q   But if he received one penny, the statement zero

2       compensation is false, correct?

3   A   Maybe they should have said zero or very little or

4       none, I don't know.  Because it depends on what you're

5       talking about.  He got zero compensation for all the

6       co-production he did.

7   Q   Ma'am, the statement itself refers to written,

8       composed, produced and performed.  We've established

9       that your husband received substantial money, and you

10      just sold his catalog for more than zero dollars, so

11      we can both agree -- it's not a sin to agree with me

12      on anything.  We can agree that a hundred thousand

13      dollars is more than zero, right?

14  A   That's true.

15  Q   Okay.  So the fact that he received a hundred -- or

16      that you received a hundred thousand dollars of

17      compensation for his catalog means that there was not

18      zero compensation paid for his work?

19              MR. QUICK:  Object to form,

20      mischaracterizing paragraph 38.

21  A   He got zero for production.

22  Q   (Continuing by MR. ALLEN):  Okay.

23  A   I think you're nitpicking the word zero.

24  Q   Are you familiar with what the term and means?

25  A   Are you familiar with what the word no money for

1    production means?

2  Q   That's not what the allegation is, ma'am.

3  A   Well, you're nitpicking.  I'm not going to agree to

4      it.

5  Q   Well, that's what lawyers are paid to do, ma'am.  We

6      look at the statements that you make and we try to

7      determine whether there's any truth to them.

8  A   Well, I'm helping you out with that by telling you he

9      got zero compensation for his co-production work.

10 Q   Okay.  But he received money for his --

11 A   So that's partially true.  I'll just stipulate it's

12     partially true.

13 Q   All right.  Partially true which means that it's

14     partially false.  And in the legal world partially

15     false is false.

16 A   That's your --

17         MR. QUICK:  That's not a question, that's a

18     speech.

19         THE WITNESS:  Yeah, I know.  That's, that's

20     ridiculous.  I mean he must think I'm an idiot.

21         MR. QUICK:  Just, just --

22         THE WITNESS:  All right.

23 Q   (Continuing by MR. ALLEN):  What is your evidence that

24     Mr. Clinton has a history of fraud, deceit and

25     delinquency when it comes to performance of contracts

1    that he has entered into on behalf of himself or his

2    companies, other than your allegations about his

3    treatment of your husband?

4            MR. QUICK:  You're referencing paragraph

5    40?

6            MR. ALLEN:  Yes.

7  A  Other than his treatment of Bernie what else do you

8    need?

9  Q  (Continuing by MR. ALLEN):  Well, ma'am, I'm trying to

10   ascertain if paragraph 40, it implies that there are

11   others other than your husband, okay.  And so one of

12   the things that we do is try to determine whether

13   you're being truthful, not just now but when you file

14   your Complaint.

15           So if there's a portion of an allegation in

16   your Complaint that is false or has no evidence, I'm

17   entitled to ask you about that, okay.  That's what I'm

18   doing here, just my job.

19           So you'll forgive me for having to ask the

20   question again.  You've already testified, I think,

21   that you allege Mr. Clinton had a history of fraud,

22   deceit and delinquency as it relates to your husband.

23   I'm asking whether or not you have any evidence that

24   Mr. Clinton engaged in fraud, deceit and delinquency

25   to others other than your husband?

1   A   To others?

2   Q   Yes.

3   A   I have no knowledge of what he did with other people,

4       only with Bernie.

5   Q   Okay.  So the allegations that relate to Jerome

6       Brailey, Dawn Silva, Dennis Chambers, Grady Thomas,

7       Rodney Skeets Curtis, you don't have any evidence

8       about those allegations, do you?

9   A   I have nothing to do with anybody except Bernie.

10  Q   Thank you.

11  A   Not Jerome, not Dawn, not anybody.

12  Q   Thank you.  I apologize for having to ask you -- or

13      have you answer the same way, but these are all

14      different allegations.  And I'm asking you about the

15      allegations that you've pled in -- or that the estate

16      that you run pled in a legal document in 2019, five

17      short years ago.

18              Did you ever witness Mr. Clinton go around

19      and say hey, man, have some to get Grady Thomas?

20  A   I have no knowledge of anything with George except

21      with Bernie.  That's why he was not in that

22      documentary.

