UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE ESTATE OF
GEORGE BERNARD
WORRELL, JR.

    Plaintiff,

v.

THANG, INC., and
GEORGE CLINTON,

    Defendants.
_____/

Case No. 22-11009

Hon. F. Kay Behm

**OPINION AND ORDER REGARDING**
**MOTIONS FOR SUMMARY JUDGMENT**

Before the court are the parties' cross-motions for summary judgment. The court heard oral argument on August 20, 2025, and took the matter under advisement while allowing the parties to file supplemental briefs. Because the court concludes that Plaintiff's claims are barred by the statute of limitations, Defendants' motion is granted.

**I.    Factual Background**

Plaintiff, the Estate of George Bernard Worrell, Jr., filed this copyright Complaint on May 10, 2022, against Thang, Inc., and George Clinton. ECF No. 1. Worrell, professionally known as "Bernie Worrell," was a former

bandmate of Clinton's and collaborated with him as a songwriter, musician, producer, and performer on the majority of songs that were recorded in the 1970s by Clinton and various bands, including "Parliament" and "Funkadelic." ECF No. 1, ¶ 3. Plaintiff alleges that Worrell and Clinton were joint authors of the 264 sound recordings at issue.

From 1969 to 1981, Worrell worked with bands founded by Clinton, including Parliament and Funkadelic, as a songwriter, performer, producer, and arranger. By all accounts, Worrell was a classically trained musical genius. Plaintiff's expert described him as "[o]ne of the most wildly innovative and technically dazzling musicians in pop music history," and a former bandmate likened him to "Jimi Hendrix on the keyboards." ECF No. 133-3 at PageID.3570.

Early on, Worrell was paid $200 per week pursuant to an oral agreement. Worrell's wife and manager, Judie Worrell, negotiated his first oral contract with Clinton's company, Thang, Inc. The oldest writings related to the recordings at issue are some American Federation of Musicians' contracts that cover recording sessions from 1974 to 1978. ECF No. 88-7. Under these contracts, Worrell agreed to render his services as a musician in exchange for union wages. *Id.*

Plaintiff alleges that Defendants presented Worrell with a recording contract on January 1, 1976. ECF No. 133-6. The document provides: "Company hereby engages Artist to render such services as it may require . . . in the production of phonographic records." *Id.* The agreement provided that "all masters recorded hereunder . . . shall be entirely and forever the property of Company." *Id.* In exchange, Worrell was to receive royalties from the sale of records. *Id.* Worrell signed the agreement; however, the contract was not countersigned by Thang, at least not on any copy currently available. *Id.*

In 1980, Worrell engaged accountants to conduct an audit of Thang, Inc. and Malbiz Music, Inc., another of Clinton's companies. The audit covered from "inception to December 31, 1979. ECF No. 134-4. The report indicated that Worrell informed the accountants that he was entitled to a .75% artist royalty from his work with Parliament, and that "Thang Inc.'s representatives had orally confirmed that factor." *Id.* The report concluded that Worrell was entitled to approximately $290,000 in royalties from various sources, including Thang. *Id.*

Worrell was apparently not paid the money he claimed was due based upon the audit; he sued Clinton, Thang, and Malbiz Music in 1981, claiming that he had not been paid in accordance with the 1976 agreement.

ECF No. 134-5. The lawsuit settled in 1982. In a General Release, Worrell "release[d] forever" Clinton, Thang, and Malbiz Music "from any legal claims [he] may have as of the date hereof" in exchange for $20,000. ECF No. 133-10. (The copy of the release in the record is signed by Thang and Malbiz Music, but not Worrell; Plaintiff does not appear to dispute its validity.) Worrell also entered into a letter agreement, stating that "notwithstanding anything to the contrary contained in the General Release Agreement," "[t]he following shall constitute our understanding with respect to sums owed to you for past services rendered to us, George Clinton, and to all of Mr. Clinton's related companies." ECF No. 134-6 at PageID.4163 (Agreement dated September 9, 1982). "We agree to pay you for said services rendered the sum of $130,000." *Id.*

Worrell was not paid pursuant to the letter agreement and sued Clinton and others in 1984. The complaint in that suit stated that the September 9, 1982 agreement "memorialized Worrell's prior understanding that defendants would pay Worrell for services he performed at defendants' request." ECF No. 134-6 at PageID.4152. It is not clear from the record how this suit was resolved, although the parties advised the court that Clinton filed for bankruptcy in 1984 and his debt to Worrell was discharged.

