**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  May 27, 2026

Mr. James P. Allen Sr.
Schenk & Bruetsch
211 W. Fort Street
Suite 1410
Detroit, MI 48226

Mr. Richard S. Busch
King & Ballow
26 Century Boulevard
Suite 700
Nashville, TN 37214

Mr. Peter E. Doyle
Schenk & Bruetsch
211 W. Fort Street
Suite 1410
Detroit, MI 48226

Mr. Jonathan Barrett Koch
Dickinson Wright
200 Ottawa Avenue, N.W., Suite 900
Grand Rapids, MI 49503

Mr. Daniel Dietrich Quick
Dickinson Wright
2600 W. Big Beaver Road, Suite 300
Troy, MI 48084

Mr. Erik W. Scharf
Law Offices
1395 Brickell Avenue
Suite 800
Miami, FL 33131

Re: Case No. 25-1863, *Estate of George Worrell, Jr. v. Thang, Inc., et al*
Originating Case No. 4:22-cv-11009

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely
Deputy Clerk

cc: Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0154p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

ESTATE OF GEORGE BERNARD WORRELL, JR.,
            *Plaintiff-Appellant*,

            *v.*

THANG, INC.; GEORGE CLINTON,
            *Defendants-Appellees*.

No. 25-1863

———————————

Appeal from the United States District Court for the Eastern District of Michigan at Flint.
No. 4:22-cv-11009—F. Kay Behm, District Judge.

Argued: April 22, 2026

Decided and Filed: May 27, 2026

Before: BOGGS, BATCHELDER, and MOORE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Richard S. Busch, KING & BALLOW, Nashville, Tennessee, for Appellant. Erik W. Scharf, THE SCHARF APPELLATE GROUP, Miami, Florida, for Appellees. **ON BRIEF:** Daniel D. Quick, DICKINSON WRIGHT PLLC, Troy, Michigan, Jonathan B. Koch, DICKINSON WRIGHT PLLC, Grand Rapids, Michigan, for Appellant. Erik W. Scharf, THE SCHARF APPELLATE GROUP, Miami, Florida, James P. Allen, Sr., Peter E. Doyle, SCHENK & BRUETSCH PLC, Detroit, Michigan, for Appellees.

———————————

## OPINION

———————————

KAREN NELSON MOORE, Circuit Judge. The year was 1997, and George Bernard ("Bernie") Worrell, Jr., stood on stage at the Rock & Roll Hall of Fame. Rock & Roll Hall of

No. 25-1863          *Est. of Geo. Worrell, Jr. v. Thang, Inc. et al.*          Page 2

Fame, *Parliament-Funkadelic's Rock & Roll Hall of Fame Acceptance Speech | 1997 Induction*, YouTube (June 15, 2020), https://youtu.be/EmOmNz5Ak-g. He was there for his induction as part of the pioneering funk group Parliament-Funkadelic ("P-Funk"). Although Worrell left P-Funk in the early 1980s, he played a central role in its rise, working as a composer, arranger, "keyboardist of astonishing ability," and "one of a writing team of three . . . behind 'hit after hit in the heyday of P-Funk.'" R. 133-3 (Exner Report ¶ 24) (Page ID #3568) (citation modified). Smiling to the side during Worrell's remarks was the band's charismatic leader, George Clinton, decked out in a gilt robe and frizzy white wig, sunglasses resting on his forehead.

Beneath the surface of this celebration, which honored one of the 1970s' most groundbreaking and enduringly influential musical acts, lay a long-running and unresolved dispute. Clinton's and Worrell's musical synergies never translated into a smooth or simple legal relationship. Quite the opposite. Their decade of collaboration is littered with informal and contested agreements, including a purported 1976 contract ("1976 Agreement") granting Thang, Inc. (Clinton's company) full ownership of sound recordings that Worrell worked on, in exchange for royalties. On top of that, Clinton and Thang were allegedly not in the habit of paying Worrell, under the 1976 Agreement or otherwise. As Worrell's wife Judie put it: Clinton "was busy hauling in the funky dollar bills and NOT sharing with those who made the MUSIC possible." R. 134-12 (Judie Worrell Blog at 5) (Page ID #4199).

Worrell died in 2016. In 2019, his estate (the "Estate," which is the plaintiff here) sued Thang in New York state court for breach of contract, a claim that Thang successfully defended on the ground that Worrell lacked a countersigned copy of the 1976 Agreement. In 2022, the Estate changed tack and sued in federal court, seeking a declaration of its joint ownership of recordings Worrell created with P-Funk and, in turn, an accounting of royalties due. Clinton and Thang moved for summary judgment, arguing that the statute of limitations on the Estate's copyright claims had long since run. The district court agreed and entered judgment in the defendants' favor.

This is not a contract case, as the Estate's contract claims under the 1976 Agreement were decided in the New York court. Notwithstanding the 1976 Agreement's invalidity, which is now res judicata, the Agreement remains the focus of the Estate's statute-of-limitations

argument.   Worrell, the Estate argues, justifiably understood that the Agreement, not federal copyright law, governed his recordings with P-Funk.  Accordingly, the Estate insists, Worrell's ownership rights under copyright law were not plainly and expressly repudiated until 2020 when Clinton and Thang denied the Agreement's validity, at which point the copyright-ownership claims accrued.   We agree with the Estate that genuine disputes of material fact preclude judgment as a matter of law.  Viewing the case's highly unusual facts in the light most favorable to the Estate, part of Worrell's copyright-ownership claim is timely.  We therefore REVERSE the district court's judgment and REMAND for further proceedings.

## I.  BACKGROUND

Worrell, "[a] classical-music child prodigy who attended the New England Conservatory of Music and Juilliard," began his "journey to the funk . . . by hanging around George Clinton's Newark, New Jersey barbershop."  R. 133-3 (Exner Report ¶ 33) (Page ID #3570).   Worrell worked with Clinton and his bands between 1969 and 1981.  R. 133 (Pl.'s Mot. for Summ. J. ¶ 2) (Page ID #3456); R. 145 (Defs.' Resp. to Pl.'s Mot. ¶ 2) (Page ID #4591).   Worrell's legal relationship with Clinton and P-Funk was informal at the outset.  Clinton recalled, for instance, an oral agreement according to which Worrell played at a rate of $200 per week.  R. 133-5 (Clinton Dep. at 6–7) (Page ID #3613–14).[1]

There is little question as to Worrell's creativity or the central role his efforts had in P-Funk's recordings.  His work spans hundreds of songs in the P-Funk discography between 1970 and 1981.  *See* R. 133-19 (App'x of Sound Recordings) (Page ID #3769–77); R. 145-2 (Works by Year) (Page ID #4828–41).  According to "The Authorized P-Funk Song Reference," there is "clear evidence of [Worrell's] involvement on all of the band's most commercially successful tracks."  R. 133-3 (Exner Report ¶ 46) (Page ID #3572).  And although Clinton's top-down vision animated much of the group's work, it was Worrell who "provide[d] [P-Funk] with the structural foundation," creating a "sonic stew" and "radically charting the course of emerging keyboard technology during the golden age of analog synthesis."  R. 133-5 (Clinton Dep. at 98–

---

[1]Our recitation of the facts views the evidence, as we must, in the light most favorable to the Estate and draws reasonable inferences in the Estate's favor.  *See Boyd v. N. Biomedical Rsch., Inc.*, 165 F.4th 424, 431 (6th Cir. 2026).