23  Q   Okay.  Was he asked to be in the documentary?

24  A   Yes.

25  Q   Who asked him?

```
 1   A   The producer.

 2   Q   Who was the producer?

 3   A   I don't remember his name.

 4   Q   Was he working for Armen Boladian?

 5   A   No.

 6   Q   And the reason you decided -- or the reason -- was it

 7       your decision, his decision or a decision made

 8       together not to appear in the documentary?

 9   A   By him do you mean Bernie?

10   Q   Yes.

11   A   Bernie and I talked about it.

12   Q   And what was his position?

13   A   What I said to Bernie is this is just going to be a

14       bunch of things about his personal life.  I don't care

15       about George Clinton's lamentable personal life.  This

16       is about business.

17             So we decided that Bernie would not join in

18       on this because we were only concerned with business,

19       not whether or not all this other stuff went on.

20   Q   Okay.  Let's talk about the lamentable personal life.

21       What about Mr. Clinton's life is, in your opinion,

22       lamentable?

23   A   I'm not commenting on that.  I just said we don't

24       comment on other peoples lamentable personal lives.

25       It's not what this is about.
```

1    Q    Okay.

2    A    It's about business.

3    Q    So you would agree there are lamentable things about

4         your personal life and your husband's personal life

5         too, right?

6    A    Well, nobody's put a halo on me.

7    Q    Okay.  So some of the allegations you made about drug

8         use in this --

9    A    I didn't make the allegations.  You didn't never hear

10        me say that.

11   Q    Ma'am, these are your allegations.

12   A    Where?

13   Q    You put them in a legal document.

14   A    Where, show it to me.

15   Q    It's filled with these, ma'am.  You --

16   A    Where do I say anything about drug use?

17   Q    Ma'am, it's right here.

18   A    Where, just tell me where and what paragraph.

19   Q    Clinton used his ability --

20   A    Paragraph, paragraph.

21   Q    Paragraph 43.  Clinton used his ability as the de

22        facto drug supplier and the near constant drug use on

23        tour as a means of controlling the band members and

24        justifying retaining the majority of the money

25        received from both royalties and live performances?

1   A   And who was being quoted, not Bernie.  It's Grady

2        Thomas that's being quoted.  I didn't say that.

3   Q   Okay.  You didn't say it but you put it in a Complaint

4        and represented it as true?

5   A   Where?  No, I did not.

6   Q   Okay.  So if --

7   A   If you're saying that -- this is what you're saying

8        that I allege is true?

9   Q   So you're not alleging that paragraph 43 is true?

10   A   No, I'm not saying -- look, I said, I'll say it again

11        for the 45th time, I do not know what other people

12        did.  I know what Bernie did.

13   Q   Okay.

14   A   And that's why Bernie was not in that documentary.

15   Q   You had a second bite at the apple when you filed this

16        Complaint here, right; you filed -- that Complaint

17        wasn't successful in New York so you filed the same

18        Complaint in this case.  Do you recall that?

19   A   No, it's not the same Complaint.

20   Q   Well, you filed a Complaint --

21   A   That's right.

22   Q   -- regarding the same damages in this case?

23   A   I have no idea what that just meant.

24   Q   Here we go, paragraph 40 of your Complaint in New York

25        reads, Clinton has a history of -- history, we've

```
 1              already been through it.
 2    A    That's right.
 3    Q    Paragraph 54 of the present Complaint is that it is
 4         well-documented that Clinton has a history of deceit,
 5         delinquency and you've removed --
 6    A    You said paragraph 54?
 7    Q    Paragraph 54 of the present Complaint, ma'am.
 8                   MR. QUICK:  Do you have a copy?
 9                   MR. ALLEN:  I don't have one with me,
10         unfortunately.  I'm more than happy to share it with
11         you, but I'll read it and then you can tell me whether
12         you need me to share it with you.
13    Q    (Continuing by MR. ALLEN):  Paragraph 54 says it is
14         well-documented that Clinton has a history of deceit
15         and delinquency -- you were charitable enough to
16         remove the word fraud from there -- when it comes to
17         the performance of contracts that he's entered into on
18         behalf of himself or his companies.
19                   Although Clinton did not participate, a
20         recent documentary entitled Tear The Roof Off strips
21         away the facade of the Funkadelic and Parliament
22         collective Euphoria and illustrates the nefarious,
23         continuous and deceitful actions of Clinton in
24         relation to these monumental musical acts.
25                   Now we can go through the rest to show how
```