4

In 1994, there was litigation between record companies regarding some of the recordings at issue here. Worrell was not a party, but submitted a declaration opposing the appointment of a special master. *See* ECF No. 134-18, *Tercer Mundo, Inc. v Boladian*, No. 93-04106 (C.D. Cal.). In that declaration, Worrell indicated that he had not been paid royalties that he believed he was owed. *Id.*; *see also* ECF No. 88-4 ("[T]he catalog was widely sampled by too many entities to list here -- logic alone tells us that during the height of the sampling period, that Bernie's share would have had to be in the millions as he is/was one of the major writers."). The record does not reveal how the litigation resolved or whether Worrell received royalties as a result. Plaintiff asserts that the 1994 litigation involved songwriting royalties, which are not at issue in this case (which involves royalties for the sound recordings).

Worrell passed away on June 24, 2016. In his will, Worrell conveyed all property, including all intellectual property and rights to royalties, to his wife, Ms. Worrell, who is the personal representative of his Estate. On May 10, 2019, the Estate filed suit in the State of New York against Defendants, alleging breach of contract and seeking payment of royalties and earnings due pursuant to the 1976 agreement.

In the New York lawsuit, Clinton claimed that he did not recall countersigning the agreement and Defendants argued that no contract existed. ECF No. 133-13 (Clinton Aff. dated Jan. 10, 2020). In 2021, the New York Supreme Court ruled that Worrell and Defendants did not have a contract due to the lack of bilateral execution – specifically, due to Clinton's declaration that he never signed the 1976 contract. The New York Supreme Court further determined that any testimony on Worrell's behalf would be a violation of New York's Dead Man's statute.

Plaintiff alleges that, because the 1976 agreement was declared to be null and void, Worrell never transferred his interests in the sound recordings to Defendants. Because Worrell never transferred his interests, Plaintiff argues, then by default Worrell was entitled to rights as a co-creator and joint owner of the master recordings, based upon his contributions. The first count of the Complaint asks the court to declare that Worrell was a co-creator and joint owner of the sound recordings, and that the Estate has the right to continuing royalties. The second count of the Complaint seeks an accounting of Defendants' books and records related to royalties.

The parties have filed cross-motions for summary judgment. Plaintiff seeks partial summary judgment on the issue of Worrell's co-authorship of

6

the sound recordings. Defendants seek summary judgment based upon the statute of limitations, the lack of evidence regarding co-authorship, release, and the fact that Worrell's Estate transferred its interest in the recordings to Westbound Records as part of a settlement.

## II. Law and Analysis

### A. Summary Judgment Standard

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). Furthermore, the evidence and all

reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and to do so must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the [non-moving party].'" *Brown v. Scott*, 329 F. Supp.2d 905, 910 (E.D. Mich. 2004). To fulfill this burden, the non-moving party only needs to demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251. The court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

B. Statute of Limitations

"A principal justification for statutes of limitations is to prevent surprises from the revival of dormant claims after witnesses have passed and evidence has been lost," concerns that are particularly salient in this case. *Garza v. Everly*, 59 F.4th 876, 883 (6th Cir. 2023). Under the Copyright Act of 1976, the statute of limitations for a claim for copyright ownership is three years. *Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC*, 477 F.3d 383, 389 (6th Cir. 2007) (citing 17 U.S.C. § 507(b)).[1] In this case, Plaintiff seeks a declaration of ownership based upon Worrell's joint authorship of the sound recordings at issue. A copyright ownership claim "accrues only once, and if an action is not brought within three years of accrual, it is forever barred." *Id.* at 390. On the other hand, a claim for copyright infringement may accrue more than once, because each act of infringement is a "distinct harm." *Id.* "To determine the accrual date of a