No. 25-1863                    *Est. of Geo. Worrell, Jr. v. Thang, Inc. et al.*                    Page 4

99) (Page ID #3631–32).  Clinton viewed Worrell as "a founding member and Musical Director" of P-Funk.  R. 133-14 (Clinton Website at 2) (Page ID #3702).  In this capacity he both worked as a "musical arranger" and had a "significant role in the post-recording aspects of creating the final sound recording[s]."  R. 133-2 (Kohn Report ¶¶ 78, 91) (Page ID #3518, 3524) (emphasis omitted).

In 1976, Thang and Clinton presented Worrell with a proposed contract—the 1976 Agreement—with the aim of layering a more formal legal structure atop the parties' artistic relationship.  *See* R. 133-7 (Judie Worrell Dep. at 16, 48–49) (Page ID #3658–60); R. 133-6 (1976 Agreement) (Page ID #3643–3655).[2]  The 1976 Agreement's effective date was January 1, 1976, it would run for a one-year term, and Thang had the option to extend for up to two additional one-year terms.  *Id.* ¶¶ 1(a), 16 (Page ID #3643, 3655).  The 1976 Agreement required Worrell to render his services as a recording artist "exclusively to [Thang]" during its term and stated that "[a]ll masters recorded hereunder . . . , together with the performances embodied thereon, shall be entirely and forever the property of [Thang]."  *Id.* ¶¶ 1, 3 (Page ID #3643–44).  In exchange, the Agreement provided Worrell a $10,000 advance, union-scale payment for all recording sessions, and set a schedule of royalties to be paid for sales of LPs containing Worrell's "performances hereunder."  *Id.* ¶ 5 (Page ID #3646–48).  Worrell had the right under the 1976 Agreement to conduct an accounting of Thang's sales—*i.e.*, to "appoint a certified public accountant or attorney to inspect the books and records of [Thang]" and determine royalties owed.  *Id.* ¶ 6 (Page ID #3649).  The Agreement contained a merger clause, "supersed[ing] all prior negotiations, understandings and agreements between the parties hereto."  *Id.* ¶ 13(a) (Page ID #3654).

Thang's dealings with third parties suggested its understanding that the 1976 Agreement governed the company's relationship with Worrell.  Years after 1976, Thang entered into agreements with record companies and warranted that its assignment of rights to the companies was free of any liens or encumbrances—*i.e.*, did not violate anyone else's copyright ownership.

---

[2]There is no direct evidence that the Agreement originated with Clinton and Thang.  But the Agreement, which lists "THANG, INC., c/o Weiss & Meibach, 888 Seventh Avenue, New York" as a party, R. 133-6 (1996 Agreement at 1) (Page ID #3643), coupled with the surrounding context and other evidence, allows for the reasonable inference that it was presented to Worrell by the defendants.

No. 25-1863            *Est. of Geo. Worrell, Jr. v. Thang, Inc. et al.*            Page 5

R. 131 (Warner Agreement at 5) (Page ID #3340); R. 132 (Casablanca Agreement at 25) (Page ID #3388).  Thang's agreement with Casablanca Records expressly referenced the existence of an "'Exclusive Artist's Production Agreement' . . . relating to the recording services of the recording artist known, as of the date hereof, as 'Bernie Worrell.'"  *Id.* at 8 (Page ID #3371).

After January of 1976, Worrell "worked under the idea that [the 1976 Agreement] was a viable contract."  R. 133-7 (Judie Worrell Dep. at 16) (Page ID #3658).  When Thang didn't pay him, Worrell commissioned an audit of Thang's books (and those of Malbiz Music, Inc., a related company), which determined he was owed nearly $150,000.  R. 133-9 (Audit at 2–3) (Page ID #3677–78).  Worrell stopped working with Clinton and P-Funk in 1981.  *See* D. 28 (Appellant Br. at 8).  That same year, Worrell sued Thang, Malbiz, and Clinton, referencing the 1976 Agreement and Thang's alleged failure to pay Worrell the royalties he was due thereunder.  R. 134-5 (1981 Compl.) (Page ID #4136–46).  This suit led to two further agreements between the parties, each executed in September 1982.  First was a general release whereby Worrell, in exchange for $20,000, "release[d] forever Thang, Inc., Malbiz Music, Inc., [and] George Clinton . . . from any legal claims [Worrell] may have as of the date hereof . . . ."  R. 133-10 (Release) (Page ID #3693).  Second, Worrell and Tercer Mundo, Inc. (apparently on behalf of Clinton and his companies) signed a letter agreement whereby Worrell was to receive the sum of $130,000 in semiannual installments over two years as consideration "for past services rendered" to Tercer Mundo, Clinton, and his companies.  R. 133-18 (Letter Agreement at 1) (Page ID #3767).

Worrell never received his due under those agreements, so in 1984 he sued Clinton again.  R. 134-6 (1984 Compl. ¶¶ 14–17) (Page ID #4152–53).  Clinton filed for bankruptcy that same year, listing among his debts $150,000 owed to Worrell for "Royalty Commissions."  R. 162-3 (Bk. Pet. at 4) (Page ID #5082).

Worrell died in June 2016, leaving his property—including intangible property and intellectual property rights—to his wife, Judie Worrell, who is the Estate's representative.  R. 1 (Compl. ¶ 24) (Page ID #2); R. 1-2 (Will at 1) (Page ID #25).  In 2019, the Estate sued Clinton and Thang in New York state court, alleging that Thang had still failed to account for and pay royalties owed to Worrell under the 1976 Agreement.  R. 1-4 (2019 N.Y. Compl.) (Page ID #64–86).  In an affidavit produced in that litigation, Clinton, noting that the Estate's copy of the 1976

Agreement was not countersigned by Thang, swore under penalty of perjury that Thang never signed such an agreement and that Clinton himself "did not sign the original or a copy of the document." R. 1-5 (Clinton Affidavit ¶¶ 2–4) (Page ID #87–88). The state court dismissed the Estate's suit on the ground that "no one signed [the 1976 Agreement] on behalf of Thang, Inc." and the Estate had done "nothing to refute [Clinton's] testimony." R. 33-2 (N.Y. Decision at 1) (Page ID #210).