1   they track with this Complaint if you'd like.
2 A  Is there a question?
3 Q  Ma'am, the question is so far back I don't know if our
4   reporter can find it but...
5 A  You said paragraph 54 and then you began reading a
6   whole bunch of stuff, and I want to know what it is
7   you want me to respond to.
8 Q  Right.  Well, --
9 A  Because I've already told you Bernie was not part of
10   that documentary and what they said is what they said.
11   Bernie did not say that.
12 Q  Is it your testimony today that Mr. Clinton's drug
13   culture caused many of the band members to become
14   addicts who had to seek treatment for their addiction
15   later in life?
16 A  Where are you reading this?
17 Q  I'm reading from page 44 of the New York Complaint
18   that you have in front of you.
19 A  This one?
20        MR. QUICK:  Paragraph 44.
21 Q  (Continuing by MR. ALLEN):  And I'm not asking about
22   the Complaint.  I'm asking you whether it is your
23   testimony today, and you may look at paragraph 44 --
24 A  I'm looking at it.
25 Q  -- if it will help you.

1              Is it your testimony today that

2       Mr. Clinton's drug culture caused many of the band

3       members to become addicts who had to seek treatment

4       for their addiction later in life.  Mr. Nelson later

5       in the documentary states he knew he was going to get

6       involved in it (drug use).  They actually encouraged

7       getting high and all of that kind of thing.  And as a

8       result, I got strung the fuck out.  Pardon my use of

9       profanity, I'm just reading what's on the page.  Many

10      of the band members never recovered and drug addiction

11      cost them their lives.  Clinton manipulated the band

12      members with drugs and promises which were never kept.

13              Is it your testimony today that Mr. Clinton

14      did any of that?

15  A   I never even said that.

16  Q   Okay.  So it's not your testimony today that

17      Mr. Clinton's drug culture caused many band members to

18      become addicts, is it?

19  A   I have no knowledge.

20  Q   Okay.

21  A   And I didn't say any of this.  You're still getting

22      this from the documentary.

23  Q   I'm getting it from your Complaint which you --

24  A   Which is quoting the documentary.

25  Q   But you've testified that you don't agree with the

1   statement in paragraph 44?

2 A No, I'm not saying that.  I said Bernie didn't say

3   that.

4 Q Okay.  Do you agree with the statement contained in

5   paragraph 44 of the New York Complaint?

6 A It's a possibility.

7 Q Okay.  What evidence do you have that Mr. Clinton's

8   drug culture caused members of the band to become

9   addicts?

10     MR. QUICK:  Asked and answered.

11 A You'll have to ask them.

12 Q (Continuing by MR. ALLEN):  Okay.  You don't have any

13   information, though, correct?

14     MR. QUICK:  She's told you three times.

15     THE WITNESS:  I don't think he hears well.

16 Q (Continuing by MR. ALLEN):  No, I hear just find,

17   ma'am.  I'm looking for a straight answer to my

18   question.

19 A I gave you a straight answer.

20     MR. QUICK:  Don't be insulting, counsel.

21     MR. ALLEN:  I'm not being insulting.  I'm

22   merely explaining --

23     THE WITNESS:  If we're going down this road

24   again, I'm going to the bathroom.

25     MR. ALLEN:  -- what it is I'm looking for.

1    A    I already told you Bernie never said anything like

2         that.

3    Q    (Continuing by MR. ALLEN):  All right.  What evidence

4         do you have to support the claim that the band members

5         who survived are suffering severe financial difficulty

6         despite being part of one of the most successful bands

7         in the '70's and '80's?

8    A    What evidence do I have?

9    Q    Uh-huh.

10   A    The life that my husband and I and our children had to

11        live because of what he did.  That's my evidence.

12   Q    Okay.  But the -- ma'am, I know that that's how you

13        feel --

14   A    No, that happens to be business.

15   Q    -- but -- okay, ma'am.  But the question that I asked

16        did not pertain to your husband, it pertained -- or to

17        you or your children.  There are other allegations

18        that don't involve you that you put in the Complaint.