---

[1] When created, the works at issue were subject to different legal standards, including common law copyright, the Copyright Act of 1909, and the Copyright Act of 1976. *See* 1 NIMMER ON COPYRIGHT § A.01 (2025). The parties appear to agree, however, that a three-year statute of limitations applies to each of Plaintiff's claims. *See generally* 3 NIMMER ON COPYRIGHT § 12.05[C][1] (2025) (discussing statute of limitations applicable to co-ownership claims).

claim for copyright ownership between co-authors, we have explained that the statutory period for any action to establish ownership begins to run whenever there is a 'plain and express repudiation' of ownership by one party as against the other." *Everly v. Everly*, 958 F.3d 442, 450 (6th Cir. 2020) (cleaned up; citation omitted).[2]

The Sixth Circuit has described the following situations that constitute an express repudiation: (1) "a direct statement from one party to another claiming exclusive rights to the work"; (2) "the work is published but the plaintiff is not appropriately credited"; or (3) the co-author "learns she is entitled to royalties she is not receiving." *Everly*, 958 F.3d at 451-52; *see also Santa-Rosa v. Combo Recs.*, 471 F.3d 224, 228 (1st Cir. 2006) (failure to pay royalties); *Aalmuhammed v. Lee,* 202 F.3d 1227, 1230-31 (9th Cir. 2000) (movie credits served as express repudiation); *Zuill v. Shanahan,* 80 F.3d 1366, 1369 (9th Cir.1996) (repudiation occurred when alleged co-creator claimed to be sole owner of copyright).

---

[2] As the *Everly* court explained, copyright authorship and ownership are distinct concepts, and the distinction matters under circumstances not present here, such as when the plaintiff is seeking a declaration of authorship and *not* ownership. *Everly*, 958 F.3d at 452 (claimant seeking a declaration of authorship to pursue copyright termination rights available only to authors); *see* 17 U.S.C. § 203. In this case, Plaintiff is seeking a declaration that Worrell is a co-owner based upon his co-author status. To prevail, Plaintiff's claim for co-ownership must be timely. *See Everly*, 958 F.3d at 451 ("An ownership claim therefore must be brought within three years after the purported owner's status as such is challenged by a party with a competing claim of ownership.").

Plaintiff argues that the first time Worrell's co-ownership of the sound recordings was repudiated was when Clinton disclaimed the existence of the 1976 agreement in 2020.[3] Until then, Plaintiff claims, Worrell operated under the impression that the 1976 agreement was in effect and had no reason to believe that his rights were being violated. However, the record does not support the claim that ownership was *first* repudiated in 2020. Although Worrell may have subjectively believed that the (unsigned) agreement was in effect, neither he nor Clinton acted in a manner consistent with that belief in recent decades. Prior to the 2019 New York litigation, the last time Worrell attempted to enforce his rights under the 1976 agreement was in 1984. The record is silent with respect to actions either party took commensurate with the agreement from 1984 to 2019. Clinton did not pay royalties pursuant to the agreement, and Worrell did not attempt to ensure payment of those royalties. As stated in the Complaint, "Defendants have refused to pay *any* royalties or other earnings from the Works to Plaintiff" and "Defendants have been exploiting, licensing, and

---

[3] Plaintiff does not argue that the statute of limitations should be tolled, but that the claim first accrued in 2020. *See generally Gomba Music, Inc. v. Avant*, 62 F. Supp. 3d 632, 646 (E.D. Mich. 2014) (discussing elements of tolling based upon fraudulent concealment, including "wrongful concealment" by defendants and "plaintiff's due diligence until discovery of the facts"). Contrary to Plaintiff's argument, the court did not previously rule on the accrual date, but it determined that disputes regarding "the factual allegations in the Complaint are best left to a motion for summary judgment on the issue of statute of limitations." ECF No. 46 at PageID.350-51.

making millions from the master recordings of the Works without *ever* sharing the profits with their rightful co-owner, Mr. Worrell and Plaintiff." Compl. at ¶¶ 5, 19 (emphasis added). That Clinton disavowed an unsigned agreement, under which he had not performed for decades, was not the first indication that Clinton did not acknowledge Worrell's alleged ownership or authorship rights. Repudiation of Worrell's ownership occurred well before 2020.