The Estate then brought this suit in Michigan federal court on the theory that, if the 1976 Agreement was never valid (*i.e.*, if Worrell never bargained away his intellectual-property rights to the recordings covered by that agreement), he is a co-owner of the recordings under federal copyright law. R. 1 (Compl. ¶¶ 58–66) (Page ID #19–21). After discovery, both the Estate and the defendants moved for summary judgment. R. 133 (Pl.'s Mot. for Summ. J.) (Page ID #3443–81); R. 134 (Defs.' Mot. for Summ. J.) (Page ID #3784–3836). The district court granted judgment in favor of Clinton and Thang on statute-of-limitations grounds, R. 170 (Summ. J. Mem. Op. at 15) (Page ID #5220), and the Estate timely appealed, R. 174 (Notice of Appeal) (Page ID #5227).

## II. ANALYSIS

### A. Standard of Review

"We review a district court's grant of summary judgment de novo." *Boyd v. N. Biomedical Rsch., Inc.*, 165 F.4th 424, 431 (6th Cir. 2026). "A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Everly v. Everly*, 958 F.3d 442, 448 (6th Cir. 2020) (quoting *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018)) (citation modified). In determining whether such a dispute exists, "the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party." *Id.* (quoting *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013)).

### B. Statute of Limitations

The 1976 Copyright Act governs our review of Worrell's claim here. Under the Act, the author of a protected work owns its copyright, and "[t]he authors of a joint work are coowners of

No. 25-1863            *Est. of Geo. Worrell, Jr. v. Thang, Inc. et al.*            Page 7

copyright in the work." 17 U.S.C. § 201(a). A person claiming to be a co-owner may sue in federal court seeking declaratory relief, *see Everly*, 958 F.3d at 447, and such a claim must be brought "within three years after [it] accrued," *id.* at 450 (quoting 17 U.S.C. § 507(b)). Accrual of a copyright claim is simple in the infringement context. Because "each infringement is a distinct harm . . . 'each new infringing act causes a new three year statutory period to begin.'" *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 390 (6th Cir. 2007) (quoting *Ritchie v. Williams*, 395 F.3d 283, 288 n.5 (6th Cir. 2005)). Thus, if a copyright owner files suit against an infringer on January 1, 2026, the owner may recover only for acts of infringement that occurred after January 1, 2023. The law treats copyright ownership claims like the Estate's differently, however. An ownership claim "accrues only once, and if an action is not brought within three years of accrual, it is forever barred." *Id.* (quoting *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996)). Following other circuits, we have held that an ownership claim under the Copyright Act accrues "whenever there is a 'plain and express repudiation' of ownership by one party as against the other." *Ritchie*, 395 F.3d at 288 n.5 (quoting *Aalmuhammed v. Lee*, 202 F.3d 1227, 1230–31 (9th Cir. 2000)).

As with most legal terms of art, the meaning of "plain and express repudiation" is not obvious on its face. And although we have repeatedly applied the concept, we have not given it a precise definition. To determine when Clinton and Thang repudiated Worrell's copyright coownership, we therefore begin by looking to our prior cases and the principles they incorporate.

The phrase "plain and express repudiation," has its origin in the Ninth Circuit's 1996 *Zuill* decision. *See* 80 F.3d at 1369. In that case, repudiation occurred when the defendant "claimed sole ownership of the copyright by, among other things, claiming sole ownership in [a] compensation agreement between himself and Zuill and providing Zuill with a copy of the product which stated in writing that [the defendant's] company owned the copyright." *Everly*, 958 F.3d at 451 (citing *Zuill*, 80 F.3d at 1368, 1371). The Ninth Circuit used the term again in *Aalmuhammed*, holding that a failure to acknowledge authorship in a film's credits repudiated ownership, but a discussion with the film's producer in which the producer said he could

"discuss [the issue of a screenwriter credit] further at some point" did not amount to plain and express repudiation.  202 F.3d at 1231.

We imported the concept into our caselaw in *Ritchie*.[3]  There, Robert James Ritchie (a.k.a. Kid Rock) "wrote a letter" to the defendants in which he "made it clear that he regarded the songs he had written as his songs" and "openly claimed exclusive ownership of . . . the rights to his songs."  395 F.3d at 288.  The letter, we held, triggered accrual of any claim by the defendants that they owned copyright in the songs.  *Id.* at 288 & n.5.  *Roger Miller Music* affirmed this understanding of repudiation as triggering operation of the accrual rule.  477 F.3d at 390.

*Everly* added more meat to the bones of our copyright-accrual law, providing that "plain and express repudiation" occurs when "the purported owner's status as such is challenged by a party with a competing claim of ownership."  958 F.3d at 451.  In so doing, *Everly* bound up the doctrine with two more familiar legal concepts: adverse possession and inquiry notice.  We approvingly cited *Zuill* for its comparison of repudiation to adverse possession.  *Id.*; *see also Zuill*, 80 F.3d at 1370 (noting "similarity between co-ownership of a copyright, and tenancy in common in real property"); *Gaiman v. McFarlane*, 360 F.3d 644, 654 (7th Cir. 2004) ("There is a close analogy to the doctrine of adverse possession in the law of physical property.").  In that sense, repudiation is like "[a]n express or implicit ouster of a cotenant by an unequivocal act of ownership."  *Zuill*, 8 F.3d at 1370; *see also* 3 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 12.05[C][1], Lexis (database updated 2026) (discussing adverse-possession analogy and noting that "[t]he considerations at work here would seem to implicate equitable notions").

*Everly* also suggested that repudiation may be related to inquiry notice, quoting the Seventh Circuit for the idea that "the copyright statute of limitations starts to run when the plaintiff learns, or should as a reasonable person have learned, that the defendant was violating his rights."  958 F.3d at 450 (quoting *Gaiman*, 360 F.3d at 653).  We noted, however, that other

---

[3]We are joined in our application of the Ninth Circuit's principle in this context by at least three other courts of appeals.  *Sumrall v. LeSea, Inc.*, 104 F.4th 622, 627 (7th Cir. 2024); *Horror Inc. v. Miller*, 15 F.4th 232, 257 (2d Cir. 2021); *Cooper v. NCS Pearson, Inc.*, 733 F.3d 1013, 1016 (10th Cir. 2013).

circuits' decisions adopting an inquiry-notice standard have "all turned on whether the plaintiffs' claims had been 'expressly repudiated,' rather than any other nuance of notice rules." *Id.* at 450–51 n.8. We therefore deferred "consider[ation] [of] whether some conduct *other* than express repudiation is sufficient to trigger the statute of limitations in [other] circuits or this one." *Id.*