19             I want to know whether you have any

20        evidence to support the claim in paragraph 45 that

21        band members survived after suffering severe financial

22        difficulty, despite being part of one of the most

23        successful bands of the '70's and '80's?

24             MR. QUICK:  Other than Mr. Worrell, is that

25        your question?

```
 1                  MR. ALLEN:  Yes.
 2    A   Again I don't know -- I only dealt with Bernie, okay.
 3        So I have no direct knowledge of -- or proof of what
 4        other people have said, but I can look at the way they
 5        live.
 6    Q   (Continuing by MR. ALLEN):  All right.
 7    A   Again I can only speak for Bernie.
 8    Q   Were there any other people that were affiliated with
 9        the band that engaged in activities to promote drug
10        use amongst other people that you're aware of?
11    A   I wouldn't know.
12    Q   Okay.  Well, you do know about one person that was
13        involved in promoting drug use in the band?
14    A   And that would be?
15    Q   Well, promoting drug use period.
16    A   That would be?
17    Q   Your husband.
18    A   Bernie didn't promote drug use.
19    Q   Well, he gave you your first joint, did he not?
20    A   That's not a drug, number one.
21    Q   Oh, that's not a drug?
22    A   No.
23    Q   Okay.
24    A   I don't care what the United States says.  It happens
25        to be an herb and it's used for medicinal purposes.
```

1   Q   And so --

2   A   That's why they're busy legalizing it all over the

3       place.

4   Q   All right.  So you don't deny that your husband gave

5       you your first joint?

6   A   Of course not.

7   Q   Okay.

8   A   I do wonder why you're making such a big deal out of a

9       joint.

10  Q   I'm not making a big deal out of it, ma'am, but

11      apparently -- well...

12              Paragraph 49, the first three words,

13      without royalty statements, the band members had no

14      way of knowing how much money was actually coming in,

15      so on and so forth.

16              Does paragraph 49 apply to anyone other

17      than, plural, band members; does that apply to any

18      other members of the band other than Mr. Worrell?

19  A   I have no knowledge of anybody but Bernie.

20  Q   Okay.  So the statement that band members, plural, did

21      not receive royalty statements, what's the basis of

22      using the term band members instead of Bernie Worrell?

23              MR. QUICK:  Object to form.

24  A   I guess your answer is in the first sentence of number

25      50.  And I'm now going to the bathroom.

1   Q   (Continuing by MR. ALLEN): Ma'am, I'd appreciate it

2       if you would complete your answer.

3   A   I just did.

4   Q   So your answer is that the evidence you have to

5       support that more than your husband did not receive

6       royalty statements is the first sentence in paragraph

7       50?

8   A   No. My answer is I do not know what anybody else

9       received or did not receive except for Bernie.

10   Q   Okay.

11   A   So I'm going to have --

12           MR. QUICK: Off the record.

13           MR. ALLEN: 4:00.

14              (WHEREUPON a short pause was

15              had in the proceedings 4:00

16              p.m. to 4:04 p.m.)

17           MR. QUICK: We have about 30 minutes left.

18           MR. ALLEN: We've taken a few breaks but,

19       yeah, I should be finished in 30 minutes.

20   Q   (Continuing by MR. ALLEN): Turning your attention to

21       paragraph 57 of the 2019 Complaint. That's 18 -- 6,

22       sorry.

23   A   Are you waiting on me?

24   Q   I'm waiting on you, yeah.

25   A   Okay, you don't need to wait on me.

1    Q    All right.  Paragraph 57, ma'am.  Oh, I'm sorry,

2         before we get to 57 let's go to 56.  Fifty-six of that

3         Complaint alleges that Mr. Clinton committed a wrong.

4         And that is in the third from bottom line of paragraph

5         56.

6                    I'm just trying to get an idea as to

7         whether the wrong that is referenced in this sentence

8         is a wrong separate and apart from anything that

9         you've already testified to today?