Indeed, Worrell *never* received co-author credit on the sound recordings at issue. *Cf. Everly*, 958 F.3d at 445 (finding question of fact regarding date of repudiation when "[a]fter sharing credit with his brother for many years, Don suddenly changed his tune"). Accordingly, his claim arguably was barred three years after each of the recordings were released and he did not receive co-author credit. *See Santa-Rosa*, 471 F.3d at 228. As the First Circuit explained under similar circumstances: "It goes without saying that Santa Rosa was present when his performances were recorded by Combo Records, and thus knew from the moment that each recording was created that he had a potential claim for ownership of it. Thus, there is little question that Santa Rosa's claims for co-ownership accrued as soon as he finished recording each album." *Id.*

Under Plaintiff's theory, Worrell consented to Thang's ownership of the sound recordings in the 1976 agreement and did not have reason to question that arrangement until 2020. But it does not appear that Defendants ever complied with the contract. When Worrell attempted to enforce the 1976 agreement in 1981, he did not raise the issue of co-authorship or ownership, but sought payment for "artistic musical services" under the agreement. ECF No. 134-5. The parties entered into a release and letter agreement in 1982, and again there was no recognition of Worrell as a joint author of the sound recordings. The 1982 agreement provided that the "following shall constitute our understanding with respect to sums owed to you for *past services rendered* to . . . George Clinton and to all of Mr. Clinton's related companies." ECF No. 134-6 (emphasis added). To the extent Worrell believed that he was entitled to co-authorship or ownership, this dispute, where Clinton was not complying with the agreement or recognizing Worrell as a co-author, should have alerted Worrell to protect those rights. *See Santa-Rosa*, 471 F.3d at 228 ("[W]e cannot think of a more plain and express repudiation of co-ownership than the fact that Combo openly, and quite notoriously, sold Santa Rosa's records without providing payment to him."). Instead, Worrell arguably *released* any claim to ownership in 1982, when he "hereby release[d]

13

forever Thang, Inc., Malbiz Music, Inc., George Clinton, and George Clinton's related companies from *any legal claims* [he] may have as of the date hereof," in exchange for $20,000. ECF No. 133-10 (emphasis added).

Moreover, even if Plaintiff's theory of repudiation is accepted, the repudiation of the 1976 agreement could not have been the first time that Worrell's ownership in pre-1976 recordings was repudiated. By its terms, the 1976 agreement does not apply to the recordings created from 1969 to 1975. It is dated January 1, 1976, and provides that Worrell "agrees to render such services exclusively to Company for a period of one (1) year commencing on the date hereof." ECF No. 133-6. During the contract term, Worrell agreed "to perform for the recording of master recordings," which would be the property of Thang. *Id.* In exchange, Worrell was to receive royalties "for performances *hereunder*." *Id.* at PageID.3646 (emphasis added). The agreement makes no mention of prior services or recordings. Plaintiff's theory that repudiation of the contract was the first time Worrell's ownership rights were repudiated does not plausibly account for the works that were created from 1969 to 1975, before the effective date of the contract on January 1, 1976.

Unfortunately for Plaintiff, Worrell was not reasonably diligent in protecting his alleged co-authorship or ownership rights for decades.

14

Clinton's 2020 "repudiation" of a (non) contract was not the first time that Worrell's co-authorship or ownership rights were expressly repudiated by Clinton. Worrell's ownership claims accrued well before 2020, either when the works were recorded and he was not credited or when Worrell learned that he was not receiving the royalties to which he was allegedly entitled, no later than the late 1980s. *See Everly*, 958 F.3d at 450 ("[T]he copyright statute of limitations starts to run when the plaintiff learns, or should as a reasonable person have learned, that the defendant was violating his rights.") (citation omitted). Accordingly, the court concludes that Plaintiff's claims for copyright ownership are barred by the statute of limitations.

### III.     Conclusion

Therefore, the court need not consider the parties' remaining arguments. It is **ORDERED** that Plaintiff's motion for partial summary judgment (ECF No. 133) is **DENIED** and Defendants' motion for summary judgment (ECF No. 134) is **GRANTED.**

**SO ORDERED.**

Dated: September 4, 2025          s/F. Kay Behm
                                  F. Kay Behm
                                  United States District Judge