Applying these principles, *Everly* recognized three circumstances that may constitute plain and express repudiation. The first and "most straightforward means of repudiating a[n] [ownership] claim is a direct statement from one party to another claiming exclusive rights to the work." *Everly*, 958 F.3d at 451. Second, a claim "may be repudiated if the work is published but the plaintiff is not appropriately credited." *Id.* at 452. Third, "courts have found that a co-owner's claim may be repudiated when she learns she is entitled to royalties she is not receiving." *Id.*

*Everly* is clear that the three means of repudiation are not yes/no tests to be applied in a vacuum. They instead involve a context-dependent factual inquiry to determine whether the purported repudiation is "actually . . . adverse to the plaintiff's authorship status." 958 F.3d at 453. Express repudiation, therefore, involves a plaintiff's being "alerted to the potential violation of his rights." *Id.* (quoting *Brownstein v. Lindsay*, 742 F.3d 55, 70 (3d Cir. 2014)). In sum, *Everly*, our other cases, and out-of-circuit law provide that "plain and express repudiation" is subject to equitable considerations and demands careful consideration of the facts of each case.[4]

Applying these principles to Worrell's claim reveals a genuine dispute of material fact regarding whether the statute of limitations bars the Estate's claims of co-ownership over recordings falling within the ambit of the 1976 Agreement. That agreement purported to assign to Thang ownership rights to "[a]ll masters recorded hereunder . . . , free from any claims

---

[4]These considerations must also recognize that copyright ownership may be contracted away. Doing so has distinct advantages, providing artists and publishers alike with clarity and certainty about ownership and royalties. Importantly, however, "[t]he issue of copyright ownership is distinct from that of the copyright owner's entitlement to royalties when . . . he is not the publisher of the copyrighted work," which is "a matter of contract." *Gaiman*, 360 F.3d at 655. "The existence of a dispute over a . . . contract," therefore, may not necessarily "alert the author to a challenge to his copyright." *Id.*

whatsoever by [Worrell]."    R. 133-6 (1976 Agreement ¶ 3) (Page ID #3644).    Had the Agreement been validly executed, Worrell's claim to ownership of any recordings he participated in under the Agreement would have been extinguished from the outset.   That is, under the 1976 Agreement copyright ownership is what he intended to give up in exchange for his right to royalties.  But according to the New York Supreme Court, whose opinion the parties agree is res judicata, Thang never executed the 1976 Agreement.  This means that Worrell could in fact possess ownership rights if he was a coauthor of P-Funk's recordings.

Even though Worrell may have co-ownership rights in the sound recordings that he worked on a half-century ago, Clinton and Thang arguably did not plainly and expressly repudiate his rights to recordings covered by the 1976 Agreement until 2020, when they denied its validity in a sworn affidavit.  The 1976 Agreement (even if never validly executed), coupled with Clinton's and Thang's behavior, gave Worrell good reason to believe that he had exchanged his co-ownership for royalties.  The 1976 Agreement was apparently produced by a law firm on Thang's behalf and contemplates a detailed scheme for Worrell's recordings with P-Funk.  More importantly, Thang and Clinton repeatedly acted in a manner that was consistent only with the 1976 Agreement being in effect.  They submitted to Worrell's audit of Thang's books to determine royalties owed under the Agreement's terms.  R. 133-9 (Audit at 2–3) (Page ID #3677–78).  They told third parties that Worrell had signed away his ownership rights, even expressly referencing an agreement with him.  R. 131 (Warner Agreement at 5) (Page ID #3340); R. 132 (Casablanca Agreement at 8, 25) (Page ID #3371, 3388).  When Worrell sued Thang and Clinton in 1981, specifically alleging that he was owed royalties under the 1976 Agreement, they settled the case and promised to pay.  R. 134-5 (1981 Compl.) (Page ID #4136–46); R. 133-10 (Release) (Page ID #3693); R. 133-18 (Letter Agreement at 1) (Page ID #3767).  Until 2020, therefore, Worrell may justifiably have viewed Clinton's and Thang's failure to pay royalties or credit him as a simple "dispute over a . . . contract" insufficient to "alert [him or the Estate] to a challenge to his copyright."  *Gaiman*, 360 F.3d at 655.[5]  The defendants' behavior may have

---

[5]To the extent that the Estate's briefing conflates the copyright-law concept of plain and express repudiation with the contract-law concept of repudiation, *see* D. 29 (Appellee Br. at 16), our focus is solely on the former.  Repudiation in the contract-law context is a "statement by a party to the other that he will not or cannot perform without a breach, or a voluntary affirmative act that renders him unable or apparently unable to perform without a breach."  Restatement (Second of Contracts) § 250 cmt. a (Am. L. Inst. 1981).  The question in this case is

been plain and express but, viewed in context, denied only Worrell's apparent contractual rights, not his "status as" a "purported [copyright] owner[]," so Worrell was never "'alerted to the potential violation of his rights.'" *Everly*, 958 F.3d at 451, 453 (quoting *Brownstein*, 742 F.3d at 70).[6]  Because all this evidence, viewed in the light most favorable to the Estate, creates a genuine dispute of material fact, summary judgment on statute-of-limitations grounds was inappropriate.

*Everly*'s animating principles underscore this conclusion.  We begin with the adverse-possession analogy, which, viewing the record in the light most favorable to the Estate, would run something like this:  Thang tells Worrell that it would like to lease his property and presents him with a proposed lease agreement, which he signs.  Thang uses Worrell's property before subletting it to third parties, assuring those third parties that it holds a valid lease from Worrell. After Thang falls behind on rent payments, Worrell sues under the lease and Thang settles. Thang then continues to refuse to pay but does not (until much later) defend its nonpayment on the ground that the lease was never validly executed.  Under these circumstances, Thang's nonpayment of rent under an agreement both parties viewed as valid would not be hostile towards Worrell's underlying property rights.  It is black-letter law that "use or occupation of property with the owner's permission is insufficient to establish adverse possession." *W. Mich. Dock & Mkt. Corp. v. Lakeland Invs.*, 534 N.W.2d 212, 215 (Mich. Ct. App. 1995).  That is, if Worrell's failure to vindicate his ownership rights arose from the parties' joint (if mistaken) belief that they were bound by the 1976 Agreement—which contemplated "a voluntary transfer

not one of contract repudiation, which cannot occur absent a valid and breachable contract, which did not exist here. Rather, as we discuss above, it is whether the defendants' 2020 denial that the contract existed, rather than the failure to pay or credit Worrell, resulted in plain and express repudiation and, therefore, accrual of the Estate's copyright-ownership claims.