10   A    I don't think so.

11   Q    Thank you.  Paragraph 57 there's a claim that Clinton

12        used Thang as a method to control all royalties,

13        advances, and monies received from the exploitation of

14        any sound recording produced by his various groups,

15        including Parliament and Funkadelic, as a means to

16        retain the proceeds from the records, and as a way not

17        to pay or distribute the proceeds to his band members,

18        including Mr. Worrell.

19                   Now I'm assuming from your prior answer

20        that you're going to tell me that this reference to

21        other band members, you have no knowledge or

22        information about what Mr. Clinton did or didn't do

23        with respect to the other band members as is

24        referenced in paragraph 57?

25   A    That's right.

1    Q    Thank you.  Now why do you believe that Mr. Clinton

2         needed Thang as a means to accomplish the ends that

3         are referenced in paragraph 57?

4    A    I have no idea.

5    Q    Okay.  Do you have any knowledge or information about

6         the reasons why Mr. Clinton incorporated Thang?

7    A    I have no idea.

8    Q    Okay.  You weren't there when he incorporated Thang?

9    A    Of course not.

10   Q    You weren't part of any discussions he had with any of

11        his counsel as to why that might be a good idea or

12        not?

13   A    No.

14   Q    Okay.  So you don't know the reason sitting here today

15        why Mr. Clinton created Thang, Inc., do you?

16   A    That's what I said.

17   Q    All right.  The final statement in that paragraph is,

18        is he then had his band members contracts with him and

19        Thang in such a way that all money from the records

20        went directly to Thang, and then he was able to

21        control how it would be -- it would then be

22        distributed.

23             Do you see that?

24   A    I see that.

25   Q    How do you know that Mr. Clinton received all money

1       from records and that it went directly to Thang?

2   A   I don't.

3   Q   And paragraph 59, I think I know the answer to the

4       question, it says unlike the majority of the other

5       band members, Mr. Worrell has a contract with

6       defendants for royalty payments.

7               The contract that we're referencing in

8       paragraph 59 is the contract that we had marked as

9       Exhibit 1, correct?

10  A   I think so.

11  Q   What do you know about Mr. Clinton's accounting of

12      royalties?

13  A   Nothing.

14  Q   So the statement made in paragraph 64 that,

15      furthermore, Clinton never kept adequate accounting or

16      records for Mr. Worrell to keep track and determine

17      what is rightfully owed, you don't know what

18      Mr. Clinton did to adequately account for monies that

19      were received, do you?

20  A   I only know what Bernie didn't receive.  He didn't

21      receive any accounting or records or money.

22  Q   Would you agree with me that your husband and

23              Mr. Clinton had conversations with each

24      other about business where you were not present?

25  A   I doubt it.

1 Q Okay.  Approximately how long -- well, your husband

2   toured with the band for approximately a decade.  I

3   know that there was a statement that you told him to

4   tell one of his band mates why he doesn't bring you on

5   the road, because bringing you on the road was like

6   bringing sand to the beach?

7 A Yeah, that was funny.

8 Q So you didn't accompany Mr. Worrell on the road all

9   the time, did you?

10 A I did a lot 'cause he wanted me to.

11 Q But you would agree with me that there was an awful

12   lot of time that he spent away while you were home

13   caring for your son and daughter, correct?

14 A I wouldn't say an awful lot of time.

15 Q Okay.

16 A But sometimes, sure.

17 Q So you weren't privy to those discussions that he had

18   with Mr. Clinton while you weren't there?

19 A What discussions?

20     MR. QUICK:  Let me --

21 Q (Continuing by MR. ALLEN):  Any discussions.  I'm

22   asking were there discussions that your husband had in

23   the period of time that he was affiliated with

24   Mr. Clinton that you would not be privy to?

25     MR. QUICK:  Form and foundation.

1    A    How would I know that?

2    Q    (Continuing by MR. ALLEN):  Do you believe it to be

3         true that your husband had conversations over an

4         approximate 10 year period of time that you were not

5         privy to?

6    A    I doubt it.

7    Q    Okay.  You doubt it, but can you state with a degree

8         of moral certainty that your husband did not have any

9         conversations with Mr. Clinton outside of your

10        presence?