[6]The defendants also point to a declaration submitted by Clinton in which he claims that in 2016, "Worrell called [him] shortly before [Worrell] died and asked [him] for financial assistance," but Clinton "could not and would not relinquish to [Worrell] or anyone else the rights in the sound recordings at issue here or recognize his rights and told him so." R. 134-10 (Clinton Decl. ¶¶ 14–15) (Page ID #4191).  This declaration might, were we construing the facts in the light most favorable to Clinton and Thang, demonstrate plain and express repudiation of Worrell's copyright co-ownership.  The declaration is insufficient, however, to eliminate the genuine dispute of material fact that exists here.  It is unclear what "rights" (contractual or copyright) Clinton was purportedly refusing to recognize.  And even if Clinton did tell Worrell that Worrell had no copyright co-ownership in the recordings, whether this statement sufficed as plain and express repudiation could still depend on the context, including whether the conversation touched on the 1976 Agreement.  All told, the impact (if any) of this alleged conversation with Worrell is a question for the finder of fact.

in which [Worrell] 'sold'" his ownership rights—the defendants' pre-2019 "conduct would not be a repudiation of his [copyright ownership], and his claim would be timely." *Everly*, 958 F.3d at 457.

Second, although we need not incorporate the full sweep of inquiry-notice principles into our copyright jurisprudence, we note that they would lead to the same result. There is a triable issue of fact as to when Worrell "should as a reasonable person have learned[] that the defendant[s] w[ere] violating his [ownership] rights." *Id.* at 450 (quoting *Gaiman*, 360 F.3d at 653). Though the Estate was not, nearly a half-century later, able to produce a jointly executed copy of the 1976 Agreement, Worrell could reasonably have believed that the Agreement governed his relationship with Clinton and Thang. And Clinton and Thang took no steps to disabuse him of this notion until the New York litigation.[7]

The district court reached the opposite conclusion by misreading *Everly*. The three means of repudiation outlined in *Everly* do not, as the district court saw it, establish repudiation in every case. *See* R. 170 (Summ. J. Mem. Op. at 10) (Page ID #5215) ("The Sixth Circuit has described the following situations *that constitute* an express repudiation." (emphasis added)). They are instead circumstances under which "a co-owner's claim *may be* repudiated," or which "*may ordinarily* . . . constitute[] a public repudiation . . . and trigger[] the statute of limitations." *Everly*, 958 F.3d at 452, 458 (emphasis added). Indeed, in *Everly* itself we found the circumstances such that "public recognition omitting any credit" did not necessarily constitute plain and express repudiation. *Id.* at 458. The fact that "Worrell *never* received co-author credit on the sound recordings at issue" and that "Clinton was not complying with the [1976 Agreement] or recognizing Worrell as a co-author" might be good reasons to find repudiation in an ordinary case. R. 170 (Summ. J. Mem. Op. at 12, 13) (Page ID #5217, 5218). But this is no ordinary case. Under these circumstances, where the Estate claims that Thang and Clinton acted for years as though Worrell had "voluntarily transferred" his ownership rights, there remains a

---

[7]Even as late as their answer in this case, after the New York decision, Clinton and Thang admitted that their business "relationship with Worrell was governed by contract." *See* R. 47 (Ans. ¶¶ 6–7) (Page ID #354); R. 1 (Compl. ¶¶ 6–7) (Page ID #3–4).

genuine dispute of material fact regarding whether Clinton and Thang plainly and expressly repudiated Worrell's status as a co-owner. *Everly*, 958 F.3d at 458.

Clinton's and Thang's attempts to rehabilitate the district court's decision fall short. They first argue that the Estate's sole path to relief would be to invoke equitable tolling. D. 29 (Appellee Br. at 14–21). True, aspects of the Estate's arguments seem to sound in equitable tolling, which, although "used sparingly," "allows courts to toll a statute of limitations when 'a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.'" *Robertson v. Simpson*, 624 F.3d 781, 783–84 (6th Cir. 2010) (quoting *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560–61 (6th Cir. 2000)). Because the Estate's arguments are sufficient under the "plain and express repudiation" standard, which itself "implicate[s] equitable notions," we need not decide whether equitable tolling would apply. 3 Nimmer on Copyright § 12.05[C][1].

The defendants look next to the First Circuit's decision in *Santa-Rosa v. Combo Records*, 471 F.3d 224 (1st Cir. 2006). *See* D. 29 (Appellee Br. at 21–25); R. 170 (Summ. J. Mem Op. at 13) (Page ID #5218). There, the defendant record company failed over the course of decades to make any royalty payments to the plaintiff musician. *Santa-Rosa*, 471 F.3d at 225. Unlike this case, however, the plaintiff's only record of a supposed recording agreement was his assertion that such an agreement existed and had been signed sometime between 1984 and 1986. *Id.* Accordingly, though the record showed a payment of "$11,280 in advance royalties," *id.*, whether or not those payments accorded with the supposed agreement was unclear on the Plaintiff's limited record. The First Circuit held that under these circumstances Santa Rosa failed to explain why he "would have been unaware that Combo Records was selling his recordings and thus claiming ownership over them." *Id.* at 228. Here, by contrast, Thang and Clinton arguably acted for years as though their nonpayment of royalties to Worrell was a problem under the terms of the 1976 Agreement, not a repudiation of Worrell's status as a co-author and co-owner of the works produced in a period covered by the purported agreement.

Finally, Clinton and Thang dispute Worrell's reliance on the adverse-possession analogy, but to no avail. D. 29 (Appellee Br. at 25–28). We agree that "federal copyright law, not state property law, governs accrual of copyright claims." *Id.* at 25; *see Everly*, 958 F.3d at 450 (citing

No. 25-1863          *Est. of Geo. Worrell, Jr. v. Thang, Inc. et al.*          Page 14

17 U.S.C. § 507(b)).  But this statement attacks a straw man.  The adverse-possession analogy is just that, an analogy, and no one is suggesting that state law actually *governs* accrual under the Copyright Act.  Courts have simply noted that the concept of "plain and express repudiation" may be *informed* by property-law principles.  *Id.* at 451, 457–58; *Gaiman*, 360 F.3d at 654; *Zuill*, 80 F.3d at 1370.[8]

Although the Estate has successfully pointed to facts potentially rendering this the rare case in which a copyright-ownership claim may be brought a half-century after-the-fact, our reversal of the district court's ruling does not encompass the ownership claim in its entirety, which covers P-Funk recordings created between 1969 and 1981.  *See* D. 28 (Appellant Br. at 8).  Our statute-of-limitations holding, which is grounded in Worrell's reliance upon and defendants' actions in accordance with the 1976 Agreement, is constrained by the terms of the Agreement itself.  The Agreement, in turn, would have affected at most ownership of recordings made between January 1, 1976 and January 1, 1979.  First, its effective date is January 1, 1976, and it could have run for three years at most.  R. 133-6 (1976 Agreement ¶¶ 1(a), 16) (Page ID #3643, 3655).  Second, the Agreement required Worrell to render his services as a recording artist "exclusively to [Thang]" during its term and stated that "[a]ll masters recorded hereunder . . . , together with the performances embodied thereon, shall be entirely and forever the property of [Thang]."  *Id.* ¶¶ 1, 3 (Page ID #3643–44).  These two features of the purported contract plainly indicate that it could not have affected Worrell's ownership of recordings made before 1976 or after January 1, 1979.  The Agreement, moreover, was to be interpreted under New York law, *id.* ¶ 13(b) (Page ID #3654), which holds that a contract "must be enforced in accordance with the plain meaning of its terms," *Vintage, LLC v. Laws Constr. Corp.*, 920 N.E.2d 342, 343 (N.Y. 2009).