11                   MR. QUICK:  Form and foundation.

12   A    I don't know.

13   Q    (Continuing by MR. ALLEN):  Okay.  So then you would

14        acknowledge that it's possible that there were

15        communications that occurred between Mr. Worrell

16        and --

17   A    No, I'm not acknowledging that.  I said I don't know.

18        That's not an acknowledgment.

19   Q    Oh, all right.  So you don't know whether there was or

20        there wasn't?

21   A    I said I don't know.

22   Q    All right.  Studio work often requires the musicians

23        and producers to work into the evening hours.  Were

24        you always in the studio with your husband as he was

25        making music?

1   A   I was never in the studio.

2   Q   So there are a number of -- pretty much all of the

3       tracks that are at issue in this case, there are

4       hundreds of them.  I know I have it somewhere, i saw

5       it yesterday.

6             I'm looking for the list of tracks.  For

7       some reason my copy of the Complaint -- there we go, I

8       found it.

9             What was your husband's contribution to You

10      Hit the Nail on the Head?

11   A   Outside of -- if he co-wrote it, he also performed it.

12       And then he would be due publishing, writers and

13       publishing because -- well, that answers your

14       question.

15   Q   So did you witness your husband performing on You Hit

16       the Nail on the Head?

17   A   You mean in the studio?

18   Q   Yeah.

19   A   No.  Bernie didn't want people in the studio.

20   Q   Did you witness your husband performing any track in

21       the studio?

22   A   Bernie did not like people in the studio so, no.

23   Q   So your evidence that your husband played on any

24       studio track would come from your husband, correct?

25   A   No, as he would say, let those with ears hear.

1    Q    And if someone's ear heard a song and concluded that

2         Mr. Worrell did not perform on the track, what

3         evidence do you have to rebut that statement?

4    A    Bernie would challenge that because he had what's

5         known as perfect pitch.  He knows every single song he

6         ever played on.

7    Q    I understand that he does.  And I have a child with

8         perfect pitch so I know what that means as well.  And

9         I would just ask you what you, not Mr. Worrell because

10        he's unfortunately not with us today, what you have as

11        evidence that your husband played on any of the

12        specific tracks that you're seeking a royalty for the

13        sound recordings?

14   A    Because that's what he said.

15   Q    Okay.  Anything else?

16   A    What else is needed?

17   Q    Okay.  So he told you that he played on A Joyful

18        Process?

19   A    He's the only one that played on A Joyful Process.

20        It's an instrumental.

21   Q    Okay.

22   A    Even though George took 50 percent of it.

23   Q    Did he tell you that he performed on We Hurt Too?

24   A    Oh, my God, I don't know each specific song that

25        Bernie would say he played on.

1    Q    Okay.  Today you don't know that?

2    A    No, today I don't know that.

3    Q    Okay.  So of the tracks that you have attached to your

4         Complaint as Exhibit D, how many of them did

5         Mr. Worrell tell you he played on?

6    A    I guess the best way to answer that is whenever you

7         see his name as co-writer, he played on it.

8    Q    Okay.  You weren't in the studio so what is the basis

9         of your conclusion that if his name is -- I'm a

10        copyrighted, I'm a copyrighted songwriter, I can't

11        play a lick on any instrument so --

12   A    Yeah, unfortunately that's true of a lot of people.

13   Q    Right.  So the mere fact that I am a credited writer

14        on music does not mean that I played on the song?

15   A    That's true, because he wasn't credited on some songs

16        that he played on.

17   Q    Okay.

18   A    Like Atomic Dog.

19   Q    Okay.  So what about Knee Deep, what's your evidence

20        that Mr. Worrell played on --

21   A    I already answered that.  You can go through every

22        single song and ask me the same question and my

23        answer's going to be the same.

24   Q    And --

25   A    Because Bernie said so.

1   Q   Because Bernie said so and that's your evidence?

2   A   That's all I need.

3   Q   Okay, great.  And did Mr. Worrell -- do you recall

4       Mr. Worrell ever telling you that he intended to be a

5       co-creator on a sound recording?

6   A   Bernie didn't speak like that.

7   Q   Okay.

8   A   You'll have to rephrase that question.

9   Q   Okay.  What is your evidence of your husband's intent

10      to be a co-creator on sound recordings when he's sued

11      Mr. Clinton three previous times and never made that

12      claim?