The Estate attempts to elude this obvious interpretation of the Agreement's terms in two ways.  It first points to two paragraphs in the Agreement that do not use "hereunder" to limit

---

[8]Clinton and Thang also argue that Worrell's copyright-ownership claim is barred by the release he signed when the parties settled the 1981 lawsuit.  D. 29 (Appellee Br. at 45–48).  This argument, however, rises and falls with the statute-of-limitations question because the release applies to claims Worrell had "as of the date hereof," *i.e.*, in 1982.  R. 133-10 (Release) (Page ID #3693).  Because there is a genuine dispute as to when the claims accrued, there is a genuine dispute as to whether they existed "as of the date" of the 1982 release.

their scope.  D. 28 (Appellant Br. at 50).  These include paragraph 1(b), which "contemplates that Thang would be soliciting agreements with third-party record companies 'for the distribution of phonograph records embodying [Worrell's] performances,'" and paragraph 5, which outlines rates for royalty payments to Worrell.  *Id.* (quoting R. 133-6 (1976 Agreement ¶ 1(b)) (Page ID #3643)).  The Estate's reliance on these provisions lands far wide of the mark.  This case is not about Thang's good-faith efforts to land Worrell his own recording contract or the 1976 Agreement's royalty schedule.  It is about copyright ownership.  Even if these other elements of the contract might plausibly affect recordings made before 1976 or after 1978, all that matters here is paragraph 3, which addresses copyright ownership and *does* limit its scope to recordings made "hereunder."  R. 133-6 (1976 Agreement ¶ 3) (Page ID #3644).

The Estate also gestures toward assurances Clinton made to Worrell prior to 1976, telling him "that he was part of Thang and that everybody was going to share in Thang, Incorporated," D. 28 (Appellant Br. at 33) (citation modified), but the Estate's reliance on the 1976 Agreement itself undermines this argument.  The 1976 Agreement contained a merger clause stating that it "supersed[ed] all prior negotiations, understandings and agreements," and that "no party shall rely on any representations or promises in connection with this agreement relating to the subject matter hereof not contained herein."  R. 133-6 (1976 Agreement ¶ 13(a)) (Page ID #3653).  And even absent a merger clause, New York law is clear that "plain meanings may not be changed by parol."  *Heller v. Pope*, 164 N.E. 881, 882 (N.Y. 1928).  Accordingly, even if the 1976 Agreement represented the "culmination of [earlier] promises" or negotiations between the parties, D. 28 (Appellant Br. at 33), Worrell could not coherently have relied on *both* the contract *and* the prior statements it superseded.  That would be having his cake and eating it too.

What all this means is that for recordings made outside of the scope of the 1976 Agreement, Worrell stands in the same position as the plaintiff in *Santa-Rosa* and cannot point to why he could have reasonably believed that Clinton and Thang were permitted to take advantage of his co-ownership in those recordings.  Worrell's ownership claims to those recordings accrued, at the latest, after Clinton's 1984 bankruptcy when he and Thang continued to fail to pay any royalties owed.  *See Everly*, 958 F.3d at 452.

\* \* \*

At the risk of repeating ourselves, but recognizing the complex and convoluted nature of the issues before us, we conclude with a high-level summary of our statute-of-limitations holding. Worrell recorded music with P-Funk between 1969 and 1981 and seeks a declaration that he is a co-owner of copyright in those recordings. The statute of limitations on copyright ownership claims expires three years after accrual, and the ownership claims here accrued whenever Clinton and Thang plainly and expressly repudiated Worrell's (now, the Estate's) co-ownership. Ordinarily, plain and express repudiation would have occurred when Clinton and Thang turned around and sold the recordings without paying Worrell royalties or giving him credit. But Worrell may have reasonably believed, based on the defendants' own actions, that these failures had no implications with respect to his copyright ownership. That is because Clinton and Thang presented him with the 1976 Agreement, which purported to assign sole ownership of recordings to Thang, and for decades allegedly acted in a manner not inconsistent with that Agreement. Arguably, only in 2020, when Clinton and Thang denied the Agreement's validity, did it become plain to the Estate that the defendants were repudiating Worrell's copyright ownership. This late-in-the-game accrual, however, turns on the 1976 Agreement, and thus is confined by a reasonable interpretation of the Agreement's terms, which do not encompass every recording Worrell worked on between 1969 and 1981. Rather, it covers (at most) recordings Worrell worked on during the three years beginning on January 1, 1976. The issue not having been briefed before us, the parties and district court on remand may determine which of the hundreds of songs at issue fall within that ambit.

## C. Copyright Co-ownership

Anticipating our potential disagreement with the district court's statute-of-limitations ruling, Clinton and Thang have another arrow in their quiver. The defendants also sought summary judgment on the ground that the Estate lacked evidence sufficient to support Worrell's joint ownership of any P-Funk recordings. Although the district court granted summary judgment on the statute of limitations alone, we may affirm a district court's grant of summary judgment "on any ground supported by the record." *Herschfus v. City of Oak Park*, 150 F.4th 489, 495 (6th Cir. 2025). The parties have fully briefed the co-ownership issue before us, and

No. 25-1863                *Est. of Geo. Worrell, Jr. v. Thang, Inc. et al.*                Page 17

we would review any decision by the district court on this point de novo.  The efficient and expedient administration of justice therefore militates in favor of addressing it now.

The Copyright Act is notoriously vague regarding the standard for joint ownership/authorship in copyright.  The Act provides that "[t]he authors of a joint work are coowners of copyright in the work," and defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. §§ 101, 201(a).  The parties (and courts addressing the issue) agree that this language comprises two elements:  (1) authorship; and (2) intent.  Just what is sufficient to satisfy each element, however, is the subject of considerable dispute.