13            MR. QUICK:  Objection, form, legal

14      conclusion, argumentative.

15   Q   (Continuing by MR. ALLEN):  Or two times and once by

16      you.

17   A   You have to ask my attorneys that question.  I'm not

18      sure.

19   Q   Well, unfortunately they're not witnesses in the case,

20      ma'am.  I'd just like to know what your --

21   A   I'm not a witness to that.

22   Q   So you're not a witness to what his intent was?

23   A   Bernie's intent was to play music, produce music,

24      write string arrangements, write horn arrangements, go

25      in the studio with George, because Bernie has perfect

1    pitch and George can't hear well and so to make the

2    mixing go well Bernie would be there.  That's what I

3    know.

4  Q  Okay, fair enough.

5         MR. ALLEN:  If I could have a few minutes

6    to confer with my clients and all, I'd appreciate it.

7                 (WHEREUPON a short pause was

8                 had in the proceedings

9                 4:20-4:26 p.m.)

10 Q  (Continuing by MR. ALLEN):  I just have a couple of

11   very simple questions.  I'm just going to ask you this

12   one question.  There were a number of times in the

13   interview you gave with the Truth in Rhythm podcast in

14   which you referenced the fact that Mr. Worrell did not

15   want to be a front man for a group?

16 A  Right.

17 Q  All right.  And you he didn't like to sing?

18 A  No, he wanted to concentrate on his music.

19 Q  Okay.  So it's still your belief and your testimony

20   today that your husband didn't want to be a front man?

21 A  No, not at first he did not.

22 Q  You said not at first?

23 A  Not at first.

24 Q  Okay.  When was his desire to become a front man

25   something that he came to realize, probably with your

275

1    help, later in life as he launched some of his solo

2    projects?

3  A  When Bernie and I re-married and he asked me to be his

4    manager, because he didn't trust anybody anymore after

5    what he did to him, I told him, I said in order for

6    you to do certain things you need to form a group.

7    The record companies know you're a phenomenal musician

8    but they don't think you can carry a show; I don't

9    want to do that.  I said, well, think about it and so

10    he did.

11  Q  Okay.  And so at that point, after he had severed his

12    relationship with Mr. Clinton by and large, with your

13    encouragement he decided that it was a good idea for

14    him to finally step out in front and be a front man,

15    correct?

16  A  I don't know if he decided it was a good idea but he

17    agreed to do it.

18  Q  Okay.  And how many record deals did he get as a front

19    man for one of his groups?

20  A  I don't know.  Well, we just released one album, that

21    was a record deal with Loantaka Records.  It's called

22    Bernie Worrell, Wave from the Wooniverse.

23  Q  I enjoyed it.

24  A  I'm glad you did.

25              MR. ALLEN:  I don't have anything else.

1           THE WITNESS:  Are we done?

2           MR. QUICK:  You're done.

3                         (WHEREUPON the deposition was

4                         concluded at approximately

5                         4:29 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        STATE OF MICHIGAN    )
                               )  SS.
 2        COUNTY OF WAYNE      )

 3

 4               I, Suzanne Lynn Bonarek, a Notary Public
          duly commissioned and qualified in and for the State
 5        of Michigan, do hereby certify that pursuant to the
          Michigan Court Rules there came before me on the 27th
 6        day of August, 2024, the following named person,
          to-wit: JUDITH WORRELL, who was by me duly sworn to
 7        testify to the truth concerning the matters in
          controversy in this cause; that she was thereupon
 8        carefully examined upon her oath and her examination
          reduced to typewritten form under my supervision; that
 9        the deposition is a true record of the testimony given
          by the witness.

10               I FURTHER CERTIFY that I am neither
          attorney or counsel for, nor related to or employed
11        by, any of the parties to the action in which this
          deposition is taken; and, further that I am not a
12        relative or employee of any attorney or counsel
          employed by the parties hereto or financially
13        interested in the action.

14               IN WITNESS WHEREOF I have hereunto set my
          hand and affixed my Notarial Seal this 4th day of
15        September, 2024.

16

17

18        _____

19        SUZANNE LYNN BONAREK, CSR 3086
          Wayne County, Michigan
20        My Commission Expires:  3-27-26

21

22

23

24

25
```