The law on the first element, authorship, developed largely in response to Nimmer's treatise, which has long advanced the view that an "author" of a joint work need only point to a contribution that is "more than *de minimis*."  1 Nimmer on Copyright § 6.07[A][1].  Unfortunately for Professor Nimmer, the key decision on joint authorship and all subsequent cases have rejected this view.  That key decision is *Childress v. Taylor*, 945 F.2d 500, 507 (2d Cir. 1991), in which Judge Newman, writing for the Second Circuit, adopted a more stringent standard under which "all joint authors [must] make [independently] copyrightable contributions" to a work.  *Id.* at 507.[9]

The gulf between the more-than-*de-minimis* and the independently copyrightable standards is wide, but neither standard, taken literally, retains any real adherents.  Under Nimmer's proposal, "almost every expressive work would be a jointly authored work, and copyright would explode."  *Gaiman*, 360 F.3d at 658.  The *Childress* standard, on the other hand, might be well-suited to simple situations like song lyrics, books, or paintings, but it crumples under the pressure of mixed and collaborative media.  It will often be the case that, although an

---

[9]As a careful reader will note, *Childress* does not use the word "independently" in its holding.  It is nonetheless clear from Judge Newman's opinion that this is what he means by the word "copyrightable."  Prior to its holding, *Childress* sets up a choice between two positions:  "whether the contribution of each joint author must be copyrightable or only the combined result of their joint efforts must be copyrightable."  945 F.2d at 506.  By "copyrightable," *Childress* therefore imposes a "requirement of copyrightability of *each contribution*."  *Id.* (emphasis added).

individual collaborator's input "*couldn't* stand alone because of the nature of the particular creative process," the joint work flowing from that creative process has "more than enough originality and creativity to be copyrightable." *Id.* at 658–59. This is particularly true in certain creative domains. *Gaiman* addressed the creation of comic-book characters, one author contributing "the idea for the characters" and the other the "drawing." *Id.* at 658.[10] But the principle applies equally to "motion pictures," *id.*, and musical recordings. Many aspects of artists' expressive contributions to a recording—a composition or arrangement of individual parts, the use of novel instrumentation, or the post-recording production of the final record— cannot, even if integral to the final product, stand on their own as a copyrightable sound recording.

Recognizing the unworkability of a strong-form independently-copyrightable standard for joint authorship, others have interpreted *Childress* as expressing a milder proposition than its language would seem to indicate. In *Brownstein*, for instance, the Third Circuit cited *Childress* and *Gaiman* together for the idea that a joint "author must contribute some non-trivial amount of creative, original, or intellectual expression to the work." 742 F.3d at 64–65. And Patry's copyright treatise takes the view that "[b]y 'copyrightability,' Judge Newman was merely referring to a requirement that each author contribute expression, not that each contribution also be independently copyrightable," noting that the cases relied on by *Childress* involved contributions of non-expressive material, and "[n]one involved a claimant who had contributed expression and none presented the issue of whether such expression need *additionally* be capable of being independently copyrightable." William F. Patry, 2 Patry on Copyright § 5:15 Westlaw (database updated 2026). Indeed, Patry's gloss on *Childress* was later cited approvingly by the Second Circuit itself. *See 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 255 n.3 (2d Cir. 2015).[11]

---

[10]Judge Posner's *Gaiman* opinion also provides the example "from academe" of a "professor [who] has brilliant ideas but can't write," and another who "is an excellent writer" with "commonplace" ideas, who together "collaborate on an academic article, one contributing the ideas, which are not copyrightable, and the other the prose envelope." *Gaiman*, 360 F.3d at 659. This type of situation, he found, exemplified the "valid core" of Nimmer's view. *Id.*

[11]Though the point is academic and ultimately a matter for our colleagues on the Second Circuit to sort out, we find this rehabilitation of *Childress* difficult to square with the opinion itself. Indeed, Judge Newman's opinion there appears to lament the concerning results of a hardcore "independently copyrightable" view before adopting

The 1976 Act's legislative history lends additional support to the view that authorship of a musical recording comes in multiple forms, not all of them independently copyrightable. The House Report noted that a "sound recording will usually, though not always, involve 'authorship' both on the part of the performers whose performance is captured and on the part of the record producer responsible for . . . capturing and electronically processing the sounds, and compiling and editing them to make the final sound recording." H.R. Rep. No. 94-1476, at 56 (1976); *see also* S. Rep. 94-473, at 53 (1975) (same). The Report's use of the plural "performers," and its distinction between the creative input that performers and producers provide suggest that joint authorship is less the exception than the norm in the musical context, and courts have relied on this language in deciding co-authorship claims. *See, e.g.*, *ABS Ent., Inc. v. CBS Corp.*, 908 F.3d 405, 423 (9th Cir. 2018); *Diamond v. Gillis*, 357 F. Supp. 2d 1003, 1007 (E.D. Mich. 2005); *Sys. XIX, Inc. v. Parker*, 30 F. Supp. 2d 1225, 1228 (N.D. Cal. 1998).

The second element, intent to contribute to a "unitary whole," is similarly contested, and *Childress* again provides the starting point. There, the Second Circuit held that a "true joint author relationship" requires the "intent of both participants in the venture to regard themselves as joint authors." *Childress*, 945 F.2d at 507. Patry views this as adopting a "collegial intent" standard: "the parties must have an intent to be joint authors in the lay" (as opposed to the legal) "sense, i.e., colleagues striving together in a creative process." 2 Patry on Copyright § 5:21. In other words, joint authors must "entertain in their minds the concept of joint authorship, whether or not they understood precisely the legal consequences of that relationship." *Childress*, 945 F.2d at 508. Other courts have adopted a more relaxed approach by which the parties must simply intend to "labor together on a common project," but need not "think[] about whether one or both of them would be regarded as its author in either a legal or collegial sense." 2 Patry on Copyright § 5:21. Determining intent under the former standard involves a "nuanced inquiry into factual indicia of ownership and authorship, such as how a collaborator regarded herself in relation to the work in terms of billing and credit, decisionmaking, and the right to enter into

___

that very position. *See* 945 F.2d at 506 ("If the focus is solely on the objective of copyright law to encourage the production of creative works, it is difficult to see why the contributions of all joint authors need be copyrightable.").

contracts." *Thomson v. Larson*, 147 F.3d 195, 201 (2d Cir. 1998) (citing *Childress*, 945 F.2d at 508–09).

As is clear, the exact nature of each element of the joint-authorship test is disputed and difficult to discern. We are therefore fortunate that this case does not require us to set out either's metes and bounds. Under any reasonable interpretation of each element, the Estate has pointed to a genuine dispute of material fact with regards to Worrell's co-authorship (and co-ownership) of P-Funk's recordings.

We begin with authorship. In applying the correct standard, we need only dispense with the strictest reading of *Childress*, which, as discussed above, makes little sense when applied in the context of works such as movies, comic book characters, or modern musical recordings. The Estate need not show that Worrell's contributions to P-Funk's discography were independently copyrightable. It may instead defeat summary judgment by relying on evidence that Worrell contributed substantial original expression to the works, which it has provided in spades. To start, we need look no further than Clinton's own admissions. He recognized in this litigation that Worrell "radically chart[ed] the course of emerging keyboard technology during the golden age of analog synthesis," and that he brought to the table a "sonic stew" including "perfect pitch and a well-honed facility with a classical canon." R. 133-5 (Clinton Dep. at 98) (Page ID #3631). Not just that—Worrell, Clinton agreed, "provide[d] [P-Funk] with the structural foundation, which while occasionally implied, was ever-present." *Id.* at 99 (Page ID #3632). P-Funk, Clinton said, "took [their] funk and rock and roll and put Bernie's chops in it, and . . . had something nobody knew what the hell [they] were doing." *Id.* at 108 (Page ID #3636). These statements contradict any suggestion that Worrell was just a session player or hired hand. *Cf. Gaiman*, 360 F.3d at 658 ("[T]he assistance that a research assistant or secretary or draftsman or helpfully commenting colleague provides in the preparation of a scholarly paper does not entitle the helper to claim the status of a joint author." (quoting *Seshadri v. Kasraian*, 130 F.3d 798, 803 (7th Cir. 1997))). Much to the contrary, Worrell's musical prowess and creativity were, according to Clinton himself, a distinctive and irreplaceable element of P-Funk's sound. On the summary-judgment record, we cannot say that Worrell's contributions were insufficiently

No. 25-1863          *Est. of Geo. Worrell, Jr. v. Thang, Inc. et al.*          Page 21

expressive, creative, and original to render him a co-author (and co-owner) under the Act, so there is a genuine dispute of material fact as to co-ownership.

Worrell's expert evidence underscores this assessment. According to the Estate's expert reports, Worrell's contributions to P-Funk included not just his prowess on the keyboard but also his work as a "musical arranger" who adapted P-Funk's songs and "exercised control over the musical arrangements he created which when performed produced the sounds fixed in the subject recordings." R. 133-2 (Kohn Report ¶ 78) (Page ID #3518) (emphasis omitted); *see also* R. 133-3 (Exner Report ¶¶ 14–29) (Page ID #3566–68). Worrell also played a "significant role in the post-recording aspects of creating the final sounds recording or 'master' recording, including editing, overdubbing, and mixing the recorded tracks." R. 133-2 (Kohn Report ¶ 91) (Page ID #3524). Any standard for authorship that includes the contributions of a typical record producer could arguably recognize Worrell's work as sufficiently expressive and original to allow for a claim of co-authorship.

Turning to intent, we reach the same conclusion. Looking to "billing and credit, decisionmaking, and the right to enter into contracts," the facts, viewed in the light most favorable to Worrell, demonstrate that Clinton and Worrell intended themselves to be co-authors. *Thomson*, 147 F.3d at 201. As for "billing and credit," Clinton viewed Worrell as "a founding member and Musical Director of Parliament/Funkadelic." R. 133-14 (Clinton Website at 2) (Page ID #3702). The evidence also shows that Worrell had key decisionmaking power throughout the creative process, arranging the music before mixing, mastering, and overdubbing the recordings. R. 133-2 (Kohn Report ¶¶ 78–84, 91–98) (Page ID #3518–21, 3524–27). He was therefore unlike a musician-for-hire who might, despite meaningful contributions to a performance, lack the intent to be regarded as an "author" of a work. To the extent that the parties mutually acted in accordance with the 1976 Agreement, its purported assignment of ownership rights to Thang lends further support to the notion that the parties viewed Worrell's contributions as substantial enough to amount to authorship for copyright purposes.

Clinton and Thang raise two main arguments as to why no genuine dispute exists—one for to each element of co-authorship. On authorship, the defendants insist that Worrell must point to specific facts in the record demonstrating his original contributions to each song, relying

in part on the Northern District of Ohio's decision in *Corwin v. Quinonez*, 858 F. Supp. 2d 903 (N.D. Oh. 2012). *Corwin* does not bind us and is readily distinguishable in any event. In that case, the defendant provided a "song-by-song description of his [sole] authorship" with respect to the recordings at issue, which the plaintiff did not rebut. *Id.* at 913–14. Under the familiar summary-judgment standard, the plaintiff's failure to "set forth specific facts" rebutting these specific claims was fatal. *Id.* at 907 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Here, however, Clinton has not pointed to evidence establishing his sole authorship as to each song, so there is nothing in that respect for the Estate to rebut.

Clinton and Thang's next argument relies on a contorted view of joint authorship's intent requirement. The defendants insist that because "Worrell genuinely believed," in light of the 1976 Agreement, that "he had assigned any rights he had in the sound recordings to Thang," he could not have "intend[ed] to be a co-owner at the time those recordings were created." D. 29 (Appellee Br. at 51–52) (emphasis omitted). This misses the mark by fudging the distinction between intent to be a *co-author* and intent to be a *co-owner*. What matters for joint copyright ownership is the former, as determined by objective criteria. *Thomson*, 147 F.3d at 201 & n.17. Whether a person intended his efforts to result in a legal status such as joint ownership is beside the point. *Childress*, 945 F.2d at 508 (noting that parties need not "under[stand] precisely the legal consequences of [their] relationship"); 2 Patry on Copyright § 5:21 ("[J]oint authorship does not depend on the parties' legal intentions."). If anything, the fact that Worrell thought he had signed away ownership indicates that he *did* intend to be a co-author with the capacity to exchange his co-ownership rights for valuable royalties. If he did not harbor such intent there would have been nothing, apart from his studio time, for him to sign away. Because the evidence creates a genuine dispute of material fact as to both elements of copyright co-ownership, summary judgment is inappropriate.

### III. CONCLUSION

Contracts enable those engaged in creative endeavors to "minimize subsequent disputes by formalizing their agreement" about ownership rights. *Childress*, 945 F.2d at 507. Having successfully argued in New York state court that the 1976 Agreement never governed their relationship with Worrell, Clinton and Thang must live with the consequence that federal

No. 25-1863          *Est. of Geo. Worrell, Jr. v. Thang, Inc. et al.*          Page 23

copyright law, not contract law, now controls. And if Clinton and Thang never, until their defense of that suit, indicated that anything other than the 1976 Agreement controlled, a portion of the Estate's ownership claim would have accrued only then. Whether the statute of limitations applies to songs within the ambit contemplated by the 1976 Agreement and whether Worrell was a co-author and co-owner of those songs are live issues for a finder of fact to decide, and the defendants' "funky dollar bills" remain, for now, within the Estate's grasp. R. 134-12 (Judie Worrell Blog at 5) (Page ID #4199).

We REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 25-1863

ESTATE OF GEORGE BERNARD WORRELL, JR.,

    Plaintiff - Appellant,

    v.

THANG, INC.; GEORGE CLINTON,

    Defendants - Appellees.

> **FILED**
> May 27, 2026
> KELLY L. STEPHENS, Clerk

Before: BOGGS, BATCHELDER, and MOORE, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Flint.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

*Kelly L. Stephens*

Kelly L. Stephens, Clerk